IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

TRAVIS TREVINO RUNNELS,

               Petitioner,

      VS.                         Cause No. 2:12-CV-0074

RICK THALER,                  Death Penalty Case
Director, Texas Department of Criminal
Justice, Institutional Division,

          Respondent

## PETITION FOR HABEAS CORPUS

      COMES NOW Travis Trevino Runnels, Petitioner in the above captioned cause and pursuant to 28 U.S.C. § 2254 submits to this Court his Petition for Habeas Corpus. Contemporaneously with this petition the Petitioner has filed a motion requesting the Court to consider this a "preliminary" petition for purposes of satisfying the AEDPA statute of limitations, subject to the amendment and/or supplementation of the Second Claim for Relief pending the decision of the United States Supreme Court in *Trevino v. Thaler*, ___ S.Ct. ___, 2012 WL 1599338 (Oct. 29, 2012), in which the Court will address the applicability of *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and decide whether Texas prisoners may show cause for procedurally defaulted ineffective assistance of trial counsel claims by demonstrating that the default resulted from state habeas counsel's ineffective representation.

Page 1

In the event this Court denies the Petitioner's motion, the Petitioner stands on this Petition for Habeas Corpus as complete, with the exception of its Second Claim for Relief.

## PROCEDURAL HISTORY

On April 29, 2003, the Petitioner was indicted for capital murder for the death of Stanley Allen Wiley a Texas Department of Criminal Justice (TDCJ) prison guard.

On October 26th, 2005, the Petitioner entered a plea of guilty to capital murder in the 320th District Court of Potter County, Texas.  After the jury rendered  its verdict on the two special issues, on October 28, 2005 the trial court imposed a sentence of death on the Petitioner.

On December 15, 2005 the District Court held a hearing on the Petitioner's Motion For a New Trial, and after hearing testimony denied the motion.

The Petitioner appealed the jury's verdict to the Court of Criminal Appeals, and on September 12, 2007, the Texas Court of Criminal Appeals issued its decision denying the Petitioner's appeal. *Runnels v. State,* No. AP-75,318 (Tex. Crim. App. 2007) (unpublished).

On September 17, 2007 counsel for the Petitioner filed a Petition for Habeas Corpus in the District Court setting forth eleven grounds for relief, along with a request for an evidentiary hearing. The district court denied the hearing request and adopted the State's proposed findings of fact and conclusions of law. *Ex Parte Runnels*, No. 48,950-

D, 320TH District Court, Potter County, TX.

On Jun8, 2011 the Court of Criminal Appeals issued an Order remanding the Petitioner's case to the district court for an evidentiary hearing on the issue of the Petitioner's claim that trial counsel were ineffective. *Ex Parte Runnels*, No. WR-46,226-01 Tex. Crim. App. 2011).

On September 9, 2011 the district court held an evidentiary hearing on the Petitioner's ineffective assistance of counsel claim.

After the hearing the parties submitted proposed finding of fact and conclusions of law, and on October 13, 2011 the district court adopted the State's proposed finding and recommended that the Petitioner's writ of habeas corpus be denied.

On March 7, 2012 the Court of Criminal Appeals issued an Order adopting the district court's findings of fact, conclusions of law and recommendation and denied the Petitioner's application for habeas corpus. *Ex Parte Runnels,* No. WR-46,226-01 (Tex. Crim. App. 2012) (unpublished).

### STATEMENT OF FACTS

The facts pertaining to the offense of which the Petitioner was convicted were set forth in the Court of Criminal Appeals' opinion denying his appeal:

> On January 29, 2003, while appellant was serving time in prison for an aggravated robbery, he killed Stanley Wiley, a supervisor at the prison boot factory. As a result, the State charged appellant with capital murder. Appellant pled guilty. Pursuant to the jury's answers to the punishment special issues prescribed by law, the trial judge sentenced appellant to death.

Page 3

Appellant did not enjoy working as a janitor at the prison boot factory. On the morning of the day of the murder, he expressed anger at the fact that he had not been transferred to being a barber as he had requested. He told fellow inmate Bud Williams that he was going to be "shipped one way or another" and that "he was going to kill someone." Appellant said that he would kill Wiley if Wiley said anything to him that morning. Appellant told another inmate, William Gilchrist, that he planned to hold the boot-factory plant manager hostage in the office after the other correctional officers had left. Finally, after appellant had arrived at the boot factory, he told fellow inmate Phillip Yow that he was going to do something.

During the first shift at the boot factory, appellant approached Wiley, raised a knife, tilted Wiley's head back, and cut his throat. Appellant then wiped the knife with a white rag and walked back toward the trimming tables. When Yow later asked appellant why he had attacked Wiley, appellant said, "It could have been any offender or inmate, you know, as long as they was white." In response to Yow's explanation that appellant could get the death penalty if Wiley died, appellant responded, "A dead man can't talk."

Wiley did die from the injury. It was later determined that the cut was a twenty-three centimeter long neck wound that transected the external carotid artery and the internal jugular vein and extended in depth to the spine. A medical examiner found that the force required to inflict the wound was "moderate to severe." Appellant was twenty-six years old when he committed the offense.

*Runnels v. State, supra.*

Upon his indictment for capital murder Mr. Runnels was appointed two attorneys to represent him; James Durham and Laura Hamilton. According to the record of the state writ evidentiary hearing, Ms. Hamilton had never participated in the trial of a capital case, had never taken any training in the defense of death penalty cases, nor did she have any familiarity with the ABA Guidelines pertaining to the representation of capital defendants. *See* State Writ Transcript Vol. 2 at 24-25 (hereinafter SWTR). With respect to Mr. Durham, who had passed away prior to the state writ hearing,  Ms. Hamilton

indicated that she was unaware of whether he had taken any training, but believed he had defended several capital murder defendants. *Id.*

As a part of their defense, trial counsel retained Kathy Garrison, a private investigator, to conduct background investigation of the case. [1] Because trial counsel elected to have Mr. Runnels enter a plea of guilty to the offense, Ms. Garrison confined her background investigation to the punishment phase of the proceedings. *See id* at 25.

During the course of her investigation Ms. Garrison interviewed family members, requested and obtained school, hospital and police and offense records as well as Mr. Runnels' TDCJ files. Ms. Garrison executed an affidavit during the course of state habeas proceedings which consisted of approximately 659 pages of her notes, records and other documents, which was introduced by the State as an exhibit at the evidentiary hearing ordered by the Court of Criminal Appeals. Unfortunately, however, the Exhibit volumes are not separately paginated and reference thereto will be cited to the actual position of the document in its respective volume.

As a result of her investigation and interviews of family members, a clear pattern began to emerge of a troubled childhood, a family history of drugs, alcohol and substance abuse on the part of family members and escalating instances of misconduct on the part of

---

[1] Although the ABA Guidelines call specifically for "at least one mitigation specialist and one fact investigator," no mitigation investigator was retained. *See* AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003), Guideline 10.4. (hereinafter ABA Guidelines).

the Petitioner. *See* 2 SWTR at 83-85. When specifically asked by Ms. Garrison what could have led to Mr. Runnels' situation, according to Ms. Garrison's notes, Mr. Runnels' uncle related that "nobody took charge and guided him when something could have been done for Travis." *Id.* at 84.

The failure on the part of family members to take any action or get any help for the Petitioner resulted in his quitting school and beginning to engage in criminal behavior, resulting in the Petitioner as a juvenile being charged with a number of offenses and incarcerated as an adult under the name of Frank Pope. *See Id.* at 193.

Ms. Garrison also examined Mr. Runnels' juvenile record which revealed he was confined to a shelter on two occasions and indicated some progress and a release to the custody of his mother on the first confinement, but on the second he simply left without completing his time. *Id.* at 115. There were no records of any treatment during this confinement

A further examination of the Petitioner's juvenile record revealed a 1993 psychological evaluation conducted in conjunction with a juvenile adjudication for a burglary offense, which recommended:

> Travis needs a highly structured environment with constant supervision; vocational training; he could use a mentoring program with a male role model; perhaps group counseling for peer support to confront maladaptive thinking and facilitate appropriate social and communication skills.

*Id..* at 117.

Page 6

Notwithstanding the foregoing recommendation, the juvenile court followed none of the recommendation in its adjudication of the offense and simply ordered restitution. *Id.* at 120.

In her communication with counsel Ms. Garrison summed up her investigation into Mr. Runnels' juvenile background as follows:

> Probation recommended Travis be sent to TYC. In the meantime he ran off from the Willingham Shelter (with Darmonica's assistance) and was later found in adult jail and was in fact on his way to TDCJ. (PIA thing in Dallas or Tarrant).
>
> All this juvenile record began in 1991. However, on other earlier occasions cases weren't filed. Travis was living everywhere. Nancy was living everywhere. Papers were issued and returned unserved numerous times as they could not be located. Sometimes Nancy was the responsible party and sometimes Lillie Mae was. She did [not] have a permanent address. Travis was "lost" off and on, using different names off and on, in school off and on, being ordered not to associate with certain individuals off and on, ad infinitum. I could not begin to tell you who he was living with at any given time, the family cannot and any documentable information we have in that regard is suspect.

*Id.* at 117.

In addition to retaining Ms. Garrison, trial counsel retained a neuropsychologist and a psychiatrist to evaluate the Petitioner. The neuropsychologist, Dr. Richard Fulbright, reviewed Mr. Runnels's entire history and  evaluated Mr. Runnels on September 8-9, 2005, but due to restrictions placed upon him and the Petitioner, he was unable to perform a complete neuropsychological evaluation, but he did prepare comprehensive report addressing some of the issues that should have been addressed by

counsel. Of significance in his report are some of the following observations:

> It appears that as a child and teenager Mr. Runnels never received any therapeutic or psychological services beyond special education programming and brief psychological testing while in juvenile detention. His marginal performance in school, his defiant behavior, and the lack of structure in his childhood home all suggest a need for more individualized attention in school. Since he did not simply have an educational problem but demonstrated serious behavioral difficulties, it would have been appropriate and clinically indicated for the school system to provide him with some psychological counseling and behavioral intervention. This does not appear to have ever been provided to him in the school system. It is impossible to determine if this would have improved his educational or behavioral outcome. **However, the absence of these services is rather striking in an individual with behavioral problems as pronounced as his.** Likewise, Mr. Runnels was apparently never afforded any psychological services(other than testing) in the juvenile detention system. He was placed in a halfway house but left after one day without being required return for further treatment. Some form of counseling could have been provided or mandated by the Court during this time.

Fulbright Report at 11-12. Vol 3 SWTR at 178-179.

Doctor Fulbright further noted that:

> One cannot assume that Mr. Runnels would not have attacked the guard if he had been given appropriate psychological services. Nonetheless, it seems probable that the likelihood of aggressive behavior on his part would have been significantly reduced if he had been given appropriate psychological and psychopharmacologic intervention. Medication could have diminished his level of agitation, and counseling of some kind may have allowed for some monitoring of his potential for aggressive acting out at any given time. He reported taking contraband medication (blood pressure medication) in an attempt to settle himself down while he was in segregation. This again supports the idea that he might have benefitted from pharmacologic intervention as a means of helping him manage his frustration and internal agitation more effectively.

> Based on the data obtained in this evaluation, Mr. Runnels may have attention deficit/ hyperactivity disorder. This would not explain his violent behavior toward the guard. However, it may be a contributing factor in light of other psychological difficulties, since the ADHD may have diminished his frustration tolerance and behavioral control. Other possible neurocognitive or neurobehavioral deficits cannot be addressed as potential contributors to his behavior, since these areas could not be appropriately measured in light of the limitations imposed on this examination.
>
> It does appear, however, that Mr. Runnels never received appropriate psychological services in school, the juvenile detention system, or in TDCJ. Given his pattern of disturbed behavior, this appears to represent an oversight on the part of authorities, both in terms of helping Mr. Runnels and in terms of managing the impact of his behavioral problems on his environment, both in the community and in prison.

*Id.* at 12, 3 SWTR at 179.

Trial counsel also had Dr. Lisa Clayton examine the Petitioner, but the record provided to undersigned counsel contains no indication as to what she was provided with in terms of background information, nor does it contain a report.

Notwithstanding the documentation of a chaotic and traumatic childhood provided by the investigation of Ms. Garrison, and the clear evidence of institutional and familial failure in getting Mr. Runnels the help he needed as a child and adolescent, defense counsel neither arranged for Doctor Fulbright to complete his neuropsychological testing , nor did they in any way attempt to formulate a mitigation case based upon this information. Instead, when questioned by the State as to why they did not call either of the experts, Ms. Hamilton testified that "[t]hey could not testify as to anything that would

Page 9

be favorable to Travis."   2 SWTR at 12

Trial counsel instead based their punishment case on challenging future dangerousness through cross examination of the State's witness and somehow attempting to "humanize" their client through calling members of his family, although this so-called strategy was never fully articulated either prior to trial or at the evidentiary hearing.[2] Given the fact that lead counsel, who tried the whole case,  was deceased at the time of state postconviction proceedings, there is a paucity of information with respect to counsel's formulation of a trial strategy other than a few pages of testimony by Mr. Durham at the hearing on the motion for a new trial in which he voices his opinion that the State's punishment evidence on the issue of future dangerousness could not withstand his motion for a directed verdict. *See*  19 RR at 22-23.

Although Mr. Runnels entered a plea of guilty at the commencement of his trial, this was done with the express assurances of defense counsel that they would put on a mitigation case during the punishment phase of his trial. a copy of Mr Runnels' Declaration addressing this issue is annexed hereto as Exhibit A.

Notwithstanding the entry of a guilty plea, after its opening statement, the prosecution nonetheless put on nine witnesses at the "guilt"  phase of the trial, in which it provided the details of the offense and Mr. Runnels' actions in connection therewith, and eleven witnesses at the punishment phase, for a total of twenty individuals who testified

---

[2] It seems that there also was some attempt to formulate a strategy based upon the fact that Mr. Runnels' great grandfather was lynched in Dallas. *See* SWTR, Vol 2 at 11.

against the Petitioner.

In contrast to the case presented by the prosecution and in express violation of the assurances made to Mr. Runnels, defense counsel made no opening statement, introduced no evidence and although defense counsel subpoenaed members of Mr. Runnels' family[3], they put on no witnesses, and confined its presentation to a nine page closing statement, thus leaving virtually unblemished the horrific picture of the Petitioner painted by the prosecution. *See* Declaration of Travis Trevino Runnels, Exhibit A.

As one of the jurors who testified at the hearing on appellate counsel's motion for a new trial noted:

> A. I came to be a juror on a trial here that carried two people's lives. We had a defendant and we had a -- the -- the deceased man. I assumed that -- I have concern in my heart for everyone who was involved in this -- in this trial who -- whose lives are at stake in this trial. I have just simply felt badly that there was no one to testify in the other young man's defense, that I was going to get the opportunity to hear.
>
> Q. Did you feel, if there was evidence, that you should have heard that?
>
> A. If there was evidence, yes, I expected to hear any kind of evidence there was, but I don't know if there was evidence. It was a heartfelt thing for me more than anything. I had no opinion against anything that happened in the trial. My heart just went out to the other young man as well, -- to this young man as well. Plain and simple

---

[3] The dispute regarding the Petitioner's family members' claim that they were told by defense counsel they would not be called and defense counsels' claim that the family members simply left will be addressed *infra*.

