# Exhibit G

# DELCARATION OF ALMA LAGARDA

1. My name is Alma Lagarda. I am over the age of 18 and otherwise competent to give this affidavit.

2. I am a staff attorney with Texas Defender Service ("TDS"). I was licensed to practice in Texas in November of 2006.

3. I joined TDS in January 2006 as the recipient of a two-year post-graduate fellowship from Reprieve. My two-year fellowship at TDS focused on providing assistance to appointed 11.071 counsel in state habeas proceedings. This assistance often took the form of discrete tasks such as summarizing the trial transcript, interviewing the client, and collecting social history documents. The goal was to help habeas counsel get started on their habeas investigation.

4. In May 2006, I spoke with Joe Marr Wilson about providing some assistance in the case of Travis Runnels, who had been sentenced to death in October of 2005. Specifically, I informed Mr. Wilson that summer interns would be able to assist with summarizing the trial transcript in Mr. Runnels' case. Mr. Wilson accepted the offer of assistance and provided a copy of the trial transcript. In November 2006, I provided a transcript summary to Mr. Runnels.

5. In January of 2007, I offered to interview Mr. Runnels at the TDCJ Polunsky Unit. The purpose of the interview was to gather preliminary information about Mr. Runnels' background that could potentially help with investigating Mr. Runnels' case.

6. At the time, I did not know whether Mr. Wilson had hired a fact or mitigation investigator in this case, so we believed that eliciting basic information from Mr. Runnels could potentially assist Mr. Wilson in identifying issues for investigation and seeking funding from the trial court for that purpose. Of particular concern was the fact that Mr. Runnels' had pleaded guilty to the offense of capital murder and that no witnesses were presented during the punishment phase of his capital trial.

7. I interviewed Mr. Runnels in February of 2007 and gathered basic information about his background, which I memorialized and provided to Mr. Wilson on March 30, 2007. The purpose of the memo was to provide a basis for developing a state habeas investigation plan.

8. The State's brief on direct appeal was filed on May 2, 2007, which put the deadline for filing Mr. Runnels' state habeas application on June 18, 2007. On

1

    June 18, Mr. Wilson filed a motion for extension of time to file the habeas application and requested 90 additional days, which the trial court granted.

9.  Around the time that Mr. Wilson sought a 90-day extension, he also asked whether I would be willing to conduct a mitigation investigation in Mr. Runnels' case. Ninety days is never a sufficient amount of time to conduct a mitigation investigation. However, after consulting with my supervising attorney at TDS, it was decided that because this was Mr. Runnels' first and only opportunity to raise any type of non-record claim, including a claim of ineffective assistance of counsel, and because Mr. Wilson had not conducted any type of mitigation investigation up to this time, I would conduct a limited mitigation investigation to help ascertain whether an IAC-at-punishment claim should be raised.

10.  In August of 2007, about one month before the deadline for filing the 11.071 application, I provided Mr. Wilson with an affidavit in support of a funding motion for a mitigation investigation. The only information I knew to include in the affidavit as a basis for a mitigation investigation was information I had obtained from Mr. Runnels during my interview of him in February 2007.

11.  I conducted interviews in Dallas, Texas from August 28, 2007 to September 4, 2007. I interviewed the following six people: Nancy Taylor Runnels (mother), Noel Runnels (father), Darmonica Runnels (brother), LaQueena Taylor (cousin), Joel Runnels, Jr. (cousin), and Lillie Taylor (maternal grandmother).

12.  I was in Amarillo from September 9, 2007 to September 17, 2007. During that time, I met with the mitigation investigator at trial, Kathy Garrison, and with the second chair attorney, Laura Hamilton. I recall learning that this was Ms. Hamilton's first death penalty case. I did not have the opportunity to talk to the first chair at trial, Jim Durham, as he had since passed away.

13.  As of September 9, 2007, Mr. Wilson had not obtained either of the trial attorneys' case files. When I met with Ms. Hamilton, I also picked up her files and delivered them to Mr. Wilson at his office later that week.

14.  Prior to my interviews in Dallas, two summer law students with TDS had traveled to Dallas in late July to locate witnesses. While in Dallas, the students located a few of Mr. Runnels' family members, whom I later interviewed during my trip to Dallas. The law students did not locate any family members outside of the people named above in paragraph 11.

