CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 MAR 15  PM 4: 48

DEPUTY CLERK_____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| TRAVIS TREVINO RUNNELS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No.  2:12-CV-0074-J-BB |
| WILLIAM STEPHENS, Director, | § | (death-penalty case) |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

### REPORT AND RECOMMENDATION
### ON PETITION FOR WRIT OF HABEAS CORPUS

Travis Trevino Runnels petitions the Court for a writ of habeas corpus challenging his conviction and death sentence out of Potter County, Texas. *State v. Runnels*, No. 48950-D (320th Dist. Ct., Potter Co., Tex. Oct. 28, 2005). He contends his conviction and sentence should be set aside because he received ineffective representation from trial counsel and state habeas counsel. He also raises several constitutional challenges to the Texas death penalty statute. For the reasons stated below, it is the opinion of the undersigned United States Magistrate Judge that the petition should be DENIED.

### I. PROCEDURAL HISTORY

After pleading guilty, Runnels was convicted and sentenced to death for the 2003 murder of Stanley Wiley, a civilian prison employee. Runnels killed Mr. Wiley while he (Runnels) was incarcerated in the penitentiary. Runnels filed a motion for new trial, which the trial court denied

after an evidentiary hearing. (19 RR 25).[1]  Direct appeal to the Texas Court of Criminal Appeals ("CCA") is automatic in death penalty cases, and in 2007, the CCA unanimously affirmed the conviction and death sentence in an unpublished opinion. *Runnels v. State*, No. AP-75,318, 2007 WL 2655682 (Tex. Crim. App. Sept. 12, 2007).  The Court takes the following recitation of facts from that opinion:

> Appellant did not enjoy working as a janitor at the prison boot factory. On the morning of the day of the murder, he expressed anger at the fact that he had not been transferred to being a barber as he had requested. He told fellow inmate Bud Williams that he was going to be "shipped one way or another" and that "he was going to kill someone." Appellant said that he would kill Wiley if Wiley said anything to him that morning. Appellant told another inmate, William Gilchrist, that he planned to hold the boot-factory plant manager hostage in the office after the other correctional officers had left. Finally, after appellant had arrived at the boot factory, he told fellow inmate Phillip Yow that he was going to do something.

> During the first shift at the boot factory, appellant approached Wiley, raised a knife, tilted Wiley's head back, and cut his throat. Appellant then wiped the knife with a white rag and walked back toward the trimming tables. When Yow later asked appellant why he had attacked Wiley, appellant said, "It could have been any offender or inmate, you know, as long as they was white." In response to Yow's explanation that appellant could get the death penalty if Wiley died, appellant responded, "A dead man can't talk."

> Wiley did die from the injury. It was later determined that the cut was a twenty-three centimeter long neck wound that transected the external carotid artery and the internal jugular vein and extended in depth to the spine. A medical examiner found that the force required to inflict the wound was "moderate to severe." Appellant was twenty-six years old when he committed the offense.

Runnels filed an application for habeas relief in the convicting court.  The trial judge entered findings of fact and conclusions of law recommending habeas relief be denied. (1 SHCR 297). The CCA held the application in abeyance, however, and ordered the trial court to conduct an evidentiary

---

[1] The 19-volume reporter's record of the trial is cited "RR," preceded by volume number and followed by page number. Likewise, the 2-volume trial court clerk's record is cited "CR," the 4-volume state habeas reporter's record is cited "SHRR," the state habeas clerk's record is cited "1 SHCR" and its supplement is cited "2 SHCR."  State trial exhibits are "SX."

hearing on an ineffective-assistance claim and on a claim that Runnels's guilty plea was involuntary. *Ex parte Runnels*, No. WR-46,226-02 (Tex. Crim. App. June 8, 2011) (remand order). The trial judge conducted the hearing, made supplemental findings of fact and conclusions of law, and again recommended that relief be denied. (2 SHCR 7). The CCA adopted both the initial and supplemental findings of fact and conclusions of law and denied relief. *Ex parte Runnels,* No. WR-46,226-02, 2012 WL 739257 (Tex. Crim. App. Mar. 7, 2012) (orig. proceeding).

Runnels filed his federal habeas corpus petition on December 28, 2012 ("Petition," doc. 17). Respondent filed its answer on July 8, 2013 ("Answer," doc. 30). At the Court's request, both parties filed supplemental briefs addressing the Supreme Court's opinion in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), which held that *Martinez v. Ryan*, 132 S. Ct. 1309 (2011) applies to Texas habeas petitioners. ("Reply," doc. 34; "Surreply," doc. 35). This petition is subject to the amendments of the Antiterrorism and Effective Death Penalty Act of 1996 in 28 U.S.C. § 2254(d) ("AEDPA"), and the Court will address the standard created by the AEDPA where specifically applicable to the issues.[2]

## II. CLAIMS RAISED

Runnels raises the following claims in the federal petition:

1.  The state court unreasonably denied his claim that trial counsel rendered ineffective assistance under *Wiggins v. Smith*, 539 U.S. 510 (2003). (Petition at 15-23).

2.  State habeas counsel rendered ineffective assistance in failing to obtain psychological testing and "meaningfully participate" in the evidentiary hearing ordered by the CCA. (Petition at 24-27).

3.  The Texas capital sentencing statute does not permit meaningful appellate

---

[2]Subsequent citations to § 2254 are to 28 U.S.C. § 2254.

review, in violation of the Eighth Amendment.  (Petition at 27-36).

4.  The Texas capital sentencing statute violates the Constitution in multiple ways.  (Petition at 36-42).

7.[3]  The Texas capital sentencing statute violates the Establishment Clause of the First Amendment.  (Petition at 42-45).

8.  The Texas death-penalty statute violates the Constitution by preventing jurors from knowing the effect of a hold-out juror at sentencing.  (Petition at 45-48).

9.  The Texas definition of mitigating evidence prevents the jury from considering all evidence relevant to mitigate the death sentence, such as the defendant's potential for rehabilitation.  (Petition at 48-58).

10.  The Texas statute violates Equal Protection and the Eighth Amendment by failing to set uniform standards for prosecutors in deciding whether to seek the death penalty in a capital case.  (Petition at 38-39, 58-86).

Respondent contends claim 2 and portions of claim 1 are unexhausted and procedurally barred.  He contends claims 3, 7, 8, 9, and most of claim 4 are procedurally barred because they were dismissed in state court as procedurally barred.  Respondent also asserts all of the claims lack merit. Runnels clarifies in his Reply that claim 2 is not a constitutional claim for relief, but an argument under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) to excuse any procedural default of claim 1 and to allow Runnels to develop and relitigate claim 1 in this Court.  (Reply at 3-4, 9).  Claims 1 and 2 will be addressed together.

### III. EFFECTIVE ASSISTANCE OF COUNSEL (CLAIMS 1 & 2)

Runnels's first claim for relief alleges trial counsel was ineffective.  Runnels first contends his trial counsel, Mr. Jim Durham, unreasonably limited or failed to conduct an adequate investigation into potentially mitigating evidence.  Specifically, he asserts the report of the trial

---

[3]Runnels's petition contains no fifth or sixth ground for relief. Respondent has combined claims 4 and 7 and renumbered them all as 1-7. For the sake of clarity, the Court will use the numbers that Runnels has assigned to his claims.

team's neuropsychologist, Richard Fulbright, should have indicated to Mr. Durham that more psychiatric testing was needed. Secondly, Runnels contends trial counsel Mr. Durham failed to formulate a viable mitigation strategy with the readily available evidence of Runnels's chaotic childhood, a history of misconduct at an extremely young age and diagnosed while Runnels was still a juvenile, and a complete lack of any attempt by family or institutions to provide help. (Petition at 20-23). In claim two, Runnels asserts state habeas counsel, Mr. Joe Marr Wilson, was ineffective in the manner he litigated the ineffective-assistance claim against Mr. Durham. (Petition at 24-27).

## A. Procedural Bar

Before state prisoners may seek federal habeas relief, they must first exhaust their available state remedies in order to give the state courts an opportunity to correct alleged violations of federal rights. *See* § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004). "[T]he petitioner must afford the state court a 'fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Johnson v. Cain*, 712 F.3d 227, 231 (5th Cir. 2013) (quoting *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004)). If a prisoner fails to exhaust a claim, it may be procedurally barred. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991).

Respondent contends the particular allegation regarding Mr. Durham's failure to obtain further psychiatric testing was not presented to the state court and is, therefore, procedurally barred. The Court disagrees. The state habeas application specifically asserted that Dr. Fulbright could not administer additional tests because of prison testing conditions. (1 SHCR 18). It further alleged that Dr. Fulbright's report, along with school and juvenile probation records, all contained information that would have prompted competent counsel to "further investigate some of the information

contained therein." (1 SHCR 16-19). The Court finds these allegations were sufficient to afford the state court a fair opportunity to apply the controlling legal principles to the facts bearing upon the assertion that Mr. Durham should have obtained more psychiatric testing. Claim one, alleging a failure to conduct an adequate mitigation investigation and a failure to present mitigation evidence, is exhausted.

### B. Factual Background

Prior to addressing the allegations of ineffectiveness against Mr. Durham and Mr. Wilson, the facts related to the prosecution and the post-conviction proceedings in this case are set out in some detail below.

#### 1. Pretrial

Stanley Wiley was murdered on January 29, 2003, and the district attorney filed a criminal complaint for the offense of murder. (1 CR 2). The State Counsel for Offenders was initially appointed to represent Runnels but sought to withdraw on the ground that they lacked experience and training in death penalty litigation. (1 CR 7). The trial judge granted the motion to withdraw in November of 2003. (1 CR 14). Runnels was indicted for capital murder several months later, in April of 2004. (1 CR 20). Jim Durham and Laura Hamilton were appointed as counsel on May 17, 2004. (1 CR 20, 24-25). About a month later, Kathy Garrison was appointed as the defense investigator. (1 CR 34). The trial court appointed a psychiatrist, Lisa Clayton, and a neuro-psychologist, Richard Fulbright, for the defense on December 21, 2004. (1 CR 68, 69). On September 6, 2005, the trial court granted Mr. Durham's request for the appointment of a third lawyer, Warren Clark, to act as a capital jury selection consultant. (1 CR 58; 2 RR 86-87). The record also indicates that Mr. Durham solicited assistance from a fourth attorney, Robert Hirschhorn,

to help prepare the juror questionnaire.  (2 RR 87).  The State had an open file policy by which defense counsel was permitted to look at everything in the State's file except the internal notes and memoranda of lawyers and in-house investigators.  (2 RR 12, 14-15).

The prison unit (Clements Unit) where the murder occurred did not want to house Runnels during trial.[4]  There was some difficulty in obtaining adequate housing facilities during pretrial and trial so that Runnels could have access to his counsel and experts.  (2 RR 25-27, 190).  Ultimately, Runnels was placed in the Potter County jail.  Some difficulties were encountered there because Runnels was considered a high risk inmate and jail standards required extra personnel any time he was moved from his cell.  (2 RR 35, 137-142).  Because of these conditions, Dr. Fulbright stated he could not administer all the tests he wanted; Runnels also told the trial judge there was an officer standing at the door, listening and making noise during testing.  (2 RR 130-32).

## 2. Trial

After three weeks of jury selection proceedings, the trial was scheduled to begin.  On the first day of trial, Runnels entered a guilty plea before the jury that had been assembled.  (15 RR 8).  The trial judge removed the jury, admonished Runnels about the consequences of a guilty plea, and received an affidavit from Runnels stating he had discussed the strategic and tactical aspects of his guilty plea with counsel and had freely and voluntarily entered it.  (15 RR 8-12).

The prosecution introduced evidence relevant to guilt and to the special punishment issues in one unified proceeding.  (15 RR 19-20, 246).  The State's "guilt" witnesses included seven inmates who had contact with Runnels on the day of the murder.  Their direct-examination testimony

---

[4] Runnels had been moved from the Clements Unit to another unit shortly after the murder, presumably for Runnels's safety so he would not be in contact with the victim's coworkers at the Clements Unit.

was that Runnels planned Wiley's murder because he was dissatisfied with his job assignment and Wiley's treatment of him. Their testimony was adequately summarized by the CCA on appeal and will not be repeated here. The testimony elicited by Mr. Durham during the cross-examination of these inmate witnesses, however, is important in the analysis of this ineffective assistance claim and is summarized below.

Bud Williams. Williams testified he was serving a fifty-five year sentence for sexual assault. He said jobs are important in prison and if a prisoner's supervisor gives him a hard time, he is an unhappy prisoner. (15 RR 68-69). Williams testified he had known Runnels for eight years and did not know him to be violent. (15 RR 77-78). He saw Runnels on an almost daily basis and had never seen him in a fight. People get in fights in prison every day, but Runnels was a peaceable person and a good prisoner and walked away from situations which could have resulted in a fight. (15 RR78-81).