19 RR at 12.

On October 28, 2005 the jury rendered its verdict on the special issues and the Court sentenced Mr. Runnels to death.

In November 0f 2005 Donald Schofield, the Petitioner's appellate attorney, filed a motion for new trial, alleging juror misconduct for statements allegedly made to defense counsel regarding their failure to put on a case. On December 15, 2005 the trial court held a hearing on the motion, and after hearing testimony from two of the jurors, the court denied the motion, during which lead counsel testified about his strategy behind his motion for directed verdict on the issue of future dangerousness. *See* 19 RR at 22-25.

On October 30, 2006 Mr. Schofield filed his appellate brief in the Court of Criminal Appeals, setting forth eleven grounds for relief and on September 12, 2007 the Court issued it opinion denying the Petitioner's appeal. *Runnels v. State, supra.*

Pursuant to Article 11.071 Section 2(b) of the Texas Rules of Criminal Procedure, upon the Petitioner's conviction and sentence of death the trial court appointed Joe Marr Wilson was appointed to represent Mr. Runnels in his state habeas corpus proceedings. Mr. Wilson retained Alma Lagarda, a Texas licensed attorney and mitigation investigator, to assist him in conducting  an investigation of Mr. Runnels' case.

Ms. Lagarda conducted a comprehensive investigation into Mr. Runnels' background, obtained, school, medical, and TDCJ records. She and her staff also interviewed members of Mr. Runnels' family and obtained detailed information about the

background and childhood of Mr. Runnels and the relationship of the Runnels family with the Petitioner's trial team. This information was included in affidavits that state habeas counsel submitted as Exhibits to his petition for habeas corpus. Virtually all of this material was available to the defense team if they had a  mitigation strategy and investigator as specified by the ABA Guidelines. A copy of Ms. Lagarda's  Declaration in annexed hereto as Exhibit G.

For example, in his affidavit Darmonica Runnels, the Petitioner's older brother provided detailed information which supports the fact that the Petitioner's childhood was both unstable and chaotic, yet the trial team's investigator simply did not ask the proper questions to elicit these responses. Also, he was not subpoenaed for the trial. A copy of this affidavit is annexed hereto as Exhibit C.

Similarly, Mr. Runnels' grandmother,  brother Joel and cousin, all of whom had important information pertaining to the Petitioner's childhood were not interviewed nor called to testify by trial counsel or their investigator. Copies of their affidavits are annexed hereto as Exhibits D, E and F.

On September 17, 2007 state habeas counsel filed an Application for Writ of Habeas Corpus in Potter County District Court setting forth eleven grounds for relief, including a claim of ineffective assistance of counsel for trial counsel's failure properly to investigate the available mitigation, and, more importantly, failure to present any testimony or evidence at the Petitioner's trial.  The application also claimed that Mr.

Runnel's guilty plea was involuntary because it was based on the misrepresentation by trial counsel that they would present a mitigation case after the Petitioner entered his plea of guilty.

In support of the application state habeas counsel filed an exhibit volume consisting of fifteen exhibits totaling approximately 95 pages, including the aforementioned affidavits, copies of trial subpoenas of members of the Petitioner's family and school and hospital records.

On March 14, 2008 the State filed its Response and supporting exhibits to the application for habeas corpus, and on October 8, 2010 the District Court entered findings of fact and conclusions of law with a recommendation that the Court of Criminal Appeals deny relief.

On June 8, 2011 the Court of Criminal Appeals issued an Order remanding the Petitioner's case to the district court and directing the directing the court to hold an evidentiary hearing on the Petitioner's claims of ineffective assistance of counsel.

Pursuant to the remand order from the Court of Criminal Appeals, on September 9, 2011 the state habeas court conducted an evidentiary hearing on the Petitioner's ineffective assistance of counsel claims. At the hearing the State put on two witnesses; Kathy Garrison, the trial team's investigator, and Laura Hamilton, second chair trial counsel. Because James Durham, lead counsel and the only attorney with any death penalty trial experience, had passed away, the only testimony the state court heard

addressing trial strategy was from Ms. Hamilton. The State also introduced approximately

600 pages of Ms. Garrison's notes and records of her investigation.

Surprisingly, counsel for Mr. Runnels called no witnesses and introduced no

exhibits, although he did request that the Court consider the affidavits submitted in

support of the application fort habeas corpus. SWTR, Vol 2 at 83-84.  Although state writ

counsel told the court he wanted to offer expert testimony at the hearing, either live or

through  affidavit, he did neither, nor did he request additional time to obtain this

evidence or object on the record to the court's not allowing him the time to get this

evidence.

The parties submitted proposed findings of fact and conclusions of law, and on

October 13, 2011the state court signed the State's proposed findings recommending that

the Petitioner be denied relief. On March 7, 2012 the Court of Criminal Appeals issued an

order adopting the trial court's recommendation and denying relief.  *Ex Parte Runnels,*

*supra.*

## <u>FIRST CLAIM FOR RELIEF</u>

### (Ineffective Assistance of Trial Counsel)

**THE ACTION OF THE STATE COURT IN DENYING THE
PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL
WAS AN UNREASONABLE APPLICATION OF CLEARLY
ESTABLISHED LAW AS SET FORTH IN *STRICKLAND V.
WASHINGTON, WIGGINS V. SMITH* AND *ROMPILLA V. BEARD***

Since Mr. Runnels  was convicted in 2005, his claims are governed by the

provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), which

provide, in pertinent part, as follows:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d)

Thus, a federal court reviewing a state court's decision under § 2254(d)(1) must

conduct a two part inquiry. The United States Supreme Court set forth the nature of this

inquiry in *Williams v. Taylor*, 529 U.S. 362,  120 S.Ct. 1495 (2000). After addressing the

mandatory language of § 2254(d) pertaining to the granting of a writ of habeas corpus, the

Court went on specifically to address § 2254(d)(1):

> This basic premise informs our interpretation of both parts of
> § 2254(d)(1):  first, the requirement that the determinations of
> state courts be tested only against "clearly established Federal
> law, as determined by the Supreme Court of the United
> States," and second, the prohibition on the issuance of the writ
> unless the state court's decision is "contrary to, or involved an
> unreasonable application of," that clearly established law. .  .

529 U.S. at 379, 120 S.Ct. at 1505.

In addressing the "clearly established law" requirement of § 2254(d)(1), the Court analogized this requirement to the antiretroactivity rule set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334  (1989), wherein this Court held that a petitioner was not entitled to habeas relief, because he relied on a rule that had not been announced at the time his state conviction became final. The Court further stated:

> The antiretroactivity rule recognized in *Teague*, which prohibits reliance on "new rules," is the functional equivalent of a statutory provision commanding exclusive reliance on "clearly established law."  Because there is no reason to believe that Congress intended to require federal courts to ask both whether a rule sought on habeas is "new" under *Teague*--which remains the law--and also whether it is "clearly established" under AEDPA, it seems safe to assume that Congress  had congruent concepts in mind.  It is perfectly clear that AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final.

529 U.S. at 379-380, 120 S.Ct. at 1506 (footnotes omitted).

In claims regarding the a violation of a Petitioner's Sixth Amendment right to counsel, the governing standard by which the performance of trial and appellate counsel are  judged is set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To demonstrate a violation of this  right petitioner must prove: 1)  counsel's representation fell below professional norms; and 2)  a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different.  466 U.S. at 687, 694.

In *Williams v. Taylor*, 529 U.S. 362,  120 S.Ct. 1495 (2000), the Supreme Court

Page 17

once again explained the standard for judging the quality of counsel set forth in *Strickland*

*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984):

> We explained in *Strickland* that a violation of the right on which Williams relies has two components:
>    "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.,* at 687, 104 S.Ct. 2052.
> To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.,* at 688, 104 S.Ct. 2052.  To establish prejudice he "must how that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  **A reasonable probability is a probability sufficient to undermine confidence in the outcome**." *Id.,* at 694, 104 S.Ct. 2052.

529 U.S. at 390-391, 120 S.Ct. at 1512 (emphasis supplied).

The foregoing standard has consistently been applied by the Supreme Court in its

review of cases in which the death penalty has been sought and imposed.

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527 (2003)  the Supreme Court

further elaborated on what constitutes reasonable performance by counsel trying a death

penalty case.  As in *Strickland*, as well as in the instant case, counsel in *Wiggins* either

limited or failed to conduct a proper investigation into potentially mitigating evidence,

and claimed that this failure was "a tactical judgment not to present mitigating evidence at

sentencing and to pursue an alternate strategy instead." 539 U.S. at 521, 123 S.Ct. at

2535.

The *Wiggins* Court then went on to note that:

> In light of these standards, our principal concern in
> deciding whether Schlaich and Nethercott exercised
> "reasonable  professional judgment," *id., at 691, 80 L Ed 2d
> 674, 104 S Ct 2052*, is not whether counsel should have
> presented a mitigation case.  Rather, we focus on whether the
> investigation supporting counsel's decision not to introduce
> mitigating evidence of Wiggins' background  *was itself
> reasonable.  Ibid.* Cf. *Williams v. Taylor, supra, at 415, 146 L
> Ed 2d 389, 120 S Ct 1495* (O'Connor, J., concurring) (noting
> counsel's duty to conduct the "requisite, diligent"
> investigation into his client's background).  In assessing
> counsel's investigation, we must conduct an objective review
> of their performance, measured for "reasonableness under
> prevailing professional norms,"

539 U.S. at 522-523, 123 S.Ct. at 2536 (*italics in original*).

The *Wiggins* Court then went on specifically to cite the ABA, Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases as "guides to

determining what is reasonable" in assessing counsels performance in death penalty

cases. *Id* at 524, 123 S.Ct. at 2537 (*citations omitted).  See also Rompilla v. Beard* , 545

U.S. 374, 125 S.Ct. 2456 (2005).

In the instant case the state habeas court placed great emphasis in its findings on

the investigation conducted by the defense investigator who obtained records and

conducted interviews in attempt to find so-called "character witnesses."  *See* Findings of

Fact and Conclusions of Law at 3. This thread runs throughout both the trial court's

findings and the testimony of counsel at the state writ hearing and clearly shows the

complete absence of any idea of how to conduct a mitigation investigation that would

satisfy the requirements of both *Wiggins, supra* and the ABA Guidelines.

In *Rompilla v. Beard* , 545 U.S. 374, 125 S.Ct. 2456 (2005), the Supreme

Court determined that trial counsel was ineffective for failing to review a case file

that contained mitigating information, including dependence on alcohol, and

possible mental health issues. In reversing the Court of Appeals decision denying

Rompilla relief, this Court once again applied the above-noted standard set forth

in *Strickland*:

> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose **it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, `might well have influenced the jury's appraisal' of [Rompilla's] culpability,', and the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing**.

545 U.S. at 374, 125 S.Ct. at 2469 (*citations omitted, emphasis supplied).*

The record in the possession of state habeas counsel clearly showed a pattern

either of neglect or sheer inability to formulate a viable mitigation strategy with evidence

that was readily available, *i.e.*, significant evidence of a chaotic childhood, a history of

misconduct commencing at a an extremely  young age and diagnosed while Mr. Runnels was still a juvenile,  and a complete lack of any attempt on the part of family or any of the institutions involved to provide or even attempt to provide him with the help he needed. Had trial counsel even taken the time to read Dr. Fulbright's report this would, or at the very least should have become apparent to them if they had the necessary experience to develop a mitigation case. It also would have spurred them to have him complete his testing in a more conducive environment so they could have a complete picture of Mr. Runnels' mental makeup.

Similarly, the "strategy" of counsel testified to at the writ hearing of attempting to elicit favorable information about the from the prosecution witnesses , *see* SWTR at 16 ll. 22-24, was completely undermined by Mr. Durham's constant objections and attempts to impeach the credibility of these self-same witnesses. One of the glaring omissions in the state postconviction process is the absence of Mr. Durham and therefore state writ counsel's inability to cross-examine and challenge him regarding his handling of this case.

Although Ms. Hamilton testifies at the hearing in the collective "we," with respect to the handling of the Petitioner's case, given her complete lack of **any** training or experience in handling a death penalty case, the record is totally devoid of what part she and Mr. Durham each played in the handling and development of the Petitioner's case. If one were to confine his examination to the trial record, with the exception of her assisting

Mr. Durham in the cross- examination of one witness early in the prosecution's case and her short colloquies with the Court on minor procedural matters, she hardly appears in the record.

It is respectfully submitted that given the fact that Mr. Durham was the only attorney who had some kind of experience in handling a death penalty case and tried the whole case to verdict, his absence at such a critical stage of the proceedings, when the Petitioner's counsel was entitled to question him thoroughly regarding his handling of the case constitutes a violation of due process and the Petitioner's Sixth Amendment right of confrontation.

This is particularly important given Mr. Runnels' claim that he entered a plea of guilty based solely on the representation of Mr. Durham, and **not** of Ms. Hamilton,4 that Mr. Durham would put on a mitigation case during the punishment phase of this trial. A copy of Mr. Runnels' Declaration is annexed hereto as Exhibit A.    Further, in her affidavit Nancy Taylor states under oath that Petitioner's counsel told them they would not be needed and it was Mr. Durham who made this decision. A copy of Nancy Taylor's affidavit is annexed hereto as Exhibit B. The state habeas court did not even address this extremely important conflict in the evidence in its Findings of Fact, and since this is one of the  of the Petitioner's ineffective assistance of counsel claim's main elements, the state habeas corpus decision is *per se* unreasonable for failing to address this conflict.

Finally, with respect to the prejudice prong of *Strickland, supra*, there is no

question that defense counsel's virtual abandonment of Mr. Runnels during the punishment phase of his trial clearly prejudiced his case and directly resulted in a sentence of death.

In sum, notwithstanding Ms. Garrison's investigation and the information obtained therefrom, trial counsel's failure and/or  inability to formulate a viable mitigation strategy on the Petitioner's behalf despite a plethora of readily available mitigation evidence, failure to do followup testing and, most importantly, to present **any** evidence or testimony on the Petitioner's behalf at the trial constituted a violation of the standards set forth by the United States Supreme Court in *Strickland v. Washington, Wiggins v. Smith* and *Rompilla v. Beard, supra*.

It is there respectfully submitted that given the constitutional violations set forth hereinabove, this Court should vacate Mr. Runnels' sentence of death and remand this case to the trial court for a new sentencing hearing, or in the alternative set this case for an evidentiary hearing.