15.  My witness interviews in Mr. Runnels' state habeas investigation consisted entirely of the two trips to Dallas and Amarillo described above. During my trip to Dallas and to Amarillo, I did not interview any teachers, friends, neighbors or

family members, other than the six people named in paragraph 11. I did not explore any medical or mental health issues in Travis' immediate or extended family, either by asking questions of them or by attempting to obtain medical records for them. I never sought releases of information, medical or otherwise, from family members. I did not meaningfully explore any medical or mental health issues in Travis, other than asking limited questions about Travis' childhood of the six people named in paragraph 11. While I obtained some social history records, I did not collect any of Travis' employment records, although I was aware based on my interview of him in February 2007 that as a teenager he worked at Lego Body Shop, McDonald's, Two Partners, Grayson Company, or RGIS. I did not attempt to locate any of Travis' former bosses or co-workers. I never interviewed or attempted to interview anyone who worked at or was incarcerated at the TDCJ Gurney, Robertson, or Clements Unit where Travis was incarcerated from 1997 to 2003 for aggravated robbery. I did not interview or attempt to interview anyone who worked at or who was incarcerated at the Dallas County Jail where Travis was incarcerated prior to his 1997 trial for aggravated robbery. I did not interview any co-defendants in the aggravated robbery case. I did not obtain the case files on any of Travis' prior offenses, either from the courts or from Travis' former attorneys. I did not attempt to speak with any of Travis' prior attorneys on the aggravated robbery offense. I did not interview anyone who had been incarcerated with Travis at the Potter County Jail from 2003 to 2005 where he was incarcerated on awaiting capital murder trial. I did not interview any witnesses to the capital murder offense.

16. Although I had identified additional family members who resided in Dallas outside the six people named in paragraph 11, there was simply not enough time to locate and interview them in my one trip to Dallas.

17. The extremely limited information I obtained in 2007 already suggested a need for a psychological evaluation. Specifically, there was evidence that Mr. Runnels had experienced academic difficulties in school and exhibited impulsive behavior from a very young age, as described in the affidavit of his cousin, LaQueena Taylor, who attended school with him. Ms. Taylor suspected that Travis had ADHD. While this information was only preliminary, I thought that a neuropsychological evaluation was warranted. I discussed the need for a neuropsychological evaluation briefly with Mr. Wilson at his office in Amarillo, but given the short amount of time he had to file an application, the focus at that time was on gathering affidavits from family members in support of a claim of ineffective assistance of counsel at the punishment phase.

18. Because I had conducted interviews of both family members and members of the trial team, Mr. Wilson asked that I draft the claim of ineffective assistance of

counsel at the punishment phase, which I did, under an extremely limited amount of time.

19. In 2011, Mr. Wilson called to notify me that the CCA had remanded Mr. Runnels' case to the trial court for a hearing on two of his claims, including the IAC-punishment claim. Mr. Wilson asked if I would assist with the evidentiary hearing.

20. After obtaining permission from my supervising attorney at TDS to assist Mr. Wilson, I notified him that I would assist but explained that additional time would be needed, at the very least to reestablish contact with the witnesses who provided affidavits in support of the 11.071 application. It was my understanding that time was not an issue and that Mr. Wilson would be requesting funds from the trial court for my assistance.

21. Prior to the hearing, I again discussed with Mr. Wilson the need for a neuropsychological evaluation. I specifically recall talking about the fact that no such evaluation had ever been conducted in Mr. Runnels' state habeas proceedings. Mr. Wilson asked if I could recommend an expert, but without having conducted a comprehensive mitigation investigation, I could not think of the appropriate kind of expert and evaluation to recommend at that time. I did not ask for referrals, and Mr. Wilson and I never discussed it again prior to the hearing.

22. In early September 2011, I emailed an updated CV to Mr. Wilson so that he could submit a funding motion for my work in preparation for the hearing. At this time, I notified Mr. Wilson that I would be able to travel to Dallas at the end of September to reestablish contact with witnesses. Shortly after sending my CV to Mr. Wilson, I received a collect call from Mr. Runnels at the Potter County Jail to notify me that his hearing had just taken place.

23. Prior to the call from Mr. Runnels, Mr. Wilson did not notify me that the hearing had been scheduled. I later emailed Mr. Wilson requesting to speak about this news. Sometime there after, Mr. Wilson called me and explained that the judge had set a hearing and would not have granted any requests for additional time. Mr. Wilson did not inform me whether he filed a motion for an extension of time, nor did he explain why he chose not to notify me about the hearing.

24. Based on our conversations, it was my understanding that I would be assisting Mr. Wilson in the location and preparation of witnesses for the hearing. It was also my understanding that he would retain an expert to evaluate Mr. Runnels. At the very least, I believed that information suggesting that Mr. Runnels' exhibited academic

4

problems in school and also displayed poor impulse control from a very young age would have been explored by a psychological expert prior to the hearing.

25. I was surprised that Mr. Wilson did not contact me to notify me about the hearing. I was further surprised to learn from Mr. Runnels that Mr. Wilson presented no witnesses at the hearing. At the very least, the witnesses that I interviewed in 2007 could have presented compelling mitigating information about Mr. Runnels' childhood that was neither presented nor discovered prior to Mr. Runnels' capital trial. Furthermore, some of the witnesses who were present at Mr. Runnels' capital trial would have testified that they left the courthouse because they were told they were no longer needed as witnesses, which would have seriously undermined the testimony presented at the evidentiary hearing that the witnesses left of their own accord.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| /s/ Alma Lagarda | 12/28/2012 |
| Signature | Date |

5