William Gilchrist. Gilchrist testified he was serving a fifty-nine year sentence for aggravated robbery. He knew Runnels for about nine or ten months and trusted him. He never saw Runnels engage in violent acts or threats, and Runnels seemed to be a good prisoner. (15 RR 113-14). Gilchrist testified Runnels was in minimum custody, meaning the authorities considered him trustworthy and, as far as Gilchrist knew, Runnels did not have a history of violent acts. (15 RR 114).

Jimmy Jordan. Jordan testified he was serving a ninety-year sentence for aggravated robbery. He testified he had a lot of incidents during his twenty-one years in prison and had been disciplined for fighting many times. (15 RR 138, 155-56). Jordan also said he had been paroled but violated his parole. (15 RR 150-51). He testified about disciplinary procedures including solitary

confinement and the loss of privileges. (15 RR 141-42). Jordan, who was fifty-seven, had been in prison since the age of twenty-three and said he was more prone to take offense at that age and "do stupid stuff" than at fifty-seven. (15 RR 157). Jordan said that, during the three months he was at the Clements Unit, he had never seen Runnels involved in any fights or have words with anyone other than Wiley. (15 RR 157). He was transferred to another prison soon after the murder because he had an incident with some "Crip dudes." (15 RR 137-38).

William Elkins. Elkins testified he was serving a life sentence for aggravated rape. He had known Runnels off and on for five years, and Runnels always had a smile on his face and seemed like a great guy. (15 RR 166, 183). He said quite a bit of disagreement exists between inmates and their supervisors, and inmates who do not want to work cause problems for themselves. Elkins said he had gotten warnings in the past for not working. (15 RR 184). Elkins also said he was transferred to another unit after he gave statements about the murder because he had reported that a correctional officer put a note under his door that he alleged contained a racial slur and a death threat. (15 RR 185-90). After his transfer, Elkins said an incident occurred where a guard turned his back while another inmate rammed his (Elkins's) head into a wall. (15 RR 193-94). Elkins said he felt the threat in the note was real, and he was in fear when the guard turned his back after his head had been busted open. (15 RR 197-98). He also identified some people in the back of the courtroom as some of his supervisors. (15 RR 197).

Tony Irvine. Irvine testified he was serving time for two aggravated robberies, robbery, and obstruction. (15 RR 200). On direct examination, Irvine testified he was threatened about his testimony by a Crips gang member. (15 RR 200-03). On cross-examination, Irvine said Runnels did not threaten him nor try to escape after the incident, and he never had trouble with Runnels. He

did not really know Runnels and did not know if Runnels is a Crip gang member. (15 RR 213-14).

Eugene Johnson. Johnson testified he was serving ninety-nine years for murder and burglary of a habitation. He lived on the same unit as Runnels for about four years and, as far as he knew, Runnels was not a hardhead or troublemaker and that he (Johnson) never had any trouble with him. (15 RR 226-28). Johnson confirmed that, after the murder, Runnels was very calm and did not run. (15 RR 229-30).

Phillip Yow. Yow testified he was serving sixty years for injury to a child. He had known Runnels for several months and had never seen him fight with anybody. (15 RR 243). He said Runnels was compliant with officers' requests after the incident. (15 RR 245).

The State next presented testimony from the medical personnel at the prison as well as from Runnels's actual supervisor at the factory, Calvin Askins, who helped the victim walk to the infirmary. (16 RR 4, 10, 16, 19, 29-30). The State also called correctional officers who testified about the following disciplinary infractions Runnels committed before and after the murder: In 1999, Runnels hit a correctional officer in the jaw, and then ran into his cell and closed the door behind him. (16 RR 45). In May of 2003, four months after the murder, Runnels threw urine in a guard's face after she wrote him up for exposing himself. (16 RR 84-85). In June of 2004, Runnels threw feces at another correctional officer. (16 RR 92).

In November of 2003, Runnels threw a light bulb at Tonia Brown, a correctional officer who was delivering paperwork to him. The bulb broke apart and hit, but did not cut, the officer. (16 RR 54-56). On cross-examination, Mr. Durham had Brown explain the three levels of administrative segregation, the cell size, the conditions of administrative segregation and security measures, feeding procedures, the procedure for moving an inmate from his cell, the punishment available for rules

violations, types of property an inmate might have, the classification levels of general population

inmates, and the fact that inmates are reclassified every year on their birthdate. (16 RR 57-63, 65-

77). Brown admitted that sometimes "predicting what a person is going to do is highly improbable."

(16 RR 79). Brown explained the training that prison employees and correctional officers receive

to stay safe, including six weeks of pre-service training that includes proxemics, basic defense

tactics, and how to apply hand restraints and transport offenders. (16 RR 80-81). She described the

force-cell move team, which is a five-person team with special equipment that can remove a hostile

inmate from an area. (16 RR 82-83).

The State next presented testimony from an expert on prison violence. (16 RR 101). The

expert described the prison classification system, as well as the rewards and restrictions available.

(16 RR 104-109). Among other things, he stated that a person convicted of capital murder and

sentenced to life imprisonment would be classified as a G-3 for a minimum of ten years and be

housed with a cellmate, free to come and go unescorted to work, visitation, church, and medical

appointments. (16 RR 108). He testified there is no safe place in prison and that 138 prosecutable

murders had occurred inside Texas penitentiaries since 1984. (16 RR 118-19).

Finally, the jury received documents showing Runnels had been previously convicted under

an alias and placed on probation for the second-degree felony of burglary of a building in 1993. His

probation was revoked when he was convicted of another burglary in 1994. In 1997, he was

convicted of first-degree aggravated robbery with a deadly weapon and was serving a seventy-year

sentence for that crime when he murdered Wiley. (16 RR 137-42; SX 26, 27).

After the State rested on October 27, 2005, Mr. Durham informed the court he had one

witness who was teaching a class and could not arrive until later that day, one witness about whom

Mr. Durham wanted to confer, and additional witnesses "out of Dallas" that were subpoenaed for the following day. (16 RR 143-44). When the judge asked if the witness teaching a class could come earlier, Mr. Durham said he would find out. (16 RR 144). The record shows that the parties took a break and when they returned, Mr. Durham elected to rest without calling witnesses.[5] (16 RR 145-46). The following morning, he moved for an instructed verdict on the future dangerousness special issue, which motion was denied. (17 RR 3).

At final argument, the prosecutor stated there was no question of Runnels's guilt and that Runnels's actions demonstrated he would be a future danger despite the fact that inmates testified he had never been in any other fights. (17 RR 15-16). The prosecution emphasized Runnels's three prior convictions, his disciplinary infractions in prison, the planning, the lack of provocation, and the extent of the victim's injury. (17 RR 16-19). During his closing argument, Mr. Durham argued, among other things, that all murders are horrific, and he emphasized Runnels's decision to plead guilty and "bare his soul," saying, "The first act of contrition is admission." (17 RR 20, 24-26). Mr. Durham argued you cannot predict the future and asked the jury to hold the State to its burden of proof on future dangerousness. (17 RR 24-25, 27-28). He argued there was "not one word" from an expert that Runnels would be a future danger and that seven inmates, who testified in front of two full rows of correctional officers, all testified about Runnels's peaceable nature and non-violence. (17 RR 21-22, 24-26). Mr. Durham pointed out Runnels had no major incidents and never actually hurt or hit anyone while incarcerated until this murder. (17 RR 25-26). In rebuttal, the State argued an expert would not have added anything to the evidence and the jury could decide future

---

[5]There was a chambers conference before Mr. Durham rested the defense case in front of the jury. (1 SHCR 301, Finding No. 11).

dangerousness based on the cold-blooded nature of the crime, Runnels's prior convictions and unsuccessful probation, and his unwillingness to conform to prison rules. (17 RR 28-35).

### 3. Motion for New Trial

Appellate counsel, Don Schofield, moved for a new trial alleging there was no credible evidence to support the jury's answers to the statutory special issues. (2 CR 400). In support, Mr. Schofield provided an affidavit from Mr. Durham stating his belief that the State failed to offer sufficient proof of future dangerousness and that his motion for an instructed verdict was erroneously denied. (2 CR 404). At a November 19, 2006 hearing, Mr. Durham testified he felt the evidence of future dangerousness fell short of proof beyond a reasonable doubt because, while there was information that might or might not lead to that conclusion, there was no evidence of future probability, in terms of either a direct statement or an expert evaluation. (19 RR 23). Mr. Durham concluded his testimony by saying, "And that's a long way to say I was flying by the seat of [my] pants." (19 RR 23).[6] The trial court denied the motion for new trial. Mr. Durham, who had been licensed to practice law in 1966, died on November 19, 2006, about a year after the hearing. (1 SHCR 207).

### 4. State Habeas Proceedings

Mr. Joe Marr Wilson filed the state habeas application about a year after Mr. Durham's death. Mr. Wilson alleged Mr. Durham rendered ineffective assistance at trial because his decision not to present punishment-phase evidence was based on an inadequate mitigation investigation. (1 SHCR 5-31). Mr. Wilson acknowledged that trial counsel had subpoenaed Nancy Taylor (Runnels's

---

[6]As discussed below, the Court interprets this statement as a reference to the fact that a witness or witnesses Mr. Durham anticipated calling to testify at punishment had left the courthouse without telling him.

mother), Lillie Mae Taylor (Runnels's grandmother), Carol Roark (custodian of records for the Dallas Morning News), and Dr. Keith Price (penologist and former Warden of the Clements Unit). (1 SHCR 7). He also asserted that Nancy Taylor, Lillie Mae Taylor, and Keith Price appeared at the trial on October 27th but were never called. Mr. Wilson alleged Mr. Durham abandoned his intent to present evidence about the 1910 lynching of Runnels's great-great-grandfather because Mr. Durham discovered, on the day of trial, that Lillie Mae Taylor disclosed she could not say Runnels knew about the lynching. (1 SHCR 6-15). Mr. Wilson alleged Mr. Durham unreasonably limited his investigation into Runnels's education, mental health, and family and overlooked evidence of Runnels's troubled childhood. (1 SHCR 16-26). He concluded that if Mr. Durham had conducted the proper mitigation investigation, the decision whether to present mitigation evidence would not have relied entirely on the potential testimony of one witness (Lillie Mae Taylor), whom, he contended, Mr. Durham had not adequately prepared. (1 SHCR 30-31). The state application was supported by affidavits from Runnels, his older brother Darmonica, his mother Nancy, grandmother Lillie Mae, and his cousins LaQueena Garcia and Joel Runnels, Jr. Their affidavits are summarized below.[7]

Nancy Taylor (Runnels's mother). Nancy Taylor dropped out of high school when she became pregnant with Darmonica. She was divorced from her husband when she became pregnant with petitioner Runnels, but she and her estranged spouse lived together until Runnels was about ten years old. Petitioner Runnels was a funny, happy-going kid and was always laughing or smiling. As a child he did not talk right and spoke fast like he was tongue-tied. At the age of ten, he would do funny things like run into the wall with his head. He did not do well in school and may have been

---

[7]These summarizations include the words and expressions used by the various affiants, to the extent possible.

dyslexic; he did not follow directions and had to be asked several times to do something. He was picked on in elementary school; he collected comic books and enjoyed baseball. He was always restless, and his grandmother once had to tie him to a chair. Nancy Taylor dated a man named Keith until Runnels was about fifteen years old. During this time, Nancy and Runnels, but not Darmonica, lived with Keith's parents. Keith was incarcerated at least once. Keith was controlling, possessive and abusive, and Runnels would try to protect his mother. Keith once choked Nancy, then started choking Runnels, until Runnels managed to run away and call the police. Keith abused and stole from his own mother, and stole from Nancy to buy crack cocaine. Nancy liked to drink and her sons would tease her about losing control. She would "whoop" her sons with belts or switches on their legs and she hit them with her fist on their chest or back. The defense investigator, Kathy Garrison, spoke to Nancy, Lillie Mae, and Darmonica in person. According to Nancy, if anyone would have interviewed her at length about her son's childhood, she would have told them everything she later stated in her affidavit. Nancy was subpoenaed for trial and was also served with Darmonica's subpoena. Garrison definitely wanted Lillie Mae to be at trial, so Nancy and Lillie Mae drove to Amarillo from Dallas with Runnels's father, Noel. Nancy Taylor waited at the courthouse with Lillie Mae Taylor, thinking she would testify, but either Garrison or the defense lawyer told them they would not be needed after all, so they went home. (1 SHCR 151-54.)

Lillie Mae Taylor (Runnels's grandmother). Lillie Mae Taylor was raised in Dallas during segregation. Petitioner Runnels was not a bad kid but got into all kinds of trouble because he played around and ran into things. Once, he ran into a fence and busted his lip, another time he ran into a beehive and was stung; the kind of things he would get into made her laugh sometimes. He was very playful and liked to play and joke and could not stay in one place. His school grades were not too

good; Runnels was not fond of school, and he did not have many school friends when he was young.