**SECOND CLAIM FOR RELIEF**

**(Ineffective Assistance of State Habeas Counsel)**

**THE ACTIONS OF STATE HABEAS COUNSEL IN FAILING TO RETAIN EXPERT ASSISTANCE TO COMPLETE PSYCHOLOGICAL TESTING AND FAILING TO MEANINGFULLY PARTICIPATE IN THE EVIDENTIARY HEARING BY CALLING WITNESSES OR INTRODUCING EVIDENCE AT THE HEARING HAS SO PREJUDICED THE PETITIONER THAT PURSUANT TO THE UNITED STATES SUPREME COURT DECISION IN *MARTINEZ V. RYAN* 132 S.Ct. 1309 (2012) THIS COURT SHOULD GRANT THE PETITIONER AN EVIDENTIARY HEARING AND RESOURCES TO PURSUE HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS AND EXCUSE ANY DEFAULT RESULTING FROM THE ACTIONS OF STATE HABEAS COUNSEL.**

The following facts support this claim.

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012), is an equitable decision intended to "ensure that proper consideration [i]s given to substantial claim[s]" of ineffective assistance of trial counsel by federal reviewing courts. *Id.* at 1318. It holds that when a state court initial-review collateral proceeding is the first proceeding designated by a state to adjudicate a Strickland claim, a prisoner may establish cause for default of such claim where, inter alia, counsel in the initial-review collateral proceeding was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984).*Id.* [4]

As noted above, on September 17, 2007 state habeas counsel filed an Application for Writ of Habeas Corpus in Potter County District Court setting forth eleven grounds

---

[4]The issue of the application of *Martinez* in Texas and pending Supreme Court litigation is discussed in the Petitioner's Motion filed contemporaneously herewith.

for relief, including a claim of ineffective assistance of counsel for trial counsel's failure properly to investigate the available mitigation, and, more importantly, failure to present any testimony or evidence at the Petitioner's trial. The application also claimed that Mr. Runnel's guilty plea was involuntary because it was based on the misrepresentation by trial counsel that they would present a mitigation case after the Petitioner entered his plea of guilty.

In support of the application state habeas counsel filed an exhibit volume consisting of fifteen exhibits totaling approximately 95 pages, including the aforementioned affidavits, copies of trial subpoenas of members of the Petitioner's family and school and hospital records.

On March 14, 2008 the State filed its Response and supporting exhibits to the application for habeas corpus, and on October 8, 2010 the District Court entered findings of fact and conclusions of law with a recommendation that the Court of Criminal Appeals deny relief.

On June 8, 2011 the Court of Criminal Appeals issued an Order remanding the Petitioner's case to the district court and directing the directing the court to hold an evidentiary hearing on the Petitioner's claims of ineffective assistance of counsel.

Pursuant to the remand order from the Court of Criminal Appeals, on September 9, 2011 the state habeas court conducted an evidentiary hearing on the Petitioner's ineffective assistance of counsel claims.

As also noted, state habeas counsel retained Alma Lagarda to conduct an investigation of Mr. Runnels' case. Ms. Lagarda conducted a comprehensive investigation into Mr. Runnels' background, obtained, school, medical, and TDCJ records. She and her staff also interviewed members of Mr. Runnels' family and obtained detailed information about the background and childhood of Mr. Runnels and the relationship of the Runnels family with the Petitioner's trial team.

Attached hereto as Exhibit G is a Declaration from Ms. Lagarda detailing both her efforts and communication with state habeas counsel during the course of the Petitioner's state habeas proceeding. Of particular significance and concern is her urging state habeas counsel to obtain a psychological examination, a request which was ignored completely.

Further, state habeas counsel's failure to notify her or any of the witnesses whose affidavits she obtained of the hearing, severely prejudiced the Petitioner's case.

Finally, and most importantly, state habeas counsel's failure to present **any** testimony or evidence at the hearing on the Petitioner's ineffective assistance of counsel claim virtually assured that the claim would be denied, even though counsel had the resources with which he could have produced the necessary evidence and testimony.

As this Court is aware, 28 U.S.C. §2254(e)(2) which provides "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim," sets forth stringent requirements for a petitioner who does not develop his claim in state court to obtain an evidentiary hearing in

federal court. By virtue of the virtual abandonment of his client at the evidentiary hearing by state habeas counsel, it is the opinion of undersigned counsel that due to the negligence of state habeas counsel the facts of the instant case will in likelihood not meet the requirements of § 2254(e)(2)(A) or (B) which allow for a hearing in federal court.

Counsel therefore respectfully requests that based upon the ruling in *Martinez v. Ryan, supra,* this Court excuse any potential default and allow the Petitioner the resources to develop his ineffective assistance claim in federal court and that this Court further set this claim for an evidentiary hearing.

## THIRD CLAIM FOR RELIEF

### PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS WERE VIOLATED BECAUSE TEXAS' STATUTORY CAPITAL SENTENCING STATUTE DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW.

The pivotal sentencing issue in Texas, the statutory *Penry* (*Penry v. Lynaugh*, 492 U.S. 302 1989)) Special Issue (Article 37.071, Sec. 2(e) (1998)), does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase. Rather, the jury is simply asked whether there is "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence. In a larger sense, however, the *Penry* Special Issue requires Texas juries to perform the same functions that other states' post-*Furman* capital sentencing juries perform: (1) the threshold findings of particular aggravating and mitigating circumstances; and (2) the balancing process, whereby jurors determine whether the

mitigating factors outweigh aggravating factors. *Cf. Gregg v. Georgia*, 428 U.S. 153

(1976) (discussing Georgia's post-*Furman* statute).

Texas' unstructured sentencing scheme is unconstitutional because it does not

permit meaningful appellate review, which is not only required by the Texas Constitution

and Texas statutes, but also is a prerequisite under the federal constitution.  Texas

Constitution Art. V, Sec. 5; Texas. Code Criminal Procedure Arts. 44.25 and 44.251(a)

(1998); *Gregg v. Georgia*, 428 U.S. 153, 195, 206 (1976); *Parker v. Dugger*, 498 U.S.

308, 321 (1991); *Jurek v. Texas*, 428 U.S. 262, 276 (1976); *see Stringer v. Black*, 112 S.

Ct. 1130, 1136 (1992).

Under the Texas Constitution, and its implementing statutes, this Court is

empowered to conduct a legal and factual sufficiency review of the sentencing Special

Issues.  In particular, the "'same Constitution which guarantees a right of trial by jury"

empowers this Court to review questions of fact in criminal cases. *Clewis v. State*, 922

S.W.2d, 126, 129-130, 135 (Tex. Crim. App. 1996).  Since the time of the first Texas

Constitution, the Legislature has consistently recognized the ability of the Texas appellate

courts with criminal jurisdiction to review the facts (as well as the law) of a case. *Id.* at

130.  Article 44.25 of the Texas Code of Criminal Procedure has remained unchanged, in

that respect, "since 1857 with each subsequent code revision." *Id*.  Article 44.25

effectuates the duty of appellate review implied in Article V, Section 5, of the Texas

Constitution.[5]  After reenacting the death penalty in 1973, the Legislature moved in 1981

to ensure meaningful appellate review of death sentences by enacting Article 44.251,

Texas Code of Criminal Procedure.  The statute guaranteed, in pertinent part, appellate

reversal upon a finding of "insufficient" evidence in regard to any one of the Special

Issue aggravating circumstances:

> The Court of Criminal Appeals shall reform a sentence of death to a sentence of
> confinement in the Texas Department of Corrections for life if: (1) the court finds
> that there is insufficient evidence to support an affirmative answer to an issue
> submitted to the jury under Article 37.071....

Texas Code Criminal Procedure Art 44.251 (a) (1981).  In exercising its constitutional

appellate jurisdiction through Article 44.251, this Court has conducted factual (as well as

legal) sufficiency review of the sentencing Special Issues.  *Keeton v. State*, 724 S.W. 2d

---

[5] In relevant part, the Texas Constitution provides:

> Sec. 5   The Court of Criminal Appeals shall have final appellate jurisdiction coextensive
> with the limits of the state, and its determinations shall be final, in all criminal cases of
> whatever grade, with such exceptions and under such regulations as may be provided in this
> Constitution or as prescribed by law.

> The appeal of all cases in which the death penalty has been assessed shall be to the Court of
> Criminal Appeals.  The appeal of all other criminal cases shall be to the Court of Appeal as
> prescribed by law.  In addition, the Court of Criminal Appeals may on its own motion,
> review a decision of a Court of Appeals in a criminal case as provided by law.  Discretionary
> review by the Court of Criminal Appeals is not a matter of right, but of sound judicial
> discretion.

Texas Constitution, Art. V, Sec. 5 (1993).  Article 44.25 states:

> The Courts of Appeals or the Court of Criminal Appeals may reverse the judgment in a
> criminal action, as well upon the law as upon the facts.

Texas Code Criminal Procedure, Art. 44.25 (1998).

Page 29

58, 61 (Tex. Crim. App. 1987) (setting up factors for determining sufficiency on the future dangerousness Special Issue in manner only consistent with factual sufficiency review).  In 1991, the Legislature reformed the punishment statute, Article 37.071, Texas Code of Criminal Procedure, to contain the *Penry* Special Issue and, at the same time, revised Article 44.251 (a) to require information of sentence based on insufficiency not only in regard to the future dangerousness (aggravating) Special Issue, but also in regard to the *Penry* Special Issue.  Article 44.25 (a) was amended to read:

> (a) The Court of Criminal Appeals shall reform a sentence of death to a sentence of confinement in the institutional division of the Texas Department of Criminal Justice for life if the court finds that there is insufficient evidence to support an affirmative answer to an issue submitted to the jury under Section 2(b), Article 37.071, or Section 3(b), Article 37.0711, of this code or a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071, or Section 3(e), Article 37.071, of this code.

Texas Code Criminal Procedure Art. 44.251 (a) (1998).

Petitioner has a right to legal and factual sufficiency review of the jury's findings regarding whether the future dangerousness and the *Penry* Special Issues that is grounded in the federal constitutional right to meaningful appellate review of a death sentence and this Court's constitutional duty, commensurate with its jurisdiction as given further definition by the Legislature, to review a

trial jury's determinations of law and fact. When a "State has created appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,' *Griffin v. Illinois*, 351 U.S. at 18, the procedures used in deciding appeals

must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey,* 469 U.S. 387, 393, (1985); *see Gregg, Parker, Jurek* and *Stringer, supra*. The Supreme Court specifically recognized this Court as the guarantor of such fair final adjudication of sentences under the original post-*Furman* death penalty statute:

> By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.  Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution.

*Jurek*, 428 U.S. at 276.  Texas appellate courts are not merely "empowered" to conduct legal and factual sufficiency review; they have the duty to conduct such review.

Commenting on *factual* sufficiency review, the predecessor to this Court held:

> [It] has never been doubted, but has always been considered by this court, not only that it has the authority, but that is was its duty to set aside a verdict where that verdict was *contrary to the evidence*, or unsupported by it, though it was with reluctance that the court will disturb a verdict where there is any evidence to sustain it.

*Walker v. State*, 14 Tex. App. 609 (1883) (cited in *Clewis*, 922 S.W.2d at 136, 138-39 (Clinton J., concurring) (emphasis in original).  In a capital case, the defendant has an "automatic review" of his judgment of conviction and sentence of death.  Texas Code Criminal Procedure, Art. 37.071, Sec. 2(h) (1998).  Review of law and facts is jurisdictional and review of a capital case is mandatory.  By its own description, this Court has laid down a very unstable history of precedents interpreting its duty to conduct

legal and factual review of a capital sentence.  In 1988, this Court wrote:

> Over the past dozen years this Court has articulated its standard for appellate
> review of sufficiency of evidence to support an affirmative answer to special issue
> two [future dangerousness] in a number of ways.  We have consistently said we
> view the evidence in the light most favorable to the jury's answer, *e.g.*, *Starvagi v.
> State*, 593 S.W.2d 323, 325 (Tex. Crim. App. 1979), without clearly explicating
> what view of the evidence would be the most favorable in light of the jury's
> constitutional function to weigh any proffered evidence in mitigation.  In other
> instances, seemingly more mindful of that function, we have held that the evidence
> was such that "the jury was justified in finding that the aggravating factors
> outweighed the mitigating factors[,]" *e.g. Duffy v. State*, 567 S.W.2d 197, 209
> (Tex. Crim. App. 1978); *Demouchette v. State*, 591 S.W.2d 488, 492 (Tex. Crim.
> App. 1979); thus suggesting "a more substantive review" of the evidence than had
> been conducted in other cases . . . As if to disown that notion, however, the Court
> has at least on one occasion combined these two pronouncements, finding that "the
> evidence, viewed in a light most favorable to the verdict, is sufficient for the jury
> to have found that the mitigating factors introduced by Petitioner did not outweigh
> the aggravating factors and there is a probability that Applicant would commit acts
> of violence that would constitute a continuing threat to society." *Green v. State*,
> 682 S.W.2d 271, 289-90 (Tex. Crim. App. 1984).

*Burns v. State*, 761 S.W.2d 353, 355 (Tex. Crim. App. 1988).  Finally, this Court claimed

to have adopted a *Jackson v. Virginia*, 443 U.S. 307 (1979), approach to reviewing future

dangerousness sufficiency.  However, this Court utilizes a standard (the *Keeton* standard)

to determine such *Jackson* sufficiency that requires factual sufficiency review, taking into

account such things as the defendant's age, character, and whether the defendant acted

under duress (mitigating characteristics that are presented by the defense).

Referring to *Burns, supra,* this Court has commented that, "[p]resuming the

Legislature to be cognizant of this Court's prior case law, we would hardly expect it to

mandate a 'sufficiency' review if by that it meant this Court should re-evaluate and

reweigh the same evidence the jury has already heard." *Eldridge v. State*, 940 S.W.2d

646, 653 (Tex. Crim. App. 1996) (also citing *McFarland*, 928 S.W.2d at 499). Such re-

evaluation and reweighing, however, is precisely what this Court does when it reviews

future dangerousness, as *Burns* and *Keeton* so clearly express. If this Court wants to call

it a *Jackson* review, fine; but it conducts factual sufficiency. It can be no other way,

because the future dangerousness special issue requires an assessment of the jury's

finding of a *probability* beyond a reasonable doubt. Probability requires the jury not

merely to "find" the existence of a fact, but to "weigh" facts presented by both sides in

order to make a prediction. This Court must determine if the jury's predictive finding has

been proven beyond a reasonable doubt. The jury's finding on probability, thus, cannot

be reviewed without appellate reweighing.[6]

　　While recognizing that it must review sufficiency of future dangerousness, this

Court has rejected any requirement by the Eighth or Fourteenth Amendments to "reweigh

punishment evidence." *Burns*, 761 S.W.2d at 356 n.4 (citing *Pulley v. Harris*, 465 U.S.

37 (1984)). This Court has found the absence of such requirement to allow it to avoid the

---

[6] In accord, this Court has recognized that certain mitigation circumstances must be weighed into a sufficiency review of future dangerousness:

> Viewing mitigating evidence in the light most favorable to the jury's answer in this particular context may mean in some cases actually considering evidence proffered in mitigation, such as youth, drug dependency, a history of child abuse, et., though in a broader sense it may "moderate blameworthiness," nevertheless to militate in favor of an affirmative answer in the narrower confines of special issue two itself.