Sometimes, she thought Runnels did not really understand what she was talking about, even though

he would always say, "uh huh" or "yeah." Nancy paid more attention to Darmonica because he had

sickle cell anemia. Runnels did not get along too well with his father, but he was not around very

much. Runnels also did not like his mother's husband, Keith, because Keith would hit her. Runnels

would spend the night at Lillie Mae's house to avoid Keith, and Lillie Mae's husband would take

Runnels to school in the morning. Once, Runnels called the police on Keith. Keith was "just crazy,"

and Lillie Mae guessed something happened to him when he was in the military. Lillie Mae and her

husband would give Runnels "whoopings" with a belt. Lillie Mae's brother was killed in a

confrontation with the police when Runnels was in elementary school. Lillie Mae's grandfather,

sixty-eight year-old Allen Brooks, was lynched by a mob in downtown Dallas in 1910. Lillie Mae

went to Runnels's trial with Runnels's mother and father and waited outside the courtroom. They

spent the night in Amarillo and came back to court the next day, but no one ever called them to

testify. One of the attorneys told them the trial was over and they would not need to testify. She met

Runnels's attorney for the first time at the trial and never talked to anyone before that. (1 SHCR

156-57).

Darmonica Runnels (Runnels's brother). Darmonica and Runnels grew up in South Dallas

"where violence was the norm." They once passed a dead body in the street on the way to the bus

stop and saw police beat up people in the neighborhood many times. The police offered them

baseball cards and candy if they could give information about someone's whereabouts. He had a

great uncle, Horace, who had been in some kind of mental facility and was killed by police. Drugs

were prevalent in their neighborhood, and there would always be needles on the ground in back of

his great-grandmother's house. His mom's family was dysfunctional, violent, and always fighting. His mother's oldest brother, James, lived in his grandmother's house and was always drinking, getting high and acting out. When Runnels was thirteen or fourteen, James threatened him and Darmonica with a loaded rifle and shot the gun in the air. James took the kids riding around with him when he was drunk and once took them to a dope house where they witnessed a shooting. Another time, James threw a tire rim through the front door of the grandparent's house. Their mother, Nancy, liked to party all the time and drank a lot. Runnels never liked school, but their mother did not notice because she had her own problems. Their parents did not always live together, and he and Runnels went back and forth between their houses. At their dad's house, they were often left alone with their cousin Joel. Darmonica never lived with their mother's abusive husband, Keith, because he got along well with his father and stayed with him. Runnels would tell him that Keith was beating on their mom. Runnels lived with their dad for one or two years at most when he was a teenager, but he left because he was tired of all the whoopings. Darmonica said they would get whoopings with belts or switches that lasted five to ten minutes from their mom, dad, grandparents, and great-grandmother. Runnels got more whoopings because he acted out more and did not learn from mistakes. Darmonica misbehaved less, but also got away with more, because he knew how to be sneaky. Their parents did not keep up with their education and sometimes did not look at their report cards. Runnels was not that smart, did not care about school, did not read when he was young, and did not do homework. Darmonica also did not do homework, but he was an honor student and went to a magnet high school. He once won a mock trial competition and was invited to the state competition, but they did not have the money for him to go. Runnels ran head first into a flagpole in elementary school and knocked himself out. Runnels did things that did not make sense, like

kicking over a bag full of leaves they had raked up and then laughing about it. In high school, Runnels lived with Darmonica for a few months and burned the apartment down after leaving the skillet on; Runnels thought this was funny. Darmonica said Runnels "just played too much as a kid" and "never knew when to stop." He and his cousin Joel would beat up on Runnels because of this, and Runnels would never give up even though he was younger. Before trial, Darmonica met with the defense team probably two times, along with his mother, grandmother, and uncle. Runnels's lawyer and investigator came to Dallas about a week before trial and spoke with him and his mother. During these meetings, the investigator or lawyer would say that they wanted to know about Runnels's life, and he would answer whatever questions they asked. If they had asked, he would have told them everything stated in his affidavit. He did not testify at trial and was never served with a subpoena. (1 SHCR 145-49).

LaQueena Garcia (Runnels's cousin). LaQueena Garcia stated in her affidavit that she is two days younger than Runnels and was raised by their grandparents, Lillie Mae and James Taylor. Runnels lived around the corner with his mother Nancy and brother Darmonica. Their father, Noel, was not around much. She attended school with Runnels, who did not understand things and was always "trying to catch up." Runnels could never stay still in school and would wander off like he was distracted. He always had to have help with school work, and if he could not do something on his own, he would give up. His reading comprehension was off; he could not tell you what a story was about after he has read it. He copied his homework and guessed his way through exams. Eventually, he was retained, lost interest, and dropped out in ninth grade. Runnels often came to their grandparents' house to hang out. He usually spent the night and it was not a big deal because his mom was only a block away. Runnels was always back and forth. Runnels's mom dated a man

named Keith when Runnels was about ten or eleven. Runnels did not like him at all and would always stay at their grandparent's house. Runnels would tell their grandmother that Keith was hitting on his mom again and Nancy would have bruises on her arms. LaQueena believed Nancy was afraid to leave Keith. Nancy drank and partied a lot on the weekends. She went out all the time and Runnels would then come to their grandparent's house. Runnels was a playful child and thought everything was funny. Sometimes he was too playful and did not know when to stop. He always got into trouble for little stuff, like playing with his school supplies before school started. He was "whooped" with belts or switches, but the whoopings did not matter to Runnels and he repeatedly got into trouble. He would have to be told twice to do something. Their great uncle Horace was mentally slow and was killed by the police when they were in elementary school. Horace talked to himself a lot and it freaked them out. In ninth grade, Runnels started hanging out with kids who had been in the juvenile system and that was when his problems started. Nancy was not the kind of mother who would sit him down and give him a serious talk about the consequences of his behavior. LaQueena's grandparents did not drink or party, her grandmother stayed at home and her grandfather worked. Runnels, on the other hand, had one parent at a time, and his mom was gone every weekend. At their grandparents' house, Runnels was treated just like her, but he was not there all the time. No one ever interviewed her for Runnels's trial, and if they had, she would have told them everything she put in her affidavit. (1 SHCR 184-87).

 Joel Runnels, Jr. (Runnels's cousin). Joel Runnels, Jr. is two years older than Runnels and their fathers are identical twins. Joel grew up in Oklahoma and saw Runnels and Darmonica during the summers. Runnels was just a good kid with a big heart who wanted to help others and was usually happy and laughing. Otherwise, he was crying. Runnels joked around and acted out a lot,

and when he did something that got them all in trouble, he would "really get it" from Darmonica. Darmonica bullied Runnels and Runnels was always telling on them. Runnels did a lot of things to get into trouble, but he was also blamed for things he did not do. Runnels liked to play around but sometimes took it too far. Runnels also talked back. Runnels engaged in risky behavior and liked to take chances without thinking about the consequences. Once, he left Joel's younger brother tied to a tree with a "kid leash" during a family barbeque. Sometimes, Joel, Darmonica, and Runnels would take coins from Runnels's dad's piggy bank. He thinks no one ever taught Runnels about consequences or explained how to stay out of trouble and protect himself. Darmonica and Runnels grew up in South Dallas with a lot of crime and exposure to drugs and it was risky growing up there. Nancy was very caring and open, but was also nonchalant and unable to guide Runnels. No one ever interviewed him for Runnels's trial, but if they had, he would have told them everything stated in his affidavit. (1 SHCR 189-91).

Runnels. Petitioner Runnels stated in his affidavit that when Mr. Durham recommended he plead guilty, Mr. Durham told him the "real fight would be in showing a jury at the punishment phase that [he] had a good side and that [he] could be rehabilitated." Runnels provided Garrison the names of at least thirty family members and ten friends who could be character witnesses and he offered information about his upbringing and family history. (1 SHCR 160-61).

Based upon the affidavits summarized above, and the procedural and factual history of the trial, the state habeas judge (who was the same judge who presided over the trial) recommended the CCA deny relief. In his Findings of Fact and Conclusions of Law, the state trial judge summarized the mitigation investigation and evidence, addressed the appointment of a mental health expert, the amount of time spent by Mr. Durham, the decision for Runnels to plead guilty and discussed the

mitigation evidence developed in cross-examination. In Finding of Fact No. 11, the judge referenced defense counsel's meeting with the judge in chambers after the State rested and counsel's reasons not to present witnesses. The judge determined that Mr. Durham's decision not to present testimony was sound trial strategy. (Finding of Fact No. 11, 1 SHCR 297, 301). Although the CCA ultimately adopted the Findings of Fact, they did not do so until after they remanded the case for an evidentiary hearing. *Runnels*, No. WR-46,226-02 (Remand Order, June 8, 2011). The trial judge held a hearing at which co-counsel Hamilton and investigator Garrison were called to testify by the State. Following that hearing, the trial judge filed supplemental Findings of Fact and the CCA denied relief. The testimony of Ms. Hamilton and Ms. Garrison is summarized below.

Laura Hamilton (second chair trial counsel). Ms. Hamilton testified this was her first and only capital murder trial, although Mr. Durham had defended several capital murder defendants. (2 SHRR 24-25). The two of them discussed their strategy and felt that guilt was a foregone conclusion. The two agreed Runnels should plead guilty to garner sympathy and not incense the jury. (2 SHRR 9-10). They also thought a guilty plea might restrict the amount of evidence the State would present. (2 SHRR 27). They hired a psychiatrist and a psychologist who both tested Runnels, but they could not testify to anything favorable. (2 SHRR 10-12). The two discovered that Runnels had a unique family history that included the lynching of his great-grandfather and an uncle who had been shot by the police. They tried to figure out a way to show these things affected the person Runnels had become.[8] (2 SHRR 11, 32). Ultimately, however, Runnels grandmother did not think

---

[8] As will be discussed in the analysis below, Garrison discovered Runnels had taken an interest in Black history and slavery and had organized Black inmates to enact changes in the prison through violence and bloodshed. This damaging information, however, was never presented to the jury. But a reasonable defense attorney would have been prepared to meet this testimony and it appears that the great-grandfather's lynching and the police shooting of Uncle Horace may have been intended for this purpose. *See* 4 SHRR 51, 75 (email from Garrison noting Runnels's "inherent racism" because of being a southern Black family with a history, including at least "the two incidents").

the family history was known to Runnels and she had some issue with "airing this . . . dirty laundry." (1 SHRR 11). Co-counsel wanted some of Runnels's family to testify, however, and received from Runnels a list of family and friends who Garrison attempted to contact. (2 SHRR 10, 15-16).

The two also had a video recording, on the issue of future dangerousness, that was made by Vince Gonzales. Gonzales was not available to testify, however, and he recommended Keith Price as his replacement. Calling Price as a witness presented two potential problems. Price had been the warden of the prison unit when the murder occurred and may have been knowledgeable about the crime. Also, Price would have been able to sponsor "hundreds of pages of disciplinary action," including assaults, that had been kept from the jury. (2 SHRR 13-15, 28, 34; 15 RR 110). Garrison's testimony does not clearly identify anything specific, but her notes describe disciplinary incidents including a sex offense, gambling, extortion, and efforts to organize Black inmates to enact changes through violence and bloodshed, none of which were presented to the jury. (3 SHRR 66, 133-34, 169). Also, Mr. Durham had been successful in excluding over twenty disciplinary infractions from the jury's consideration, which are contained in State's trial exhibit 27a. (SX 27a; 16 RR 140-41).[9]

Ms. Hamilton further testified they had explored mental illness in the family, but nothing was helpful. Runnels had an uncle retired from the Navy, his father had owned a business and Darmonica was a mortgage broker. (2 SHRR 18). Initially, they were encouraged by the fact that

---

[9] Excluded infractions that occurred prior to the murder were refusal to work (three times), possession of contraband (a telephone speaker), sitting naked on the floor and disrupting operations, assaulting a correctional officer, refusing to leave the day room, refusing to submit to hand restraints, masturbating in public, setting fire to his mattress, kicking shut his cell door during a cell search, tampering with his cell restraint slot, exposing his penis (twice), and possession of gambling paraphernalia.

Excluded infractions that occurred in the year *after* the murder were possession of contraband (sandpaper), exposing his penis (three times), masturbating (three times), refusing to comply with a strip search, and refusing to submit to hand restraints. (SX 27a).

the uncle could testify, but then discovered some facts surrounding a visit to Japan that prevented them from calling him as a witness.[10]   (2 SHRR 18).   Other potential witnesses had criminal histories, were Runnels's co-defendants in other crimes, or were other inmates.  (2 SHRR 19).