Burns, 761 S.W. 2d at 355 n.3.

literal command of Article 44.251 to conduct sufficiency review of both future dangerousness and mitigation.  This Court argues, in addition, that the Legislature could not have meant "genuine" 'sufficiency' review of the jury's negative answer to Article 37.071, Sec. 2(e), because the defendant would only be able to ask for what amounts to "factual sufficiency" review, since the defendant has the burden of production of mitigating evidence.  *Eldridge*, 940 S.W.2d at 652.  This Court fails to recognize that, no matter the allocation of burdens, by its very nature Article 37.071, Sec. 2(b)(1) requires the same kind of review; a factual reweighing.

The Eighth and Fourteenth Amendments do require this Court to carry out its appellate duty to reweigh punishment evidence in regard to both the special issues.  This Court's duty to conduct sufficiency review is founded upon the jurisdiction of this Court.  As established in Article V, Sec. 5 of the Texas Constitution, the practice of this Court and its predecessors, and Article 44.251 of the Texas Code of Criminal Procedure.  Petitioner has a "liberty interest" in consistent, reliable observance by this Court of state constitutional and statutory demands.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (cited in *Lambright v. Stewart*, 167 F. 3d 477, 487 (1999)).  That rule of reliability is heightened in a capital case.  *Woodson*, 428 U.S. at 304-05.  By preventing review afforded and required by state constitution and statute, this Court's opinions have encroached upon Petitioner's rights to due process and heightened reliability.  The difficulty to the task of reviewing the issues cannot be a reason for failing to review them.

*See e.g., Howard v. State*, 941 S.W.2d 102, 119 (Tex. Crim. App. 1996) ("Although technically a "factual question," the mitigation issues is in reality a normative determination left to the subjective conscience of each juror."). The future dangerousness issue is normative, too, requiring a judgment of character. In reality, this Court could create a standard, like the *Keeton* standard, for the review of mitigating evidence under the statutory *Penry* issue. Such a standard of review would have to withstand federal constitutional scrutiny under the *Lockett* line of cases, which might be no small task. However, the current failure to carry out appellate duties also violates the federal constitution.

An unreviewable "normative determination left to the subjective conscience of each juror" does not comport with the reasoned moral assessment that is required of capital sentencing under the federal constitution. This Court has interpreted away the attempt of the Legislature to provide for a reviewable, and therefore, reliable sentence. By making the *Penry* Special Issue completely unreviewable, this Court has given Petitioner, and others similarly situated, less process than the Supreme Court requires for money damage verdicts. *Oberg v. Honda Motor Co*., 512 U.S. 415 (1994) (requiring that appellate review of punitive damage award be made available as matter of Fourteenth Amendment due process); *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991) (due process requires post-verdict review including power to modify the extent or degree of the verdict); *see Oregon v. Cunningham*, 880 P. 2d 431, 446, 447 (Or. 1994) (Fadely, J.,

dissenting) (applying *Oberg* and *Pacific Mutual* to similar Oregon unreviewable mitigation sentencing factor).

This Court should overturn its opinions rejecting factual sufficiency review of the punishment stage Special Issues, provide Petitioner with meaningful appellate review or amend Petitioner's sentence to life imprisonment, and establish a manner of review consistent with Article 44.251 for all future cases.

<strong>FOURTH CLAIM FOR RELIEF</strong>

**ARTICLE 37.071, OF THE TEXAS CODE OF CRIMINAL PROCEDURE AND THE TEXAS CAPITAL MURDER STATUTE IS UNCONSTITUTIONAL AND VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH, AMENDMENTS TO THE UNITED STATES CONSTITUTION**

Because the death sentence imposed under Article 37.071 of the Texas Code of Criminal Procedure is not subject to meaningful review, the Texas capital murder statute violates the Eighth and Fourteenth Amendments of the United States Constitution

A death penalty statute which is not subject to meaningful review on appeal is unconstitutional.  Cf. *Gregg v. Georgia*, 428 U.S. 153, 96, S.Ct. 2909, 49 L.Ed.2d 859 (1976).  The proof required in determining the punishment issue should be the same as for guilt, as required by *In re Winship*, 397 U.S. 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  In Texas, the State is required to prove the future dangerousness issue only by a "probability", not by the more stringent "beyond a reasonable doubt."

The Court of Criminal Appeals has opined that the second punishment special

issue on mitigation is not legally or logically subject to sufficiency review or appeal. *Colella v. State*, 915 S.W.2d 542 (Tex. Crim. App. 1995); *Lawton v. State*, 913 S.W.2d 542 (Tex. Crim. App. 1995), *cert denied*, 117 S.Ct. 88, 136, L.Ed.2d 44 (1996); *Broussard v. State*, 910 S.W.2d 952 (Tex. Crim. App. 1995), *cert denied*, 177 S.Ct. 87, 136 L.Ed.2d 44 (1996).  Article 37.071, Section 2(e), of the Texas Code of Criminal Procedure (Vernon 1981, Vernon Supp. 1998), regarding mitigation, fails to provide any meaningful guidance to the jury, thus without instruction, it permits the jury to give aggravating effect to mitigating evidence in violation of *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, L.Ed.2d 235 (1983).  The use of aggravating factors which do not guide discretion to vagueness and imprecision by the State to determine the death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution.  *See Stringer v. Black*, 503 U.S. 222, 112, S.Ct. 1130, 117 L.Ed.2d 367 (1992).  Further, in regard to mitigation, the burden of proof is improperly shifted to the defendant to avoid a death sentence. *See In re Winship*, supra.

Accordingly, the Texas death penalty scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Article 37.071, Section 2(c), of the Texas Code of Criminal Procedure (Vernon 1981, Vernon Supp. 1998), mandates that the jury shall return a special verdict of "yes" or "no" on each submitted issue.  Section 2(d)(2) commands the trial court to instruct the jury that it may not answer the future dangerousness issue "yes" unless there is

unanimous agreement and that it may not answer "no" unless 10 or more of the jurors

agree.  Section 2(g) requires the trial court to sentence the defendant to life if the jury is

unable to answer any special issue.  Section 2(a) provides that the jury may not be

informed that the effect of their failure to agree on a special issue will result in a life

sentence.  When considered together, these provisions violates the Eighth and Fourteenth

Amendments to the United States Constitution.

The above provisions are violated for several reasons.  Mandating a juror that he

shall answer "yes" or "no" could reasonably cause him to shift his position to satisfy the

12-10 rule.  The statutory 10 or more vote prerequisite to a "no" response establishes an

artificial numerical threshold which bears no relationship to conditions required for

assessment of a life sentence by Texas law.  *See* Clary, *Voting for Death; Lingering

Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 St.M.L.J.

353, 374-75 (1987).  Jurors are relieved of psychological responsibility for their collective

decision which results in the imposition of the death penalty by the statutory prohibition

against informing jurors of the impact of their individual votes, and the prohibition fails

to provide full and accurate information to the jury concerning the sentencing process in

Texas.

Further, under the Texas death penalty scheme, prosecutors are given unfettered

discretion to decide whether or not to seek the death penalty in a specific case, in

violation of Petitioner's rights under the Eighth and Fourteenth Amendments to the

United States Constitution.

Petitioner was denied protection from cruel and unusual punishment due to the procedure by which the death penalty is imposed.  Statutory analysis reveals that the system used for the imposition of the death penalty allows unchecked and arbitrary discrimination amounting to a denial of equal protection under the law.  For example, two persons could commit capital offenses under very similar facts or circumstances, yet one could receive life imprisonment while the other could receive the death penalty.  This allows selective enforcement and rank discrimination by jurors in assessing the death penalty in violation of the Eighth Amendment to the United States Constitution.

Article 37.071, Section 2, of the Texas Code of Criminal Procedure (Vernon 1981, Vernon Supp. 1998), permits the presentation of evidence "as to any matter that the court deems relevant to sentence".  The absence of guidelines or standard violates the equal protection of the laws and allows cruel and unusual punishment to be inflicted.  Further, equal protection of the laws is denied to a defendant because two different trial courts could treat identical fact situations in an absolutely different manner.  Such delegation of authority violates the Separation of Powers doctrine. *See Grunsfeld v. State*, 843 S.W.2d 521 (Tex. Crim. App. 1992), (J. Clinton concurring).

The Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10, 14, and 19 of the Texas Constitution are further violated because the Texas death penalty scheme is a mandatory one and because it does not define the

phrases and terms used in the special issues in ways that would permit the jury to give full mitigating significance to those terms. "Probability", "criminal acts of violence", and "continuing threat to society", are not defined, vague, and imprecise; accordingly, they do not guide the jury's discretion.

Submission of the special issues under Article 37.071 of the Texas Code of Criminal Procedure (Vernon 1981, Vernon Supp. 1998) is done without a real standard to guide the jury. How can a jury realistically predict probabilities as to whether a defendant will commit other acts of violence that could constitute him a continuing threat to society? Yet, that is what the Texas law commands. Such amounts to punishment for acts which might occur in the future.

The inquiry whether there is probability that the defendant would commit violent criminal acts in the future is vague and indefinite, as there is always some mathematical probability that any person might do so, and there are no statutory guidelines or limitations upon the factors to be considered by the jury to make its determination. Further dangerousness is focused upon without any regard to the offense one is on trial for, and punishment is based upon having a criminal character without due regard for the fact of the alleged offense. This violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. The proof required to determine the punishment issue should be the same as for guilt. *In re Winship, supra*, However, the State is only required to prove future dangerousness by a "probability" and not "beyond a reasonable doubt".

The special issues are meaningless, and the answers can result in a mandatory death sentence.  A defendant is not adequately protected from jurors acting arbitrarily and with caprice in arriving at the decision that result in life or death.

Punishment imposed arbitrarily and capriciously violates the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 13 and 19 of the Texas Constitution.   The special issues procedure allows total discretion to a jury to make unfavorable findings against a defendant, and the findings may be based on any individual or group prejudice.

Because the State does not have the burden of proof beyond a reasonable doubt concerning mitigating evidence, it violates the Eighth and Fourteenth Amendments to the United States Constitution.

The admission of unadjudicated extraneous offenses in the punishment phase of a capital trial does not comport with heightened reliability by the Eighth and Fourteenth Amendments to the United States Constitution.

Texas' capital punishment scheme does not provide for meaningful appellate review in that it does not require an appropriate review to determine whether the penalty assessed is proportional to other similar cases, and consequently, it violates the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner acknowledges that the procedure in a capital case set out in Article 37.071 of the Texas Code of Criminal Procedure (Vernon 1981, Vernon Supp. 1998), and

the resulting Texas capital punishment scheme have been upheld on numerous occasions. However, for the above mentioned reasons, Petitioner asserts said Article 37.071 and the capital punishment scheme in Texas is unconstitutional and in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Accordingly, Petitioner's relief should be granted as prayed for.

## SEVENTH CLAIM FOR RELIEF

**PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENT TO THE CONSTITUTION WERE VIOLATED BECAUSE THE TEXAS DEATH PENALTY STATUTE IS CRUEL AND UNUSUAL PUNISHMENT.**

From the point of view of the modern Supreme Court's death penalty jurisprudence, the "basic question" posed is whether the "system accurately and consistently determines which defendants 'deserve' to die." *Callins v. Collins*, 114 S. Ct. 1127, 1130 (1994) (Blackmun, J., dissenting from denial of petition for writ of certiorari). In *Callins*, Justice Blackmun summed up the deficiencies of the Court's death penalty regime:

> It is not simply that this Court has allowed vague aggravating circumstances to be employed, *see e.g., Arave v. Creech*, 113 S. Ct. 1534 (1993), relevant mitigating evidence to be disregarded, *see e.g., Johnson v. Texas*, 113 S. Ct. 2658 (1993), and vital judicial review to be blocked, *see, e.g., Coleman v. Thompson*, 112 S. Ct. 1845 (1992). The problem is that the inevitability of factual, legal, and moral error gives us a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution.

*Id.* The system has run aground while attempting to reconcile the consistency in sentencing sought by the Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972), with the fairness to the individual also demanded by the Court in *Lockett v. Ohio*, 438 U.S. 586 (1978). *Id.* at 1135. In Petitioner's case, the system has failed him, as is explained below.

The death penalty statutes in Texas were created to serve a particular religious interest which, in itself, is totally contrary to the Supreme Court's requirement for reliable or individualized sentencing. These statutes are void under the Establishment Clause of the First Amendment of the United States Constitution. Punishment under void statutes would be cruel and unusual in violation of the Eighth Amendment.

Any capital jury is death-prone as a result of the exclusion of venire persons, through cause or peremptory challenge, who express feeling or opposition to the death penalty. Petitioner's jury was especially death-prone due to religious bias that the system could not prevent. Although Petitioner's trial counsel should have not accepted certain jurors, counsel faced an uphill battle to obtain a fair jury, considering the religiously biased nature of the venire. No reliable or individualized sentencing should be expected of such a jury.

Statistical evidence proves the existence in Texas juries of premature decision making based upon juror biases and inadequate instruction in the law. The statistical likelihood of receiving a jury that will be given an adequate understanding of the relevant

law to make a correct factual finding on sentencing is next to nil. Burns, *Death by Default;* Burns, et al., *Foreclosed Impartiality.*

Article 37.071, as amended and interpreted consistent with Texas case law, prevented consideration by Petitioner's jury of substantial evidence of provocation as mitigating punishment. The system afforded Petitioner's trial counsel no grounds for objection, because it prevented them from requesting any kind of relief to the statutory impasse. Petitioner's resulting sentence is neither reliable nor individualized.

By making the *Penry* Special Issue unreviewable, this Court has denied capital Petitioners meaningful review that might tend to create a more constitutionally acceptable system of individualized punishment. Undoubtedly, this Court has so acted, in part, in order not to undermine the channeling of the jury's discretion under the future dangerousness Special Issue, with the purpose of serving reliability. The result, however, is that the Court has opted to create "final" convictions and sentences that are based upon a process more death-biased than the system should allow in order to meet the requirement of individualized sentencing.

The system also is fraught with unfairness, because the *Penry* Special Issue, without definition of "mitigating circumstances," allows the trial jury too much discretion in sentencing and with the statutory definition, too little discretion (in fact a mandatory death penalty). Any capital jury receiving the two instructions - presumably most if not all – has to be confused as to how to apply the punishment-relevant facts to the *Penry*

issue.  The two parts of Article 37.071 encapsulate the tension Justice Blackmun found constitutionally unacceptable in *Callins*.

Under *Clewis*, this Court has a constitutional duty to conduct factual sufficiency review of both the future dangerousness and *Penry* Special Issues.  Yet, even if this Court were to hold such review possible for future dangerousness, it would continue to deny it for the mitigation issue, precisely because of the inexorable tension in the law identified by Justice Blackmun in *Callins*.