Ms. Hamilton testified that Nancy, Noel, and Lillie Mae were at the courthouse for trial and met with them in Mr. Durham's office.  They told the family to be at the courthouse the next day, as they planned to call the grandmother and possibly the mother.  The grandmother had provided a more stable home for Runnels and could talk about the family history.  The father wanted to be in the courtroom to support Runnels, so they knew they would have an issue calling him as a witness.  Then, the grandmother backed out of her testimony and said she just did not think the family history really affected Runnels and did not know if he even knew about the lynching.  (2 SHRR 20).  When asked whether someone on the defense team should have known about this before that time, Ms. Hamilton replied, "Absolutely.  But I don't think that's what we were told."  (2 SHRR 32).  Nevertheless, Lillie Mae, Nancy, and Noel went to the courthouse the next day.  After the State rested and Garrison went to call them, however, she discovered they had left.  (2 SHRR 20-21).  When asked whether the witnesses were told to leave, Ms. Hamilton said she did not know that; all she knew was, when they went to call them, they were gone.  (2 SHRR 31).

Ms. Hamilton further stated that the person who could have testified to the pattern of abuse against their mother was Darmonica and he did not come to trial.  (2 SHRR 45).  When confronted with the information in Darmonica's affidavit, that he was never served with a subpoena, Ms. Hamilton explained that either the mother or grandmother said that the process server could serve

---

[10] Again, the testimony is unclear, but Garrison's notes shed some light on these events.  Runnels's uncle Ricky had wealthy Japanese friends who were interested in helping Runnels.  So Ricky planned a "vacation/change of environment/tutoring/exposure to a different lifestyle trip."  Ricky made plans for Runnels to live with his friends and attend school, but "socially it became a nightmare, and Travis was sent home early."  (4 SHRR 83).

everybody at their house. (2 SHRR 45-46).[11] Ms. Hamilton explained that she and Mr. Durham met with Darmonica in Dallas in 2005, and Garrison had met with him more than once and spoke with him many times. He did not have reliable transportation and was upset, possibly about how quickly he needed to be in Amarillo, and he did not accompany his family to court even though he had received a subpoena. (2 SHRR 21-22).

The defense wanted to present mental health experts Lisa Clayton and Richard Fulbright, as well as Runnels's family, and attempt to "humanize" Runnels but that strategy was "just not what was laid out" for them. (2 SHRR 16-17). In the end, counsel tried to develop some redeeming qualities about Petitioner through cross-examination. (2 SHRR 23, 41-42). When asked whether the defense could have tried to get the witnesses to come back, Ms. Hamilton said they could have, but there was also a lot of harm from testimony of Runnels's background because Darmonica did not turn out like Runnels. (2 SHRR 35). She believed they "absolutely" made a good decision not to call the witnesses they had. (2 SHRR 23).

Kathy Garrison (trial investigator). Ms. Garrison testified she had been a criminal defense investigator since 1989 and had worked on twenty to thirty capital murder cases, including writs of habeas corpus. (2 SHRR 52, 55). Her notes, totaling over six hundred pages, were admitted into evidence and are discussed below. (2 SHRR 72). Garrison testified the defense strategy at sentencing was to show that Runnels had had a pretty rough life, was poor, was shuffled back and forth between parents and grandparents and other family members, had trouble in school and disabilities that made it difficult to function, but that he could "make it" in prison on a life sentence.

---

[11] This comports with Nancy's affidavit and Runnels's assertion in his state writ application. (1 SHCR 7, 153). The state habeas application also contains a copy of Darmonica's subpoena with an officer's return dated October 26, 2005, the first day of trial. (1 SHCR 142-43).

(2 SHRR 54-55). They also had evidence of violence (presumably, the lynching and the police shooting), directed toward the family during the lifetimes of Runnels, Nancy, and Lillie Mae. (2 SHRR 54).

The contact information Runnels had provided to Garrison for his family was out of date. Nonetheless, Garrison eventually found Runnels's grandmother, Lillie Mae, by sending her a letter via Federal Express. (2 SHRR 56-57). After her initial meeting with the family, Garrison believed they would "step up to the plate," but she later had difficulty contacting the family. (2 SHRR 57-59, 70). Darmonica became angry when he received his subpoena because he had not had sufficient time, had car trouble, and "it was all unfair." (2 SHRR 59-60). They believed Darmonica could provide compelling testimony about their childhood, but he told them he would not show up. (2 SHRR 61). Another potential witness was Janet Levells, Nancy's friend and "adopted sister," who was very compassionate towards Runnels and had been to prison herself. But, she did not want to testify if Runnels was guilty. Ultimately, Levells said Runnels had taken the law into his own hands and would have to settle with God. (2 SHRR 61). It was never their intent to not put any evidence on; at the very least, they wanted Lillie Mae to testify and they hoped Darmonica, Noel, and Nancy would testify; they were all under subpoena. (2 SHRR 73-75, 81).

Garrison made efforts to locate potential witnesses and records, which are documented in her notes and discussed below. (2 SHRR 70-71). She spoke to ten or fifteen potential witnesses. Of these, Lillie Mae, Darmonica, Noel, and Nancy were potentially good witnesses. (2 SHRR 62). Lillie Mae, Nancy, and Noel rode together to the Amarillo courthouse for trial and met with the defense team to discuss their testimony. (2 SHRR 64, 68). The next day, Runnels's father, ignoring Garrison's advice, insisted on being in the courtroom "to be with his son." This was in violation of

The Rule and hindered his ability to testify. (2 SHRR 63). Garrison believed he did this because he did not want to testify. (2 SHRR 81). Runnels's mother would have testified about his birth, early life, the dissension between her and Noel, the "back and forth" living arrangements, her poverty, unemployment, drug use, and Runnels's disruptive, dysfunctional childhood. (2 SHRR 63). The grandmother would have testified about the mentally-ill uncle who was shot by police and the great-grandfather who was lynched. (2 SHRR 64-66). When Garrison went to find them in the hallway to testify, however, she discovered they had left. (2 SHRR 75). She telephoned them and discovered they were already out of town. They told her, "We can't do nothing for him now," and hung up. Garrison did not tell them they could leave nor, to her knowledge, did anyone else. (2 SHRR 67). Mr. Durham "wasn't very happy" about it, but Runnels "wasn't particularly surprised" and said, "That figures." Garrison had had several conversations with Runnels about her difficulty in contacting the family, and she knew his family had let him down in a prior case for which he had sought their help. (2 SHRR 69-70). Garrison believed the family members were afraid to testify and she wished she could have made them more comfortable, although she does not know what she could have done. (2 SHRR 68, 72, 81). She agreed a defendant's family members sometimes get "cold feet" when asked to testify because they are afraid they will be blamed. (2 SHRR 74). Garrison testified Mr. Durham believed he had been able to keep out some very damaging evidence, but he still wanted the jury to see that Runnels had a family who loved him and cared about him. (2 SHRR 78).

Garrison reviewed the family's affidavits (attached to the state writ application and summarized above) and said they contained essentially the same information the defense trial team knew and believed the family members would testify about. (2 SHRR 82). Garrison testified the

only incorrect statement in the affidavits was that somebody told the family members they could leave. Garrison added, "I don't know why you would want to leave anyway with your child here on trial." (2 SHRR 82-83). Garrison did not remember if counsel discussed seeking a continuance. (2 SHRR 76-77).

After the State's presentation of this testimony, habeas counsel Mr. Wilson made a record of the fact that he had sought a thirty-day continuance of the hearing date to obtain live testimony, which the judge had denied in order to meet the CCA's deadline. (2 SHRR 83). Mr. Wilson made a proffer of the live testimony he would have presented by reurging all the affidavits attached to the writ. (2 SHR 84-85). He acknowledged,

> I don't know their testimony would be substantially different. Obviously, we have one conflict that is now very apparent, that they're saying they were told to leave trial; people are saying they weren't. You know, I don't know even if that really becomes–becomes a big deal. That would be the only difference I believe from their affidavits. We might get more into that, as to who told them to leave, if they know.

(2 SHRR 85). Mr. Wilson also said he might offer an expert affidavit on mitigation, which would be more legal argument than evidence, and the court gave him leave to do that. (2 SHRR 85). Mr. Wilson also offered into evidence Mr. Durham's testimony from the motion for new trial. (2 SHRR 84).

The state habeas court then entered supplemental findings and conclusions, again recommending relief be denied. In particular, the court found that Lillie Mae, Nancy, and Noel appeared at the trial, but had departed by the time Garrison went to get them. The court also found that Garrison spoke to them on the telephone but they refused to return, saying they could not help Runnels. (2 SHCR 12). The court found that, once the family had departed, the defense decided the best strategy was to rest the case and rely on the mitigating potential of Runnels's guilty plea and the

mitigating facts developed through the cross-examination of the State's witnesses. (2 SHCR 12-13). The court concluded that Mr. Durham's decision not to present punishment evidence was not based on an inadequate mitigation investigation and that Runnels received effective assistance of counsel. (2 SHCR 13). The CCA adopted the supplemental findings of fact and conclusions of law as well as the initial findings and conclusions, and denied relief.

## C. Substantive Law for Ineffective-Assistance-of-Counsel Claims

The clearly established federal law governing claims of ineffective assistance of trial counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011). Under this well known standard, Runnels must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from counsel's deficiency. *See Strickland*, 466 U.S. at 688, 694. Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690)). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id.* at 196.

## D. AEDPA Standard of Review

When a federal habeas petitioner challenges a state court adjudication on the merits, the AEDPA bars relitigation of the claim in federal court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 785,

178 L.Ed.2d 624 (2011). This determination is limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d)(2); *Pinholster*, 563 U.S. at 181-82. These conditions are meant to be difficult to meet, but stop short of imposing a complete bar to the relitigation of claims rejected in state proceedings. *Richter*, 562 U.S. at 102, 131 S. Ct. at 786.

A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from relevant Supreme Court precedent and arrives at an different result. *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). A state court's application of law is "unreasonable" when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of a particular case. *Id.* at 901-02. The petitioner must show that the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103, 131 S. Ct. at 786-87. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102, 131 S. Ct. at 786; *White v. Woodall*, – U.S. –, 134. S. Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) (stating a merely wrong holding or even "clear error" will not suffice).

Factual "determinations" in a state court's decision are presumed correct and a petitioner bears the burden of rebutting them by clear and convincing evidence. § 2254(e)(1); *see Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." § 2254(d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1033, 154 L.Ed.2d 931 (2003). A "state-court factual

determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 134 S. Ct. at 15 (citing *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). The presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (quoting *Pondexter v. Dretke*, 346 F.3d 142 (5th Cir. 2003)).

### E. Habeas Counsel's Representation and *Martinez v. Ryan* (Claim 2)

In claim two, Runnels contends the AEDPA deferential standard should not apply. Runnels contends he is entitled to redevelop and relitigate claim one in federal court on the ground that state habeas counsel Mr. Wilson was ineffective. Runnels asserts Mr. Wilson ignored the recommendation of his investigator to obtain a psychiatric examination of Runnels and failed to present live testimony at the state habeas hearing. Runnels acknowledges § 2254(e)(2) would ordinarily preclude factual development but argues *Martinez v. Ryan* excuses any default and permits the district court to hold a hearing because Mr. Wilson rendered ineffective assistance by virtually abandoning him.[12]

*Martinez v. Ryan* created an exception to *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). *Martinez* held that the absence of counsel or ineffective assistance

---

[12]Section 2254(e)(2) provides:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

    (A) the claim relies on–
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

of counsel on initial collateral review could constitute cause to excuse a procedural default, *i.e.* failure to exhaust. In *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the court determined *Martinez* applied to states like Texas who, while not barring ineffective assistance claims on direct appellate review, did not afford litigants a meaningful opportunity to develop an ineffective assistance claim on direct review.

Neither *Martinez* or *Trevino* established a Sixth Amendment right to counsel on collateral review. Instead, those cases created what the Supreme Court classified as a "narrow exception" to *Coleman* if the claim of ineffective assistance of trial counsel was a "substantial" claim. *Trevino* at 1917-18.

Petitioner Runnels attempts to use *Martinez/Trevino* as an avenue to again present and/or redevelop the ineffective assistance of trial counsel claim asserted in Runnels's state habeas petition. Runnels's argument fails because:

(1)    there was no procedurally defaulted claim;

(2)    state habeas counsel was not ineffective; and

(3)    the claim Runnels classifies as not exhausted is not "substantial."

### 1. The *Martinez/Trevino* Exception Does Not Apply When There Is No Procedurally Defaulted Claim

The Court addressed this issue to some degree when it denied Runnels's motion for leave to amend and supplement his Petition (doc. 27). *Martinez/Trevino* does not apply to claims which were adjudicated on the merits. Instead, it applies only to procedurally defaulted ineffective assistance claims against trial counsel. Since there are no procedurally defaulted ineffective assistance claims in Runnels's federal petition, neither *Martinez* nor *Trevino* are applicable. *See Martinez*, 132 S. Ct. at 1320. Federal claim one (ineffective assistance of trial counsel) was adjudicated by the state court

on the merits and this federal district court's review is limited to the record that was before the state court. *See Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir. 2014) (concluding that *Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted); *see also Villanueva v. Stephens*, 619 F. App. 269, 275-76 (5th Cir. Jul. 21, 2015) (petition for certiorari filed). Accordingly, *Martinez* does not permit further development of Runnels's exhausted ineffective-assistance-of-counsel claim against Mr. Durham in this proceeding.