For all the above reasons, as well as those more directly articulated by Justice Blackmun in *Callins*, the Texas death penalty has been arbitrarily applied in Petitioner's case in violation of the Eighth and Fourteenth Amendments.  Therefore, relief should be granted.

## EIGHTH CLAIM FOR RELIEF

**PETITIONER'S RIGHTS WERE VIOLATED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE TEXAS DEATH PENALTY STATUTES PREVENTS JURORS FROM KNOWING THE EFFECT OF ONE HOLD-OUT JUROR IN THE PUNISHMENT PHASE.**

The Texas capital sentencing statutes provide that a deadlocked jury – even based on a single holdout juror – during the capital sentencing phase requires the Trial Court to automatically sentence the defendant to life.  Texas Code of  Criminal Procedure Art. 37.071, Sec. 2(g) (1998).  However, the jury cannot be informed of this provision of law. *See* Texas Code of Criminal Procedure, Art. 37.071, Sec. 2(a), (1998).  Petitioner's jury

was, thus, not so instructed about Texas' "one holdout juror" rule.

Article 37.071, Sec. 2(a) violates the Eighth and Fourteenth Amendments to the United States Constitution.  *Caldwell v. Mississippi*, 105 S. Ct. 2633, 2639-46 (1985) (Eighth Amendment violation if capital sentencing jury not informed of relevant state sentencing law); *Dugger v. Adams*, 109 S. Ct. 1211, 1215 (1989) ("To establish a Caldwell violation, the defendant necessarily must show that the [instructions] to the jury improperly described local law.); *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994) (holding that due process requires that a capital sentencing jury be informed that a "life" sentence means life-without-parole whenever the prosecution in a capital case contends the defendant would pose a future danger).

Petitioner should have been able to inform his jury that the automatic life sentence, rather than a mistrial or a sentence of years with good time, would have resulted from one juror's dissent.  "A jury may be swayed toward death" in such circumstances.  *Jones v. United States*, 119 S. Ct. 2090, 1999 U.S. LEXIS 4201, at *53, *72 (1999) (Ginsberg, J., joined by Breyer, J., Stevens, J., and Souter, J., dissenting) (citing *Simmons*, 512 U.S. at 163).  The Eighth Amendment requires that the jurors be informed about the result of a holdout, because informed jurors would be less likely to be prone to the premature decision making otherwise statistically predicted.  *See* Bowers, *Death by Default, supra;* Bowers et al., *Foreclosed Impartiality in Capital Sentencing, supra.*  In fact, in its recent opinion on this issue, the United States Supreme Court majority noted, favorably, the

coercive effect of instructions in a capital murder case that do not allow the jury to know the effect of a holdout juror. *Jones*, *supra*, at *19-20 (1999). The Supreme Court majority in *Jones* endorsed the following language from *Justus v. Commonwealth*, 266 S.E. 2d 92 (Va. 1980):

> The court properly refused an instruction offered by the defendant which would have told the jury that if it could not reach agreement as to the appropriate punishment, the court would dismiss it and impose a life sentence. While this was a correct statement of law, it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree.

*Jones, supra*, at *19. The Court found this "reasoning" "far more persuasive" than that in a case critical of such kinds of instructions as unduly coercive, because of "the strong governmental interest. . .in having a jury render a unanimous sentence recommendation." *Id.* (citing *State v. Ramseur*, 524 A.2d 188, 280-86 (N.J. 1987)). The Supreme Court majority ignores the most basic Eighth Amendment implications of a coercive charge: "[B]y allowing the jurors to remain  ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court fail[s] to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action." *State v. Williams*, 392 So. 2d 619, 624-25 (La. 1980). This was duly noted by the dissent: "The Fifth Circuit's tolerance of error in this case, and this Court's refusal to face up to it, cannot be reconciled with the recognition in *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion), that "death is qualitatively different." *Jones*, *supr*a, at *80

(Ginsberg, J., joined by Breyer, J., Stevens, J., and Souter, J., dissenting).

A capital juror in Texas will likely have a misconception about the operation of Texas parole law as it is applied to capital defendants who seek a life sentence. In particular, a capital juror will likely underestimate the time a capital defendant will serve before being eligible for parole if given a life sentence. "Heightened reliability" would be insured by informing a capital juror as to the facts and thereby erasing misconceptions about parole in capital cases. When the jury is not informed, as in the instant case, about the result of a holdout juror, and believes that they will simply be returning someone they have found to pose a future danger to the street faster than the law allows, that violates the Eighth Amendment command for "heightened reliability." Accordingly, given the statistical proof[7] that failure to inform actual jurors of sentencing alternative increases premature decision making for death, Petitioner's sentence of death is constitutionally infirm and relief should be granted.

## NINTH CLAIM FOR RELIEF

**PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BECAUSE THE JURY CHARGE DEFINITION OF MITIGATING EVIDENCE IMPERMISSIBLY RESTRICT THE JURY'S DISCRETION IN**

---

[7]Texas courts have repeatedly ruled against the instant claim, but not in light of the new social science findings which illustrate the critical need for accurate and noncoercive jury instruction if capital cases are to be at all fair. *See e.g.,* Moore v. State, 1999 WL 233918 (Tex. Crim. App. April 21, 1999), at *20 (one of the more recent rulings).

**CONSIDERING ALL EVIDENCE THAT WOULD SUPPORT A DEATH SENTENCE.**

Petitioner had a right to have his jury consider all evidence relevant[8] to mitigation of the death sentence. *Buchanan v. Angelone*, 118 S. Ct. 757, 1998 U.S. LEXIS 639 (Jan. 31, 1998) (affirming that the Supreme Court's "cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence"); *Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987) (holding that statutory refusal to allow consideration by jury to unenumerated mitigating factors violated the Eighth Amendment); *Skipper v. South Carolina*, 476, U.S. 1, 45 (1986) (holding state law impermissibly precluded jury's consideration of defendant's good behavior while awaiting trial); *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (holding that Ohio death penalty statute precluded jury's consideration of relevant mitigating factors).

In order to return a finding leading to the death sentence for Petitioner, the trial jury had to answer the *Penry* Special Issue "no":

> Whether, taking into consideration of all the evidence, including the circumstances of the offense, the defendant's

---

[8] The only evidence the Supreme Court has rejected as relevant mitigating evidence involved a defendant's request that the jury be allowed to consider at sentencing any "residual" doubt jurors entertained regarding defendant's guilt. *See* Franklin v. Lynaugh, 487, U.S. 64, 172-78 (1988) (plurality opinion); *Id*. at 187 (O'Connor, J., concurring). The Court concluded that individualized sentencing did not require a jury to reexamine its "residual doubt" about defendant's guilt. *Id*. at 174. On another occasion, the Court said in dicta that it had no quarrel with the proposition that how often the defendant took a shower might be deemed irrelevant to the jury's sentencing determination. *Skipper v. South Carolina*, 476 U.S. 1, 7 n.2 (1986) (citation omitted).

> character and background, and personal moral culpability of
> the defendant, there is a sufficient mitigating circumstance or
> circumstances to warrant that a sentence of life imprisonment
> rather than a death sentence be imposed.

Texas Code of Criminal Procedure, Art. 37.071, Sec. 2(e) (1998).   The jury was

instructed, as required by statute, that the definition of "mitigating circumstance" was

limited to "evidence that a juror might regard as reducing the defendant's moral

blameworthiness."   Texas Code of Criminal Procedure, Art. 37.071, Sec. (F)(4).

When Petitioner's jurors came to the *Penry* Special Issue, they automatically had

to vote "no," because the definition the court gave them of "mitigating circumstances"

*unambiguously*

directed them to limit their consideration of the evidence to that which might reduce

Petitioner's **culpability of the crime**. *See Graham v. Collins*, 950, F. 2d 1009, 1034 (5th

Cir. 1992) (en banc) (Reavley, J., dissenting) (citing *Lackey v. State*, 819 S.W.2d 111, 129

(Tex. Crim. App. 1991) (en banc), *aff'd on other grounds*, 506 U.S. 461 (1993)

("Culpability' at the punishment phase is not simply a question of guilt or

**blameworthiness**, but rather a question of "death worthiness'. . . .To say that evidence

mitigates a defendant's culpability is not to say that he is any less guilty or deserving of

blame, but that he is less deserving of death.") (emphasis added).  This definition of

mitigating circumstances prevented the jury from considering evidence of potential for

rehabilitation.

Evidence of potential for rehabilitation is irrelevant to "moral blameworthiness"

for the offense, because "it [does] not tend to provide a legal excuse from criminal responsibility." *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982).  All rehabilitation evidence, however is relevant to mitigation of punishment.  *Lockett v. Ohio*, 438 U.S. 586, 594 (1978) (holding statute unconstitutionally limited sentencer's ability to consider evidence that Sandra Lockett had a good "prognosis for rehabilitation" if returned to society); *Franklin v. Lynaugh*, 487 U.S. 164, 177-78, 179-80 (1988) (holding that the Texas statute allowed jurors to consider the mitigating evidence of Donald Franklin's good prison record); *see Simmons v. South Carolina*, 512 U.S. 154, 163 (1994) ("The defendant's character, prior criminal history, mental capacity, background, and age are just a few of the many factors, in addition to future dangerousness, that a jury may consider in fixing the appropriate punishment.").  It is "as if the trial judge had instructed the jury to disregard mitigating evidence [Petitioner] proffered on [her] behalf." *Eddings*, 455 U.S. at 114. "The Eighth and Fourteenth Amendments require that the sentencer . . . .not be precluded from considering, *as a mitigating factor*, **any aspect of a defendant's character or record** and  any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis added).

The instruction defining "mitigating evidence" for the jury's consideration of the *Penry* Special Issue (and indeed as mitigating evidence would be relevant to either Special Issue) **unambiguously** requires the jury to look at the defendant's evidence only

as it affects his "moral blameworthiness" or culpability for the offense.  *See Boyde v.*

*California*, 494 U.S. 370, 384 (1990) (5-4 decision denying relief on similar claim, in

part, because statutory instruction was "at worst ambiguous").  To what else

"blameworthy" about the defendant could the evidence logically apply?  By clear

language and structure of both the statute and the jury charge, the Article 37.071, Section

2(f)(4) instruction totally governs and circumscribes the jury's *Penry* Special Issue task.

Section 2(e), the third special issue, cannot be evaluated by the jury but through Section

2(f)(4), as required by the "shall consider" language in the statutory instructions by

arguing that the language of the latter section.  For this reason, this Court has

unreasonably mooted any "deficiency" in the statutory instructions by arguing that the

language of the *Penry* Special Issue itself allowed jurors to consider what Section 2(f)(4)

otherwise would not allow.  *McFarland v. State*, 928 S.W.2d 482, 518 (Tex. Crim. App.

1996).

The Court of Criminal Appeals, additionally, has made unreasonable application of

U.S. Supreme Court precedent. *Lawton v. State*, 913 S.W. 2d 542, 555-56 (Tex. Crim.

App. 1995).  Quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), for proposition that

"[u]nderlying *Lockett* and *Eddings* is the principle that punishment should be directly

related to the personal culpability of the criminal defendant," the Court held that "our

statutory definition of mitigating evidence is congruent with that of the United States

Supreme Court."  The Court failed to recognize that the Supreme Court in *Penry* was

analyzing the way in which one of the **old and now excised** Texas punishment phase

special issues that focused on "moral blameworthiness" for the offense ("deliberateness")

restricted jurors' ability to fully consider certain mitigating evidence. *See* Steiker and

Steiker, *Sober Second Thoughts: Reflections on Two Decades of Constitutional*

*Regulation of Capital Punishment,* 109 Harv. L. Rev. 355, 393, 395 (1995) (describing

*Penry* as a "limited intrusion into state practices" and noting that *Penry* addressed, in part,

the problem that this Court construed the "deliberateness" special issue "so as to preclude

a more encompassing moral inquiry into the appropriateness of the death penalty based on

a [mentally retarded] defendant's limited capacity to exercise judgment and self-

restrain"). *Penry* cannot reasonably be read as overturning *Woodson, Lockett, Eddings,*

*Hitchcock*, or *Skipper*, by restricting the jury's ability to consider mitigating evidence to

only that evidence that is relevant to the defendant's moral blameworthiness. The

Supreme Court has not strayed from its position that the Constitution requires "broad

inquiry into all relevant mitigating evidence to allow an individualized determination."

*Buchanan*, 1998 U.S. Lexis at 12 (multiple citations omitted). The Supreme Court hold

that such individualized sentencing requires "affording the sentencer the power and

discretion to grant mercy in a particular case, and providing avenues for consideration of

any and all relevant mitigating evidence that would justify a sentence less than death."

*Callins v. Collins*, 114 S. Ct. 1127, 1129 (1994) (Blackmun, J., dissenting) (quoting

*Lockett*, 438 U.S. at 605 (plurality opinion)). The opposite occurred in Petitioner's case:

the court instructed the jury that it could only consider evidence mitigating of punishment if is lessened Petitioner's moral blameworthiness for the crime.

Article 37.071, Sec. 2(e) (1998) creates a mandatory death penalty.  Petitioner's statutory instructions conflated the guilt and punishment decisions of the jury, rendering the individualization requirement of the Eighth and Fourteenth Amendments meaningless in her case.  *See Buchanan v. Angelone*, 118 S. Ct. 757, 1998 U.S. Lexis 638, at *13 (Jan. 21, 1998) (emphasiz[ing] the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination").  The jury found Petitioner "morally blameworthy" for the offense in the guilt innocence phase.  It is impossible to imagine what evidence other than mental disability would be available to the jury for consideration as mitigating under the Texas instructions.  *See Lockett*, 438 U.S. at 607-08 ("The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity."  Ohio Rev. Code Ann., Sec. 2929-04 (b)(3) (1975)).  This conflation of the guilt and punishment stage determinations by the Texas statute is, in itself, arbitrary and capricious under the Eighth and Fourteenth Amendments.

In *Boyde v. California*, 494 U.S. 370 (1990), the Supreme Court considered a defendant's claim that the California statutory scheme prevented the jury from considering evidence that was unrelated to the crime.  494 U.S. 370, 378, 381 (1990).  In *Graham v. Collins*, 506 U.S. 461 (1993), and *Johnson v. Texas*, 509 U.S. 350 (1993), the

Supreme Court significantly distinguished the *Boyde* rule and the *Lockett/Eddings* line of cases from the analysis of Texas' old death penalty statute in *Penry v. Lynaugh*, 492 U.S. 302 (1989):

> In [the *Lockett/Eddings* line of] cases, the constitutional defect lay in the fact that relevant mitigating evidence was placed beyond the effective reach of the sentencer. In *Lockett, Eddings, Skipper*, and *Hitchcock*, the sentencer was precluded from even considering certain types of mitigating evidence. In *Penry*, the defendant's evidence was placed before the sentencer but the sentencer had no reliable means of giving mitigating effect to that evidence.