If Runnels is arguing he is asserting a new ineffective assistance claim that was not adjudicated and which is now procedurally barred, *i.e.* the failure to have additional psychological testing performed, his contention is without merit. Runnels's ineffective assistance claims in state court alleged ineffective assistance of trial counsel for unreasonably limiting or failing to conduct an adequate investigation into potentially mitigating evidence. As was previously stated in this Report and Recommendation, Dr. Fulbright's report was one of the grounds upon which state habeas counsel contended should have prompted trial counsel to "further investigate." Those allegations were sufficient to exhaust the ineffective assistance claim Runnels contends was procedurally defaulted. *See supra* p. 5.

## 2. Habeas Counsel Joe Marr Wilson Was Not Ineffective

Alternatively, and assuming for purposes of argument that *Martinez* were expanded to allow the factual development Runnels requests, it would not afford Runnels any relief because the record does not show state habeas counsel was ineffective. Mr. Wilson's investigator, Alma Lagarda, is now an attorney with the Texas Defender Service ("TDS"). She provided a declaration to federal habeas counsel about Mr. Wilson's performance. (Petition, Ex. G ). Lagarda stated that during her

fellowship with TDS and before she was licensed to practice law, she offered her services and the services of TDS summer interns to Mr. Wilson for the purpose of summarizing the trial transcript and gathering "preliminary information about Mr. Runnels's background." After the CCA remanded the case for a hearing (and Lagarda obtained her law license), Lagarda understood Mr. Wilson would request funds for her assistance at the hearing. She learned, after the fact, that the hearing had taken place without her assistance. In her declaration, Lagarda identified areas of investigation that she did not complete, stated there were people--unidentified--who she had not interviewed, and said that Mr. Wilson did not follow her recommendation to obtain a neuropsychological evaluation. (Petition, Ex. G). The respondent, citing *Pinholster*, argues Lagarda's affidavit may not be considered by this Court. The undersigned agrees. Lagarda's affidavit was not before the state habeas court and cannot be considered by this Court on Runnels's ineffective assistance of trial counsel claim against Mr. Durham. Consequently, the Court considers Lagarda's affidavit only in the alternative and in connection with Runnels's argument that *Martinez* allows him to further develop his ineffective assistance of trial counsel claim.

Lagarda's declaration does not indicate she found or anticipated finding any mitigating facts or psychological diagnoses different from what was known to habeas counsel or, for that matter, to trial counsel. In fact, Lagarda's affidavit does not address the mitigation evidence Ms. Garrison gathered, nor does it acknowledge the neuropsychological examination by Dr. Fulbright. Instead, the assertion that Mr. Wilson was ineffective rests on Lagarda's apparent assumption that habeas counsel must reinvestigate the case in its entirety, irrespective of the investigation which had been conducted by the trial team. Even at the trial level, however,

> the defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited

> time and resources. Just as counsel is not obliged to advance every available nonfrivolous argument, . . . so counsel is not necessarily ineffective for failing to investigate every conceivable matter [the] inquiry into which could be classified as nonfrivolous.

*Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) (citations omitted). Like trial counsel, state

habeas counsel is not obliged to investigate every conceivable, nonfrivolous matter that could be

raised on collateral review. The allegation that Mr. Wilson's representation fell outside the wide

range of reasonably competent habeas assistance must contain more than a laundry list of subject

areas or unnamed people that might have been investigated, without a showing of how the absence

of any additional information was prejudicial. Lagarda's affidavit does not demonstrate the habeas

investigation was deficient nor does it show to any degree the requisite prejudice.

Nor does Mr. Wilson's decision not to present live testimony from the family demonstrate

ineffective assistance. Complaints of uncalled witnesses are especially disfavored because the

presentation of testimonial evidence is a matter of trial strategy, and allegations of what a witness

would have stated are largely speculative. *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010).

To prevail on this type of claim, a petitioner must name the witness, demonstrate he was available

to testify and would have done so, set out the content of the proposed testimony, and show that the

testimony would have been favorable to a particular defense. *Alexander v. McCotter*, 775 F.2d 595,

602 (5th Cir. 1985). Although they provided affidavits to state habeas counsel Wilson, who

presented them for purposes of the trial-level ineffective assistance allegations against Mr. Durham,

the record before this Court contains no indication that Nancy Taylor, Lillie Mae Taylor, Darmonica

Runnels, LaQueena Garcia, or Joel Runnels would have appeared and testified *at the habeas

hearing*. Nor can the Court simply infer that their live testimony would have differed from their

affidavits in a way that benefits Runnels. In short, Runnels provides no evidence that the absence

of live witnesses was a result of ineffective habeas counsel or that it prejudiced him.

Further, the record indicates Mr. Wilson considered the potential importance of live testimony and moved for a continuance to obtain live testimony, which was denied. When no continuance was granted, Mr. Wilson made a proffer of what the testimony would have been by reurging the affidavits. (2 SHCR 4; 2 SHRR 84-85). In doing so, Mr. Wilson accomplished at least two things. He presented the evidence he is accused of not presenting to the state habeas court and he avoided subjecting the affiants to cross-examination. This Court may not second-guess counsel's decision in hindsight but reviews it under the circumstances facing counsel at the time the decision was made. *See Pinholster*, 563 U.S. at 189. Mr. Wilson certainly knew the habeas judge was the same judge who had presided over the trial and therefore was likely to have an independent recollection of the circumstances surrounding the family's leaving the trial based on his meeting with Mr. Durham in chambers. (1 SHCR 307); *Buxton v. Lynaugh*, 879 F.2d 140, 146 (5th Cir. 1989) (holding that such a judge is in a better position to make determinations regarding the facts and circumstances surrounding the trial than other courts on direct or collateral review). Mr. Wilson could have reasonably abandoned the presentation of live testimony on the belief that it would have been futile under the circumstances, that it would not have achieved any significant benefit, and that it would have simply resulted in an unfavorable credibility assessment of his witnesses. As it stands, Mr. Wilson's actions at least possibly preserved a complaint for future litigation. In death penalty cases, preservation of potential error is oftentimes more strategically advantageous than litigating an issue to completion.

With no evidence in the record that live testimony from the family would have improved Runnels's position, this Court, following *Strickland*, must presume Mr. Wilson's competence.

Moreover, the record fails to demonstrate prejudice, meaning a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's alleged unprofessional errors the result of the habeas proceeding would have been different. *Strickland*, 466 U.S. at 694.

Lastly, the claim, or the portion of the ineffective assistance claim which Runnels contends he should be allowed to further develop, *i.e.*, additional psychological testing, is not, for the reasons discussed previously, a "substantial" ineffective assistance claim.

Consequently, the Court finds *Martinez/Trevino* inapplicable since Runnels's ineffective assistance of trial counsel claims, and specifically, the asserted failure to adequately investigate mitigation evidence, were presented to the state courts, were exhausted and are not procedurally defaulted. Alternatively, the Court finds any expansion of *Martinez/Trevino* unwarranted because Runnels has not demonstrated state habeas counsel Mr. Wilson was ineffective, nor has he shown the claim he wishes to present to be "substantial."

The Court next turns to Runnels's contention that the state court adjudication of the ineffective assistance claim against Mr. Durham was unreasonable. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. It is not a *de novo* determination of whether Mr. Durham's performance fell below *Strickland*'s standard. *Id.* Instead, review is "doubly deferential," meaning the federal court takes a "highly deferential" look at counsel's performance through the "deferential lens of § 2254(d)." *Pinholster*, 563 U.S. at 190. Runnels must demonstrate it was necessarily unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of competence and (2) that he failed to undermine confidence in the jury's sentence of death. *Id.*

### F. Analysis

Runnels first contends the record "clearly shows a complete absence of any idea of how to conduct a mitigation investigation that would satisfy both *Wiggins . . .* and the ABA Guidelines." (Petition at 20). The objective standard of reasonable representation is defined by prevailing professional norms and, consequently, is necessarily a general standard. *See Bobby v. Van Hook*, 558 U.S. 4, 7, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (per curiam). Restatements of professional standards, such as the American Bar Association guidelines, are "only guides" to what is reasonable. They are properly considered only to the extent they describe the prevailing professional norms and standard practice, and are not so detailed that they "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 8-9 n.1. The Constitution imposes "one general requirement: that counsel make objectively reasonable choices." *Id.* at 9.

### 1. Mr. Durham's Mitigation Investigation

The state habeas record does not demonstrate Mr. Durham was ignorant about how to conduct a mitigation investigation. First, Mr. Durham had prior capital murder defense experience. Second, the investigator, Ms. Garrison, had significant experience in death penalty cases and provided over 600 pages of her notes and emails. (2 SHRR 52, 55, 78). The Court has reviewed these records extensively. (3 SHRR, 4 SHRR). They show Ms. Garrison investigated all aspects of the case, including Runnels's extended family and ancestors, their migration to Texas, their criminal history, their substance abuse history, and their history of mental illness. She sought Runnels's school records (through his home school district as well as the prison's Wyndham school district), Runnels's medical records (at two hospitals and one clinic), his juvenile file, his prison

records and disciplinary infractions, and his jail records. She obtained a 1993 psychological evaluation conducted by Dallas County Juvenile Probation that diagnosed Runnels with conduct disorder. That evaluation stated that Runnels's problems could be mediated if Runnels had family support, but that this was unlikely as he had been on his own for several years without family supervision.

Her notes further show Garrison interviewed Runnels for the first time on September 1, 2004 and several times thereafter. They spoke about his psychiatric history and placements, his criminal history under the alias "Frank Pope," the schools he attended, his employment history, his family tree, his sexual experiences, his past injuries, past "scam" lawsuits filed by his mother on his behalf, the lack of childhood abuse or sexual abuse, his drug use, hobbies, pets, church attendance, two suicide attempts, the people he writes to, the music he likes, his favorite books, his love of hunting and fishing, his talents in sports and art, his "great resentment" over the seventy-year aggravated robbery sentence he was serving, and the facts regarding the instant homicide. Runnels told Garrison he did not want his childhood used as an excuse for his behavior and justified the murder he had committed by saying his manhood was being trampled. Runnels told Garrison about his Uncle Joel, who worked as a "fence" and who was more of a father to him than his own dad, and about his brother, Darmonica, who was his "best friend–in the world." Runnels spoke about his parents' disciplinary methods and how his brother showed him how to commit burglaries. Garrison knew that Darmonica, now a mortgage broker, was on probation for "the same things that Runnels was in trouble for." Her notes describe the abuse of Runnels's mother by his stepfather, Keith, and their drug and alcohol use. Garrison screened a list of potential character witnesses that Runnels wanted to call, but her notes indicate there were a number of them that had criminal records. Ms. Garrison

wrote to trial counsel that "some of those people are going to hurt us."  The notes show Garrison spent time looking for about ten prison guards that Runnels believed could be helpful, but she had difficulty locating them with the minimal identifying information provided.

Garrison first met with Runnels's mother, brother, uncle, and grandmother on March 4, 2005. Her notes indicate his mother and brother were tearful and agreed to let Garrison read all the letters Runnels had written from prison; they believed the seventy-year sentence he was serving was "devastating" for him.  His grandmother indicated Runnels did not know how to express himself when he was young and did not understand when she asked him to do something.  Garrison learned about Uncle Ricky, who had sent Runnels to Japan and Thailand for passing all of his classes when he was sixteen years old.  In a follow up interview, the uncle said that Runnels had some trouble in Japan and was sent home early.  Ricky described Runnels as a social nightmare and a manipulator who, good looking and fairly bright, thought he could smile his way out of anything. He also said Darmonica helped Runnels abscond from a "three strikes" program.

Her notes reflect Garrison arranged for evaluations by a psychiatrist and a neuropsychologist; she investigated the *Atkins* bar to execution and other mental health defenses; she consulted a prison gang expert; and she investigated the victim's work and education history.  Garrison documented the file when information from the District Attorney, though voluminous, did not contain all the information the defense might need.  She researched prison classification and custody levels to discover why Runnels had access to factory knives.  She proposed defensive strategies early and continued to suggest strategies such as, what the effect of being locked up can do to the mind, the possibility that the victim was worse than the inmate (relying on the prison reform ruling in *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir. 1982)), organic mental problems related to impulsivity, the family's

history of officer-related violence, Darmonica's terminal illness and its effect on Runnels, the family's financial status and stability, the possible unfairness of Runnels's seventy-year sentence, the family's race relationships, and Runnels "being passed back and forth" between his grandmother and parents.