*Johnson v. Texas*, 509 U.S. 350, 366 (1993) (quoting *Graham v. Collins*, 506 U.S. 461, 475 (1993)). The Court found in *Graham* that "Graham's evidence [of youth] – unlike Penry's – had mitigating evidence relevance to the second special issue concerning his likely future dangerousness." *Id.* (quoting *Graham*, 506 U.S. at 475).

Petitioner's complaint, however, raises directly from the *Boyde* and *Lockett* line of cases and, additionally, has nothing to do with *Penry*. Texas Code of Criminal Procedure Article 37.071, Sec. (f)(4) provides "no reliable means" for its consideration by the jury, as was the issue in *Penry, Graham*, and *Johnson*. Rather, it actively prevents the evidence from being placed before the sentencer. Petitioner's claim is governed by the "clearly established" precedent of *Boyde*, not *Penry*. Petitioner's grounds does not raise a *Penry* issue: i.e., that "**no additional instruction** [is] constitutionally required" where the evidence can be given mitigating effect in some way under the Texas special issues. *Motley v. Collins*, 18 F. 3d 1223, 1234, (5th Cir.), *cert. denied*, 513 U.S. 960 (1994); *see*

*Johnson*, 509 U.S. at 370.  Petitioner's complaint is with **the instruction that now exists**, preventing the jury's access to that mitigating evidence.  *Boyde*, 494 U.S. at 386.

The Texas legislature enacted the current Article 37.071, Sec. 2(e) Special Issue as an attempt to do away with the *Penry* problem that the special issues otherwise not provide, in any given circumstance, a "reliable means of giving mitigating effect" to a defendant's evidence.  The problem now with the statute is that Article 37.071, Sec. 2(f)(4) governs what the jury may consider to be "mitigating" under the otherwise adequate *Penry* Special Issue.  Article 37.071 places any mitigating evidence that is not relevant to the defendant's moral blameworthiness" for the offense "beyond the effective reach of the sentencer."  The jury, in effect, is commanded **not** to consider it under either Special Issue.

The Supreme Court has emphasized this moment of "selection," now statutorily grounded in Texas' *Penry* Special Issue, as critical to fair operation of the death penalty.  *See Buchanan*, *supra*.  Petitioner's jury simply could not get to the evidence that, under Tex. Code Crim. Proc. Art. 37.071, Sec. 2(e), would have served as a "basis for a sentence less than death." *Skipper v. South Carolina*, 476, U.S. 1, 5 (1986).  This is constitutionally unacceptable.  The Supreme Court in *Lockett* distinguished the (old) Texas statute it had recently evaluated in *Jurek v. Texas*, 428 U.S. 262 (1976), from Ohio statute under review as "significantly different" because it had found the Texas Court of Criminal Appeals had broadly interpreted the otherwise facially narrow future

Page 56

dangerousness special issue to "permit the sentencer to consider 'whatever mitigating circumstances' the defendant might be able to show." *Lockett v. Ohio*, 438 U.S. 586, 607 (1978). The Texas statute has evolved, however, after the Supreme Court later held in *Penry* that the *Jurek* statute could not always provide the sentencer a reliable means to give mitigating effect to the defendant's evidence. The ironic result is that the current statute, under which Petitioner was tried, has been structured like the condemned Ohio statute in *Lockett*. The Statute now **prevents** the "broad interpretation" this Court used to give the future dangerousness issue in order to save the statute's constitutionality.

Since the issue presented is not whether relevant aspects of the defendant's prospects for rehabilitation, and other matters irrelevant to moral blameworthiness for the offense, were beyond the effective reach of the statute, but rather, whether the "moral blameworthiness" instruction precluded the jury from considering Petitioner's mitigating evidence under the *Penry* Special Issue, *Penry, Graham*, and *Johnson*, and their progeny – which contemplated the effective reach of the old statutes – are not apropos. *Lockett* and *Boyde* are the controlling precedents that require relief under the instant claim. The error is egregious, because it "vitally affect a defensive theory." *Hutch*, 922 S.W.2d at 170-71 (citing *Almanza*, 686 S.W. 2d at 172). The error also is structural; therefore, no waiver can be attached to counsels' advocacy of the moral blameworthiness definition at closing argument. *Hargrave v. Dugger*, 832 F. 2d 1528, 1531-33 (11th Cir. 1987), *cert. denied*, 489 U.S. 1071 (1989) (violations of rule of *Lockett* are *per se* reversible, citing

*Hitchcock*); *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) (exempting error

that defies analysis by harmless error standards).  Relief should be granted.

## TENTH CLAIM FOR RELIEF

**ART. 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE
FAILS TO PROVIDE A METHOD BY WHICH THE STATE
DETERMINES THE "DEATHWORTHINESS" OF THE
DEFENDANT.  THIS FAILURE ELIMINATES RATIONALITY
AND CONSISTENCY IN THE DECISION TO SEEK DEATH AND
VIOLATES THE DEFENDANT'S RIGHT TO EQUAL
PROTECTION AND DUE PROCESS AS SET OUT IN THE 5TH
AND 14TH AMENDMENT TO THE UNITED STATES
CONSTITUTION**

Under the Equal Protection principle announced by the Supreme Court in *Bush v.

Gore*, 531 U.S. 98 (2000), current Texas law is unconstitutional because it fails to set

forth uniform standards as to when a prosecutor should seek the death penalty in a

potentially capital case.  The intense reactions which greeted the Bush opinion in the fall

of 2000 notwithstanding, the Supreme Court's holding in that case is quite simple: when

fundamental rights are involved, the Equal Protection Clause of the Fourteenth

Amendment requires that there be "uniform" and "specific" standards to prevent the

arbitrary and disparate treatment of similarly situated people.  *Bush*, 531 U.S. at 106.

Because the Florida Supreme Court did not set forth such standards in its opinion

ordering a recount, but instead announced only that ballots should be counted according

to a vague "intent of the voter" standard, the recount would not respect the "equal dignity

owed to each voter."  *Id.* at 104.

The Texas death penalty system concerns a right even more fundamental than the right to vote, that is, the right to life.  As was true in the Florida recount, in Texas the lack of statewide standards to guide prosecutors in determining which cases warrant seeking the death penalty inevitably leads to the disparate treatment of similarly situated people accused of potentially capital offenses.  While the Supreme Court stated that its holding in Bush v. Gore was limited to the facts of that case, the principles it announced are sound and must be subject to respect as precedent.  Those principles require that the method used by prosecutors in deciding which defendants will face the death penalty should be subject to at least as much scrutiny as the process of counting votes.  The need for equality and non-arbitrariness when the state seeks to deprive a citizen of his life outweighs any benefits of unbridled prosecutorial discretion.

If anything, courts must require additional safeguards to ensure the equal treatment of all persons in the context of death penalty prosecutions than in that of an election recount.  Whereas the right to vote is "fundamental" because of historical trends and legislative decisions, the right to life that is at stake in Texas' system of capital punishment is the most fundamental of all rights, and accordingly is found in the very text of the United States Constitution.

In *Bush v. Gore*, the Supreme Court recognized that "the individual citizen has no federal constitutional right to vote for electors for the President of the United States." *Bush*, 531 U.S. at 104.  However, "[h]istory has favored the voter," and since every state

now chooses its electors through a statewide election, "the right to vote as the legislature has prescribed is fundamental."  Id.

In contrast to the implied Constitutional right to vote, the right to life is contained in the text of the Constitution.  The Fifth and Fourteenth Amendments provide that neither the federal government nor the states shall deprive any person of "life, liberty, or property" without due process of law.  U.S. Const. amend. V; amend. XIV, §1.  The Supreme Court has long recognized the fundamental nature of the right to life, particularly in the context of the death penalty.  See *Furman v. Georgia*, 408 U.S. 238, 359 (1972) ("because capital punishment deprives an individual of a fundamental right [i.e., the right to life], . . . the State needs a compelling interest to justify it").

Because the right to life is fundamental, when a state implements a death penalty system it must establish mechanisms to ensure that the system values the lives of all of its citizens equally. As the Supreme Court noted with respect to voting, "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush*, 531 U.S. at 104-05.  By the same reasoning, since the Constitution has ensured both the right to life and to the equal protection of the laws, a state may not, by arbitrary and disparate treatment, value one person's life over that of another.  In the brief period since Bush was handed down, several commentators have taken notice of this result; see Laurence Benner et. al., *Criminal Justice in the Supreme Court: An Analysis of United States Supreme Court*

*Criminal and Habeas Corpus Decisions* (October 2, 2000 - September 30, 2001), 38 Cal.

W. L. Rev. 87, 91 (forthcoming 2001) ("Certainly the *Bush v. Gore* equal protection

principle ought to be no less applicable when a state permits "disparate treatment" of

death eligible defendants because county prosecutors use differing standards for electing

which defendants they will seek to execute."); Michael P. Seng, *Commentary:*

*Reflections on when "We, the People" Kill*, 34 J. Marshall L. Rev. 713, 717 (2001)

("Certainly, if a state or its courts cannot arbitrarily dilute or deny a person's right to vote

because of the Equal Protection clause, then human life must also be given equal

protection."); Cass R. Sunstein, *Symposium:  Bush v. Gore:  Order without Law*, 68 U.

Chi. L. Rev. 737, 758 (2001) (noting that the *Bush* holding might require that "methods

be in place to ensure against the differential treatment of those subject to capital

punishment").

Texas' lack of standards to ensure non-arbitrary treatment with regard to the

fundamental right to life is enough in itself to establish an Equal Protection violation; a

showing of intentional discrimination against a protected class is not required. Bush, 531

U.S. at 106.  While in traditional claims of discrimination against individuals courts

require evidence of discriminatory intent by a state actor in that particular case, see, e.g.,

*McCleskey v. Kemp*, 481 U.S. 279 (1987), in Bush the Court did not require any such

showing.  Unlike these traditional Equal Protection claims of intentional discrimination

against a protected class, claims like this one and the one in Bush are not based on an

individual act of discrimination, but rather challenge a system in which unchecked official discretion makes arbitrary and unequal treatment inevitable.

The Texas death penalty prosecution system must be subject to the same Equal Protection constraints.  If the Equal Protection clause requires rules to ensure that localities do not treat "identical types of ballots used in identical brands of machines and exhibiting identical physical characteristics" differently, *Bush*, 531 U.S. at 134 (Souter, J., dissenting) (agreeing with per curium that the lack of standards for the statewide recount violated the Equal Protection Clause but disagreeing as to the proper remedy), then it must require rules to ensure that localities do not treat similarly situated offenders committing the same types of crimes differently with respect to their lives.  While the *Bush v. Gore* opinion declares that its "consideration is limited to the present circumstances," Id. at 109, suggesting that the principle announced might not apply to any other situations, the fundamental nature of the right to life requires that the principle also apply, as logically appropriate, to the death penalty system.

The per curium opinion in Bush explains the narrow scope of its holding by distinguishing the somewhat unusual situation of a court-ordered statewide recount from an ordinary election.  In ordinary elections, the Court says, the Equal Protection Clause does not prohibit counties from developing "different systems for implementing elections." *Bush*, 531 U.S. at 109.  One reason for this distinction is that once ballots have been cast, the "fact finder confronts a thing, not a person," and thus "[t]he search for

intent can be confined by specific rules designed to ensure uniform treatment." *Id.* at 106.

Also, individual counties may have "expertise" that justifies letting them choose their

own methods of conducting elections. *Id*. at 109.  Another explanation is that "local

variety (in voting machines and procedures) can be justified by concerns about cost, the

potential value of innovation, and so on" whereas a "different order of disparity" occurs

when, after ballots have been cast, physically identical ballots are hand-counted according

to different rules. *Id*. at 134 (Souter, J., dissenting).  Finally, of course, voting is different

than capital punishment, and arguably the differences between the two might justify

different constitutional analyses.

These explanations do not diminish the relevance of the Bush Equal Protection

rule to Texas' death penalty system, however.  Just as Florida counties can use different

voting machines in their elections, Texas counties can certainly have separate prosecutors

and can structure those prosecutors' offices differently; this allows the flexibility

demanded by limited budgets and justified by local expertise, and takes into account the

potential for innovation inherent in a system of local control.  With regard to the Court's

distinction between a "thing" and a "person," although it is true that prosecutors charged

with deciding when to seek the death penalty confront people and not things, this does not

diminish the Equal Protection Clause's requirement of non-arbitrariness.  While it might

be easier to design standards about whether to count "hanging chads" as legal votes, it is

certainly not impossible to write standards to guide prosecutors in the decision making

process with regards to when the death penalty should be sought.  See, e.g., United States Attorneys' Manual §9-10.010 et. seq. (1995) (laying out "federal protocol" for capital cases); U.S. Department of Justice, *The Federal Death Penalty System:  Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (2001) 6, http://www.usdoj.gov/dag/pubdoc/ deathpenaltystudy.htm.  It is true that elections and capital punishment are different, but the fact remains that both involve a fundamental right and therefore should be subject to the same "minimum requirement for non-arbitrary treatment," *Bush*, 531 U.S. at 105.  The Fourteenth Amendment protections required in an election recount do not derive from the candidates' right to have all the votes for them counted correctly, but from the "equal dignity owed to each voter," Id. at 104.  Surely the equal dignity owed to each person's life requires no less.

It is not necessary to imagine what disparities might result from a system wherein 254 local prosecutors each use different standards for determining whether to seek the death penalty; that is the system that exists in Texas today.  Texas law provides no standards to guide prosecutors in their decisions as to when to seek the death penalty; instead, prosecutors in each county make such decisions on their own, according to unwritten and widely varying standards.  The result is that whether a person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred and, even more disturbingly, the race of the victim. While under the *Bush* standard it is not necessary to show that a standardless system has,

or will have, a disparate or discriminatory impact, the evidence of such an impact in Texas underlines the arbitrariness inherent in such a system. Statewide standards would remedy this blatant violation of the Equal Protection Clause.

Current Texas law does not comply with the Equal Protection Clause's "minimum requirement for non-arbitrary treatment," *Bus*h, 531 U.S. at 105, because it contains no standards as to when local prosecutors should seek the death penalty in a potentially capital case. While the law contains provisions to limit the class of offenders eligible for the death penalty and allows for individualized sentencing determinations by juries, see Tex. Penal Code §19.03 (2000); Tex. Code Crim. Proc. art. 37.071 (2000), there are no standards to guide a prosecutor's decision whether or not to seek the death penalty. Tex. Code Crim. Proc. art. 37.071 (2000). The Texas statute's definition of capital murder narrows the class of those who are subject to the death penalty, but the statute does not indicate how local prosecutors are to distinguish among those defendants charged with murder to determine who should face a possible death sentence and who should not. Worse, Texas law does not even provide an "abstract proposition" or a "starting principle," *Bush*, 531 U.S. at 106, as to how local prosecutors ought to make these life-and-death decisions. In *Bush v. Gore*, the Florida Supreme Court had at least set forth a general principle regarding how the recount was to proceed. By contrast, Texas law does not provide any general principles to guide prosecutors in their decision as to when the death penalty should be sought.