These notes, when considered together with Garrison's testimony, (2 SHRR 52-83), simply do not support Runnels's claim of a "complete absence of any idea of how to conduct a mitigation investigation." In fact, this evidence shows the opposite, that a thorough investigation into Runnels's background was conducted and evaluated relevant to the plausible options. *See Wiggins*, 539 U.S. at 524 (noting that bar guidelines suggest counsel consider medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences as potential mitigating topics). While Garrison was not solely a mitigation investigator, and also investigated the facts of the offense as well as potential defenses, she conducted a thorough mitigation investigation.

### 2. Mr. Durham's Mental Health Investigation

Runnels also contends that, had Mr. Durham "even taken the time to read" Dr. Fulbright's report, it would have spurred him to complete testing so they could have had a more complete picture of Runnels's mental makeup. (Petition at 21). Garrison's notes contain Dr. Fulbright's report, which states that Runnels had not received appropriate psychological services in school, in the juvenile detention system, or in prison. The report also states that prison conditions prevented Fulbright from testing Runnels for attention deficit disorder (ADHD) and from ascertaining three areas of higher-level executive functioning: "reasoning processes, his impulse control, and his ability to plan." (4

SHRR 167, 177).[13]  Dr. Fulbright concluded, however, that Runnels had essentially intact neuro-cognitive functioning and average intelligence. (4 SHRR 177).  And he stated, "One cannot assume that Mr. Runnels would *not* have attacked the guard [Wiley] if he had been given appropriate psychological services," and that ADHD "would *not* explain his violent behavior toward" Wiley. (4 SHRR 178) (emphasis added).  Furthermore, an email from Ms. Garrison indicates that the psychiatrist, Lisa Clayton, was likewise unable to help the defense "because of her findings." (4 SHRR 202).  Given the opinions of his experts and considering that Dr. Fulbright was able to provide a diagnosis, Mr. Durham could have reasonably decided it was fruitless to pursue further testing because the results would not have changed his defense strategy.  For example, if further testing revealed or substantiated poor impulse control, a prosecutorial argument could be made that such would show future dangerousness.  If further testing revealed good impulse control, then the facts of the murder could potentially be presented as more heinous.

*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533.  When counsel recognizes the possible mental health issues and the need for expert assistance and employs a defense expert, counsel is not ineffective for failing to canvass the field to find a more favorable expert. *See Dowthitt v. Johnson,* 230 F.3d 733, 747-48 (5th Cir. 2000), *overruled in part on other grounds, Lewis v. Thaler*, 701 F.3d 783, 790 (2012); *see also Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (concluding counsel was not deficient for failing to locate an expert who would conclude that Williams was retarded or suffered from mental illness).  Mr. Durham received opinions from two mental health experts whose qualifications are unchallenged

---

[13] All page citations to volumes 3 and 4 of SHRR are the .pdf page numbers, as Garrison's notes are not numbered.

and whose reports ultimately proved unhelpful. He was also in possession of 1993 evaluation diagnosing Runnels with conduct disorder and concluding he was "a difficult and challenging candidate for therapeutic change." (4 RR 115-16). The state court could have reasonably determined that Mr. Durham had an adequate basis to conclude that a mental health defense was not the best strategy, and to decide that additional testing for ADHD and "higher-level executive functioning" was unnecessary. *See Bell v. Thompson*, 545 U.S. 794, 810, 125 S.Ct. 2825, 2835, 162 L.Ed.2d 693 (2005) (acknowledging that counsel's investigation and reliance on experts adequately supported the chosen mitigation strategy to present evidence of defendant's good character and the capacity to adjust to prison, rather than evidence of mental illness); *Charles v. Stephens*, 736 F.3d 380, 391 (5th Cir. 2013) (holding that counsel is not ineffective for failing to obtain mental health records whose mitigating nature "was not altogether clear," and where counsel had reason to believe they would not be helpful or worse, harmful). Furthermore, as discussed in more detail below, Dr. Fulbright's report contained damaging information indicating Runnels lacked remorse, resisted institutionalization, and did not intend to go back to prison alive. Mr. Durham could have reasonably concluded that the risk of disclosure of this information outweighed any perceived benefits from a mental health defense.

### 3. Mr. Durham's Strategy

Runnels next contends the record shows a pattern of neglect or sheer inability to formulate a viable mitigation strategy with the available evidence of Runnels's chaotic childhood, early history of misconduct, and the complete lack of any attempt on the part of the family or institutions to provide him with needed help. (Petition at 20-21). The record reflects, however, that after receiving unhelpful reports from his experts, Mr. Durham intended to present evidence that Runnels had had

a rough life, was poor, was shuffled back and forth between parents and grandparents and other family members, had trouble in school and suffered disabilities that made it difficult to function, but that he could serve a life sentence in prison. The testimony of Ms. Hamilton and Ms. Garrison, as well as Garrison's notes, show Mr. Durham possessed the information Runnels now contends should have been presented to the jury. Unfortunately for Runnels, there is uncontradicted testimony that petitioner's brother, Darmonica, simply refused to appear at trial, and there is testimony that the rest of Runnels's family made themselves unavailable by exiting the courthouse and leaving Amarillo before they were called to testify. When Ms. Garrison called them and asked them to return, they told her they could not do anything for Runnels and hung up the phone.

While there was an issue argued by state habeas counsel as to whether Mr. Durham should have sought a continuance and writs of attachment for the departed family witnesses, it would not have been unreasonable for Mr. Durham to conclude their usefulness as potential mitigation witnesses had been seriously diminished by their patent lack of desire to assist Runnels, a fact which would have likely been brought up on cross-examination if they were somehow convinced to testify. *See Pinholster*, 563 U.S. at 196 (holding that federal habeas court is not required to simply give trial counsel the benefit of the doubt but to "affirmatively entertain the range of possible reasons" counsel may have had for proceeding as he did). Also, as Ms. Hamilton noted in her testimony, the benefits of the family's background testimony had to be balanced against the potential harm caused by the fact that Darmonica received a similar upbringing but did not "turn out that way." (2 SHRR 335). There is certainly no basis upon which to find trial counsel was ineffective for failing to anticipate Runnels's grandmother, mother, and father would leave the trial and be unavailable.

In now appears, in hindsight, that it might have been helpful to have the option of calling

Runnels's cousins, LaQueena and Joel, to testify after Runnels's family left the courthouse, but counsel could not have known in advance that the family members under subpoena would leave. Counsel's strategy was not deficient for failing to develop LaQueena and Joel as witnesses, as their testimony would have simply been cumulative of the same evidence counsel had been prepared to present through the absent family members. Judicial second-guessing is especially inappropriate under these circumstances where the argument essentially comes down to a matter of degrees. *See Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743).

### a. Lack of Testimony From Family Members

Runnels suggests the family left the courthouse because someone on the defense team told them they would not be needed to testify. The state court, however, specifically found otherwise, and that credibility determination is entitled to AEDPA deference on federal habeas review unless overcome by clear and convincing evidence. *See Summers v. Dretke*, 431 F.3d 861, 871 (5th Cir. 2005). There is no record evidence to overcome the state court's credibility finding. Instead, the evidence supports it.

A note dated March 5, 2005 in Ms. Garrison's file states that Runnels's family on his mother's side "are cooperative and willing to help him and us." (3 SHRR 158). On September 2, 2005, Ms. Garrison wrote that when she asked Runnels about family support and how best to approach his family, Runnels replied that his mother's side was irresponsible and that a face to face meeting was best. Ms. Garrison then told counsel she was willing to take "one more shot" with both sides of the family. (3 SHRR 355). On September 7, 2005, her notes indicate the "family seems to have some difficulty being available." (4 SHRR 31). On September 13, 2005 she states, "I doubt very seriously they will commit to much personal causation in our client's history." (4 SHRR 75).

On October 20, her notes reflect she set aside time to meet the family and called Noel, Nancy, Darmonica, and Lillie Mae but "received no response whatsoever." (4 SHRR 147). Ms. Garrison's notes next document that she spoke with Runnels's father on October 22, who told her to tell Runnels "he is coming." (4 SHRR 196). On October 25, the day before trial, Ms. Garrison called Lillie Mae, who confirmed that she was "quite sure" Nancy and Darmonica will be there, and maybe Janet (Levells). (4 SHRR 219). These notes indicate that the family's commitment vacillated over time. This observation coincides with Ms. Garrison's notes regarding her conversation with Uncle Ricky that Runnels had become unwelcome with the Runnels side of the family and had "alienated many members of his family on both sides." (4 SHRR 83). Further supporting the finding that the family left Runnels's trial of their own accord is Mr. Durham's testimony, at the motion for new trial hearing less than two months after the verdict, that he was "flying by the seat of [my] pants" at the time he moved for an instructed verdict. (19 RR 23).

The state court could have reasonably found that the affidavits of Nancy and Lillie Mae lacked credibility. First, it is clear Lillie Mae's affidavit is incorrect in the assertion that she never met with anyone on the defense team before the trial, since this conflicts with Ms. Garrison's notes as well as the affidavits of both Nancy and Darmonica. (1 SHCR 148, 153). Second, neither Lillie Mae nor Nancy identify the person who allegedly told them they could leave, nor do they elaborate in any way on what would have been a surprising, if not disappointing, development for a family who had driven all the way from Dallas to testify. If they had been willing to testify on Runnels's behalf, reason dictates they would have sought some explanation from counsel or, at a minimum, even if not needed as witnesses, would have stayed in the courtroom to watch what little remained of the trial and learn of the outcome. The fact that they left Amarillo entirely and hung up on Ms.

Garrison, refusing to return when she called them, supports the conclusion that, for whatever reason, they did not want to be available to testify. As Ms. Garrison suggested in her testimony refuting the family's allegation that they were told they could leave, it is difficult to imagine why a supportive family would ever leave their son's trial when closing arguments were imminent, even if they were told they could. (2 SHRR 83).

It is true that Runnels did not have the benefit of live testimony from Nancy or Lillie Mae at the state habeas hearing, but they also avoided potentially damaging cross-examination. These facts do not undermine the state court's credibility decision. The state habeas judge was the same judge who presided at trial. He stated in his initial findings (which were adopted by the CCA), that after the State rested its punishment case, he met with defense counsel in chambers to discuss their intentions. (1 SHCR 301). Such a judge is arguably in a better position to make determinations regarding the facts and circumstances surrounding the trial than courts of review. *See Buxton*, 879 F.2d at 146. Under these circumstances, the trial judge's finding that the affidavits of Nancy and Lillie Mae lacked credibility is a finding entitled to AEDPA deference. *See May v. Collins*, 955 F.2d 299, 310 (5th Cir. 1992) (holding under former version of statute that § 2254(d) does not preclude the federal court from presuming the correctness of findings made from a paper record, especially where the state habeas judge and trial judge are the same person). As previously noted, there is no suggestion in this record that live testimony from Nancy or Lillie Mae would have been any different from their affidavits.

After Runnels's family walked out, Mr. Durham was left with few alternative strategies regarding sentencing. The witnesses had been subpoenaed. He could have pursued writs of attachment and attempted to present their testimony at a later date, with possibly the same outcome

or, worse, end up with hostile witnesses on the stand. But a writ of attachment would not have overcome the problem with Runnels's father violating The Rule against observing trial testimony, nor with Lillie Mae, who had changed her story entirely by saying she did not know if Runnels even knew about the lynching in the family history. In the end, trial counsel Mr. Durham, during the middle of a trial and faced with having to make a tough trial decision, weighed the alternatives of trying to compel testimony of uncertain usefulness from the family who should not have left, and elected to rely on the guilty plea and the testimony he had elicited during cross-examination, in the hope the jury would agree that the State did not prove future dangerousness.

### b. Decision Not to Call Dr. Keith Price

Even after Runnels's family left, Mr. Durham could have called Dr. Keith Price on the issue of future dangerousness and prison security. The defense contacted Dr. Price when their chosen expert, Vince Gonzales, became unavailable and recommended Dr. Price in his stead. (2 SHRR 13-14). Ms. Garrison's notes indicate that Dr. Price had retired as warden of the unit where the murder occurred, was teaching at a university, and was not on the State's witness list. (4 SHRR 96). Dr. Price was subpoenaed. (1 SHCR 140). Any benefit from Price's testimony, however, had to be weighed against the significant possibility that, as the former warden, he might provide damaging information on cross-examination about the offense itself or about Runnels's behavior in prison. (3 SHRR 96). Dr. Price could have opened the door to damaging testimony including over twenty disciplinary infractions, the admission of which Mr. Durham had successfully prevented. (SX 27a; 16 RR 140-41).[14]

---

[14] There may also have been other damaging information the prosecution could have developed on cross-examination. Whether there was or not is not relevant. What is relevant is that defense counsel could not have known for sure what information the prosecution might have had available for cross-examination or impeachment.