The *Bush* Court surveyed examples of the kinds of disparities in vote-counting procedures that the lack of uniform standards created.  The examples were merely illustrative of the kinds of problems that would result from an Equal Protection Clause violation; a showing of inequality in the treatment of individual voters or protected classes of voters was not required to prove such a violation.

Texas' system, or lack of system, for determining who will face the death penalty creates levels of disparity and arbitrariness that dwarf the problems addressed by the Supreme Court in the Florida election recount.  As in the Florida recount, standards vary from county to county, and even within a county the standards may change dramatically when a new district attorney takes office.  Whether a life-and-death decision is made according to legally relevant criteria, financial considerations, moral judgments, or by whim is often impossible to determine, since there are generally no written standards for prosecutors to consult as a guide to making such a decision.  As longtime Harris County District Attorney John Holmes admitted, "The decision (whether to seek the death penalty) is mine unilaterally."  Armando Villafranca, *A Man of Conviction:  For Securing Death Penalty, Offering Blunt Views, Few Top District Attorney*, Houston Chronicle, November 29, 1998, LEXIS.  In other Texas counties, differing systems are used.  In Travis County, committees of assistant prosecutors assist the district attorney when making decisions in potentially capital cases.  Richard Willing, *Prosecutor Often Determines Which Way A Case Will Go*, USA Today, Monday, December 20, 1999, at

1A.  Meanwhile, in Dallas County, for many years the District Attorney's first assistant,
Norman Kinne, made the decisions himself.  Holly Becka, *Vance Retiring With Legacy Of
Helping Crime Victims; Attorneys Note Ethical Standards Set by DA, Assistant*, Dallas
Morning News, December 31, 1998, LEXIS.

When a District Attorney decides who will face the death penalty, the importance
of that person's personal philosophy should not be underestimated.  "Indeed, the
willingness of the local prosecutor to seek the death penalty seems to play by far the most
significant role in determining who will eventually be sentenced to death."  Richard
Willing and Gary Fields, *Geography of the Death Penalty*, USA Today, December 20,
1999, at 1A.  When John Holmes retired as District Attorney for Harris County, a debate
between the two candidates competing to succeed him revealed the utter lack of
consensus as to how life-and-death decisions should be made.  Chuck Rosenthal, Holmes'
hand-picked successor and the current District Attorney for Harris County, stated that the
county's system of seeking and obtaining death sentences (unilateral decision by the
D.A.) "works great."  Rosenthal's opponent Jim Dougherty, however, was more
circumspect.  Dougherty questioned both the eagerness with which the Harris County
District Attorney's office seeks the death penalty and the arbitrariness underlying that
decision, saying, "[w]e need to be conscious of the fact that there is great
disproportionality in the system" and that "[i]f you push hard enough you can get the
death penalty in most of these cases, but is that the right thing to do every time?"  Julie

Mason, *Candidates for D.A. Draw Differences; Pair Disagree on State's Death-Sentence System*, Houston Chronicle, October 26, 2000, LEXIS.

Indeed Harris County, with its lack of standards for determining which individual defendants will face death, provides the most glaring example of the resultant disparities in Texas' system.  The approach of District Attorneys Holmes and Rosenthal has been not to consider criteria such as the relative moral culpability of the defendant or the heinousness of the crime, but rather, as Rosenthal says, to seek the death penalty whenever prosecutors judge there is a "better than average chance" of a jury returning a death sentence.  Mike Tolson and Steve Brewer, *Harris County is a Pipeline to Death Row*, Houston Chronicle, February 2, 2001, LEXIS.  This approach has been roundly criticized, not only by defense attorneys and death penalty advocates but also by other prosecutors and judges.  As state District Judge Doug Shaver, himself a former prosecutor, said in regard to Harris County, "It seems to me that there are cases going through that are not necessarily death cases.  It is no longer reserved for the special cases it ought to be reserved for."  Id.   Former District Attorney Holmes acknowledged but dismissed the fact that different counties employ different standards in deciding whether or not to seek the death penalty; commenting, "I'd rather be tried for horse theft in Houston than in West Texas, where I'm going to get a harsher sentence, but what does that prove?"  Willing and Fields, *supra.*  What it proves is that when it comes to capital punishment, which, unlike horse theft, involves the fundamental right to life, the lack of

statewide standards as to when prosecutors should seek the death penalty has led to a system lacking the "minimum requirement for non-arbitrary treatment," *Bush,* 531 U.S. at 105, that the Equal Protection Clause commands.

As was the case in the Florida recount, the lack of standards in Texas' death penalty prosecution system leads to glaring disparities in the number of people sent to death row in different counties.  Just as the more lenient standards for counting ballots in Broward County as compared to Palm Beach County led to a "markedly disproportionate" number of new votes being discovered in Broward County, *Bush,* 531 U.S. at 107, the different standards employed by prosecutors in Texas' 254 counties leads to people being sentenced to death at rates markedly disproportionate to their counties' populations and murder rates.  For instance, in 1999 Harris County had 140 people on death row, while Dallas County, whose population is about two-thirds that of Harris County's, had only 37.  This is despite the fact that Dallas County's murder rate is higher than Harris County's.[9] Willing and Fields, *supra,* at 6A.  Indeed, if Dallas County and Bexar County were combined into one, they would have a population greater than Harris County's, but would have less than half the number of people on death row.[10]  While Harris County had 26%

---

[9] Harris County's average population from 1988 to 1997 was 2,857,978; Dallas County's was 1,917,501.  Harris County had a murder rate of 17.3 per 100,000; Dallas County's was 19.3 per 100,0000.  Statistics are from research conducted by USA Today.  Willing and Fields, *Geography of the Death Penalty*, USA Today, December 20, 1999, at 6A.

[10] Bexar County's average population from 1988 to 1997 was 1,245,209 and it had 29 inmates on death row in 1999.  Thus, Dallas and Bexar Counties combined had a population

of the state's murders from 1988-1997, it was responsible for 31% of the people on death

row in the state.  Dallas County, with 19% of the state's murders, was responsible for

contributing only 9% to the population on death row.  *Id.*  Meanwhile, 138 (more than

half) of Texas' 254 counties have never sentenced anyone to death.  Tolson and Brewer,

*supra.*

Even more disturbing than the differences among county prosecutors' approaches

to deciding whether to seek the death penalty are the racial disparities evident in those

decisions.  Researchers have concluded[11] that all other things being equal, a Texan who

murders a white person is twice as likely to be charged with capital murder than one who

murders a Hispanic person, and almost *five* times more likely to be charged with capital

murder than one who murders an African-American.[12]  Jonathan R. Sorensen and James

W. Marquart, *Prosecutorial And Jury Decision-Making in Post-Furman Texas Capital*

---

of 3,162,710 and 66 inmates on death row (compared to Harris County's population of less than 3 million and 140 death row inmates).  Willing and Fields, *supra,* at 6A.

[11] Sorensen and Marquart's study compared death-eligible arrestees to defendants charged with capital murder, excluding acquittals, from 1980 to 1988, in order to measure prosecutorial discretion.  Acquittals were excluded because there were very few of them. Thus, the defendants referred to as being charged with capital murder were also convicted. Sorensen and Marquart, *supra,* at 758.

[12] 25.8% of death-eligible offenders in white-victim cases were charged and convicted of capital murder, compared with just 5.6% of those in black-victim cases and 11.9% in Hispanic-victim cases.  Sorensen and Marquart, *supra,* at 764, Table 1.

*Cases*, 18 N.Y.U. Rev. L. & Soc. Change 743, 765 (1990/91).  Some legally relevant criteria also increase the chance that an offender will be charged with capital murder; for instance, those who commit murder-rapes and those who kill multiple people are more likely to be charged with capital murder than are other death-eligible offenders.[13]  Id. at 764-65.  The fact that a murder victim is white increases an offender's chance of being charged with capital murder *more* than if he is charged with multiple killings.[14]  *Id.*

Racial disparity is a problem not just in Texas, but across the nation.  A study by the General Accounting Office found that 82% of studies conducted nationwide reported that the race of the victim increased the likelihood that a defendant would be charged with capital murder or receive the death penalty.  That is, "those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks."  United States General Accounting Office, *Death Penalty Sentencing:  Research Indicates Pattern of Racial Disparities*, GDD-90-57, 5 (1990), www.gao.gov/docdblite/summary.  The "evidence for the race of the victim influence was stronger for the earlier stages of the judicial process (e.g., prosecutorial decision to charge defendant with a capital

---

[13] 56.6% of defendants in rape-murder cases were charged with capital murder, vs. 15.5% of those in robbery-murders and 12.4% of those in burglary-murders.  45.9% of defendants in multiple-victim cases were charged with capital murder, vs. 16% in single-victim cases.  Sorensen and Marquart, *supra*, at 764, Table 1.

[14] A defendant in a white-victim crime is 4.6 times as likely to be charged with capital murder as a defendant in a black-victim crime; a defendant in a multiple-victim crime is 2.86 times as likely to be charged as one in a single-victim crime.  See *supra* notes 4 and 5.

Page 71

offense, decision to proceed to trial rather than plea bargain) than in the later stages." *Id.*

It is evidence like this that has led the New Jersey Supreme Court to "strongly

recommend" that the state adopt "guidelines for use throughout the state by prosecutors in

determining the selection of capital cases." *State v. Koedatich*, 548 A.2d 939, 955

(1988); *State v. Marshall*, 613 A.2d 1059, 1112 (1992).  Guidelines would not only help

to ensure uniformity, but would "be able to screen out any possible effects of race or

socioeconomic status in the charging and selection process." *Marshall*, 613 A.2d at 1112.

The Bush Equal Protection principle makes such a system not just beneficial, but

constitutionally required.

The circumstances surrounding the 2000 Presidential election and the *Bush* ruling

were certainly unusual, but that cannot diminish the validity of the Court's reasoning or

its applicability to future cases.  The authority of our judicial system depends upon the

presumption that court rulings are based on principles rather than on the personal political

viewpoints of judges.  This is ensured by the principle of s*tare decisis*, which literally

means, "to stand by things decided."  Black's Law Dictionary, Seventh Edition, p. 1414

(1999).  *Stare decisis* ensures that there will be stability and predictability in the legal

system, and that decisions will be made according to law, not men.  As Robert Bork has

written:

> The requirement that the Court be principled arises from the resolution of
> the seeming anomaly of judicial supremacy in a democratic society.  If the
> judiciary really is supreme, able to rule when and as it sees fit, the society is
> not democratic . . . [I]t follows that the Court's power is legitimate only if it

> has and can demonstrate in reasoned opinions that it has a valid theory,
> derived from the Constitution . . . If it does not have such a theory, but
> merely imposes its own value choices . . . the Court violates the postulates
> of the Madisonian model that alone justifies its power.

Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 Indiana L.J. 1, 2-3 (1971).   To write off the Bush decision as a politically motivated anomaly or to consider its rule to be valid one day and not the next would undermine the very foundation upon which the judicial system depends.

Although some portions of the *Bush v. Gore* decision are vulnerable to criticism, its core Equal Protection holding is neither implausible nor unsupportable.   While many judges and commentators have questioned parts of the ruling, that criticism has focused solely on the Court's remedy.   *Bush*, 531 U.S. at 127 (Stevens, J., dissenting), 135 (Souter, J., dissenting), 143 (Ginsburg, J., dissenting), 147 (Breyer, J., dissenting); David A. Strauss, *Symposium:  Bush v. Gore:  What Were They Thinking?*, 68 U. Chi. L. Rev. 737 (2001); Cass R. Sunstein, *Order Without Law*, 68 U. Chi. L. Rev. 757 (2001).   As the per curium opinion noted, seven Justices were in agreement on the basic premise that the Florida Supreme Court's recount order violated the Equal Protection Clause because it lacked standards to ensure the non-arbitrary treatment of voters.   *Bush*, 531 U.S. at 111 (referring to Justices Souter and Breyer and the five Justices who signed the per curium opinion).   Similarly, even critics who lambasted the decision allowed that the Equal Protection reasoning in the opinion, while not dictated by the Court's prior precedents, was reasonable and even praiseworthy.   Thus, erstwhile critics commented that the

Court's interpretation of the Equal Protection clause "has considerable appeal," Sunstein, *supra*, at 773, and "can be seen both as an extension of the Warren Court's vision of democracy and as a logical implication of the view, seriously proposed a generation ago, that the Constitution limits the degree to which discretion can be vested in executive officials of both the state and federal governments." Strauss, *supra,* at 740. The closeness of the election and the political implications of the Court's decision do not mean that the principle upon which its ruling was based can be ignored.

To the extent that the Equal Protection principle in *Bush v. Gore* conflicts with the Court's declaration that the holding only applies to the particular circumstances of the 2000 Presidential election, the principle must take precedence. It is not only appropriate but wise for courts to limit their holdings to the facts of the particular case with which they are confronted. However, in a legal system based on precedent, a legal principle cannot be valid on one day and not the next. The reasoning of *Bush v. Gore*, like that of any of the Court's rulings, must apply to all other situations to which it logically extends. The Equal Protection Clause mandates that when a fundamental right is threatened, states must establish standards to ensure that localities do not treat its citizens in an arbitrarily disparate manner. Thus, Texas' death penalty prosecution scheme, which provides no standards to ensure the non-arbitrary treatment of capital offenders by prosecutors, is unconstitutional.

No argument for prosecutorial discretion can justify a system that contains no

safeguards to ensure that the lives of similarly situated offenders are treated with equal dignity. Because the right to life is fundamental, if Texas is to maintain such a system, its justifications for that system would have to pass strict scrutiny. *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (reversing an order to sterilize a felon because the law allowing for sterilization did not pass strict scrutiny, as it treated larceny and embezzlement differently despite their being essentially the same crime). In order to pass strict scrutiny, the state would have to show that allowing prosecutors the unbridled discretion to decide when to seek the death penalty is necessary to achieve a compelling governmental interest. Our constitutional structure does not bar courts from evaluating the Constitutionality of the system by which prosecutors decide whether or not to seek the death penalty. Neither do the arguments in favor of prosecutorial discretion that have been made over the years justify the arbitrary seeking of death.