It is likely Dr. Price, as warden, also knew about Runnels's efforts to organize African-American inmates and in any event, he could have been asked whether or not he was aware of Runnels's efforts. Ms. Garrison's notes indicate Runnels is "anti-TDCJ" and started reading literature in 2001 about Black history, slavery, and economics. Runnels's favorite book was "Breaking the Chains of Psychological Slavery," and according to Ms. Garrison, he has resisted institutionalization, is militant, and has organized Black inmates to use aggression, violence, and bloodshed to enact change. (3 SHRR 66, 101, 114, 134, 355). Her notes about Yow, an inmate who testified, state that Yow was in one of the groups on the yard when Runnels talked about violent change. (3 SHRR 169). In an email to counsel, Ms. Garrison stated, "There is an abundance of stuff for you guys to contend with in the TDCJ files. I can't really see any STG [security threat group] problems at the moment, but it is possible something may pop up. All these Black slavery letters, notes, etc. came from somewhere, and it appears Travis communicated to other O/Fs re his beliefs." (3 SHRR 134). Mr. Durham would certainly be justified in limiting the presentation of evidence in order to avoid "opening the door" to what could have painted an entirely different picture of the nature and motivation behind Wiley's murder.

As summarized above, Mr. Durham was able to elicit information on cross-examination that Runnels was truthful and not violent, that the authorities considered him trustworthy, that he was essentially no worse than any other inmate, that some prisoners mellow with age, that the murder was due to unique circumstances involving harassment from a man who was not his supervisor, that the prison employees received training to stay safe and the prison had restrictions to control him, and that predicting what a person is going to do in the future is highly improbable. It does not appear, therefore, that Dr. Price could have added much to the body of helpful evidence Mr. Durham had

presented and there was a genuine risk he could have provided harmful information.  Mr. Durham's

decision was not outside the wide range of reasonable decision-making.  *See Williams*, 125 F.3d at

278-79 (rejecting ineffective assistance claim where mitigating testimony would have been presented

by witnesses whose knowledge would have opened the door to more damaging evidence under

cross-examination).

### c.  Reliance on Cross-Examination

Runnels asserts that Mr. Durham's strategy of relying on cross-examination was undermined

by Mr. Durham's constant objections and attempts to impeach the credibility of those same inmate

witnesses.  The trial record does not support this characterization of the events.

At times, Mr. Durham impeached the inmates with prior inconsistent statements in which

they had originally denied knowledge of the murder.  This was obviously part of his attempt to show

that their testimony incriminating Runnels was coerced by prison officials after multiple

interrogations.  In fact, Mr. Durham would later argue that the attendance of correctional officers at

the trial during the inmates' testimony was meant to intimidate.  (17 RR 22).  At other times, Mr.

Durham's cross-examination elicited information about the serious offenses for which the inmates

were incarcerated, their parole violations, and their disciplinary infractions.  The Court interprets this

tactic as an attempt to show that, by comparison, Runnels was a good inmate or at least no worse

than any other, and that disciplinary infractions are common.  This supported Mr. Durham's closing

argument that Runnels "threw things" at the guards but "that probably will happen twenty times in

the next hour at the prisons in Texas" and does not justify taking a man's life.  (17 RR 26).  Mr.

Durham also repeatedly objected to the State's direct examination, making at least forty-seven

*sustained* objections for hearsay, leading questions, assuming facts not in evidence, and non-

responsive answers. Indeed, the trial court repeatedly instructed the prosecutor to stop leading his witnesses and eventually admonished him outside the presence of the jury. Far from being ineffective, Mr. Durham was successfully preventing the prosecution from helping its witnesses testify, which was especially necessary because they had all given prior statements inconsistent with their incriminating testimony. Further, not only are such objections by defense counsel in criminal prosecutions a common tactic, but such objections limit the evidence a witness may volunteer, can disrupt the flow of the prosecution's case, and are clearly a strategic tool. (15 RR 101, 108).

Mr. Durham's objections did not undermine the beneficial testimony he elicited on cross-examination regarding prison conditions, classification, and Runnels's history of non-violence. Mr. Durham's objections and attempts to impeach with prior inconsistent statements were designed to impugn the prosecution and the prison authorities rather than the witnesses themselves. Moreover, as often as not, juries expect counsel to object, and repeated objections can cause the witness or the prosecutor to lose their composure. While not favored by the Court, "talking" objections are used strategically to inform or make arguments for the benefit of the jury. Based on the foregoing, Mr. Durham's objections and attempts to impeach witnesses were not unreasonable trial strategy. *See United States v. Shetterly*, 971 F.2d 67, 75 (7th Cir. 1992) (holding that allegedly excessive objections were within the realm of counsel's trial strategies and tactics).

Given the multiple eyewitnesses to the murder and its after effects, Mr. Durham did not give up any viable defense when Runnels pleaded guilty. The defense conducted an extensive mitigation investigation. Counsel developed a strategy to show that Runnels grew up impoverished, was shuffled back and forth between grandparents and parents, and had disabilities that made school difficult, but that Runnels could successfully serve a life sentence. Counsel also knew the family

history of being subject to racial violence and violence at the hands of law enforcement. But the record also reveals that Runnels had a difficult relationship with his family and, for whatever reason, his family abandoned him at the courthouse. At that point, it was not unreasonable for counsel to rely upon the guilty plea in mitigation, arguing as he did that admission is the "first act of contrition." Further, it was not unreasonable for counsel to rely upon his cross-examination testimony of the State's witnesses to negate Runnels's future dangerousness rather than calling Dr. Price, whose cross-examination by the State could have been the proverbial double edged sword and painted a very different, radically violent image of Runnels as an inmate incapable of institutionalization. *See Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, C.J., dissenting) (dismissing the "current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation" because not all defendants are capable of rehabilitation and not all juries are susceptible to such a plea), *rev'd sub nom. Cullen v. Pinholster*, 563 U.S. 170 (2011).

### 4. Prejudice

Runnels concludes that there is no question that Mr. Durham's ineffective representation prejudiced his case. He makes no discrete argument as to how Mr. Durham's alleged errors prejudiced him, however. In deciding the question of prejudice under *Strickland,* this Court is required to determine whether it was necessarily unreasonable for the CCA to conclude that Runnels failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 563 U.S. at 190.

As previously stated, to prevail on a complaint of uncalled witnesses, a petitioner must demonstrate the uncalled witness was available to testify and would have done so. *Alexander*, 775 F.2d at 602. Runnels has failed to show that Noel, Nancy, Lillie Mae, Darmonica, LaQueena, or Joel would have testified. At most, their affidavits say they would have told counsel the information in

their affidavits or, in the case of Nancy and Lillie Mae, they "thought" they would testify. But they do not unequivocally say they would have testified at trial if called. (1 SHCR 148, 153, 157, 187, 192). In fact, their actions and behavior at the trial support the conclusion that Runnels's family would *not* have testified. Nancy, Noel, and Lillie Mae departed the courthouse during trial, and Darmonica became angry when he received his subpoena and told the defense team that he would not appear at trial. (1 SHCR 149; 2 SHRR 45, 60-61, 75). The Court has previously discussed LaQueena and Joel, who were not at the trial, and determined that Mr. Durham was not ineffective for not predicting the other family members would leave.

The body of evidence presented to the jury showed that Runnels murdered Mr. Wiley because he was irritated with his work assignment and felt hassled by Wiley, who was not his supervisor, to the point he intended to get himself transferred. It is important to note that Runnels's guilty plea caused the State to remove ten witnesses from its witness list. (15 RR 18, 109). The State also did not offer the contents of Runnels's written statement and a recorded telephone conversation between Runnels and prison personnel that had survived the defense's motion to suppress. (2 RR 100-08; SX 46). The trial court excluded three prior instances of Runnels's refusal to work and about nineteen additional infractions, and there was no evidence of Runnels's attempt to organize prisoners to use aggression and bloodshed to enact change. All of this evidence was available to the State, and if Mr. Durham had pressed a mitigation theme, it may well have triggered the State and opened the door for the presentation of such damaging information on these subjects through cross-examination or rebuttal.

Additionally, had Mr. Durham relied on a mental health defense, Dr. Fulbright's report (which would have been discoverable by the State under Texas Rule of Evidence 705), contained

many harmful details about Runnels's drug use, criminal history, "kind of wild" family life, violent personality, failure in school despite an average IQ, and apparent refusal to maintain legitimate employment. In fact, the report revealed the breadth of Runnels's misbehavior in prison, showing he was in administrative segregation for two years, and that he engaged in negative behavior when left alone with nothing to do, such as when he was segregated. The report also reflects Runnels's lack of remorse for Wiley's death and his belief it was justified, his refusal to accept responsibility for the robbery and sentence he was serving at the time of the murder, and his dislike of police and correctional officers. Most damaging of all, it contained statements Runnels made to Darmonica that he did not feel he could complete his robbery sentence, that he was not "going back to jail alive," that "there has got to be another way out," and that "these young white guys can play with your life because you are locked up." The jury could have learned all of this damaging information plus the fact that Runnels was so tired of prison, he had attempted suicide at least once. (4 SHRR 167-72). All of this is direct evidence that Runnels would have been a poor candidate for a life sentence and was likely to commit additional violent acts in prison. This evidence would have completely undermined any attempt to show Runnels could be safely incarcerated if spared the death penalty. In short, his resistance to institutionalization could have been made graphically plain.

While ADHD, poor impulse control, the lack of psychological care, and a dysfunctional childhood can be somewhat mitigating, these facts can also demonstrate a dangerous personality not likely to change. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1244 (2013) (concluding counsel's decision to not offer evidence of a defendant's troubled, impoverished, and disadvantaged background was reasonable because the evidence could suggest he was a product of his environment and therefore likely to be dangerous in the future). Life-long

problems offered to show a jury why the defendant committed an offense also tend to show the defendant's potential to repeat violent acts. They allow an easy response by the State that acceptance of such evidence as mitigation means no one would ever be held responsible because everyone has such "issues." Moreover, whatever mitigating impact this information may have had in this particular case would have been diminished by the fact that Dr. Fulbright did not believe the lack of psychological care or ADHD contributed to the murder and by the fact that Runnels rejected opportunities for help by getting expelled from an alternative school designed for students with behavior disorders and by absconding from a juvenile halfway house. (4 SHRR 169-70). The mitigation impact would have been further diluted because Darmonica was raised in the same environment but managed to make different choices. *See Guevara v. Stephens*, No. 13-7003, 2014 WL 3894303 at *5 (5th Cir. Aug. 11, 2014) (per curiam) (holding that any information about Guevara's difficult life in El Salvador would have been undermined by, among other things, his brother's clean record despite their shared childhood).

More importantly, the aggravating facts in this case are overwhelming. Runnels planned and committed a calculated, cold-blooded murder of a prison employee who gave him no provocation and who put up no defense to the attack, which Runnels committed from behind the victim's back, while the victim was simply doing his job. At the time, Runnels was already serving a lengthy prison sentence, had committed multiple previous assaults on prison personnel, and committed the murder merely because he did not get the work assignment he wanted. There was also evidence the murder was racially motivated. In sum, the evidence shows that another lengthy prison sentence would likely put more prison employees or other inmates at risk. Given these aggravating factors, Runnels asserted mitigation evidence is not so compelling as to undermine confidence in the

sentencing verdict.

Runnels fails to demonstrate that the CCA unreasonably rejected his claim of prejudice. This Court concludes not only that it was not unreasonable for the CCA to determine that Runnels failed to undermine confidence in the death sentence the jury handed down, but that nothing has been presented to meet that significant burden of showing the result of the trial would have been different. *See Simon v. Epps*, 394 F.App. 138, 148 (5th Cir. Sept. 7, 2010) (holding that state court reasonably found no *Strickland* prejudice based on aggravating factors, including the heinous nature of the crime, as well as the lesser degree of childhood abuse compared to those cases in which Supreme Court found prejudice).

### 5. Mr. Durham's Death

Finally, Runnels asserts that, given Ms. Hamilton's inexperience as second chair counsel, Mr. Durham's absence from the state habeas proceedings was a *per se* violation of his right to due process and confrontation. To the extent he is claiming Mr. Durham's absence from the habeas proceedings was a constitutional error cognizable on federal habeas, Runnels's argument fails. A claim regarding an alleged deficiency in the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself. *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995). As such, it does not present a ground for federal habeas relief. *Kinsel v. Cain*, 647 F.3d 265, 273-74 (5th Cir. 2011); *see also Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (holding that Fifth Circuit precedent makes clear that infirmities in state habeas proceedings do not constitute grounds for relief in federal court) (citing *Hallmark v. Johnson*, 118 F.3d 1073 (5th Cir. 1997)). To the extent Runnels may be claiming that Mr. Durham's absence through death rendered the state habeas court's ruling unreasonable under § 2254(d), he provides no authority for that claim. Ms.

Hamilton and Ms. Garrison were competent fact witnesses to describe the investigation they pursued on Runnels behalf and the strategies chosen, and Runnels does not show otherwise. If anything, Mr. Durham's absence from the habeas hearing benefitted petitioner Runnels because Mr. Durham was unable to defend himself against the allegations of ineffectiveness and/or incompetence.