The separation of powers doctrine does not bar courts from requiring some restraint on prosecutorial discretion. Courts can and do evaluate particular prosecutorial decisions for Equal Protection violations; see, e.g., *United States v. Armstrong*, 517 U.S. 456 (1996) (declining to allow discovery on defendant's selective prosecution claim but acknowledging that such discovery would be allowed if petitioner had shown that the Government declined to prosecute similarly situated persons of other races); *Wayte v. United States*, 470 U.S. 598 (1985) (reviewing the prosecution of a man for refusing to register with the Selective Service System under a "selective prosecution" Equal

Protection analysis); *United States v. Batchelder*, 442 U.S. 114, 125 (1979) (noting that while it is broad, prosecutorial discretion is nonetheless "subject to constitutional constraints"); *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1977) (same); *Oyler v. Boles*, 368 U.S. 448 (1962) (same); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (ordering the release of Chinese petitioners who were prosecuted and jailed for operating laundries without a permit while similarly situated Caucasian laundry operators were not prosecuted).  In selective-prosecution and vindictive prosecution cases, courts are deferential to prosecutorial decisions and require "clear evidence" to rebut the presumption that prosecutors have acted legally.  *Armstrong*, 517 U.S. at 464, quoting *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926).  Because of separation of powers concerns, courts refuse to force district attorneys and U.S. Attorneys to prosecute particular offenders, as doing so would "encroach on the prerogatives of another department of the Government." *United States v. Shaw*, 226 A.2d 366, 368 (1967); see also *Newman v. United States*, 382 F.2d 479 (1967); *United States v. Cox*, 342 F.2d 167 (1965).  However, "there is an enormous difference between, on the one hand, forcing a prosecutor to charge or stripping him of authority to charge and, on the other, regulating that authority . . ."  James Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 Harv. L. Rev. 1521, 1546 (1981).  This analysis is neither attacking a particular decision of an individual prosecutor as vindictive or selective, nor is it asking the courts to force prosecutors to file charges in particular cases.  Rather, it is alleging that the laws

of Texas violate the Equal Protection Clause by failing to establish standards by which

prosecutors are to decide whether to seek the death penalty in a potentially capital case.

"The law has long recognized the distinction between judicial usurpation of discretionary

authority and judicial review of the statutory and constitutional limits to that authority."

*Nader v. Saxbe*, 497 F.2d 676, n. 19 (1974).  After conducting such a review, courts can

only conclude that Texas' lack of a system to guide prosecutors in the decision whether

certain offenders will face the death penalty violates the Constitutional guarantee of equal

protection.

  As the Court noted in *Bush v. Gore*, despite the "limits on judicial authority"

imposed by the Constitution, when Constitutional violations are brought to the attention

of the courts, "it becomes our unsought responsibility to resolve the federal and

constitutional issues the judicial system has been forced to confront."  *Bush*, 531 U.S. at

111.  When faced with a Constitutional violation, courts cannot wait for the Legislature to

take action.

  The frequently cited reasons for allowing prosecutors broad discretion as to what

charges to bring cannot justify a system which allows some defendants' lives to be

arbitrarily valued less than others'.  Because of the fundamental nature of the right to life,

such rationale would have to pass strict scrutiny.  *Skinner v. Oklahoma*, 316 U.S. at 541.

The primary justification for judicial noninterference with prosecutorial decision making

is that judicial review of individual prosecutorial decisions would be difficult or

inefficient.  *Wayte v. United States*, 470 U.S. at 607.  One reason that courts may have

difficulty reviewing prosecutors' decisions as to whether to seek the death penalty is that

there are no clearly articulated, uniform standards by which those decisions are made.  If

such standards were in place, judicial review would be much more feasible.  Further, the

existence of statewide standards would not mean that courts would have to begin micro-

managing prosecutors' offices; they could remain fairly deferential to prosecutors'

decisions so long as prosecutors are able to justify their decisions according to the

standards.  See *Vorenberg, supra*, at 1546-47.  Concerns about the increased burden on

courts and prosecutors that could result from statewide standards cannot justify ignoring a

constitutional mandate.  Standards to guide a prosecutor's discretion as to when to seek

the death penalty would not constitute a mandatory death penalty, nor would they

completely eliminate a prosecutors' discretion or ability to consider the individual

circumstances of each case.  Statewide standards would simply provide "some assurance

that the rudimentary requirements of equal treatment and fundamental fairness are

satisfied." *Bush*, 531 U.S. at 109.

Other rationale for broad prosecutorial discretion are similarly unable to excuse the

disparities and arbitrariness of Texas' current system.  Such considerations as the need for

flexible use of prosecutorial resources based on changing enforcement priorities, or the

loss of deterrence which might result from revealing prosecutorial motives, are not

"compelling governmental interests" sufficient to overcome the need for non-arbitrariness

when the state decides whether to seek to take a defendant's life.  While such

considerations may justify broad discretion in the criminal justice system in general, they

are incapable of justification when life is at stake.  Allowing the decision whether to seek

the death penalty to be made based on an individual prosecutor's feeling that one

particular type of crime needs to be deterred more than another allows an unconstitutional

degree of arbitrariness, inconsistency and unpredictability.  Further, even if the reasons

for allowing broad prosecutorial discretion were "compelling" by themselves, they cannot

justify the risk that life-or-death decisions might be made on the basis of mere caprice or,

worse, racial prejudice.

Requiring standards to ensure that prosecutors do not, through the exercise of

unfettered discretion, arbitrarily value some peoples' lives more than others' would not

only ensure that the Texas death penalty system complies with the Equal Protection

clause, but would further the Eighth Amendment's mandate of reliability and consistency

in the imposition of the death penalty.  In 1972 the Supreme Court invalidated the death

penalty in part on the grounds that the standard less death penalty statutes then in effect

allowed the ultimate punishment to be applied "wantonly and freakishly," *Furman v.

Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring), and that in practice there

was no meaningful basis for distinguishing between the cases in which it was applied and

those in which it was not, id. at 313 (White, J., concurring).  Four years later, when the

court approved revised death penalty statutes, it held that state legislatures confronted

these problems by drafting statutes that provided the sentencer with guidance in

determining the appropriate sentence and narrowed the sentencer's discretion to impose

the death penalty. *Jurek v. Texas*, 428 U.S. 262, 270 (1976); *Gregg v. Georgia*, 428 U.S.

153, 195 (1976).   The new statutes did not, however, require states to provide standards

to guide prosecutors' decisions as to whether to seek the death penalty in the first place.

See Tex. Code Crim. Proc. art. 37.071 (2000). As Justice Brennan has pointed out,

> . . . discrimination and arbitrariness at an earlier point in the selection
> process nullify the value of later controls on the jury.  The selection process
> for the imposition of the death penalty does not begin at trial; it begins in
> the prosecutor's office.  His decision whether or not to seek capital
> punishment is no less important than the jury's.  Just like the jury, then,
> where death is the consequence, the prosecutor's "discretion must be
> suitably directed and limited so as to minimize the risk of wholly arbitrary
> and capricious action." . . . The prosecutor's choices are subject to no
> standards, no supervision, no controls whatever . . . if the price of
> prosecutorial independence is the freedom to impose death in an arbitrary,
> freakish, or discriminatory manner, it is a price the Eighth Amendment will
> not tolerate.

*DeGarmo v. Texas*, 474 U.S. 973, 975 (1985) (Brennan, J., dissenting from denial

of cert.).  If imposing the death penalty on a freakishly and randomly selected subset of

those who commit murder violated the Eighth Amendment, see *Furman*, then surely

allowing prosecutors to choose, without any standards whatsoever, what subset of those

accused of capital murder will face the death penalty is equally unconstitutional.

In light of the new Equal Protection analysis of *Bush v. Gore*, the Supreme Court's

previous approval of Texas' system for selecting which defendants should face the death

penalty must be revisited.  The Court has reasoned that such unbounded prosecutorial

discretion does not violate the Eighth Amendment because a prosecutor's decision not to seek the death penalty when the law allowed him to do so involved the "decision to afford an individual defendant mercy" rather than the unconstitutional decision to impose the death penalty on a "capriciously selected group of offenders." *Gregg*, 428 U.S. at 199. The decision to show a particular defendant mercy is an invalid reason for allowing prosecutorial discretion because, as noted by Justice Blackmun in his dissent in Furman, "the power to be lenient is the power to discriminate." *McCleskey*, 481 U.S. at 312. While statutes channeling the discretion of the jury can reduce the dangers of arbitrary jury decisions in a particular case, they cannot change the arbitrariness inherent in a system in which the decision of who will be chosen to face that sentencing jury is guided by nothing more than one person's personal philosophy.  Put another way, if local prosecutors decide to "afford mercy," that is, decline to seek the death penalty, based on vastly different standards, or racially discriminatory standards, or no standards at all, the resulting system  remains arbitrary and capricious, and thus, unconstitutional.  The insight of the *Bush v. Gore* Equal Protection reasoning is that arbitrariness can exist not just when an individual defendant (or ballot) is subjected to a judgment that is unguided by any standards, but also when an entire system lacks consistent standards so that defendants (or ballots) in each locality may be subjected to vastly differing penalties.

The evidence that individual prosecutors do, indeed, use vastly different standards to decide whether to seek the death penalty also requires a re-evaluation of the Supreme

Court's approval of unbounded prosecutorial discretion.  In a concurrence in *Gregg,* Justice White expanded on the reasons why he thought unbounded prosecutorial discretion did not violate the Eighth Amendment, writing that "absent facts to the contrary" he would not assume that prosecutors will "exercise [their] power in a standardless fashion." *Gregg*, 428 U.S. at 225 (White, J., concurring).  Justice White assumed that "the standards by which [prosecutors] decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and innocence.  Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong." *Id.*  In fact, as discussed above, under the current system many prosecutors do not seek the death penalty in every death-eligible case if they think that a jury would not return a death sentence.  Some decide not to seek the death penalty upon request by the victim's family, (see *Jury Process in Zamora Murder Trial to Start Jan. 20*, Dallas Morning News, December 6, 1997, LEXIS), or because the defendant hires an experienced defense attorney, (Texas Civil Rights Project, *The Death Penalty In Texas* 22 (2000), http://www. texascivilrightsproject.org), or, as discussed above, possibly because the victim of the crime is not white.  Taking into consideration all of these facts, the assumption that it is unnecessary to channel a prosecutors' discretion is illogical and misguided.

Noting the constitutional problems inherent in a system where prosecutors enjoy

unchecked freedom and widely varying standards when deciding whether to seek the

death penalty, the New Jersey Supreme Court has called for standards to "instill

uniformity in charging and prosecuting practices throughout the state." *State v. Marshall*,

613 A.2d at 1112.  That court acknowledged the fact that courts should not usurp the

decision-making function of prosecutors, but argued that in light of the "need to promote

uniformity in the administration of the death penalty," statewide standards were

warranted. *State v. Koedatich*, 548 A.2d at 955.  These recommendations were made on

the basis of the Eighth Amendment requirements of reliability and non-arbitrariness in

capital proceedings.  Combined with the Equal Protection Clauses' requirement that

standards be in place to ensure equality with regards to fundamental rights, such standards

are not simply advisable, they are constitutionally required.

*Bush v. Gore* was not the first time a court has held that a system in which

government officials have unbounded discretion is unconstitutional.  The Supreme Court

and federal appellate courts have found violations of the Fourteenth Amendment when

governments and governmental agencies have unlimited discretion to select among

qualified Petitioners for licenses and government benefits.  Those courts reasoned that

allowing governmental decision makers to make choices without any uniform standards

allows an intolerable amount of arbitrariness.  Although these cases have not been widely

followed, they provide further persuasive support for the Equal Protection holding in

Bush and for the necessity of some channeling of prosecutorial discretion in the Texas

death penalty system.

The Supreme Court held that a lack of standards in a scheme of issuing permits, and the arbitrary and discriminatory refusal to grant permits to one group when they were routinely granted to other groups, violates the Equal Protection clause. *Niemotko v. Maryland*, 340 U.S. 268, 273 (1951) (alternative holding).   In that case, a City Council refused to grant a permit to a group of Jehovah's Witnesses who wished to hold a meeting in a public park.  While that case also involved the First Amendment and a prior restraint on the freedom of speech and religion issues, id. at 271, the Court found that the complete discretion vested in the City Council as to whether to grant permits violated the Equal Protection clause.  The Fifth Circuit applied similar reasoning to a case not involving the First Amendment in *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964).   The city of Atlanta's system for granting liquor licenses was found to violate the Equal Protection clause because it operated under no standards, allowing the city to arbitrarily deny applications of eligible Petitioners.  *Id.* at 610.  The court rejected the city's argument that the Equal Protection requirement of non-arbitrary standards did not apply because liquor licenses are not protected rights or entitlements but rather a "privilege."  *Id.*  While "government bodies have great latitude in enacting reasonable standards," they do not have the latitude to make decisions "on the basis of uncontrolled discretion and whim" or "without any established standards."  *Hornsby v. Allen,* 330 F.2d 55, 55 (5th Cir. 1964) (denying petition for reh'g).  For the same reason, the problems of arbitrariness inherent

in a standardless system for choosing among "non-preference" Petitioners for public housing violated the Due Process Clause. *Holmes v. New York City Hous. Auth*., 398 F.2d 262 (1968).

As in these cases, where governmental decision makers had complete discretion as to which eligible Petitioners they would grant permits or accept into public housing, in the Texas death penalty prosecution system 254 individual county prosecutors have complete discretion as to which death-eligible defendants will face a possible death sentence and which will not. This standardless system allows for the arbitrary and inconsistent treatment of similarly situated defendants and is thus unconstitutional. Even if a prosecutor's decision not to seek the death penalty is a "privilege" of mercy granted to some capital defendants but not others, the decision whether to grant that privilege cannot be left to the unfettered discretion of 254 individual county prosecutors. Such a system allows for an unacceptable level of arbitrariness with life-or-death consequences. Of course, mandating that prosecutors seek the death penalty in any death-eligible case would not solve these problems. Such a mandate would not only mean a tremendous misuse of time and money, but would run afoul of the Eighth Amendment requirement of individualized consideration of each offender and the related prohibition against an "unduly harsh and unworkably rigid" mandatory death penalty statute. *Woodson v. North Carolina*, 428 U.S. 280, 293 (1976). While the reasoning in *Holmes* and Hornsby and the alternative holding in *Niemotko* have not been widely followed, their support for the

reasoning in *Bush v. Gore* reinforces its validity and underlines the fact that a system of unfettered discretion, like Texas' standardless system for deciding when to seek the death penalty in capital cases, violates the Equal Protection Clause.

WHEREFORE, Petitioner respectfully requests this Court to vacate the Petitioner's sentence of death and remand this case to the trial court for a new sentencing, or in the alternative set this matter for an evidentiary hearing.

Respectfully submitted this 28th day of December, 2012.


/s/   Donald vernay
Donald Vernay
1604 Golf Course Road SE
Rio Rancho, NM 87124
(505) 892 2766
Texas State Bar No. 24035581
minimal243@yahoo.com

Counsel for Travis Trevino Runnels

## STATEMENT OF COUNSEL

My name is Donald Vernay. I am an attorney licensed by the State of Texas and in this Court.  I am the attorney for the Petitioner. Because of the AEDPA time limitations imposed on filing this petition for writ of habeas corpus, I am unable to transmit this petition to Petitioner for his signature before filing.  I have reviewed the Petitioner's state court file and done as much investigation as time has allowed since my  appointment, and have  read the foregoing Petition for Writ of Habeas Corpus and based upon my investigation of this case said petition is true and correct, to the best of my knowledge and belief.

 /s/   Donald Vernay
Donald Vernay

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was filed electronically and also was mailed to the Petitioner at the following address:

Travis Trevino Runnels
Polunsky Unit
3872 Fm. 350 South
Livingston, TX 77351

/s/   Donald Vernay
Donald Vernay