While counsel has a duty to make a reasonable investigation, he is not required to present mitigating evidence at sentencing in every case. *Wiggins*, 539 U.S. at 533. Here, Mr. Durham conducted a reasonable mitigation investigation and formulated a strategy that was derailed when Runnels's family walked out or otherwise made themselves unavailable to testify. He conducted rigorous cross-examinations and made difficult strategic decisions about how to defend a man who murdered a prison employee while serving a seventy-year prison sentence, who had stated to more than one person that he could not accept prison, who could not be institutionalized, and who had actively sought to enact changes in prison through violence. Mr. Durham's decision to rely on his cross-examination to rebut future dangerousness, thus preventing the State from possibly introducing a significant body of harmful evidence on cross-examination or rebuttal, was reasonable strategy at the time. In fact, it is this Court's experience that effective defense counsel often try their cases through cross-examination rather than direct-examination to avoid the risk of opening the door to unfavorable facts. This Court may not, in hindsight, second guess Mr. Durham's strategy merely because alternative courses of action existed when Runnels's family became unavailable. *See Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011); *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (holding that the failure to present mitigating evidence, if based on well informed, strategic decisions, is well within the range of practical choices not to be second-guessed). Runnels has not demonstrated the state court was unreasonable in its conclusion that the lack of mitigation evidence

was not a product of ineffective representation.  The Court recommends claims 1 and 2 be denied.

## IV.  CONSTITUTIONAL CHALLENGES TO DEATH PENALTY STATUTE

In the remaining claims, Runnels raises various constitutional challenges to the Texas death penalty statute.  Respondent contends that claims 3, 7, 8, 9, and most of claim 4 are procedurally barred because they were procedurally barred in state court.  (Answer at 19).  The Court agrees.

### A.  Procedural Bar

The CCA found that, in addition to lacking merit, all of Runnels's challenges to the Texas death penalty statute were procedurally barred because they should have been raised on direct appeal or because they had been raised on appeal and were rejected.  *Runnels,* 2012 WL 739257, at *1 (citing *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989) and *Ex parte Acosta*, 672 S.W.2d 470 (Tex. Crim. App. 1984)).  Respondent's position that the claims which were procedurally barred in state court on the ground that they should have been, but were not, raised on direct appeal and are now procedurally barred in federal court is meritorious.  *See Swain v. Thaler*, 466 F.App. 393, 403-404 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 476 (2012)  (citing *Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007)).  Further, Runnels makes no argument to excuse the procedural default.  *See Coleman*, 501 U.S. at 750 (holding that where petitioner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner can demonstrate cause and prejudice).  Therefore, all the challenges to the Texas death penalty statute are procedurally barred except the prosecutorial discretion issue in claims 4 (based on the Eighth Amendment) and 10 (based on Equal Protection), which were adjudicated on the merits in the direct appeal.  *Runnels*, 2007 WL 2655682, at *12.

Even if Runnels could overcome the procedural default bar, the CCA's alternative holding

denying the claims on the merits was not an unreasonable application of clearly established federal law.  As discussed below, Runnels's defaulted claims seek to change existing law and/or establish a new rule of constitutional law.

## B.  Meaningful Appellate Review (Claim 3)

In claim three, Runnels asserts the Texas sentencing statute is unconstitutional because it does not permit meaningful appellate review of the mitigation issue. (Petition at 28).  This claim has been rejected in this Circuit.  *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) (holding that no Supreme Court or circuit precedent requires that the mitigation issue be assigned a burden of proof and that circuit precedent rejects the argument that it be subject to appellate review by the state); *Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002) (explaining that Texas death penalty statute is not constitutionally obligated to provide appellate review of mitigation special issue).

To the extent this claim interweaves an argument that Runnels is entitled under the Texas Constitution to appellate review of the future dangerousness issue under the now abandoned "factual" sufficiency standard, such argument is based on state law and is not a basis for federal habeas corpus relief.  (Petition at 28-36).  *See Caldwell v. Thaler*, 770 F. Supp. 2d 849, 861 (S.D. Tex. 2011) (holding that federal habeas courts do not sit as super state supreme courts for review of state law issues).  To the extent Runnels also interweaves a conclusory argument that the abandoned factual sufficiency review is required by the United States Constitution, (Petition at 34), he cites no clearly established federal law to that effect.  On the contrary, on federal habeas review, only the legal sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307 (1979) need be satisfied, even if the state law would impose a more demanding standard of proof.  *West v. Johnson*, 92 F.3d 1385, 1394 (5th Cir. 1996); *e.g., Woods*, 307 F.3d at 358.  Petitioner's third claim, if not procedurally barred,

should be denied.

## C. Various Constitutional Claims (Claims 4 and 7)

These claims contain the following challenges to the Texas statute: failure to require proof

beyond a reasonable doubt, *contra Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (holding that, even

after *Walton v. Arizona*, a state death penalty statute may place on the defendant the burden of

proving that mitigation circumstances outweigh aggravating circumstances); failure to provide

meaningful guidance to the jury regarding mitigation and giving the jury total discretion to make

unfavorable findings against a defendant, *contra Tuilaepa v. California*, 512 U.S. 967, 979-80

(1994) (recognizing that juries may be given unbridled discretion in determining whether to impose

the death penalty once the defendant is determined eligible to receive it); *Hughes v. Dretke*, 412 F.3d

582, 594 (5th Cir. 2005) (agreeing that the "unrestricted discretion" argument is entirely without

merit and *Teague* barred, citing *Callins v. Collins*, 510 U.S. 1141 (1994)); discouragement of

"holdout" jurors by requiring ten votes for a life sentence and failing to inform the jury of the impact

of an individual vote, *contra Druery v. Thaler,* 647 F.3d 535, 543 (5th Cir. 2011) (rejecting claim

that the "12-10 Rule" violated due process and the right to freedom from cruel and unusual

punishment); *Hughes*, 412 F.3d at 593-94; failure to define terms in the special issues such that it

results in a "mandatory" death sentence, *contra Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. ),

*cert. denied*, 137 S. Ct. 477 (2014) rejecting argument that Constitution requires Texas to define the

terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society");

*James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993); the admission of unadjudicated extraneous

offenses at punishment violates the Eighth Amendment,[15] *contra Parr v. Thaler*, 481 F.App. 872, 879 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 842 (2013); and the death penalty statute violates the Establishment Clause of the First Amendment, *contra Roach v. Quarterman*, 220 F.App. 270, 278 (5th Cir. 2007) (holding that no reasonable jurists could debate the district court's conclusion that the Texas death penalty statutes do not offend the First Amendment). Accordingly, these claims and their subparts, if not procedurally barred, should be denied.

### D. Failure to Inform Jury Regarding Deadlock (Claim 8)

In claim eight, Runnels contends the Texas statute violates the Eighth Amendment because it prevents the jurors from being told that a "hold-out" juror at punishment results in a life sentence. This issue lacks merit. *See Sprouse*, 748 F.3d at 623 (holding that clear Supreme Court and Fifth Circuit precedent forecloses this issue).

To the extent this claim also asserts that the jury was inclined to assess a death sentence because it would underestimate the time Runnels would have to serve on a life sentence before becoming parole-eligible, this claim is refuted by the record. (Petition at 47-48). The jury was instructed that, if given a life sentence, Runnels would not become eligible for parole until the actual time served by him equaled forty years, without consideration of good conduct time. The jury was also instructed that eligibility for parole does not guarantee parole will be granted. (2 CR 339). Runnels's claim that the jury was likely to underestimate his parole eligibility date is refuted by the record. This claim, if not procedurally barred, should be denied on the merits.

---

[15] In relation to this issue, the Court observes that the trial court's charge instructed the jury not to consider testimony that Runnels committed extraneous offenses or bad acts unless they found, beyond a reasonable doubt, that he committed such offenses or acts. (2 CR 336).

### E. Definition of "Mitigating Evidence" (Claim 9)

In claim nine, Runnels asserts that the definition of mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness" unduly restricts the jury's discretion to consider all the evidence relevant to mitigate a death sentence. (Petition at 48-58).

Runnels has not identified the evidence he contends the jury was prevented from considering. Further, Runnels has not cited and this Court has not found any Supreme Court opinion mandating a definition of mitigating evidence broader than the one provided by the Texas statute. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(f)(4) (West 1991); *accord Bartee v. Quarterman*, 574 F. Supp. 2d 624, 710 (W.D. Tex. 2008). Runnels argues the Texas definition prevents the jury from considering admissible evidence of his potential for rehabilitation. The Fifth Circuit has rejected a similar argument regarding "good character" evidence. Like evidence of good character, evidence of a defendant's potential for rehabilitation may be adequately considered under the future dangerousness special issue. Furthermore, virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's moral culpability. *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (citing *Graham v. Collins*, 506 U.S. 461 (1993)). The holding in *Beazley* has been reaffirmed in *Blue v. Thaler*, 665 F.3d 647, 666-67 (5th Cir. 2011).

It appears Runnels's argument seeks to establish a new constitutional rule, not in effect at the time of conviction, that would require jurors to be able to base their sentencing decision on mercy or sympathy. (Petition at 53). Runnels fails to consider that such a rule would arguably also allow jurors to assess a death sentence based on their emotional response to grisly facts or sympathy for the murdered victim. In any event, the adoption of such a rule by this Court would violate *Teague v. Lane*, 489 U.S. 288, 306-07 (1989). *See Saffle v. Parks*, 494 U.S. 484, 489, 110 S.Ct. 1257, 1261-

62, 108 L.Ed.2d 415 (1990) (holding that the Constitution does not require that jurors be allowed to base their sentencing decisions on sympathy they feel for the defendant after hearing his mitigating evidence and that the adoption of such a rule would be barred by *Teague*). As the Supreme Court noted, "It is no doubt constitutionally permissible, if not constitutionally required, for the state to insist that the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." *Saffle*, 494 U.S. at 492-93 (citations and internal quotation marks omitted); *see also California v. Brown*, 479 U.S. 538, 544, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring) (stating that the sentence imposed at the penalty stage should reflect "a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion."). This claim, if not procedurally barred, should be denied.

### F. Prosecutors' Discretion to Seek the Death Penalty (Claims 4 and 10)

In claims 4 and 10, Runnels contends unfettered prosecutorial discretion to decide whether to seek a death sentence violates the Eighth Amendment and the Equal Protection clause. (Petition at 38-39, 58-86). Since these issues were adjudicated on the merits in the CCA on direct appeal, they are subject to the AEDPA deferential standard of review. *Runnels*, 2007 WL 2655682, at *12; *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (holding that exhaustion requirement is met when claim is presented to highest state court).

The equal-protection argument Runnels asserts under *Bush v. Gore*, 531 U.S. 98 (2000), has been rejected in this Circuit. *Coleman v. Quarterman*, 456 F.3d 537, 542-43 (5th Cir. 2006). Moreover, Runnels's conclusion under the Eighth Amendment is not supported by any case law and fails to demonstrate that the state court decision was unreasonable. (Petition at 38-39).

Nevertheless, the Supreme Court has rejected the notion that the Eighth Amendment limits prosecutorial discretion regarding whether to seek the death penalty. *McClesky v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Runnels fails to demonstrate that the CCA's rejection of these claims was unreasonable, and they should be denied.

## VII. CONCLUSION

After reviewing the trial and state-habeas records and the pleadings filed of record in this case, the Court finds that trial counsel's representation did not deprive Runnels of his Sixth Amendment right to effective assistance of counsel.

At the time this case was tried, counsel was presented with a particularly cold-blooded murder. Runnels had killed a prison employee who was defenseless and was attacked from behind. The evidence was that the "motive" for taking Mr. Wiley's life was either trivial or non-existent. The evidence reflected Runnels showed no remorse. Mr. Durham formulated a strategy for Runnels to plead guilty, which could be argued as remorse and/or acceptance of some responsibility.

The mitigation investigation, however, resulted in evidence that was as detrimental as it was beneficial, and which would have been an evidentiary minefield. The defense's plan to personalize the defendant with the grandmother's testimony was wrecked, and counsel elected to proceed with the evidence he had developed. Even in hindsight, it cannot be said that counsel was ineffective.

The petition for federal habeas relief should be denied because Runnels has not shown the CCA unreasonably adjudicated his ineffective assistance claim against Mr. Durham in claim 1 or his prosecutorial discretion argument in claims 4 and 10. Furthermore, Runnels's contention in claim 2 that *Martinez* allows him to relitigate the ineffective assistance claim against Mr. Durham is an unauthorized extension of *Martinez*. Finally, the remaining challenges to the Texas death penalty

statute in claims 3, 4, 7, 8, and 9 should be denied because they are procedurally barred and

alternatively, because they lack merit.

IT IS SO RECOMMENDED.

ENTERED this __15th__ day of March, 2016.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE  JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).