75318

# R E P O R T E R ' S   R E C O R D
VOLUME 15 of 19

## TRIAL COURT CAUSE NO. 48,950-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE 320TH DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | IN AND FOR |
| | ) | |
| | ) | |
| TRAVIS TREVINO RUNNELS | ) | POTTER COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS

OCTOBER 26, 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAY 0 2 2005

Louise Pearson, Clerk

On the 26th day of October, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Don Emerson, Judge Presiding, held in Amarillo, Potter County, Texas:

Proceedings reported by Machine Shorthand.

*ORIGINAL*

A-P-P-E-A-R-A-N-C-E-S:

FOR THE STATE:                      MR. RANDALL SIMS
                                    SBOT:  18426650
                                    MR. JAMES ALLEN YONTZ
                                    SBOT:  24044106
                                    MR. JOHN L. "JACK" OWEN
                                    SBOT:  15369200
                                    47th District Attorney's Office
                                    501 Fillmore, Suite 5-A
                                    Amarillo, Texas  79101


FOR THE DEFENDANT:                  MR. JAMES D. DURHAM
                                    SBOT:  06284000
                                    Attorney at Law
                                    1008 W. 10th
                                    Amarillo, Texas  79101


                                    MS. LAURA D. HAMILTON
                                    SBOT:  20016450
                                    Attorney at Law
                                    215 W. 7th
                                    Amarillo, Texas  79101

CHRONOLOGICAL INDEX

VOLUME 15

(TRIAL ON THE MERITS)

Page

OCTOBER 26, 2005

Caption and Appearances --------------------------------- 1-2

Proceedings -------------------------------------------- 3

Jury Sworn --------------------------------------------- 4

Defendant's Plea --------------------------------------- 8

State's Opening Statement ------------------------------ 21

| STATE'S WITNESSES: | DX | CX | RDX | RCX | VDX |
|---|---|---|---|---|---|
| CATHERINE NALL | 24 | | | | |
| SRIDHAR NATARAJAN, M.D. | 26 | 42 | | | |
| BUD WILLIAMS, JR. | 52 | 65 | 76<br>82 | 78<br>83 | |
| WILLIAM GILCHRIST | 84 | 111 | | | |
| JIMMY JORDAN | 124 | 136 | 158<br>163 | 159<br>164 | |
| WILLIAM ELKINS | 165 | 178 | 192<br>198 | 196 | |
| TONY IRVINE | 199<br>202 | 213 | | | 202 |
| EUGENE JOHNSON | 216 | 224 | | | |
| PHILLIP YOW | 231 | 242 | | | |

Adjournment ---------------------------------------- 246

Reporter's Certificate ------------------------------- 247

## ALPHABETICAL INDEX

### VOLUME 15

|  | DX | CX | RDX | RCX | VDX |
|---|---|---|---|---|---|
| Elkins, William | 165 | 178 | 192 198 | 196 | |
| Gilchrist, William | 84 | 111 | | | |
| Irvine, Tony | 199 202 | 213 | | | 202 |
| Johnson, Eugene | 216 | 224 | | | |
| Jordan, Jimmy | 124 | 136 | 158 163 | 159 164 | |
| Nall, Catherine | 24 | | | | |
| Natarajan, M.D., Sridhar | 26 | 42 | | | |
| Williams, Jr., Bud | 52 | 65 | 76 82 | 78 83 | |
| Yow, Phillip | 231 | 242 | | | |

## EXHIBIT INDEX

### VOLUME 15

| EXHIBIT NUMBER | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| Sx. 1 | Photo of Stanley Allen Wiley | 25 | 25 |
| Sx. 36 | Diagram of neck used to describe injuries | 41 | 41 |
| Sx. 37 | Diagram of neck | 41 | 41 |
| Sx. 51 | Photograph of knives | 105 | 105 |

THE STATE OF TEXAS      Multi-Page™      TRIAL ON THE MERITS
vs. TRAVIS TREVINO RUNNELS      OCTOBER 26, 2005

Case 2:11-cv-00074-J-BR  Document 84-2  Filed 01/17/13  Page 5 of 67  PageID 852

---

**Page 3**

1 PROCEEDINGS

2 OCTOBER 26, 2005

3 (Open court, defendant present, no jury)

4 MR. OWEN: Before we proceed, in the interest

5 of time, the State moves to -- for trial amendment to correct

6 an error of nomenclature in the indictment. The prison system

7 is referred to as the Texas Department of Corrections,

8 Institutional Division, and we would ask that it be amended to

9 refer to it as the Texas Department of Criminal Justice,

10 Institutional Division.

11 MR. DURHAM: A trial amendment after we pick

12 the jury, three years after the alleged crime, two years after

13 the indictment? We cannot agree on that, Your Honor. We move

14 that they proceed to trial on the indictment that was

15 returned.

16 MR. OWEN: That's fine, Your Honor. We were

17 just trying to save some time in the presentation.

18 THE COURT: Well, maybe saving time would have

19 been easier if we had indicted it to begin with.

20 Okay. Bring the jury in.

21 (Jury enters the courtroom)

22 THE COURT: Well, we are all finally here

23 together. Thank you for being with us. The first thing I

24 need to do this morning is swear you in as jurors. If you'll

25 each please raise your right hands.

---

**Page 4**

1 (Jury panel sworn)

2 THE COURT: Okay. You have some instructions

3 there. Those are your rules of the road to operate by during

4 the trial of this case. There's -- you know, one copy is

5 laminated. Obviously, you can't fold that up. But there's

6 another copy that you can certainly fold up and keep with you.

7 The important thing about these badges you have

8 is that I need you to keep those on at all times that you're

9 in the courthouse. No one would intentionally say anything in

10 your presence about this case if they knew you were a juror,

11 but if they -- if you don't have a badge on, they might not

12 know. We all ride up in the same two elevators together,

13 except those of us who choose to walk up the stairs. I don't

14 know any of those folks, but I think there are some that do

15 that, but the rest of us ride the elevator. So if you'll keep

16 those on, I would certainly appreciate it.

17 As I told you at various times while we were

18 selecting the jury in this case, we will work from about

19 nine o'clock each day until about five o'clock. We'll take an

20 hour and 15 minutes or so for lunch each day. We will try to

21 take only one major break during the morning and one during

22 the afternoon, and we'll just move through this case as

23 quickly and expeditiously as we possibly can.

24 There may be things that come up and I may need

25 to remove you from the courtroom for other reasons so that the

---

**Page 5**

1 lawyers can discuss some things with me. If that occurs and

2 it looks like it's going to be a little while, I'll --

3 certainly, Gary will tell you and you can separate and that

4 will just be an additional break for you.

5 But we -- I guess what I'm really trying to say

6 is, we're not going to be dawdling around, okay? We'll get

7 you in and out of here just as quickly as we can. That's

8 something we sort of take pride in trying to do.

9 Okay. The first thing we will do this morning

10 is I will have the indictment read. Following that, the

11 completion of the indictment being read, we will take the

12 defendant's formal plea to the charge contained in the

13 indictment. After that, I'll swear as many of the jurors

14 (sic) who are here in the hallway and present at this time as

15 a group so I won't have to do it individually.

16 MR. DURHAM: Pardon me. You mean the

17 witnesses?

18 THE COURT: What did I say?

19 MR. DURHAM: The jurors.

20 THE COURT: No, I just swore them.

21 MR. DURHAM: I thought you did. I was

22 wondering if we were going to have a shadow jury or something.

23 THE COURT: Okay. Well, as long as Mr. Durham

24 is here, he's going to keep me on my toes with the words that

25 I use. The witnesses is who I'll swear as a group, and that

---

**Page 6**

1 way we don't have to do it individually.

2 After that, then, I will remove all the

3 witnesses who were sworn from the courtroom and have them wait

4 in the hallway or elsewhere in the building.

5 The attorneys will have an opportunity to make

6 opening argument to you. Opening argument is not -- actually,

7 I should call it opening statement. It's not intended to be

8 argument in the case, it's more intended to be an outline of

9 how the presentation of the evidence will go; how the

10 witnesses will come forth to testify, perhaps by name, but an

11 explanation will be given whether they're going to proceed

12 kind of chronologically or whether things will be a little bit

13 mixed up and out of order so that you can better understand

14 the nature of how the case will progress.

15 Neither side is under an obligation to make an

16 opening statement, but they normally do. The State normally

17 makes an opening statement first because the burden of proof

18 is always on them, as we discussed.

19 The defendant may choose to make an opening

20 statement or may choose to wait until the State has concluded

21 its presentation of evidence and then make an opening

22 statement. That's completely up to them and I haven't asked

23 and they haven't told me as to what they intend to do about

24 that. That's the next thing that will happen, if it does.

25 After that, we'll begin the presentation of the

---

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00074-DRH Document 84-2 Filed 01/17/13 Page 6 of 67 PageID 9938

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 7

1  evidence. We'll just start going through the witnesses one by
2  one and see where we go.
3         Okay. All right. Mr. Runnels, if you would
4  please stand for the indictment to be read.
5         Mr. Sims, if you would read the indictment,
6  please.
7         MR. SIMS: "In the name and by the Authority of
8  the State of Texas:
9         "The Grand Jurors for Potter County, Texas,
10 duly organized and sworn as such at the January Term A.D.,
11 2004 of the District Court of the 251st Judicial District, in
12 and for Potter County, Texas, upon their oaths in that Court
13 at that term, present that Travis Trevino Runnels, on or about
14 the 29th day of January, 2003 and before the presentment of
15 this indictment, in Potter County, Texas, did then and there
16 intentionally or knowingly cause the death of an individual,
17 namely, Stanley Allen Wiley, by cutting Stanley Allen Wiley
18 with a knife, and the defendant was then and there
19 incarcerated in a penal institution, to-wit: the William P.
20 Clements Unit of the Texas Department of Corrections,
21 Institutional Division, and the said Stanley Allen Wiley was
22 then and there employed in the operation of said penal
23 institution.
24        "Against the peace and dignity of the State."
25        It is signed by the foreperson of the grand

Page 8

1  jury.
2         THE COURT: Mr. Runnels, how do you plead,
3  guilty or not guilty?
4         MR. RUNNELS: I plead guilty, Your Honor.
5         THE COURT: Members of the jury, I will need
6  you to step into the jury room, please, at this time. I'll
7  get you back out here shortly.
8         (Jury left the courtroom)
9         THE COURT: Mr. Runnels, you have entered a
10 plea of guilty to the offense charged in the indictment before
11 this jury. Several things come into play at this point that I
12 need to visit with you about.
13        First of all, because this is a case in which
14 the State has indicated it's -- that it's seeking the death
15 penalty, it's not a situation where any jury trial can ever be
16 waived. You understand that?
17        MR. RUNNELS: Yes, sir.
18        THE COURT: And that's why the jury is here.
19 However, your -- your plea of guilty before the jury, you need
20 to understand, sir, that if you persist in that plea and I
21 find that that plea is -- is voluntary and that you have done
22 it with full knowledge of the results of your plea of guilty,
23 I'll instruct the jury to return in accordance with your plea
24 a finding of guilt. Do you understand that?
25        MR. RUNNELS: Yes, sir.

Page 9

1         THE COURT: That instruction will preclude them
2  from even having the opportunity to consider whether the State
3  has met its burden of proof. Your plea of guilty in this
4  case -- and this doesn't differ from any other criminal
5  case -- will be all the evidence that's necessary to support a
6  finding of guilt. Do you understand that?
7         MR. RUNNELS: Yes, sir.
8         THE COURT: Even though that's true, the State
9  no doubt will put on much of the same evidence that it would
10 have anyway in order to give the jury an idea of what this
11 case is all about. Do you understand that?
12        MR. RUNNELS: Yes, sir.
13        THE COURT: But there will not be an issue of
14 your guilt or innocence. Do you understand that?
15        MR. RUNNELS: Yes, sir.
16        THE COURT: You understand that you still
17 maintain all the rights and privileges that you enjoy under
18 the constitution and laws of the State of Texas and of the
19 United States, but the -- with regard to the jury being able
20 to consider guilt/innocence stage of this trial, that will not
21 be one of them?
22        You still have the right against self-
23 incrimination, you know. You're not going to have to testify
24 in this case. And I only tell you that because there have
25 been cases in the past where people have said, "Well, my

Page 10

1  entering a plea of guilty to the jury is really, in effect,
2  testifying, and nobody told me that I didn't have to do that."
3         And our court of criminal appeals has said,
4  "No, that's not the case," but -- under Texas law and the
5  United States constitutional law, but I'm telling you that
6  just to give you a heads up on that. All right?
7         And you're still going to be able to, you know,
8  call witnesses of your own, cross-examine witnesses, have all
9  the witnesses testify in front of you.
10        Nothing is going to change in this trial with
11 regard to all of your rights other than the ability of the
12 jury to require the State -- and your ability to require the
13 State to prove their case beyond a reasonable doubt with
14 regard to your guilt or innocence. Do you understand what
15 I've told you?
16        MR. RUNNELS: Yes, sir.
17        THE COURT: Knowing that your plea of guilty,
18 if I receive that, is going to result in you being found
19 guilty of this case, and knowing that the State is seeking the
20 death penalty in this case, do you really want to do this?
21        MR. RUNNELS: Yes, sir.
22        THE COURT: Okay. The State is still going to,
23 as you've heard us discuss time and time again for days, they
24 have the burden of proof with regard to the first special
25 issue, and there will still be evidence entertained with

THE STATE OF TEXAS  
vs. TRAVIS TREVINO RUNNELS

Case 2:11-cv-00074-J-BR   Document 84-2   Filed 01/17/13   Page 7 of 67   PageID 3889

Multi-Page™

TRIAL ON THE MERITS  
OCTOBER 26, 2005

Page 11

1 regard to the second special issue, that being the mitigation
2 issue. You understand that?
3     MR. RUNNELS: Yes, sir.
4     THE COURT: So the only thing that's going to
5 change is that I will have to tell this jury that they must
6 return a finding of guilt if you persist in this plea. Is
7 that what you want to do? Do you want to persist in it?
8     MR. RUNNELS: Yes, sir.
9     THE COURT: Okay.
10     MR. DURHAM: Your Honor, I have a document I
11 wish to file for the Court. I'll provide a copy, unsigned
12 copy, but a copy to the district attorney.
13     THE COURT: Okay. Mr. Runnels, this affidavit
14 that I've been handed says that you, having discussed the
15 strategic and tactical aspects of a plea of guilty in this
16 case, freely and voluntarily decided to enter this plea of
17 guilty, and you have signed that.
18     Is that what you fully intended to do?
19     MR. RUNNELS: Yes, sir.
20     THE COURT: All right. I will file that, then,
21 among the papers of this cause.
22     Okay. Bring the jury in.
23     (Jury returned to the courtroom)
24     THE COURT: Members of the jury, the defendant
25 has entered his plea of guilty to the charge contained in the

Page 12

1 indictment before you. I have talked with him and he persists
2 in his plea of guilty. I have found that that plea is freely
3 and voluntarily entered into, and because of that, at the
4 conclusion of this case, I will instruct you to return a
5 finding of guilty of the charges contained in the indictment
6 in this case.
7     That does not preclude anything about the
8 presentation of the evidence. The State will still call
9 witnesses, as will the defense, with regard to other factors
10 in this case. Then both sides are interested in you having a
11 full and complete opportunity to know everything that you can
12 about this case in order to make an intelligent decision with
13 regard to those special issues that we discussed that will
14 still be put to you.
15     Okay. Do you have any witnesses here that are
16 to be sworn?
17     (Pause)
18     THE COURT: Okay. If you folks who intend to
19 testify this morning will please raise your right hands.
20     (Witnesses sworn)
21     THE COURT: Okay. If you would step back
22 outside, please, we'll call you in when we need you. Do not
23 discuss anything about the case among yourselves or with
24 others.
25     MR. DURHAM: Your Honor, for the record, we

Page 13

1 will invoke the Rule. Our witnesses are under subpoena for
2 the 31st, and they will be instructed as to the Rule.
3     THE COURT: Okay. Thank you, sir.
4     Does the State wish to make an opening
5 statement?
6     MR. SIMS: Your Honor, could we approach a
7 moment?
8     THE COURT: Sure.
9     (At the bench, off the record)
10     THE COURT: Okay, folks, we're going to take a
11 15-minute recess. I know you're sitting there thinking, "He
12 tells us he moves these cases quickly and we just don't
13 believe it." We'll get rolling here one of these days.
14     Okay. And feel free to step outside in the
15 hallway, whatever you care to do.
16     Okay. We're in recess.
17     (Jury left the courtroom)
18     MR. SIMS: I wanted to make sure we're on the
19 same page about -- procedurally about what we thought was
20 going to happen, which I think we're going to put on some
21 evidence, probably significantly less than what we would have,
22 you're going to wind up charging the jury, then we'll come
23 back and then do the punishment phase issues separate?
24     THE COURT: Well, I anticipated that it would
25 be a unified procedure just like --

Page 14

1     MR. SIMS: Okay.
2     THE COURT: I mean, I don't see any reason not
3 to send them out with one charge at this point instructing
4 them to return a finding of guilty based upon that, and then
5 to answer the questions --
6     MR. SIMS: Okay.
7     THE COURT: -- that are asked.
8     MR. DURHAM: I thought that -- well, I thought
9 they would go out and find -- a charge to find guilt, and then
10 come back and proceed on the punishment and two different
11 charges, because to do it in one charge, you are, in effect,
12 instructing them to find him guilty, which is entirely proper,
13 but it's at the same time that they have to make certain other
14 findings that is the State's burden, and I believe that --
15 it's our position, procedurally it would be proper for the
16 jury at this time to be sent out to return the verdict of
17 guilty and then proceed on punishment.
18     THE COURT: Well --
19     MR. DURHAM: It would be a little more
20 cumbersome, but we believe it's more protection for the
21 defendant in terms of making sure that the burden is squarely
22 on the State rather than going in with a ringing endorsement
23 of the State by instruction to find the defendant guilty,
24 followed by questions --
25     THE COURT: Well, the ringing endorsement of

Page 15

1　the State is driven by the defendant's plea --
2　　　　MR. DURHAM: Oh, I understand that.
3　　　　THE COURT: -- of guilty.
4　　　　MR. DURHAM: I understand. I'm not complaining
5　about the ringing endorsement, I just would like the ringing
6　to stop before they consider punishment.
7　　　　THE COURT: Well, whichever way it is, I'm
8　still, when I send them out -- if I do that in separate
9　charges, I'm still going to tell them again --
10　　　　MR. DURHAM: I understand that.
11　　　　THE COURT: -- in the punishment charge, "You,
12　having found the defendant guilty of the offense of capital
13　murder, must now assess his punishment."
14　　　　MR. DURHAM: I understand that.
15　　　　THE COURT: "You do so by" blah, blah, blah.
16　　　　MR. DURHAM: I understand that.
17　　　　THE COURT: And I assume that no charge has
18　been prepared and not laying on your desk to instruct them to
19　return a verdict of guilty?
20　　　　MR. OWEN: No, Your Honor.
21　　　　THE COURT: And the jury -- do you have any
22　basis for me doing that other than just a gnawing feeling?
23　　　　MR. DURHAM: Just -- just the feeling within my
24　innards, also know as gut feeling, yeah, uh-huh.
25　　　　THE COURT: Okay. How about you, Ms. Hamilton?

Page 16

1　　　　MS. HAMILTON: The only other case I've had
2　this way, and it wasn't a death penalty case, was that they
3　did put on a little bit of evidence and then they did send the
4　jury out and instructed them to come back with guilt, and then
5　we went on into punishment. We did it that way.
6　　　　MR. SIMS: It doesn't matter to me. I just
7　want to make sure we're all on the same page.
8　　　　THE COURT: For 20-odd years, I have done it as
9　a unified procedure. Maybe I've been wrong all this time,
10　but --
11　　　　MR. DURHAM: I just think that -- I perceive it
12　to be prejudicial to the defendant to make it a unified
13　procedure, and it's my obligation to try to prevent that
14　prejudice, so I'm requesting the Court to send the jury out
15　for a verdict and then start on punishment.
16　　　　THE COURT: Do you want me to handwrite one
17　here on a yellow pad and send them out with it?
18　　　　MR. DURHAM: I don't expect the Court to do the
19　State's work.
20　　　　THE COURT: I can do that. It would be very
21　short and sweet. Wouldn't be a lot of repeated things in it.
22　　　　I think what we will do is -- you have somebody
23　begin to prepare that, please, sir --
24　　　　MR. SIMS: Yes, sir.
25　　　　THE COURT: -- and we'll begin to take some

Page 17

1　testimony, and then at some point --
2　　　　MR. DURHAM: Why is testimony necessary?
3　　　　THE COURT: Because the State has got the right
4　to present testimony.
5　　　　MR. DURHAM: He's pled guilty.
6　　　　THE COURT: Doesn't make any difference. The
7　State has the right to present testimony with regard to the
8　entire thing.
9　　　　MR. DURHAM: Okay. So it's going -- you're
10　going to allow repetitious testimony?
11　　　　THE COURT: Well, yeah, I guess that's one way
12　of putting it. I mean, I think that's what the -- that's what
13　the court of criminal appeals has told us that the State has
14　the right to do.
15　　　　MR. DURHAM: I understand that.
16　　　　THE COURT: That's one of the things that the
17　jury will be instructed in making the decision in regard to
18　these two questions, is all the evidence surrounding the
19　crime. Right? Isn't that part of the --
20　　　　MR. DURHAM: Well, I understand that's what the
21　Court has done in terms where there was a plea of not guilty
22　and the State proved their case and then the evidence was re-
23　tendered either through a motion to reconsider or to recall
24　the same witnesses. But when we have a plea of guilty, I
25　think that that would be just like calling -- that would be

Page 18

1　calling the same witness twice on the same issue.
2　　　　THE COURT: Well, that's what we'll do, then.
3　　　　Now, given that, do you still want two separate
4　charges?
5　　　　MR. DURHAM: No.
6　　　　THE COURT: Do you want to let it in anyway?
7　　　　MR. DURHAM: No, I don't think so. What you're
8　proposing makes it even more prejudicial, so I'm forced to
9　withdraw my request.
10　　　　THE COURT: Okay. All right.
11　　　　MR. SIMS: So we're just going to do one
12　unified charge at the end, then, or --
13　　　　THE COURT: Apparently so, yes, sir.
14　　　　We're going to begin -- if somebody changes
15　their mind, that's fine. We're going to begin presenting
16　evidence.
17　　　　MR. SIMS: Okay. We're ready to do that. We
18　just wanted to try to line up some witnesses because we
19　weren't planning some until next week. Those that were from
20　out of town, we weren't planning on getting them until next
21　week, and we'll get them in here sooner because we'll just --
22　　　　THE COURT: Oh, okay. But you do --
23　　　　MR. SIMS: There's about ten witnesses we won't
24　call.
25　　　　THE COURT: You've got somebody here --

## Page 19

1    MR. SIMS: Oh, yes, we're ready to go.

2    THE COURT: -- ready to put on?

3    MR. SIMS: Yes, sir, we're ready to go.

4    THE COURT: Okay, okay.

5    MR. SIMS: We've got at least seven or eight

6 that are ready to go.

7    THE COURT: Bring the jury in, please.

8    MR. DURHAM: You will explain to the jury about

9 the unified charge?

10    THE COURT: Yeah.

11    MR. DURHAM: Before we start --

12    THE COURT: I think I really already did. I

13 said -- I said, "I'm going to tell you in the Court's charge

14 that you are to return a verdict of guilty, and then you will

15 go on to consider those two questions."

16    MR. DURHAM: Well, see, my problem is that was

17 really not clear to me. I really thought that they would go

18 out and return a verdict. I'm not sure it's clear to them.

19    THE COURT: Okay.

20    MR. DURHAM: And I'm going to make a request

21 that you restate it where they -- where I understand it and

22 hopefully they will.

23    THE COURT: Okay. All right.

24    (Jury entered the courtroom)

25    THE COURT: Okay. Members of the jury, at

## Page 20

1 the -- with the possibility that my words have been confusing

2 at different times this morning, I've decided to tell you --

3 explain a little more in depth.

4    You know, we spent the entire jury selection

5 process talking to you about the bifurcated system we have in

6 Texas law; that the first portion of the trial has to do with

7 the guilt/innocence stage of the trial. The testimony is

8 presented with regard to that. The jury then takes a charge

9 that I read to you back to the jury room and you consider that

10 charge and consider your verdict and determine whether the

11 State has met its burden to your satisfaction. And if it has,

12 then you return a verdict of guilty.

13    At that point, then, the second phase of the

14 trial, the punishment phase begins. The -- what we're doing

15 here today, however, with the plea of guilty by the defendant,

16 will result in only one charge being presented to you, and you

17 will do two things in that charge.

18    As a matter of fact, that charge will sort of

19 tell you to begin with that because the defendant has pleaded

20 guilty and I have accepted his plea of guilty, that you are

21 instructed to return a finding of guilty.

22    Then if we were to jump to the back of the

23 different charges that you'll receive, they will talk again

24 about -- I mean, the jury will make a decision there in

25 accordance -- one of the things that you will make a decision

## Page 21

1 with will be in accordance with my instruction.

2    So I'll tell you to find him guilty and then

3 you'll find him guilty. Does everyone understand that? And

4 then you will proceed to answer the questions that we

5 discussed at great length.

6    Okay. State wish to make an opening statement?

7    MR. SIMS: A very brief one, Your Honor.

8    THE COURT: Go ahead.

9    STATE'S OPENING STATEMENT

10    MR. SIMS: May it please the Court, Mr. Durham.

11 Good morning, ladies and gentlemen.

12    JURY PANEL: Good morning.

13    MR. SIMS: The guilty plea in regards to this

14 particular case is going to shorten the State's witness list

15 by quite a bit. At this point, I would anticipate we're going

16 to probably call about ten to 12 witnesses in regards to the

17 matters and incidents that occurred on January 29th, 2003, to

18 establish that it occurred at the prison, and that Mr. Wiley

19 was involved in this particular incident, and that Mr. Wiley

20 was working there and was the victim in regards to the

21 offense.

22    I'm not going to go into a very long lengthy

23 statement about what all we're going to go through, but we're

24 going to call -- we're going to call someone to identify a

25 photograph of Mr. Wiley so that it can be used for

## Page 22

1 identification purposes with some of our other witnesses,

2 particularly the inmates that observed what happened that day.

3 And, in fact, I anticipate we'll tell you some of the things

4 that would indicate that the case -- and the actions by the

5 defendant were thought out and planned. We'll probably bring

6 somewhere in the neighborhood of six to eight witnesses in

7 regards to that.

8    That will probably conclude, then, the evidence

9 that we will present to you during the guilt/innocence phase

10 of the trial, and then we will move on into some other

11 evidence that we think will assist you in regards to answering

12 Question No. 1 and Question No. 2.

13    The evidence that you're going to hear in

14 regards to the offense that occurred on January 29th of 2003

15 when Mr. Wiley was killed is also going to be critical and

16 important for you to know and assess in determining your

17 answer to Question No. 1 and Question No. 2. That's the

18 reason we're going to go ahead and present that evidence to

19 you, even though the defendant has pled guilty, because it's

20 going to provide you information that will assist you in

21 answering the probability of future dangerousness as well

22 as --

23    MR. DURHAM: Pardon me, Your Honor. It's -- I

24 have to object. They have the burden to prove future

25 dangerousness, so it's not an assist, it's their burden to

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00070-LRR Document 84-2 Filed 01/17/13 Page 10 of 67 PageID 1204

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

---

**Page 23**

1 prove future dangerousness.

2     THE COURT: Okay. Thank you.

3     MR. SIMS: Again, the State of Texas has the

4 burden of proof on Question Issue No. 1. We have no burden of

5 proof on Question Issue No. 2.

6     That is what we're going to do in regards to

7 our case. As I said, it will be quite a bit shorter than

8 what it would have been otherwise. I appreciate you being

9 here.

10     Judge, that concludes my statement.

11     MR. DURHAM: Your Honor, the defendant, Travis

12 Runnels, reserves opening statement until presentation of the

13 State's case, before we call our witnesses. Thank you.

14     THE COURT: Okay. Call your first witness.

15     MR. SIMS: Catherine Nall.

16     Your Honor, may we approach a minute?

17     THE COURT: Sure.

18     (At the bench, on the record)

19     MR. SIMS: We've got family members that we may

20 call in the punishment phase and they're still in the

21 courtroom.

22     THE COURT: It is a unified procedure.

23     MR. SIMS: Pardon?

24     THE COURT: We've got a unified proceeding at

25 this point. You're going to have to take them out of the

**Page 24**

1 courtroom.

2     MR. DURHAM: I invoked the Rule.

3     MR. SIMS: Okay.

4     MR. DURHAM: Your Honor, while we're here --

5 while we're here, they have inmates who are under subpoena

6 that they intend to call, I want them brought into the

7 courtroom and sworn and instructed on the Rule.

8     THE COURT: I'll do that at the next break.

9     MR. DURHAM: Okay.

10     (Open court)

11     CATHERINE NALL,

12 having been first duly sworn, testified as follows:

13     DIRECT EXAMINATION

14 BY MR. YONTZ:

15 Q. Would you state your name, please, ma'am.

16 A. Yes, sir. My name is Catherine Nall.

17 Q. Where do you live?

18 A. I live in Austin, Texas.

19 Q. Ms. Nall, do you know an individual by the name of

20 Stanley Allen Wiley?

21 A. Yes, that would be my brother.

22 Q. And --

23     MR. YONTZ: May I approach, Your Honor?

24     THE COURT: Sure.

25 Q. (BY MR. YONTZ) I'll show you what's marked as

**Page 25**

1 State's Exhibit No. 1. Do you know who that individual is?

2 A. Yes, this is my brother, Stanley.

3 Q. Where did Stanley work?

4 A. Stanley worked at the prison in the boot factory.

5 Q. And do you know what his position was as an employee

6 of the prison?

7 A. I believe he was a supervisor.

8     MR. YONTZ: I have no other questions, Your

9 Honor. May we publish Exhibit 1?

10     MR. DURHAM: May I see Exhibit 1? I didn't

11 look at the back of it.

12     MR. YONTZ: It says "1".

13     MR. DURHAM: Well, I don't -- I haven't seen

14 the back of it, so -- okay. No objection.

15     THE COURT: Okay. Are you offering Exhibit 1?

16     MR. YONTZ: Yes.

17     THE COURT: All right. Now, no objection,

18 correct?

19     MR. DURHAM: That's correct, Your Honor.

20     THE COURT: All right. The exhibit is

21 received.

22     MR. YONTZ: No further questions.

23     MR. DURHAM: I have no questions.

24     THE COURT: Okay, Ms. Nall, you may step down,

25 please. If you would return outside, please.

**Page 26**

1     MS. NALL: Have I been excused? Do I need to

2 go outside?

3     MR. YONTZ: May she be excused?

4     THE COURT: Does anybody intend to recall the

5 witness?

6     MR. SIMS: For right now, if she could wait

7 outside, please.

8     MR. DURHAM: I have no objection to her being

9 excused.

10     THE COURT: Call your next witness.

11     MR. YONTZ: Your Honor, the State would next

12 call Dr. Sridhar Natarajan.

13     THE COURT: Doctor, if you would come right up,

14 please, and take a seat here on the witness stand.

15     SRIDHAR NATARAJAN, M.D.,

16 having been first duly sworn, testified as follows:

17     DIRECT EXAMINATION

18 BY MR. YONTZ:

19 Q. Sir, would you state your name, please?

20 A. Sridhar Natarajan.

21 Q. How are you employed, sir?

22 A. The Chief Medical Examiner for Lubbock County, the

23 Director of the Division of Forensic Pathology at the Texas

24 Tech School of Medicine, and an assistant professor at the

25 School of Medicine.

---

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00074-J-BR   Document 84-2   Filed 02/17/13   Page 11 of 67   PageID 2893

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 27

1    Q. Following that answer, I've got a couple more
2  questions. First of all, what's forensic pathology?
3    A. Forensic pathology is the -- providing a manner and
4  cause of death on a deceased individual after most times
5  conducting an autopsy, taking photographs, making sure the
6  body is properly identified, examining the body for wounds,
7  natural disease, completing a formal report, as well as
8  providing expert testimony.
9    Q. Doctor, what experience have you had -- let me go
10  back beyond that. Can you briefly outline your medical
11  training for the ladies and gentlemen?
12         MR. DURHAM: Your Honor, we'll stipulate that
13  the doctor is qualified.
14         THE COURT: Come up just a minute, please.
15         (At the bench, on the record)
16         THE COURT: I know what they want to do, but,
17  you know, you can't run their case, so please don't offer to
18  stipulate in front of the jury. I mean, if you want to come
19  up here and do that and if they want to accept the
20  stipulation, that's fine.
21         MR. DURHAM: Just not do it in front of the
22  jury?
23         THE COURT: Yes.
24         MR. DURHAM: Okay. I can do that.
25         THE COURT: Because then it kind of puts them

Page 28

1  in a position of, you know --
2         MR. DURHAM: Which I intended to do.
3         THE COURT: Okay. Well, then, I'm going to
4  instruct you not to do it again.
5         MR. YONTZ: I'll just be real brief on this and
6  we'll tender.
7         THE COURT: Okay.
8         (Open court)
9    Q. (BY MR. YONTZ) Again, Doctor, would you briefly
10  outline your medical experience and your experience as a
11  forensic pathologist?
12    A. I did my medical degree at the Medical University of
13  South Carolina in Charleston, where I received my M.D.
14  Afterwards, I entered active duty service in the Army and I
15  trained at the Walter Reed Army Medical Center in Washington,
16  D.C. and the Brooke Army Medical Center in San Antonio, Texas,
17  where I did my internship as well as my training in anatomic
18  and clinical pathology.
19         Afterwards, I was retained at the Brooke Army
20  Medical Center and was the medical director there for
21  microbiology, transfusion medicine, as well as flow cytometry
22  and also conducted autopsies and was a surgical pathologist.
23  I completed my time in the Army. I went in the Army Reserves,
24  and at that time also I went over to the Bexar County Forensic
25  Science Center and received my subspecialty training in

Page 29

1  forensic pathology. And from there, I came out to Lubbock and
2  Texas Tech.
3    Q. As a forensic pathologist and the head of the
4  division at Texas Tech in Lubbock, how did you become involved
5  in a Potter County case?
6    A. The County of Lubbock and Texas Tech has contracts
7  with the outlying counties, such as Potter County, where, when
8  a justice of the peace requests an autopsy, it will come out
9  to us.
10    Q. And approximately how many autopsies have you
11  performed or assisted in?
12    A. I've performed myself approximately 1,300 autopsies,
13  and I've overseen and reviewed approximately three to four
14  thousand autopsies.
15         MR. YONTZ: Your Honor, at this time, we would
16  tender Dr. Sridhar Natarajan as an expert in the area of
17  forensic pathology.
18         MR. DURHAM: I have no objection.
19         THE COURT: Okay. The witness is qualified.
20  Let's proceed.
21    Q. (BY MR. YONTZ) Doctor, can you explain to us what
22  an autopsy is and the steps that are taken pursuant to
23  protocol in conducting one?
24    A. Initially, a body will be received at the medical
25  examiner's office. It will arrive in a -- usually in a body

Page 30

1  bag. Photographs will be taken. There will be verification
2  of the identity of the decedent, after which an individual
3  will be assigned to conducting an autopsy.
4         The autopsy -- the body will then be placed on
5  a table and an external examination will be performed, which
6  will include examination of clothing as pertinent.
7         Once the external examination is done, which
8  we'll be looking for things such as disease processes,
9  injuries, as well as examining the body for height and
10  appropriate age.
11         Once that's completed, then an internal
12  examination will be conducted, which will involve actually
13  cutting into the body, and this will begin with a Y-shaped
14  incision which is on the chest, and then proceeds down the
15  chest to the abdomen.
16         The tissue and skin will be reflected back.
17  Again, there will be an evaluation for injuries and natural
18  disease. The ribs will be removed, organs within the chest,
19  as well as the abdomen will be removed, weighed, and examined.
20         In a similar fashion, the neck and head will be
21  examined. Once the scalp is removed and reflected, the bone
22  will be cut, the brain will be taken out, examined. And once
23  all of these things are done, there may be photographs taken
24  during the process.
25         When completed, we'll provide a preliminary

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Case 2:12-cv-00744-BR   Document 84-2   Filed 01/17/13   Page 12 of 67   PageID 2994
Multi-Page™
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 31

1 report, and at some point, probably within a few weeks to a
2 couple of months, a final report will be put together.
3    Q. Doctor, in regard to this, did Justice of the Peace,
4 Haven Dysart, authorize and request an autopsy to be performed
5 on the body of Stanley Allen Wiley?
6    A. Yes.
7    Q. Can you tell us how that body was received at the
8 medical investigator's (sic) office?
9    A. It was received with some medical intervention that
10 had taken place. It was brought there --
11    Q. What do you mean by medical intervention?
12    A. By medical intervention, I'm stating that Mr. Wiley,
13 after receiving some injuries, had been transported to a local
14 hospital where an attempt was made to try to minimize his
15 injuries or try to repair them.
16    Q. In conducting an autopsy, do you also review the
17 medical history that may accompany the person, I guess like
18 hospital reports, hospital information that may give you an
19 idea as to what the hospital did?
20    A. Yes.
21    Q. And did you do that in this case?
22    A. Yes.
23    Q. I'm sorry, you were telling us how the body arrived.
24    A. Correct. It -- it just was received with a tan
25 blanket overlying the body in a body bag, and we also had law

Page 32

1 enforcement accompany the body to attend the autopsy.
2    Q. Okay. Is that unusual to have law enforcement
3 accompany?
4    A. No. In a case where there's a suspicious death or a
5 violent death, oftentimes law enforcement will accompany the
6 body.
7    Q. Did you, in fact, conduct an autopsy on the body of
8 Mr. Wiley?
9    A. Yes.
10    Q. And did you use the same protocol as you outlined
11 previously?
12    A. Yes.
13    Q. Can you explain to the ladies and gentlemen what
14 your examination revealed as far as injuries that had been
15 sustained?
16    A. The main injuries sustained to Mr. Wiley involved
17 his neck region. Essentially, we had -- when he arrived to
18 the morgue, he -- since he had been already at the hospital,
19 one of the things that had taken place was there was a
20 suturing of the wound that was found on his neck. The wound,
21 once it was opened up, we measured it. It was approximately
22 23 centimeters in length and essentially began from high up on
23 the right side of his neck and then proceeded downward towards
24 the front of the neck, across the front, and then over to the
25 side on the left.

Page 33

1    The tissue in this region was reflected and we
2 examined to see what were the main injuries within the neck.
3    Q. Doctor, you indicated it ran from this --
4 approximately this location under the ear, around to the left
5 side. (Indicating) Were you able to determine the direction
6 that the injury was inflicted, whether it was this way or --
7 from left to right or right to left?
8    A. I was not able to decide that. There had been some
9 medical intervention with the suturing, which then hindered
10 the actual interpretation. But it was definitely a clean
11 wound in the sense that it was due to a sharp instrument.
12    Q. Doctor, were there any other significant injuries to
13 other parts of the body other than the neck and throat area?
14    A. The only other finding was, evidently some
15 cardiopulmonary resuscitation had been performed, and there
16 were two associated rib fractures which we felt were due to
17 the CPR.
18    MR. DURHAM: Are you asking me to approve it
19 before you ask questions?
20    MR. YONTZ: No, I'm asking for you to look at
21 it.
22    THE COURT: Just go on with your examination of
23 the witness.
24    Q. (BY MR. YONTZ) Doctor, could I have you step down,
25 please?

Page 34

1    MR. DURHAM: If he intends to use that as an
2 exhibit, I don't want it shown to the jury until it's properly
3 admitted.
4    THE COURT: Okay. Have the witness identify
5 that, please.
6    MR. YONTZ: I'll do that with my next question,
7 Your Honor.
8    THE COURT: Okay.
9    Q. (BY MR. YONTZ) Doctor, are you familiar with this
10 particular item?
11    A. Yes.
12    Q. And what is this?
13    A. This is a diagram of the region of the neck by a
14 gentleman by the name of Frank Netter, who did quite a few
15 anatomy illustrations.
16    Q. And are the Netter diagrams accepted as accurate
17 anatomical depictions?
18    A. Yes.
19    Q. And is this also accurate?
20    A. Yes.
21    MR. YONTZ: Your Honor, we would move State's
22 Exhibit 37 -- not -- I would mark it at this time as State's
23 Exhibit 37. I may have a mark on it.
24    MR. DURHAM: I certainly have no objection to
25 it being marked.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

Case 2:13-cv-00070-DBR Document 84-2 Filed 01/17/13 Page 13 of 67 PageID 2691

TRIAL ON THE MERITS
OCTOBER 26, 2005

---

Page 35

1        MR. YONTZ: That's fine, it's already marked.

2        THE COURT: Okay. Are you offering it then?

3        MR. YONTZ: No, sir, because we may mark on it.

4 I don't want to --

5        MR. DURHAM: Then I don't want it displayed

6 until it's -- until it's admitted, Your Honor. I think that's

7 the proper procedure.

8        MR. YONTZ: Not when you're using charts and

9 diagrams to diagram injuries.

10        MR. DURHAM: Your Honor, this is improper

11 argument before the jury. I've made my objection.

12        THE COURT: For the purposes of illustration,

13 I'll allow you to exhibit it.

14        MR. YONTZ: Thank you.

15        THE COURT: And then you can offer it later as

16 marked up. Thank you.

17        MR. YONTZ: Thank you.

18    Q. (BY MR. YONTZ) Doctor, could you step down, please.

19        Doctor, what are we looking at?

20    A. This is a diagram of the neck. Mainly it's showing

21 here the anterior or the front aspect of the neck with the

22 skin and some of the muscle and tissue has been removed. So

23 you're looking at the internal contents, essentially, of the

24 neck, predominantly of the vessels and skeletal muscle.

25    Q. Okay. This indicates superficial veins. Are there

Page 36

1 structures beneath this also?

2    A. Yes.

3    Q. And what would those be?

4    A. If you were to reflect or take away the superficial

5 muscles here, such as the sternocleidomastoid muscle, and

6 moved it back, which has been done over here, you would see

7 deeper vessels.

8        So the right side is showing more superficial,

9 but with reflection of the muscles, you're seeing some of the

10 deeper vessels.

11    Q. You indicated that there was a rather lengthy cut.

12 Can you indicate to us approximately where that cut would have

13 gone through on the superficial vessels?

14    A. (Witness complies)

15    Q. Okay. As it transversed across there, what, if any,

16 structures were damaged or severed?

17    A. The main injuries that took place here were to the

18 external carotid, the internal jugular on the right side.

19    Q. Okay.

20    A. And those -- we can see the external carotid over

21 here, but it's not as easily labeled here because they

22 reflected more of the tissue. It happens to be on the left

23 side, but in this particular case, the injuries themselves

24 took place on the right side.

25    Q. When you cut a major vessel like that, what happens

Page 37

1 to the body?

2    A. Well, with a sharp force injury such as this, you

3 are going to have a great deal of blood and -- blood that's

4 going to be released from both the vein and the artery,

5 particularly the artery, and even more so because the entire

6 vessel has been cut.

7    Q. Okay. And in this case, was it a transection of

8 those vessels?

9    A. Yes, it was.

10    Q. Does that pose a serious risk to the individual's

11 health?

12    A. Yes.

13    Q. Can you explain that to the ladies and gentlemen?

14    A. Yes. Once vessels of this size, with a large amount

15 of blood flow going through them, are either partially cut or

16 transected, there's going to be a great deal of hemorrhaging

17 or bleeding taking place.

18        There's a large amount of blood flow that goes

19 to the head, and it precedes through these vessels. So

20 there's going to be hemorrhaging coming out, and then in

21 addition, the tool itself, the weapon, also cut across the

22 trachea, opening the trachea, as well as being -- the thrust

23 was forceful enough that it went towards the spine, striking

24 the spine, which is located behind all of these systems.

25    Q. You indicated the word trachea, what is the trachea?

Page 38

1        MR. DURHAM: Pardon me, Your Honor. If counsel

2 is not using the chart, he should remain seated, is my

3 understanding of the rules. The doctor is the one using the

4 chart.

5        THE COURT: Overruled.

6    Q. (BY MR. YONTZ) Go ahead. What is the trachea,

7 Doctor?

8    A. The trachea is the airway where oxygen and other

9 elements are going to be proceeding down into the lungs.

10    Q. Doctor, I'll show you what has been marked as

11 State's Exhibit No. 36, and ask if you're familiar with this

12 particular item?

13    A. Yes.

14    Q. What is this?

15    A. These are diagrams that we use in our office to

16 describe, in a region of the neck, injuries that may have

17 taken place.

18    Q. And does this relate to any particular individual

19 specifically?

20    A. Yes. This relates to Stanley A. Wiley.

21    Q. What are we looking at here on these three areas?

22    A. Here we're looking at -- actually just looking at

23 the front of the trachea. This is some tissue here, soft

24 tissue. This is cartilage here. And then we have the

25 tracheal cartilage as it proceeds downward. And if you

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00414-RFB  Document 84-2  Filed 01/17/13  Page 14 of 67  PageID #: 626

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

| Page 39 | Page 41 |
|---|---|

Page 39

1 continued, you would see it branching into each of the right
2 and left lungs respectively.
3      There's a line that has come across here which
4 essentially is descriptive of the type of injury that was
5 received location-wise on the trachea.
6   Q. Okay. There is also items on this one, which is the
7 diagram on the left here, what are we looking at here and
8 what's noted?
9   A. If you were to take this diagram and rotate it, you
10 would be looking at the back of it. And that's what we're
11 looking at here, is the back side of this diagram here, which
12 is now showing you -- again, you're looking at the back of the
13 cartilage here. This is the epiglottis.
14      And down here, we just indicated that the
15 thyroid gland was cut with that injury, as well as, on one
16 side it was completely cut, and then on the other side it was
17 partially cut.
18   Q. You indicated this is cartilage. As far as the
19 make-up of things in the body, skin, muscle, bone, how does
20 this relate in density and I guess toughness?
21   A. It's going to be more tough than skeletal muscle or
22 muscle itself. It's going to be -- essentially, the concept
23 of once a wound is penetrated through the skin, if your blade
24 is sharp enough, it's going to continue to cut until it
25 strikes something very firm, which would be most likely like

Page 40

1 dense bone.
2      In striking something like cartilage, if your
3 weapon is sharp enough and there is enough of an adequate
4 thrust, it should cut through it.
5   Q. And you indicated this actually went through and
6 actually went into the spine in the back of the neck?
7   A. That's correct.
8   Q. Is that a wound that's going to be sustained simply
9 by drawing a sharp object across or are we looking at
10 something you would describe as with considerable force?
11      MR. DURHAM: Your Honor, some leading is
12 acceptable, but --
13      THE COURT: Your objection as to leading --
14      MR. DURHAM: Leading.
15      THE COURT: - is sustained.
16      MR. DURHAM: Thank you, Your Honor.
17   Q. (BY MR. YONTZ) How would you describe the force
18 necessary to cut through the structures of the neck as well as
19 the cartilage and into the spine?
20   A. When we're describing force, we don't really use a
21 quantitative number value with sharp force injuries. But with
22 the type of injuries that are seen, I would state that this is
23 a moderate to severe level of force required since it did
24 strike the spine.
25   Q. Okay.

Page 41

1      MR. YONTZ: Your Honor, the State would move
2 Exhibits 36 and 37 at this time.
3      MR. DURHAM: No objection.
4      THE COURT: Exhibits are received.
5      MR. YONTZ: Thank you.
6   Q. (BY MR. YONTZ) Doctor, you've indicated sharp force
7 injury. What are you talking about when you say the words
8 sharp force injury?
9   A. Sharp force injuries are injuries due to some sort
10 of a tool or implement where the cutting edge is sharp enough
11 that once it is striking, most times the skin, there's going
12 to be clean separation of the tissue without what we see
13 underneath, something we call bridging of underlying tissue;
14 in other words, strands of tissue that are still connected as
15 we would see in blunt force trauma.
16   Q. Would this be consistent with an injury that could
17 be caused by a sharp knife?
18   A. Yes.
19   Q. Doctor, during the course of your examination, did
20 you determine a cause of death in this matter?
21   A. Yes.
22   Q. What was that?
23   A. Sharp force injuries of the neck.
24   Q. Okay. And in regard to this, is that -- those
25 findings also consistent with the finding that the manner of

Page 42

1 death is a homicide?
2   A. Yes.
3      MR. YONTZ: I have no further questions, Your
4 Honor.
5      MR. DURHAM: If I may have just a moment, Your
6 Honor.
7      CROSS-EXAMINATION
8 BY MR. DURHAM:
9   Q. Just a couple of questions. And usually when a
10 lawyer says a couple of questions, they go on and on, but,
11 really, I just have two.
12      You've just testified that the manner of death
13 was homicide, but that's not consistent with your autopsy
14 report, is it?
15   A. The manner of death, if I was asked the opinion
16 of --
17   Q. Sir, it's a yes-or-no question. Is it consistent
18 with what you put on your autopsy report?
19   A. The manner of death would be determined by the
20 justice of the peace.
21   Q. Okay. You didn't determine the manner of death?
22   A. No.
23   Q. So, see, I'm already -- already gone past -- that's
24 my two, except I've got one more, so it's three. Let's go for
25 four.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00775-BR Document 84-2 Filed 01/17/13 Page 15 of 67 PageID 1392

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 43

1       How long is 23 centimeters?
2   A. Approximately nine to ten inches.
3   Q. All right. Would you open that board and draw the
4 approximation of 23 centimeters for the jury's benefit,
5 please?
6       Or better yet, could we -- could you -- well,
7 these are not to scale, are they?
8   A. No, they're not.
9   Q. Okay. So it would be -- you couldn't -- if you put
10 23 centimeters on that, it wouldn't show it properly, would
11 it?
12   A. I don't believe it would.
13   Q. Okay. Well, just open the board and demonstrate to
14 the jury how long 23 centimeters is, if you -- if you know
15 exactly how long 23 centimeters is.
16   A. Well, we would need a ruler.
17   Q. Okay. I don't have a ruler.
18       THE COURT: Go to my office and get one.
19   Q. (BY MR. DURHAM) Does that have centimeters on it?
20 It doesn't have centimeters.
21   A. Well, we can just -- we can convert.
22   Q. Okay.
23   A. 2.5 centimeters --
24   Q. You may be able to, but I can't.
25       Just draw it there for us.

Page 44

1   A. (Witness complies)
2   Q. Okay. That's -- you're showing that's -- how long
3 is that, please?
4   A. This should be approximately 23 right here.
5 (Indicating)
6   Q. Okay. Okay. So in inches -- tell me in inches
7 about what that would be. Just measure it there. Just kind
8 of tell us with your measurement about how far that would be.
9   A. It would be approximately nine inches.
10   Q. Okay. Will you put "nine inches" above that,
11 please? You see, I don't understand meters and centimeters or
12 millimeters. So the wound was about nine inches long, right?
13   A. Yes.
14   Q. And a round -- and a roundness like -- of course,
15 the neck is round.
16   A. Well, the wound is nine inches long.
17   Q. On a round surface?
18   A. It would be on any surface, it's nine inches.
19   Q. Well, but -- well, yeah, that's right. I'm just
20 saying that if I draw nine inches across my neck, it would
21 cover more than my neck, where if I started up here, it could
22 stop somewhere in between or just past halfway. Would you
23 agree with that?
24   A. I would just state that it's nine inches on your
25 neck and you could get it in a variety of ways.

Page 45

1   Q. Depends on the size of your neck?
2   A. Yes.
3   Q. That's the reason they make shirts in different
4 sizes?
5   A. Well, it's nine inches on your neck.
6   Q. Well, I'm sorry I asked you more than two questions,
7 but I really intended to only ask two. Thank you very much.
8       MR. DURHAM: I'll pass the witness.
9       MR. YONTZ: No further questions, Your Honor.
10      THE COURT: Okay, Doctor, you can step down.
11      MR. YONTZ: Your Honor, may Dr. Natarajan be
12 excused?
13      MR. DURHAM: We certainly have no objection.
14      THE COURT: Okay. You're free to go. Thanks.
15      DR. NATARAJAN: Thank you.
16      THE COURT: Call your next witness.
17      MR. SIMS: Bud Williams. Our next witness has
18 not been sworn, Your Honor.
19      (At the bench, on the record)
20      MR. DURHAM: This is an inmate who, when he
21 gets through testifying, will go back --
22      THE COURT: Okay, okay. All right. I wasn't
23 aware that we were beginning with the penitentiary guys. I
24 thought I said I was going to take them out and swear them all
25 in.

Page 46

1       MR. SIMS: Okay.
2      (Open court)
3      THE COURT: Okay, folks, if you'll step into
4 the jury room, please.
5      (Jury left the courtroom)
6      THE COURT: Okay, Gary, -- how many witnesses
7 do you have down there that you intend to call who are
8 inmates?
9      MR. SIMS: Eight, Your Honor.
10      THE COURT: Okay. I need to chain them all in
11 a line and bring them up here.
12      MR. SIMS: Actually, there's only seven there,
13 Your Honor. One is on parole, so he's not in the back.
14      THE COURT: Okay. So seven of them on a chain
15 and bring them up here to the courtroom, please. Go no
16 further than the edge of the jury box with them when they're
17 brought up. You can take this guy back and do him the same
18 way.
19      With regards to your others, what I know is
20 coming, there will be no ability to keep these people apart
21 after their testimony. I'll swear them in, I'll instruct them
22 on the rule. You may certainly voir dire each of them as they
23 come up here with regard to any discussions they have, but
24 there is simply no way to keep them separate.
25      MR. DURHAM: I understand that and I will

**Page 47**

1 ask -- I would like the opportunity to ask appropriate
2 questions about their contact outside the presence of the
3 jury.
4          MR. SIMS: Your Honor --
5          THE COURT: I don't know how I'll work that.
6 Yes, sir?
7          MR. SIMS: The guards have informed me that
8 they don't have -- they're just in hand restraints.
9          THE COURT: Okay.
10         THE GUARD: We have other restraints down in
11 holding, we can get them if we need it.
12         MR. SIMS: And they also are planning, I'm not
13 sure how, but they're planning on trying to keep them
14 separate. Once they testify, they're going to try to keep
15 them not -- from getting back together.
16         THE COURT: Okay.
17         MR. DURHAM: That would meet -- what you just
18 brought up, that would be okay with me.
19         MR. SIMS: That had been previously discussed
20 with them.
21         THE COURT: All right. If that's the
22 situation, then, how many -- how many do you feel comfortable
23 bringing up at a time here just for me to swear in and take
24 them back?
25         THE GUARD: We can bring them all up if you

**Page 48**

1 need them, all seven of them. We have two officers in here.
2          THE COURT: Okay. That would make it a lot
3 easier, then. And just bring them and hold them right there
4 in that area and I'll swear them in and then --
5          THE GUARD: Hand restraints?
6          THE COURT: Well, yeah, keep --
7          MR. SIMS: Just hands.
8          THE COURT: Yeah, just hands is fine, yeah.
9          (Pause)
10         MR. SIMS: Judge, I've now been told they're
11 going to be put in the holding cell together after they
12 testify. There's not a way to keep them separate here.
13         THE COURT: Okay.
14         (Pause)
15         THE COURT: Okay, I'm going to swear each of
16 you in as a witness, then I'll give you some instructions with
17 regard to this trial.
18         (Witnesses sworn)
19         MR. YOW: No, sir.
20         THE COURT: Okay. And your name, sir, is?
21         MR. YOW: Yow.
22         THE COURT: Yow?
23         MR. YOW: Yes, sir.
24         THE COURT: Okay. Will you affirm to that,
25 Mr. Yow?

**Page 49**

1          MR. YOW: Yes, sir. I will not testify at all.
2          THE COURT: Okay. All right. So you will not
3 swear nor affirm that you will tell the truth if called as a
4 witness in this case?
5          MR. YOW: I'm saying that I would not testify,
6 so I would not swear in.
7          THE COURT: All right. Well, that's a decision
8 that you make. If you -- if you're called as a witness -- you
9 know, I've got to tell you Mr. Yow, I feel kind of foolish
10 telling you this --
11         MR. YOW: Uh-huh.
12         THE COURT: -- you being in the penitentiary
13 and all.
14         MR. YOW: Yes, sir.
15         THE COURT: But if you refuse to testify as a
16 witness, I'll hold you in contempt and keep you in jail until
17 you do agree to testify.
18         MR. YOW: That's fine. I'll stay in jail, sir.
19         THE COURT: That's why I say that I feel kind
20 of foolish.
21         Okay. Now, as a practical matter, Mr. Yow,
22 what is going to happen, though, is, if the State insists on
23 calling you into the courtroom as a witness, I'm still going
24 to bring you in.
25         MR. YOW: All right. That's fine. I'll come,

**Page 50**

1 sir.
2          THE COURT: And then we'll -- then you can --
3 if that's your choice, then you'll repeat that refusal again.
4          MR. YOW: Yes, sir.
5          THE COURT: Okay. All right. Now, what I was
6 going to tell you, those of you who will testify, is this:
7 The Rule has been invoked. What that means is that I am
8 instructing you not to discuss your testimony or the testimony
9 of other witnesses with each other or anyone else.
10         You're not to read anything in the newspaper or
11 watch television and see the media reports of it, don't listen
12 to anything about it on the radio with regard to the testimony
13 of other witnesses. Does everybody understand those things?
14         WITNESSES: Yes, sir.
15         THE COURT: Okay. All right. Thanks a lot.
16         No, sir, step back, please, while we're doing
17 this. Nobody but prison folks over here. I'm completely
18 serious, Mr. Sims, not in this area.
19         Okay. All right. Take them back, please.
20         Okay. We'll be in recess for about another ten
21 minutes until the jury gets back, then.
22         Okay. I need to make something clear here. No
23 lawyers, State, defense, or otherwise are allowed through this
24 door.
25         MR. DURHAM: I've not --

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00076-J-BR  Document 84-2  Filed 01/17/13  Page 17 of 67  PageID 1892

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 51

1    THE COURT: Nobody.
2    MR. DURHAM: I've not been through there.
3    THE COURT: I know you haven't, sir, and it's
4 not pointed to you --
5    MR. DURHAM: All right.
6    THE COURT: -- that comment.
7    Another thing is, this is a huge security
8 issue, and I'm running the courtroom, so when I say, "Move,
9 stop, don't," I want those instructions followed explicitly.
10    MR. SIMS: Yes, sir.
11    THE COURT: I'm not trying to bully this
12 courtroom, I'm trying to keep the jurors, the litigants, the
13 lawyers, and the gallery safe during this trial.
14    MR. SIMS: Yes, sir.
15    THE COURT: All right.
16    (Recess)
17    THE COURT: Okay. Everybody be seated, please.
18    (Jury returns to the courtroom)
19    THE COURT: Be seated, please.
20    Okay. Bring Mr. Williams in, please.
21    Mr. Williams, if you would come right through
22 the middle there, please, sir, and take a seat back on the
23 witness stand.
24    Now reach up and pull that microphone sort of
25 towards you, Mr. Williams. Thank you.

Page 52

1    Go right ahead.
2    BUD WILLIAMS, JR.,
3 having been first duly sworn, testified as follows:
4    DIRECT EXAMINATION
5 BY MR. SIMS:
6    Q. Would you state your name, please, sir?
7    A. Bud Williams, Jr.
8    Q. Where are you currently residing?
9    A. Bill Clements Unit.
10    Q. Is that a maximum security unit for the Texas
11 Department of Criminal Justice, Institutional Division?
12    A. Yes, sir.
13    Q. What are you in prison for at this time, sir?
14    A. Aggravated sexual assault.
15    Q. Doing a 55-year sentence out of Potter County; is
16 that correct?
17    A. Yes, sir.
18    Q. In regards to your testimony here today, has anybody
19 promised you anything at all?
20    A. No, sir.
21    Q. Do you know a Travis Trevino Runnels?
22    A. Yes, sir.
23    Q. See him here in the courtroom today?
24    A. Yes, sir.
25    Q. Would you please point him out and describe what

Page 53

1 he's wearing?
2    A. Red shirt and tie, glasses, tan pants, brown shoes.
3    Q. How long have you known him?
4    A. About eight years.
5    Q. Before being on the Clements Unit with him, were
6 y'all in another unit together?
7    A. In the Robertson Unit.
8    Q. For about how long were you there together?
9    A. He was in seg and I was in G-3. I used to cut hair
10 back then. Didn't know him back then.
11    Q. Okay. Do -- did you know Stan Allen Wiley?
12    A. Yes, sir.
13    Q. Who was he out at the prison, sir?
14    A. He was a boot factory worker, staff.
15    Q. I'll show you State's Exhibit No. 1. Are you able
16 to recognize that?
17    A. Yes, sir.
18    Q. Who is that, sir?
19    A. Mr. Wiley.
20    Q. How did you come to know Mr. Wiley at the prison?
21    A. I worked out there about 12 days in the second shift
22 boot factory.
23    Q. That's all you worked at the boot factory; is that
24 correct?
25    A. Yes, sir.

Page 54

1    Q. What's your current job?
2    A. Barber.
3    Q. On January 29th of 2003, are you aware of where this
4 defendant, Mr. Runnels, was working?
5    MR. DURHAM: Calls for a hearsay response, Your
6 Honor, unless he was personally present.
7    THE COURT: Overruled.
8    Q. (BY MR. SIMS) Are you aware of where Mr. Runnels
9 was working?
10    A. Yes, sir.
11    Q. Where was he working at?
12    A. First shift boot factory.
13    Q. And there's only one boot factory out at the prison,
14 isn't there?
15    A. Yes, sir.
16    Q. From your discussions with Mr. Runnels, are you
17 aware of where he worked at before he was in the boot factory?
18    A. He was in the boot factory.
19    Q. Before he was in the boot factory?
20    A. Before that, he was working as a barber and then in
21 the kitchen.
22    Q. And from your discussions with Mr. Runnels, why was
23 he no longer in the -- a barber, and then why was he no longer
24 in the kitchen and now in the boot factory?
25    MR. DURHAM: Your Honor, that -- that calls

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Case 2:12-cv-00775-BR Document 84-2 Filed 01/17/13 Page 18 of 67 PageID 7026
Multi-Page™
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 55

1  for -- that calls for a hearsay response unless it could
2  involve subjective desires.
3      THE COURT: Overruled.
4      A. He was working as a barber and he got switched to
5  the kitchen, but he had problems in the kitchen with someone,
6  but they never wrote him a case and he --
7      MR. DURHAM: That's exactly the gravamen of my
8  objection, Your Honor. How would he know that -- what those
9  problems were, if there were, in fact, problems?
10     THE COURT: As I understood -- and I may be
11  wrong. As I understood, the question was predicated on what
12  Mr. Runnels told him.
13     MR. DURHAM: That was not the answer. That's
14  my objection. Then it's nonresponsive, ask that it be --
15     THE COURT: Sustained.
16     MR. DURHAM: -- stricken and the jury to
17  disregard.
18     THE COURT: The jury will disregard the last
19  answer given.
20     Q. (BY MR. SIMS) Based on your discussions with
21  Mr. Runnels, what is your understanding of why he was no
22  longer in the kitchen, just --
23     MR. DURHAM: Okay --
24     THE COURT: Sustained.
25     A. He told me that a sergeant --

Page 56

1      Q. (BY MR. SIMS) No, you can't --
2      A. Okay.
3      Q. Just a minute. Let me ask it this way. Well, I'll
4  come back to that.
5      Earlier during the week of January 29th of
6  2003, did you have some communications and discussions with
7  the defendant, Mr. Runnels?
8      A. Yes, sir.
9      Q. Did any of those deal with -- well, start with that
10  Monday. Where were you at when you first had a discussion
11  with Mr. Runnels?
12     A. We was on the pod in the section together where we
13  stayed.
14     MR. DURHAM: Would you speak up just a little
15  bit, sir?
16     A. We stayed in the same section together on the pod.
17     Q. (BY MR. SIMS) Okay. What happened at that time?
18     A. He was just saying he was trying to get released
19  from the boot factory to get another job, and saying he was
20  supposed to have been released from the boot factory, trying
21  to go back being a barber. And he said that the plant
22  manager, Mr. Williams, said he would release him if he would
23  get someone to call him for a job. And so this sergeant
24  called and said he would give him a job, but they didn't
25  release him from the job.

Page 57

1      Q. Was Mr. Runnels upset, or how would you characterize
2  Mr. Runnels' behavior in regards to them not releasing him
3  from work at the boot factory?
4      A. He was upset because he was saying that once he got
5  released, that he would get a barber job, which the sergeant
6  said he would give him a job, and they didn't release him, so
7  he was talking to different rank, you know, about trying to
8  get a job, get from out of there. And one thing led to
9  another when he said that he was trying to leave from -- he
10  wanted to be from out there.
11     So that night, I went in there, I barber, I go
12  to school, and I went in there --
13     MR. DURHAM: At some point, this became
14  nonresponsive to the question.
15     THE COURT: Sustained.
16     Q. (BY MR. SIMS) Let me ask a few questions in there,
17  okay?
18     Now, in regards to this conversation, that
19  happened two days before the incident at the boot factory; is
20  that correct?
21     A. Yes, sir.
22     Q. After that -- now, you go to school; is that
23  correct?
24     A. Yes, sir.
25     Q. What time do you have to get up and go to school?

Page 58

1      A. I get up around 4:00. I have to be at school at
2  5:00.
3      Q. Okay. Is that about the same time that the
4  individuals are getting ready to go to the boot factory?
5      A. Yes, sir.
6      Q. Y'all start out early --
7      A. Yes.
8      Q. -- in the prison system; is that right?
9      A. Yes, sir.
10     Q. Okay. Did you wake up one morning and find anything
11  under your door?
12     A. I woke up and there were some barber combs up under
13  my door, and I woke up and asked my cellie who put them under
14  there. So he said he didn't know. So --
15     MR. DURHAM: Objection. It's -- Your Honor,
16  it's not responsive, and also has hearsay in the answer.
17     THE COURT: Sustained.
18     MR. DURHAM: May I have an instruction?
19     THE COURT: Let's proceed.
20     Q. (BY MR. SIMS) You didn't know who had placed the
21  barber combs under there, correct?
22     A. Not at that time. When I woke up, I didn't.
23     Q. Okay. You asked your cellie about it; is that
24  correct?
25     A. Yes, sir.

**Page 59**

1  Q. After that, who did you ask about it?
2  A. They rolled the doors for us to come out, and a
3  couple of other guys said Runnels put his barber combs under
4  the door.
5      MR. DURHAM: Your Honor, that's not responsive.
6  We continually get hearsay responses.
7      THE COURT: Sustained. Mr. Williams, listen to
8  the question that you're asked, sir, and answer just that
9  question, all right?
10     THE WITNESS: Yes, sir.
11  Q. (BY MR. SIMS) Once you got out, did you decide to
12  make contact with Mr. Runnels about --
13     MR. DURHAM: Leading question, Your Honor.
14  Counsel is leading his witness.
15     THE COURT: Don't lead the witness, please,
16  sir.
17  Q. (BY MR. SIMS) Did you eventually decide to contact
18  anyone about the combs that were left under your door?
19  A. Yes, sir.
20  Q. Who did you contact?
21  A. When I come out the cell door, Runnels was standing
22  in the day room and he told me he put the combs under there.
23  I said, "For what?" And he said --
24     MR. DURHAM: Nonresponsive to the question.
25  Objection.

**Page 60**

1      THE COURT: Sustained.
2  Q. (BY MR. SIMS) You've got to let me ask questions
3  before you answer.
4  A. Okay.
5  Q. You just can't tell a narrative story, okay?
6      MR. DURHAM: We're going to object to the
7  sidebar comment.
8      THE COURT: Let's proceed.
9  Q. (BY MR. SIMS) So you talked to this defendant, when
10  you said Mr. Runnels; is that correct?
11  A. Yes, sir.
12  Q. And he told you what?
13  A. That he put the barber combs up under my door.
14  Q. What happened at that point, very next thing?
15  A. He had a letter in his hand and asked me would I
16  mail this letter off to his mom if he don't come back. And I
17  asked him, "Where are you going?" and he said, "I might not
18  come back. I ain't going to be coming back." So I said,
19  "Okay. What you going to do?"
20  Q. What happened at that point?
21  A. I got the letter and just slid it up under my door
22  and we were walking on out. He said, "Do you want to know?"
23  I said, "Not really." He said, "I ain't coming back. Just
24  make sure the letter gets mailed to my mom." I said, "All
25  right." He said, "Because they're going" --

**Page 61**

1  Q. Did he --
2  A. -- "they're going to ship" --
3  Q. Did he, in fact, give you a letter --
4  A. He gave me a letter.
5  Q. -- at that time?
6  A. Yes, sir.
7  Q. Okay.
8  A. And he said, "Because if they don't release me, I
9  ain't coming back. They're going to ship me one way or the
10  other."
11     MR. DURHAM: That's not responsive to any
12  question.
13     THE COURT: Sustained.
14     MR. DURHAM: May I have --
15     THE COURT: The jury is instructed to
16  disregard.
17  Q. (BY MR. SIMS) After he gave you the letter, what's
18  the very next thing that happened? Just --
19  A. I put the letter --
20  Q. -- the very next thing. Not a whole bunch, just the
21  next thing.
22  A. I put the letter up under my door.
23  Q. Then what happened?
24  A. We walked off the section.
25  Q. Okay. Now, you said he told you what about the

**Page 62**

1  letter? What were your instructions to do with the letter?
2      MR. DURHAM: Asked and answered.
3      THE COURT: Sustained.
4  A. He asked me would I mail it --
5      THE COURT: Okay. You don't need to answer
6  that question. I sustained the objection to that, so he'll
7  ask you another question now.
8  Q. (BY MR. SIMS) Did you read the letter at that time?
9  A. No, sir.
10  Q. At one point, did you tell him, yes, you would like
11  to know what he was going to do?
12  A. Yes, sir.
13  Q. What happened after you told him that?
14  A. He told me what his intent -- what -- what he was
15  going to do.
16  Q. What did he tell you?
17  A. He said he was going to get shipped one way or
18  another, that he was going to kill someone. I said, "Man, you
19  tripping." I mean, you know, "What are you talking about?"
20  He said, "I'm for real." So --
21  Q. What happened after that?
22  A. He went on to the boot factory and I went on to
23  school.
24  Q. Did he give you anything else at that time?
25  A. No, sir.

Page 63

1   Q. Did you ever remember seeing a yellow sheet of
2 paper?
3       MR. DURHAM: Leading question.
4   A. No, sir.
5       MR. DURHAM: Objection --
6       THE COURT: Sustained.
7       MR. DURHAM: -- to the leading --
8       THE COURT: Sustained.
9       MR. DURHAM: May I have an instruction to
10 counsel to stop leading?
11       THE COURT: Proceed.
12   Q. (BY MR. SIMS) Besides delivering the letter, did he
13 ask you to do anything else?
14   A. No --
15   Q. At that time, at that time.
16   A. No, sir.
17   Q. Okay. Now, did you go on and go to school that day?
18   A. Yes, sir.
19   Q. What happened while you were at school?
20   A. We was in school doing classwork, and all of a
21 sudden, they said -- had a response to the boot factory.
22       MR. DURHAM: Hearsay.
23       THE COURT: Okay. Let's don't ask open-ended
24 questions that call for a narrative, please. Let's ask direct
25 questions and then we -- I don't think Mr. Williams knows when

Page 64

1 we want him to stop, you know, when it becomes nonresponsive,
2 so ask direct questions.
3   Q. (BY MR. SIMS) You went on to school that day; is
4 that correct?
5   A. Yes, sir.
6   Q. While you were at school that morning, did you
7 become aware that something had happened on the unit?
8   A. After they did a response and racked us up.
9       MR. DURHAM: Your Honor, that's a yes-or-no
10 question.
11       THE COURT: Sustained.
12       MR. DURHAM: It's not a responsive answer.
13   Q. (BY MR. SIMS) Did you become aware that something
14 had occurred on the unit?
15   A. Not until they racked us up.
16   Q. Tell the ladies and gentlemen of the jury what
17 racking you up means.
18   A. That means that everybody on the unit, you go back
19 to your pod, to your cell, and you're in lockdown.
20   Q. Will just any kind of minor policy cause the whole
21 unit to get racked up?
22       MR. DURHAM: Objection, that calls for an
23 interpretation of prison policy, Your Honor.
24       THE COURT: Sustained.
25   Q. (BY MR. SIMS) How long have you been in prison,

Page 65

1 sir?
2   A. This is my 13th year.
3   Q. Based on you being aware that the whole unit had
4 been racked up, based on your observations, what did you think
5 had happened that day?
6       MR. DURHAM: Your Honor, that's not admissible,
7 what he thought happened, and it calls for a hearsay response
8 and it is immaterial and it is irrelevant.
9       THE COURT: Sustained.
10       Rephrase your question, please.
11   Q. (BY MR. SIMS) After the unit was racked up -- or,
12 as a matter of fact, after Mr. Runnels left to go to the boot
13 factory and you went to school, did you ever see the defendant
14 again?
15   A. No, sir, not until today.
16       MR. SIMS: I'll pass the witness, Your Honor.
17       MR. DURHAM: Thank you.
18       CROSS-EXAMINATION
19 BY MR. DURHAM:
20   Q. Mr. Williams, just a few questions.
21       You forgot to tell the jury about Travis
22 telling you that Mr. Wiley was messing with him, didn't you?
23   A. He never told me Mr. Wiley was messing with him.
24   Q. Well, in your statement you said that. Do you not
25 remember your written statement?

Page 66

1       MR. DURHAM: May I approach the witness, Your
2 Honor?
3       THE COURT: Sure.
4   Q. (BY MR. DURHAM) Here, you gave a rather lengthy
5 voluntary statement, three -- three pages worth. Do you
6 want -- do you want to review that? Go ahead and review it.
7       First, is that the statement you gave? Look at
8 the signature there and see if that's the statement you gave.
9   A. That's my signature.
10   Q. That's your signature, that's your statement. Do
11 you want to read that -- take a moment, please?
12   A. (Witness reading)
13       THE COURT: Mr. Durham, perhaps you'll direct
14 his attention out of that three pages to the part that you
15 wish to cross-examine about.
16       (Pause)
17       THE COURT: Have you completed your --
18       THE WITNESS: Yes, sir.
19       THE COURT: -- review, Mr. Williams?
20       THE WITNESS: Yes, sir.
21       THE COURT: Thank you. Let's proceed. He says
22 he's completed his review.
23   Q. (BY MR. DURHAM) Okay. Right, and did you find the
24 part where you told them about Mr. Wiley messing with Travis?
25   A. Yes, sir.

THE STATE OF TEXAS
Case 2:12-cv-00410-JRG Document 84-2 Filed 01/17/13 Page 21 of 67 PageID #: 2713
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 67

1    Q. Okay. So you forgot to tell the jury about that,
2 didn't you?
3    A. Well, he said that --
4    Q. Sir, did you tell the jury about that in all the
5 statements you made?
6    A. Yes, sir.
7    Q. Oh, you did tell them?
8    A. Do you want me to tell them?
9    Q. And I missed it?
10    A. Do you -- do you want me to tell them?
11    Q. Sir, did he tell you that Mr. Wiley was messing with
12 him?
13    A. He said Mr. Wiley was messing with him.
14    Q. Yes, sir, that's --
15    A. That's what he said. I don't know.
16    Q. Now, that's just based on what he said, right?
17    A. Yes, sir.
18    Q. Okay. Let me -- you've been in prison quite a
19 while. Is the sexual offense the only case you've been
20 convicted on?
21    A. Yes, sir.
22    Q. Okay. Having been in prison, you've been in more
23 than one unit?
24    A. Yes, sir.
25    Q. Okay. What other units have you been in?

Page 68

1    A. Robertson, Hughes, Garza, Gurney.
2    Q. And what occasioned you being transferred from one
3 unit to another?
4    A. They just transfer us.
5    Q. For no reason?
6    A. No reason.
7    Q. Okay. In the prisons, are jobs important?
8    A. Yes, sir.
9    Q. So various jobs carry various benefits with them?
10    A. That's the way you do your job.
11    Q. Well, I mean, there's a difference in being on a
12 farm unit and being out in the sun chopping cotton and being
13 in a unit where it's air-conditioned and you're doing
14 paperwork. Would you say there's a difference?
15    A. There's a difference there.
16    Q. And so jobs are very important?
17    A. If you've got the skills to do it.
18    Q. Okay. And your relationship with your supervisors
19 is important; is that correct?
20    A. That's correct.
21    Q. Okay. And if you've got a good relationship with
22 your supervisor, you're a happy prisoner, right?
23    A. Yes, I guess.
24    Q. And happy prisoners don't cause problems, do they?
25    A. Yes, happy.

Page 69

1    Q. And if your supervisor is giving you a hard time,
2 you're an unhappy prisoner, aren't you?
3    A. Yes.
4    Q. Okay. Now, when Travis told you he -- he might not
5 be coming back, that could have meant a lot of things,
6 couldn't it?
7    A. Well, he stipulated why he didn't want to be out
8 there.
9    Q. Stipulated he did not want to be there?
10    A. Yes.
11    Q. So not coming back could mean that he was going to
12 climb over the fence?
13    A. Well, he put it in --
14    Q. Pardon?
15    A. -- words that he was going to do something to make
16 them ship him.
17    Q. Well, climb -- if he ran to climb over the fence,
18 that would get their attention, wouldn't it?
19    A. Yeah, if he done that.
20    Q. Yeah. And you weren't present when anything
21 happened?
22    A. No, sir.
23    Q. And you don't personally know what was going on in
24 that boot factory?
25    A. No, sir.

Page 70

1    Q. Are you -- strike that.
2       Let me see if I can get this straight. He told
3 you about problems he was having, correct?
4    A. Yes, sir.
5    Q. And he told you that he intended to put an end to
6 those problems some way?
7    A. Yes, sir.
8    Q. And he didn't say, "I am going to" -- did he say, "I
9 am planning to do A, B, C?"; that is, "I'm going to get a
10 knife and go kill somebody"? Did he say that?
11    A. No, he didn't say it -- he never told me he was
12 going to get a knife and go do something. He just said that
13 he was going to make them ship him some kind of way. And I
14 said, "What you mean? You tripping."
15    Q. Okay. So he -- he was -- he apparently was having a
16 miserable time within that job?
17    A. He didn't want to be out there.
18    Q. And did he tell you what his job was out there?
19    A. I think janitor, sweeping up, cleaning up, I think.
20    Q. You don't know?
21    A. I'm pretty sure that's what he said, that he was a
22 janitor or something to the sort.
23    Q. These various units you've been in -- I notice the
24 State swore in several witnesses this morning, were -- and you
25 were one of them, correct?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00070-J-BR Document 84-2 Filed 01/17/13 Page 22 of 67 PageID 2704

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 71

1    A. Yes, sir.
2    Q. And they were all inmates, correct?
3    A. Yes, sir.
4    Q. And there were seven of them, correct?
5    A. Yes, sir.
6    Q. And one of them was white, correct?
7    A. Yes, sir.
8    Q. And the other seven were black; is that correct?
9    A. Yes, sir.
10   Q. Is that -- does that represent the population at
11 Clements, primarily black?
12         MR. SIMS: Objection, calls for speculation.
13         THE COURT: Well, overruled. If he can answer
14 the question.
15   Q. (BY MR. DURHAM) Is the population out there
16 primarily black?
17   A. I wouldn't say that.
18   Q. Pardon?
19   A. I wouldn't say that, to my knowledge.
20   Q. It's just that the witnesses they swore in were all
21 black?
22   A. I guess that was the ones that worked out there. I
23 didn't work in there at that time.
24   Q. Well, you're familiar with using knives, aren't you?
25   A. Why would you say that?

Page 72

1    Q. You used a knife when you raped that 80-year-old
2 woman that you went to prison for.
3    A. That's what they claimed.
4         MR. SIMS: Objection, Your Honor. It's not
5 admissible.
6         THE COURT: Sustained.
7    Q. (BY MR. DURHAM) All right. Have you ever used --
8 did you use a knife in the commission of the offense you're in
9 prison for?
10   A. No, sir. That's what they put down. Wasn't no
11 knife ever found.
12   Q. Oh, they lied about it?
13   A. I guess so. If they would give me a DNA, I would be
14 innocent today.
15   Q. So you're an innocent man in prison?
16   A. Give me a DNA and it will prove it.
17   Q. You're an innocent man in prison?
18   A. Yes, sir.
19   Q. So you're hoping to get a DNA to help you get out of
20 prison --
21   A. Yes, sir.
22   Q. -- and you haven't been promised a DNA for
23 testifying?
24   A. No, sir.
25   Q. You're not worried about getting a snitch sheet?

Page 73

1    A. No, sir.
2    Q. You know what a snitch sheet is, don't you?
3    A. Yes, sir.
4    Q. And no one has -- are you -- have you been moved
5 since you were told you were going to testify?
6    A. No, sir.
7    Q. You're still in the same unit?
8    A. Still in the same unit.
9    Q. Same pod?
10   A. Different pod.
11   Q. Pardon?
12   A. Different pod.
13   Q. Oh, what pod did they switch you to?
14   A. I got my ten years in and I got dorm eligibility.
15   Q. Eligibility for what?
16   A. To move to the dorms.
17   Q. To the dorms?
18   A. The dormitories.
19   Q. Okay. So there are different classifications out
20 there?
21   A. Yes. You've got to become a different class to be
22 moved to the dorm.
23   Q. All right. Are you familiar with the classification
24 system?
25   A. Yes, sir.

Page 74

1    Q. Okay. What is it?
2    A. I was a G-3, which if --
3    Q. All right. What is a G-3?
4    A. If you've got -- if you've got 50 years or more,
5 you've got to have ten years calendar flat time on it to be
6 moved to the dormitory or the --
7    Q. And in the dormitory, you're not locked up?
8    A. You're locked up, but you're not in a cell block.
9    Q. Okay. What other classifications are there than
10 G-3?
11   A. You've got a G-4, which is medium custody; you've
12 got a G-5, which is closed custody. Anything after that is
13 seg.
14   Q. All right. Five is -- five is --
15   A. High security.
16   Q. -- is the worst? It's the high security?
17   A. Yes, sir.
18   Q. And four is just below that?
19   A. Yes, sir.
20   Q. And at some point in time, were you either a four or
21 a five?
22   A. I've never been a five; I've been a four.
23   Q. Okay. And four is --
24   A. Medium.
25   Q. -- is what kind of security?

Page 75

1   A. Medium security.

2   Q. And then you moved down to a three?

3   A. Yes.

4   Q. And now you're a two?

5   A. Yes, sir.

6   Q. What happens when you become a one?

7   A. I'll never become a one.

8   Q. You can't become a one?

9   A. No, sir.

10   Q. Why not?

11   A. Because of my case, what I'm locked up for.

12   Q. Well, what is the one? What level is one? Is it a

13 trusty or what?

14   A. That's a trusty.

15   Q. Trusty?

16   A. Trusty status.

17   Q. So you can never be a trusty?

18   A. No, sir.

19   Q. Okay. And -- because of your classification?

20   A. Yes, sir.

21   Q. It must be hard to be doing 80 years when you're

22 innocent?

23   A. I don't have 80 years.

24   Q. Fifty-five years, I'm sorry, 55 years.

25       The -- your alleged victim was 80. You're only

Page 76

1 doing 55, though, correct?

2   A. Yes, sir.

3       MR. DURHAM: I'll pass the witness.

4       REDIRECT EXAMINATION

5 BY MR. SIMS:

6   Q. When you asked Mr. Runnels yes -- or told

7 Mr. Runnels yes, you wanted to know what he was going to do

8 that morning --

9   A. Yes, sir.

10   Q. -- do you recall what it is he told you?

11       MR. DURHAM: Asked and answered, Your Honor.

12       THE COURT: Sustained.

13   Q. (BY MR. SIMS) In regards to the question Mr. Durham

14 asked you while ago, you indicated that Mr. Runnels did not

15 specifically tell you what he was going to do.

16       MR YONTZ: Mr. Runnels.

17   Q. (BY MR. SIMS) Mr. Runnels, I'm sorry.

18   A. Yes, sir.

19   Q. Is that correct?

20   A. Yes, sir.

21   Q. And Mr. Durham indicated you gave a witness

22 statement shortly after this all happened; is that correct?

23   A. Yes, sir.

24   Q. If you were to read that, would that help refresh

25 your memory as to what might have actually been said?

Page 77

1   A. It could, yes, sir.

2   Q. Okay. Mr. Williams, it's right here. If you would

3 read starting right here. (Indicating)

4       THE COURT: Read it to yourself.

5       THE WITNESS: Okay. (Witness reading)

6   Q. (BY MR. SIMS) Does that help refresh your memory

7 about what Mr. Runnels told you?

8   A. Yes.

9   Q. What is it he told you, sir?

10   A. He asked me, did I really want to know. And I told

11 him no and he said -- then I said yes. He said that he was

12 going to kill Mr. Wiley if he say something to him this

13 morning. I said, "Man, you tripping." I said, "You're going

14 to get a job change."

15   Q. Now, you had known Mr. Runnels for some -- close to

16 ten years; is that correct --

17   A. Eight years.

18   Q. -- at the time this occurred?

19   A. About eight years, yes, sir.

20   Q. Eight years?

21   A. Yes, sir.

22   Q. To you, had you always found him to be a truthful

23 person and do what he said?

24   A. Yeah, he was always a truthful person. He was a

25 good person to me.

Page 78

1   Q. And do what he would tell you he would do?

2   A. Yes, sir.

3       MR. SIMS: Pass the witness.

4       RECROSS-EXAMINATION

5 BY MR. DURHAM:

6   Q. Well, to you, has he been a violent person?

7   A. Not since I've known him.

8   Q. And you have known him eight years. He's been in

9 prison eight years and not been violent, correct?

10   A. Not to my knowledge, he hasn't.

11   Q. Been a pretty good prisoner, as far as you know?

12   A. Yes, sir.

13   Q. But, of course, your memory is kind of on and off,

14 isn't it?

15   A. No, sir.

16   Q. Well, did you forget about being in prison in

17 Florida?

18   A. No, sir. You didn't ask me about Florida.

19   Q. No, sir, I asked you if you had been convicted of

20 anything else and you said no. Now, what were you convicted

21 in Florida for?

22   A. A robbery.

23   Q. I guess you were innocent of that also?

24   A. No, sir, I didn't say that.

25   Q. But you were convicted. Now you're telling the jury

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Case 2:13-cv-00070-BR   Document 84-2   Filed 01/17/13   Page 24 of 67   PageID 2706
Multi-Page™
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 79

1 while ago when you said you didn't have any other felony
2 convictions, that was incorrect?
3    A. I thought you were talking about the state of Texas.
4    Q. Oh. Well, do you have felony convictions other
5 places than Florida?
6    A. No, sir.
7    Q. Just Florida and Texas?
8    A. That's it.
9    Q. Now, how did you get to Texas?
10   A. I moved down here with my wife.
11   Q. Why did you leave Florida?
12   A. I wanted to change up.
13   Q. What about that probation you did for beating a man,
14 did you forget about that one, too?
15   A. I got probation. It got taken off my record.
16   Q. You went to court --
17   A. That was self-defense.
18   Q. -- again and it was taken off your record?
19   A. Yes, sir.
20   Q. It was not a final conviction?
21   A. No, sir.
22   Q. Oh, so it doesn't count?
23   A. I guess.
24   Q. Well -- all right. But you can truthfully say that
25 Travis has been a pretty peaceable prisoner, hasn't he?

Page 80

1    A. Yes.
2    Q. Do people get in fights in prison?
3    A. Every day.
4    Q. You haven't seen him get in a fight in eight years,
5 have you?
6    A. No, sir.
7    Q. He takes a lot of pushing to get his dander up,
8 doesn't he?
9    A. I can't say that.
10   Q. Have you ever seen him lose his temper?
11   A. Several times, but he didn't get in no fight over
12 it.
13   Q. He reined it in; is that correct?
14   A. What do you mean? What are you trying to say?
15   Q. Well, he -- he held his temper; he didn't go out and
16 do anything about it?
17   A. No, he didn't fight, if that's what you're trying to
18 insinuate.
19   Q. Well, okay. Did he later do something about it, put
20 slop in their food or hide their shoe laces or something?
21   A. No, sir.
22   Q. Okay. So it would take more than just a little to
23 push him to a point of doing something violent, in your
24 opinion; is that correct?
25   A. I don't know the -- about the pushing. I mean, I'm

Page 81

1 not him.
2    Q. No, sir, I'm asking you, based on your observations
3 over your eight-year relationship with Travis Runnels, you've
4 had occasion to see him almost on a daily basis; is that
5 correct --
6    A. Yes, sir.
7    Q. -- or incorrect?
8    A. That's correct.
9    Q. All right. And he's appeared to be a peaceable
10 person?
11   A. Yes, sir.
12   Q. He's been a good prisoner?
13   A. Yes, sir.
14   Q. So for him to react, it would take more than just an
15 unkind word, in your opinion?
16   A. I imagine if someone put his hand on him, he would
17 have fought back, or something like that, but -- but --
18   Q. It would take something unusual, wouldn't it?
19   A. I can't say that.
20   Q. Well, based on your experience, do you have an
21 opinion?
22   A. I mean, for me, for me doing my time, I can --
23   Q. No, sir.
24   A. -- I can look over and walk away from things now,
25 but when I first come in, I wouldn't have, but now I do.

Page 82

1    Q. But you saw him walk away from things on many
2 occasions, didn't you?
3    A. I seem him walk away from things that he could have
4 fought about, but he walked away from them.
5    Q. Many times?
6    A. Several times when I've been around.
7        MR. DURHAM: Pass the witness.
8        REDIRECT EXAMINATION
9 BY MR. SIMS:
10   Q. Are you with the defendant 24 hours day at the
11 prison?
12   A. No, sir.
13   Q. So some of these things, you don't know whether he
14 retaliated against anybody or not, do you?
15   A. No, sir. I wasn't there to see it.
16   Q. Tell the jury what you think about Mr. Wiley.
17   A. He was a good -- he was a good guy. If he could
18 help you, he would help you. If you had a problem, you could
19 go to him and talk to him about it. He would see what he
20 could do for you. I worked there like 12 days, and when I
21 wanted to leave because I liked cutting hair, he was trying to
22 get me to stay to cut hair -- I mean to stay and work, said I
23 was a good worker, but I told him I didn't like that, I liked
24 to cut hair. So when I got my line class, I left to go cut
25 hair.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00470-JRG Document 84-2 Filed 01/17/13 Page 25 of 67 PageID #: 

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

| Page 83 |
|---|
| 1   Q. In fact, you even had an opportunity to talk to |
| 2 Mr. -- |
| 3      MR. DURHAM: Objection, leading. |
| 4   Q. (BY MR. SIMS) Did you ever have an opportunity to |
| 5 talk to Mr. Wiley about a problem? |
| 6   A. Yes, sir. |
| 7   Q. Did he get that resolved? |
| 8   A. Yes, he got it resolved. |
| 9   Q. It wasn't any kind of physical altercation problem, |
| 10 though, was it? |
| 11      MR. DURHAM: That's -- that's a leading |
| 12 question. |
| 13      THE COURT: Sustained. Don't lead the witness, |
| 14 please. |
| 15      MR. SIMS: Pass the witness, Your Honor. |
| 16      RECROSS-EXAMINATION |
| 17 BY MR. DURHAM: |
| 18   Q. Mr. Williams, how long did you know Mr. Wiley? |
| 19   A. I knowed him about 12 days, when I was working in |
| 20 the boot factory. |
| 21   Q. Twelve days. And in that 12 days, y'all had a good |
| 22 relationship? |
| 23   A. Yes, sir. |
| 24   Q. Was he -- were you working in the boot factory? |
| 25   A. He was over me. |

| Page 84 |
|---|
| 1   Q. He was over you at the boot factory? |
| 2   A. Yes. |
| 3   Q. But you transferred out of there? |
| 4   A. Yes, sir. |
| 5   Q. For a better job? |
| 6   A. Yes, sir. |
| 7      MR. DURHAM: Okay. No further questions. |
| 8      MR. SIMS: Nothing further. |
| 9      THE COURT: Okay, Mr. Williams, you can step |
| 10 down. |
| 11      THE WITNESS: Yes, sir. |
| 12      THE COURT: Call your next witness. |
| 13      MR. SIMS: William Gilchrist. |
| 14      THE COURT: Mr. Gilchrist, if you would come |
| 15 right around here, please, sir, and take a seat up there on |
| 16 the witness stand. |
| 17      Pull that up a little bit and kind of |
| 18 towards -- yeah, yeah, right there. That's good. Thanks. |
| 19      Go ahead. |
| 20      WILLIAM GILCHRIST, |
| 21 having been first duly sworn, testified as follows: |
| 22      DIRECT EXAMINATION |
| 23 BY MR. SIMS: |
| 24   Q. State your name, please, sir. |
| 25   A. William Gilchrist. |

| Page 85 |
|---|
| 1   Q. Where are you residing, sir? |
| 2   A. Clements Unit. |
| 3   Q. Max unit for the Texas Department of Criminal |
| 4 Justice; is that correct? |
| 5   A. Yes, sir. |
| 6   Q. You're in for an aggravated robbery with a deadly |
| 7 weapon; is that correct? |
| 8   A. Yes, sir. |
| 9   Q. On a 59-year sentence? |
| 10   A. Yes, sir. |
| 11   Q. Has anyone promised you anything in regards to your |
| 12 testimony here today? |
| 13   A. No, sir. |
| 14   Q. Do you know Travis Trevino Runnels? |
| 15   A. Yes, sir. |
| 16   Q. See him here in the courtroom today? |
| 17   A. Yes, sir. |
| 18   Q. Point him out and describe the clothing he's |
| 19 wearing. |
| 20   A. Red shirt and some slacks. |
| 21   Q. How did you come to know this defendant? |
| 22   A. Just through -- just kicking it with him on the |
| 23 Clements Unit. |
| 24   Q. Can I ask you to speak up just a little bit? |
| 25   A. Yes, sir, yes, sir. |

| Page 86 |
|---|
| 1   Q. That's way better. Thank you. |
| 2      You knew him how, sir? |
| 3   A. Just, you know, playing basketball, barber shop, all |
| 4 that type of stuff. |
| 5   Q. On January 29th of 2000 (sic), where were you |
| 6 working at, sir? |
| 7   A. The boot factory. |
| 8   Q. Is there just one boot factory out there? |
| 9   A. Yes, sir. |
| 10   Q. On January 29th of 2003, what particular job did you |
| 11 have there? |
| 12   A. I was working in the lasting cage. |
| 13   Q. Explain just real briefly to the jury what that |
| 14 means. |
| 15   A. It's where you put the uppers on the rack, and |
| 16 then -- it goes from one machine to another machine to put the |
| 17 sole on, and I was at the beginning of the process. |
| 18   Q. The boot factory makes all the boots and all the |
| 19 tennis shoes for the prison system in the state; is that |
| 20 correct? |
| 21   A. Yes, sir. |
| 22   Q. That's your understanding? |
| 23      About how many people are out there working on |
| 24 a shift? |
| 25   A. About 50, somewhere around there. |

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00410-BR   Document 84-2   Filed 04/17/13   Page 26 of 67   PageID 2708

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 87

1    Q. About 50 inmates, and then there's some other people
2  there, correct?
3    A. Yeah.
4    Q. Correctional officers, and then also civilian
5  employees that are in charge of the boot factory?
6    A. Yes, sir.
7    Q. Is that right?
8         In regard to that, do you know Mr. Wiley, Stan
9  Wiley?
10   A. Yes, sir.
11   Q. How did you know him, sir?
12   A. From -- he was an officer at first before he went to
13  the boot factory. And by him being an officer, we had contact
14  on the pods and stuff.
15   Q. And he would -- what is the word you used before he
16  was in the boot factory? I didn't quite understand.
17   A. Correctional officer.
18   Q. Okay. He was a CO?
19   A. Yes, sir.
20   Q. Correctional officer.
21        And then he changed jobs and went to the boot
22  factory as a civilian employee?
23   A. Yes, sir.
24   Q. Is that your understanding?
25   A. Yes, sir.

Page 88

1    Q. Okay. Now, did you, in fact, turn out for work on
2  the 29th in 2003?
3    A. Yes, sir.
4    Q. Went to the boot factory?
5    A. Yes.
6    Q. About what time did that take place?
7    A. The turn out, when we first turned out?
8    Q. Yes, sir.
9    A. About 4:45, five o'clock, in that time frame.
10   Q. And then about what time did you head to the boot
11  factory?
12   A. About 5:15, after everybody had been rostered in.
13   Q. Now, did you see the defendant at the boot factory
14  that day?
15   A. Yes, sir.
16   Q. Did you see Mr. Wiley at the boot factory that day?
17   A. Yes, sir.
18   Q. Explain your relationship, or tell the ladies and
19  gentlemen of the jury about Mr. Wiley.
20   A. Well, Mr. Wiley was a -- he was an all right
21  officer, tended, you know what I'm saying, to be a little
22  aggressive sometimes, but more or less, he come to do his job.
23   Q. If you did your job, did you ever have a hassle with
24  him?
25   A. No, sir.

Page 89

1    Q. Based on your observation -- how long had you been
2  working at the boot factory out there?
3    A. About a year and a half.
4    Q. Did you ever work the same shift with Mr. Wiley
5  until that week?
6    A. That was the first time.
7    Q. Okay. Now, they had just changed some shifts at the
8  boot factory, correct?
9    A. Yes, sir.
10   Q. Eliminated one, didn't they?
11   A. Yeah, second shift.
12   Q. And combined them -- combined it with the first
13  shift?
14   A. Yes, sir.
15   Q. That's when Mr. Wiley went to work --
16   A. Yes, sir.
17   Q. -- on the same shift you were; is that correct?
18   A. That's correct.
19   Q. About how long do you recall it being that y'all had
20  been working together?
21   A. About -- almost a week.
22   Q. And when did Mr. Runnels go to work with you out
23  there, the first time you remember?
24   A. I don't exactly know the date or nothing like that,
25  but I think he was out there like about three or four days.

Page 90

1    Q. He had only been out there three or four days?
2    A. Like -- yeah, yeah.
3    Q. Now, during that day, shortly after getting to work
4  at the boot factory, did you see Mr. Wiley having a discussion
5  with someone?
6    A. In the -- what you mean, when we first went out
7  there?
8    Q. Yeah, shortly after you got out there, yes, sir.
9    Q. Well, he was, you know, conversating with a lot of
10  people.
11   Q. Okay. Did you wind up talking to Mr. Runnels that
12  day?
13   A. Yes, sir.
14   Q. When did that first occur?
15   A. When we first got out there in the boot factory.
16   Q. About what time would that have been?
17   A. About 5:20.
18   Q. So you get out to the boot factory, but you don't
19  immediately start working; is that correct?
20   A. No, no, sir.
21   Q. What are the inmates doing until you start work once
22  you're out there?
23   A. Well, everybody go get some coffee to jump off, you
24  know what I'm saying. But I'm the head of the process, so
25  everybody got to wait until I start the process and then it

Page 91

1 will work its way on down. But usually, they just standing
2 around waiting on the racks to get to them.
3     Q. So once things start moving through the system, then
4 the others will start working as the work gets to them?
5     A. Right.
6     Q. Is that what you're telling me?
7     A. Yes, sir.
8     Q. Okay. I'm going to show you what's been marked for
9 identification purposes as State's 50. Are you able to
10 recognize that, sir?
11     A. Yes.
12     Q. Can you tell the ladies and gentlemen of the jury
13 basically what that represents?
14     A. The layout of the boot factory. The layout of the
15 boot factory.
16         MR. DURHAM: Your Honor, may I move where I can
17 follow the testimony?
18         THE COURT: Sure.
19     Q. (BY MR. SIMS) If you can - you're able to recognize
20 this; is that correct?
21     A. Yes, sir.
22     Q. I'm just going to have you go ahead and stay up
23 there, if that's all right.
24         What's along this wall over here? (Indicating)
25     A. That's where the bathroom --

Page 92

1     Q. Just start up here and work your way down.
2     A. That's the storage room, you got Mr. Williams'
3 office coming down, then you got a little closet as you come
4 down, and then the bathroom stalls, and then you got the
5 maintenance shop coming on down.
6     Q. Down here; is that correct?
7     A. Yes, sir.
8     Q. Now, the doors are here and here; is that correct?
9 (Indicating)
10     A. Right.
11     Q. Okay. Now, where were you working on this
12 particular day?
13     A. I worked further up, go up, go up, go up. Yeah, go
14 up -- keep going. Right there in the boxing area.
15     Q. In this --
16     A. That's my assigned job right there. But in them
17 little bins right there. (Indicating)
18     Q. These --
19     A. No, right there. No, come down. No, keep coming
20 down, keep coming. Now go over this way. No, right there.
21 (Indicating)
22         Okay. You see where the 30 at, with the boxes?
23     Q. Yes.
24     A. Now go straight to your right, this way. Right
25 there. That's -- yeah. (Indicating)

Page 93

1     Q. Okay. So you were working in this area here?
2 (Indicating)
3     A. Right.
4     Q. Okay. I'm going to -- if it's all right, I'll put
5 your initials right here. Is that all right?
6     A. Uh-huh.
7     Q. WG?
8     A. Uh-huh.
9     Q. That's where you were working --
10     A. Yes, sir.
11     Q. -- correct?
12         Now, approximately where was Mr. Wiley that
13 day?
14     A. He was -- he was everywhere.
15     Q. Walking everywhere --
16     A. Walking everywhere.
17     Q. -- initially? Okay.
18         Now, you came into contact with the defendant
19 shortly after getting to work while y'all were drinking
20 coffee, or before you started working?
21     A. Right.
22     Q. What happened at that point, sir?
23     A. When we first came in, Runnels pulled me and another
24 guy aside and said that he was getting tired of the boot
25 factory, he didn't want to be out there no more. And he said,

Page 94

1 "I'm going to do something to either get you out of the boot
2 factory or you can get shipped." And I asked him what it was.
3         And then he said he was going to hold Williams
4 hostage in the office when the other officers leave. I told
5 him why he want to do that. He said, well, it's the only way
6 he feels that he can get off the farm or get out of the boot
7 factory.
8     Q. Who is Williams?
9     A. Who is who?
10     Q. You said he was going to hold Williams hostage.
11     A. Oh, Mr. Williams, that's the plant manager.
12     Q. I'm sorry, that's -- the plant manager at the boot
13 factory?
14     A. Yes, sir.
15     Q. What else did he tell you?
16     A. That I can use this information to either get off
17 the farm or get out of the boot factory myself.
18     Q. What happened then?
19     A. We all went our separate ways.
20     Q. Did y'all start work --
21     A. Yeah.
22     Q. -- shortly after that?
23     A. Yes, sir.
24     Q. Did you wind up talking to him again later --
25     A. Yes, sir.

THE STATE OF TEXAS     Multi-Page™     TRIAL ON THE MERITS
vs. TRAVIS TREVINO RUNNELS     OCTOBER 26, 2005

Case 2:13-cv-00070-DER Document 84-2   Filed 01/17/13   Page 28 of 67   PageID 2710

## Page 95

1  Q. -- meaning Mr. Runnels?

2  A. Yes, sir.

3  Q. About how much later?

4  A. Approximately about 45 minutes, somewhere, to an

5  hour.

6  Q. What happened at that point?

7  A. Well, I was sitting in the back in the boxing area

8  over there, and he came -- was sitting on the table, and he

9  came up and he said that Wiley was giving him a hard time.

10  Q. Then what happened?

11  A. And then he said, "I'm going to go take the trash

12  out and when I come back I'm going to ask him what's up."

13  Q. Okay. Did you ever see the defendant come back from

14  taking out the trash?

15  A. Yes, sir.

16  Q. What happened then?

17  A. He approached Mr. Wiley and they had a little

18  conversation. I couldn't hear it all, but he was like, you

19  know, why you keep jigging at me, why you keep pointing me

20  out. And Mr. Wiley said, "Well, you're a janitor. It's your

21  job to take the trash out. Those two inmates right there,

22  they're assigned to do something else, and that's their job.

23  If I ask you take out the trash, take out the trash."

24  Q. Okay. And is that basically how all the other

25  supervisors that you've dealt with handle things?

## Page 96

1  A. More or less --

2  MR. DURHAM: Objection --

3  A. -- yes, sir.

4  MR. DURHAM: -- Your Honor. What someone else

5  does is not material.

6  THE COURT: Sustained.

7  Q. (BY MR. SIMS) What happened after that

8  conversation? Let me ask this: Was there any kind of --

9  anything other than a verbal discussion that you saw?

10  A. That was it, just a verbal discussion.

11  Q. What happened after that?

12  A. Runnels walked off.

13  Q. What did you do then?

14  A. I went back to work.

15  Q. Okay. What's the next thing that you're aware of

16  about Mr. Runnels doing that day?

17  A. He asked me could I get him a knife and I told him

18  no, they all had been checked out already. I said, "But you

19  can go around the corner and ask this Mexican dude if you want

20  to use his knife."

21  He walked off and came back and he said he

22  wouldn't give it to him.

23  Q. And what -- what did he do then with you again at

24  that point?

25  A. Asked me how he can get another knife.

## Page 97

1  Q. What happened then?

2  A. I told him to ask this dude, Mr. Blue -- I don't

3  know his real name, but we call him Blue. And he asked him

4  could he use his knife, and Mr. Blue said, no, he was busy at

5  the time.

6  MR. DURHAM: I'm going to object to what

7  Mr. Blue said. If he said anything, it would be hearsay --

8  THE COURT: Sustained.

9  MR. DURHAM: -- unless he was present at the

10  conversation.

11  Q. (BY MR. SIMS) Did Mr. Blue let him use the knife?

12  A. Not the first time.

13  Q. Did it happen again?

14  A. Yes, sir.

15  Q. And you saw it happen, or heard?

16  MR. DURHAM: Your Honor, first, that's leading;

17  second, it would be hearsay unless he was there and heard the

18  conversation. It's speculation and conjecture of what the

19  conversation was.

20  THE COURT: Rephrase the question, please.

21  Q. (BY MR. SIMS) Did you observe it happen again?

22  A. No.

23  MR. DURHAM: Objection as to what --

24  Q. (BY MR. SIMS) Okay. Did --

25  MR. DURHAM: -- happened, Your Honor.

## Page 98

1  THE COURT: Sustained.

2  Q. (BY MR. SIMS) What's the next thing you saw happen?

3  A. I went to do my work. I didn't know that he had got

4  the knife. I don't know when he got the knife.

5  Q. Okay.

6  A. But I asked Mr. Runnels, I said, "Are you all

7  right?" I said, just playing with him, I said, "You take your

8  medication?" And, you know, he just --

9  MR. DURHAM: Nonresponsive to the question and

10  also --

11  THE COURT: Sustained.

12  MR. DURHAM: -- hearsay.

13  Q. (BY MR. SIMS) When is the next time you saw

14  Mr. Runnels?

15  A. The next time I saw Mr. Runnels is when he was

16  walking away with the knife in his hand.

17  Q. Walking away from what?

18  A. Mr. Wiley.

19  Q. Did you see Mr. Runnels before that?

20  A. No.

21  Q. Okay. You said -- when is it you asked him a

22  question? You said you had asked him a question.

23  A. I asked him a question when I seen him on the wall

24  with a broom in his hand, and I asked him, "You all right?"

25  And he said -- he was kind of mumbling, like, "Yeah, yeah, I'm

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00070-J-BR   Document 84-2   Filed 01/17/13   Page 29 of 67

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

**Page 99**

1  all right." And I walked off.
2      Q. Is this before or after you saw him walking away
3  from Mr. Wiley?
4      A. This was before.
5      Q. Okay. Approximately how much earlier before?
6      A. Maybe like 20 minutes, 20 or 30 minutes.
7      Q. And when you saw the defendant ask Mr. Blue for the
8  knife --
9          MR. DURHAM: That's a leading question and also
10 calls for a hearsay response because he doesn't --
11         THE COURT: Please lower your voice, and your
12 objection is sustained.
13         MR. DURHAM: Well, I'm sorry. It's just --
14         THE COURT: Do not --
15         MR. DURHAM: -- the same question that was
16 asked before.
17         THE COURT: Do not lead the witness, please.
18     Q. (BY MR. SIMS) How much time elapsed from the time
19 you saw the defendant talking to Mr. Blue until -- let me
20 rephrase that.
21         How much time elapsed from the time you saw
22 Mr. Wiley and the defendant having their discussion to the
23 time you saw the defendant talking to Mr. Blue?
24     A. About 15 -- about 15 to 20 minutes.
25     Q. And then after that is when you talked to

**Page 100**

1  Mr. Runnels again?
2      A. Right.
3      Q. After having that conversation with him, then when
4  is the next time you saw the defendant?
5      A. When he was walking away with the knife.
6      Q. Where was -- where was he walking from?
7      A. From behind me, because I had my head down and I was
8  putting --
9          MR. DURHAM: Objection, nonresponsive after
10 "from behind."
11         THE COURT: Sustained.
12     Q. (BY MR. SIMS) What were you doing at the time that
13 you saw him?
14     A. I was putting insoles on the racks, getting ready to
15 come to the heel last, and I was -- had my head down, but I
16 was putting the soles on the bottom of the molds.
17     Q. Okay. On this chart, where would that put you?
18     A. Right there where you've got the "WG" at.
19     Q. There at your work station?
20     A. Right.
21     Q. And you're facing which way?
22     A. I'm facing toward the lasting area, facing this way.
23 (Indicating)
24     Q. Facing this way? (Indicating)
25     A. Right.

**Page 101**

1      Q. Is this the lasting area here?
2      A. Yeah.
3      Q. Okay. So you were facing out this way?
4  (Indicating)
5      A. Yes, sir.
6      Q. And when you raised up, you saw what?
7      A. I saw -- well, I heard a noise --
8      Q. Okay.
9      A. -- and I turned.
10         MR. DURHAM: Nonresponsive. The question was
11 what he saw.
12         THE COURT: Sustained.
13     Q. (BY MR. SIMS) You heard a noise, what did you do?
14         MR. DURHAM: Leading question.
15         THE COURT: Approach the bench, please.
16         (At the bench, on the record)
17         THE COURT: I'm going to instruct you to quit
18 leading the witness. You're putting me in a position to
19 sustain the objection every single time you do it.
20         MR. SIMS: To repeat what the answer said and
21 then ask what -- what did you do after that, is leading?
22         THE COURT: Yes, sir. If you repeat the answer
23 that is given, that is an act of bolstering the witness.
24 That's another objection.
25         Just ask a question and let the guy answer it,

**Page 102**

1  please.
2          MR. DURHAM: Also, Your Honor, his -- what you
3  heard was an objectionable, nonresponsive answer that he based
4  a question on.
5          THE COURT: Well --
6          MR. SIMS: That's fine. I understand, Your
7  Honor.
8          (Open court)
9      Q. (BY MR. SIMS) You had your head down and were
10 working. What happened then?
11     A. Say it again.
12     Q. You had your head down and you were working. What
13 happened then?
14     A. I heard a noise behind me.
15     Q. What did you do then, sir?
16     A. I turned to face Mr. Wiley.
17     Q. About how far was Mr. Wiley from you?
18     A. About as close as he is right there in the black
19 shirt.
20     Q. Okay. Say ten feet?
21     A. Yes, sir.
22     Q. Would that be a fair enough estimate?
23     A. Yes, sir.
24     Q. Were you facing Mr. Wiley?
25     A. When I turned around, yeah, I was facing Mr. Wiley.

Page 103

1  Q. And what else did you see at that point?

2  A. I saw -- Mr. Wiley was holding his neck. And you

3  know how when you scratch yourself you see white, and then all

4  of a sudden blood start coming.

5  Q. Where did you see that? Where did you see that

6  incident that day?

7  A. Behind me in the lasting area, right there.

8  (Indicating)

9  Q. No, the white and then the blood coming, where was

10 that at?

11 A. In that area right there where you got "WG" at.

12 Q. On whom, sir? On whom? On whom?

13 A. From whom? I don't know because I -- I don't

14 understand the question, what you're trying to say.

15 Q. You said you saw white and you saw somebody

16 bleeding. Who did you see bleeding?

17 A. Mr. Wiley.

18 Q. Okay. What else -- did you see anything else around

19 Mr. Wiley at that point?

20 A. Not at the time, until I followed Mr. Wiley's eyes.

21 That's when I turned back this way. (Indicating)

22 Q. Turned back to your left?

23 A. Turned back to my left.

24 Q. Which would be turning --

25 A. Towards 24 right there. (Indicating)

Page 104

1  Q. Turning down this way? (Indicating)

2  A. Right.

3  Q. Okay. What did you see then?

4  A. Mr. Runnels was walking away with the knife.

5  Q. This defendant?

6  A. Yes, sir.

7  Q. Could you tell what kind of knife it was?

8  A. The kind of knife that we have in the boot factory.

9  I don't know the name of it. It's the regular knife that they

10 use.

11 Q. It was one of the equipment --

12 A. Right.

13 Q. -- pieces of equipment used in the boot factory?

14 A. Yes, sir.

15 Q. You recognized it as that?

16 A. Yes, sir.

17     MR. SIMS: May I approach, Your Honor?

18     THE COURT: Sure.

19 Q. (BY MR. SIMS) I'll show you State's Exhibit No. 51.

20 Are you able to recognize that, sir?

21 A. Yes, sir.

22 Q. Okay. Did the instrument you saw look like --

23     MR. DURHAM: Leading question, Your Honor.

24     THE COURT: Sustained.

25 Q. (BY MR. SIMS) Are you able to recognize what these

Page 105

1  are?

2  A. Yes, sir.

3  Q. Do they fairly and accurately show what they are --

4  A. Yes, sir.

5  Q. -- in this photograph?

6  A. Yes, sir.

7     MR. SIMS: Your Honor, I'll offer State's

8  Exhibit 51.

9     MR. DURHAM: No objection.

10    THE COURT: Exhibit is received.

11 Q. (BY MR. SIMS) What is State's Exhibit No. 51?

12 A. Those are the -- those are the knives that they give

13 us in the boot factory. We check them out when we first get

14 there. We have to turn in our ID and get one of these knives.

15 Q. Are there only a certain number of those that are --

16    MR. DURHAM: Leading question.

17    THE COURT: Go ahead.

18    I'm not going to rule on that at this time. I

19 will have a discussion with the lawyers during the lunch hour.

20 Thank you.

21 Q. (BY MR. SIMS) How do you wind up with one of those?

22 A. You have to go by the maintenance room. There's

23 going to be an officer -- well, one of the people that's in

24 free world clothes that work in the boot factory, they're

25 going to ask you what you want. You can either get a knife, a

Page 106

1  staple gun, a staple puller, any kind of instrument that

2  you're using in the boot factory.

3     You have to turn in your ID and then they will

4  hand you your equipment.

5  Q. Can anyone just go get one of those?

6  A. Yes, sir.

7  Q. But you have to do the ID process to get it?

8  A. Yes, sir.

9  Q. Is the instrument that you saw the defendant with

10 similar to those?

11 A. Yes, sir.

12 Q. What happened next?

13 A. Next on what?

14 Q. After you saw Mr. Wiley bleeding -- as a matter of

15 fact, where did you see him bleeding from, what part of his

16 body?

17 A. His neck.

18 Q. And then you said you had seen Mr. Runnels walking

19 away?

20 A. Yes, sir.

21 Q. Then what happened?

22 A. Mr. Wiley ran toward the office area and I ran

23 toward the boxing area.

24 Q. Why did you go towards the boxing area?

25 A. That was my only line of flight.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00470-RBR Document 84-2 Filed 01/17/13 Page 31 of 67 PageID 262

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 107

1    Q. What happened after that, sir?
2    A. I talked to a couple of dudes, told them what had
3  happened, and I grabbed my coat, my cup, and started
4  proceeding to the door area because I knew the officers was
5  coming eventually.
6        MR. SIMS: Pass the witness, Your Honor.
7        THE COURT: Okay. Let's recess for lunch at
8  this point.
9        Folks, I'll ask you to be back here in the jury
10 room at 1:15, please.
11       (Jury left the courtroom)
12       MR. DURHAM: Randall, can you approach for a
13 moment?
14       THE COURT: I want the jury out of here before
15 any discussion.
16       MR. DURHAM: Well, this was about --
17       THE COURT: Just wait five seconds.
18       MR. DURHAM: I was going to request that he
19 review his statement during the recess and save us some time.
20       THE COURT: Oh, sure, okay.
21       MR. DURHAM: He has two statements.
22       THE COURT: Okay. Let him have a copy of
23 those. Who's got a copy of those two statements?
24       MR. SIMS: If you don't mind it being marked
25 up, I'll give him mine.

Page 108

1        MR. DURHAM: It's for him to read, not for me.
2  I'm not going to read your notes.
3        There are two statements, correct?
4        MR. GILCHRIST: Yes, sir.
5        THE COURT: All right. During lunch,
6  Mr. Gilchrist, if you would look over those so that they can
7  visit with you about them afterwards.
8        (Pause)
9        THE COURT: Okay. When we come back from
10 lunch, please stop leading the witness.
11       MR. SIMS: Your Honor, my understanding, I'm
12 not trying to argue with the Court, but repeating part of the
13 answer, I don't think makes the question leading.
14       THE COURT: I don't care what you think, then,
15 Mr. Sims, if I tell you not to do it, then it's objectionable,
16 and you can talk to the appellate court about it, okay? So if
17 I say something, whether you agree or disagree, you've got to
18 follow my rules while we're in here, and that's the way we're
19 going to try the case.
20       MR. SIMS: I understand that, Your Honor.
21       THE COURT: Thank you.
22       (Recess)
23       (At the bench, on the record)
24       MR. DURHAM: Your Honor, during the noon
25 recess, the State has indicated they plan to be through by

Page 109

1  noon tomorrow. Our subpoenas were issued for Monday and most
2  of them -- or all of them at this point in time are in Dallas.
3  We do have one subpoena that we're trying to serve locally.
4  But we can't be prepared to proceed until Monday.
5        MR. SIMS: And I don't know that we'll be
6  through by noon, Judge, but I really think we will be through
7  by 5:00 tomorrow, without any problem.
8        THE COURT: Are there any that you can move up?
9  I mean, this whole deal is necessitated by your tactical
10 move --
11       MR. DURHAM: I thought it would surely take
12 them three days with the -- with the future dangerousness
13 testimony they were going to put on, Your Honor, even assuming
14 the plea of guilty.
15       MS. HAMILTON: We might be able to --
16       THE COURT: Well, Mr. Sims works quickly.
17       MS. HAMILTON: -- get the one that --
18       MR. SIMS: I'm trying. I cut out about ten
19 witnesses.
20       MR. DURHAM: That's the -- he hasn't been
21 served yet.
22       MS. HAMILTON: Right, but he should be --
23       THE COURT: What's his name?
24       MR. SIMS: Do you want me to step away from --
25       THE COURT: No, no.

Page 110

1        MR. DURHAM: He's - he was the warden at
2  Clements --
3        THE COURT: Oh. I thought you said --
4        MS. HAMILTON: He should be easy to serve.
5        MR. DURHAM: -- at the time this happened.
6        THE COURT: -- doctor somebody.
7        MR. DURHAM: Well, he is a doctor. He's got
8  his doctorate in --
9        THE COURT: Okay.
10       MR. DURHAM: -- penology or --
11       THE REPORTER: In what, I'm sorry?
12       MS. HAMILTON: Penology.
13       MR. SIMS: Have you got the spelling on that
14 word, Jill?
15       THE COURT: Okay.
16       THE REPORTER: Penology.
17       MR. DURHAM: P-e-n-a-l-o-g-y. (sic)
18       THE COURT: Okay. Well, what we'll do is -- I
19 mean, try to get him moved up here.
20       MR. DURHAM: We'll try and get him served and
21 get him here. I'll make it instanter.
22       THE COURT: Okay. And what we'll do is, we'll
23 just -- we'll just mosey as far as we can.
24       MR. DURHAM: Okay. I just wanted to alert you.
25 I didn't want to stand up when they quit and say, "Oh."

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Case 2:12-cv-00676-LRR Document 84-2 Filed 01/17/13 Page 32 of 67 PageID #:

Multi-Page™
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 111

1    THE COURT: I gotcha.
2    MS. HAMILTON: And I'm going to call Kathy
3 and see if she can get them here.
4    MR. SIMS: And we let them know that as soon as
5 we sat down and kind of figured out what --
6    THE COURT: Yeah. Okay.
7    MR. SIMS: Because we did, we dropped a bunch
8 of people.
9    THE COURT: We'll get as far as we can, then
10 we'll come back.
11    (Open court)
12    THE COURT: Bring the jury in.
13    (Jury entered the courtroom)
14    THE COURT: Okay, Mr. Durham.
15         CROSS-EXAMINATION
16 BY MR. DURHAM:
17    Q. Mr. Gilchrist, you've had an opportunity during the
18 noon recess to review your two statements, have you not?
19    A. Yes, sir.
20    Q. Well, they're really pretty different, aren't they?
21    A. More or less.
22    Q. Well, in your first statement on the 29th, which was
23 the same day the incident occurred, you don't say anything
24 whatsoever about Travis, do you?
25    A. No, I don't.

Page 112

1    Q. And you didn't see anything or hear anything that
2 day, according to your statement of the 29th; is that correct?
3    A. That's true.
4    Q. But overnight, you remembered a lot of stuff
5 apparently?
6    A. Not necessarily. I just didn't want to say it the
7 first time.
8    Q. Oh, you didn't want to say it the first time. Well,
9 what -- what inducement did you get to say it the second time?
10    A. I just thought about what had happened.
11    Q. And -- well, did you go to the officials and say, "I
12 remembered some stuff"?
13    A. No. They called me out.
14    Q. They called you out and interrogated you again?
15    A. Yes, sir.
16    Q. Uh-huh. Speaking of officials, I noticed during the
17 noon recess we had some new spectators come. Do you recognize
18 those people as being guards at the penitentiary?
19    A. Yes, sir.
20    Q. And they're the ones staring at you now. What did
21 they promise you for your testimony?
22    A. They didn't promise me nothing.
23    Q. Nothing? Are you still at the Clements Unit?
24    A. Yes, sir.
25    Q. Uh-huh. And how long have you known Travis?

Page 113

1    A. Some months.
2    Q. And you knew Mr. Wiley how long?
3    A. For some years.
4    Q. You knew him years?
5    A. Yes, sir.
6    Q. Okay. And how long have you been at the Clements
7 Unit?
8    A. Since '94.
9    Q. Okay. And you're serving how long a sentence?
10    A. Fifty-nine years.
11    Q. And that was for what?
12    A. Aggravated robbery.
13    Q. What is aggravated robbery?
14    A. With a deadly weapon. I tried to rob somebody with
15 a deadly weapon.
16    Q. What was the deadly weapon?
17    A. A shotgun.
18    Q. A shotgun?
19    A. Yes, sir.
20    Q. Okay. Now, during the time you knew Travis -- when
21 you say "months," would that be a month, two months, four
22 months, or just how long did you know him?
23    A. About nine months, ten months.
24    Q. Nine months or ten months. And you knew him well
25 enough that he trusted you and confided all this stuff in you?

Page 114

1    A. Yes, sir.
2    Q. Okay. During that time, did you ever see him engage
3 in any violent act?
4    A. No, sir.
5    Q. Did you ever hear him threaten anyone?
6    A. No, sir.
7    Q. Okay. So did he seem to be a good prisoner?
8    A. Yes, sir.
9    Q. Okay. Do you know what his classification was?
10    A. We was both on minimum custody.
11    Q. He was on minimum custody?
12    A. Yes, sir.
13    Q. Which meant he -- the authorities considered him
14 trustworthy?
15    A. Yes, sir.
16    Q. So apparently he didn't have a history, as far as
17 you knew, of any violent acts?
18    A. Yes, sir.
19    Q. Okay. Now, in your second statement -- do you have
20 a copy of it there with you? That's the statement of the
21 30th.
22    A. Yes, sir.
23    Q. Okay. In that statement, you relate word for word a
24 conversation, don't you?
25    A. Yes, sir.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Multi-Page™
Case 2:13-cv-00470-RR Document 84-2 Filed 01/17/13 Page 33 of 67 PageID 2465
TRIAL ON THE MERITS
OCTOBER 26, 2005

**Page 115**

1    Q. Okay. And would you share that with me and the
2 jury? When he took out the trash and he came back and he
3 stopped where you were, and what do you in your statement say
4 he said?
5    A. He said -- you want it word for word?
6    Q. Yes, sir. Do you find that?
7    A. Yeah. "He walked up to me and said, 'I don't know
8 why he keeps fucking with me. When I get through, I'm going
9 to ask him.' When he came back, he walked up to Mr. Wiley and
10 said, 'Why do you keep fucking with me? All those white boys
11 are standing there doing nothing and you pick me out.'"
12    Q. Okay. And did you hear him say anything else to
13 Wiley later on in your statement?
14    A. No, sir.
15    Q. You didn't say -- did you hear what Wiley's response
16 was?
17    A. Yes, sir.
18    Q. And what did he tell him?
19    A. Mr. Wiley said, "You just do what I say." Runnels
20 said, "You need to quit fucking with me," and Mr. Wiley said
21 again, "Just do what I say." Runnels said, "Okay, I'll do
22 what you say," and he walked off.
23    Q. Okay. They had some problems, didn't they?
24    A. Well, from what I -- from what I heard, that
25 Mr. Wiley had messed with him the day before.

**Page 116**

1    Q. All right. Messed with him the day before?
2    A. That's what I heard. I didn't see that.
3    Q. Okay. And -- now, these knives, they're just loose
4 there in the place?
5    A. No. Each individual is assigned to a knife when he
6 turns in his ID.
7    Q. Okay. And they pass them from hand to hand as they
8 need to?
9    A. Yes, sir.
10    Q. So if I sign -- if I'm a prisoner and I sign out for
11 a knife, I can let another prisoner use it or just whatever?
12 I'm not responsible for that knife?
13    A. You're not supposed to, but they do.
14    Q. They do it all the time?
15    A. (Witness nods head up and down)
16    Q. Is that true or untrue?
17    A. That's true.
18    Q. Okay. And the knife that --
19    MR. DURHAM: Was that exhibit admitted?
20    MR. SIMS: Pardon?
21    MR. DURHAM: The picture of the knives?
22    MR. SIMS: Yes. It's up on the counter,
23 Mr. Durham.
24    MR. DURHAM: Where?
25    MR. SIMS: It's up on the counter.

**Page 117**

1    MR. DURHAM: Okay. May I approach --
2    THE COURT: Sure.
3    MR. DURHAM: -- to look at this?
4    Q. (BY MR. DURHAM) And this -- this is the type knife
5 that's used out there?
6    A. Yes, sir.
7    Q. You don't know which one if any of these were used?
8    A. No, sir.
9    Q. No, you don't. It's just the type of knife that's
10 used out there?
11    A. Yes, sir.
12    Q. It doesn't seem to have a sharp point on it?
13    A. No, sir.
14    Q. How are they sharpened?
15    A. With a sharpening stone.
16    Q. Who sharpens them?
17    A. The inmate who has it.
18    Q. There at the work station?
19    A. Yes, sir.
20    MR. DURHAM: May I publish this to the jury,
21 Your Honor?
22    THE COURT: Sure.
23    MR. DURHAM: I want to look at those things,
24 please.
25    Your Honor, we need to approach for me to ask a

**Page 118**

1 question regarding something.
2    (At the bench, on the record)
3    MR. DURHAM: A motion in limine was filed about
4 change in procedures. I want to ask what they do with the
5 knives now.
6    THE COURT: Okay. I don't recall when we heard
7 that. What did I rule?
8    MR. DURHAM: You ruled there was -- the motion
9 in limine was granted. That's the reason I'm coming up to ask
10 now.
11    THE COURT: Okay. All right. Well, that's
12 fine.
13    MR. SIMS: Why would a change of procedure on
14 what they do with the knives now be relevant in this
15 particular case?
16    THE COURT: What?
17    MR. SIMS: He's wanting to ask him about the
18 change in procedure on how they handle the knives. I don't
19 see how that's relevant to this case.
20    THE COURT: Well, it's probably relevant in
21 that there was something wrong and Mr. Wiley got killed.
22    MR. DURHAM: Yeah.
23    (Open court)
24    Q. (BY MR. DURHAM) Okay. Mr. Gilchrist, do you still
25 work in the shoe factory?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Case 2:13-cv-00470-RFB   Document 84-2   Filed 01/17/13   Page 34 of 67   PageID #: 726

Page 119

1    A. No, sir.
2    Q. Have you been in there since the incident?
3    A. Sir?
4    Q. Have you been in there since the incident?
5    A. Well, after the incident happened, I stayed in there
6  for some more months.
7    Q. Okay. Well, that's -- that's what I mean. So did
8  they change the procedure --
9         MR. YONTZ: Objection, Your Honor. May we
10 approach?
11        MR. SIMS: That s what we just did, Jim.
12        MR. YONTZ: Okay.
13        THE COURT: Go ahead.
14   Q. (BY MR. DURHAM) Did they change the procedure with
15 the issuance of the knives?
16   A. Yes, sir.
17   Q. How are the knives issued now?
18   A. They made a -- they made a -- kind of like a tube or
19 something like out of metal to where the knives go inside, and
20 you've got a perimeter on the outside to where that's only as
21 far as the knife will reach, is to that perimeter.
22   Q. Oh, are they tethered now?
23   A. Yes, sir.
24   Q. They weren't tethered before?
25   A. No, sir.

Page 120

1    Q. So that opportunity no longer exists?
2    A. Yes, sir.
3    Q. Okay. And Mr. Wiley had just transferred to the
4  shoe department; is that correct, or did I --
5    A. No, he went from second shift to first shift.
6    Q. All right. So he had transferred shifts and had
7  been on the new shift just a week?
8    A. Yes, sir.
9    Q. Okay. And Travis had been on that shift just two or
10 three days?
11   A. Yes, sir.
12   Q. So did you notice a clash in personalities then?
13   A. No, not from my -- what I saw, no, sir.
14   Q. You didn't see them having words?
15   A. No, sir.
16   Q. You don't think what you just read was a
17 confrontation of words?
18   A. Well, not before then. I hadn't ever seen them have
19 no conflict before that day.
20   Q. Well, why do you think that Travis -- do you have an
21 opinion as to why Travis said to you what he said, "He's
22 fucking with me"?
23   A. Well, that's up to him. I don't -- I didn't see it,
24 so I can't answer that question. I don't know what was going
25 through his mind.

Page 121

1    Q. You said something about --
2         MR. DURHAM: Just a moment, Your Honor.
3    Q. (BY MR. DURHAM) That some other guy told you about
4  something that Travis told him when he was coming out of the
5  chow hall; is that right?
6    A. Yes, sir.
7    Q. Who was that person?
8    A. I do not remember.
9    Q. You don't remember?
10   A. No, sir.
11   Q. Well, this statement was given -- this is the second
12 statement. You didn't remember it on the 29th, apparently,
13 did you?
14   A. No, sir.
15   Q. And you didn't remember it on the 30th?
16   A. A lot of people walked up to me, so I can't remember
17 exactly who it was.
18   Q. You heard a lot of stories about what had happened?
19   A. No. I knew what happened. I just didn't say the
20 first time.
21   Q. Well -- all right. Why did you not say it the first
22 time?
23   A. You know, being in the penitentiary, you know, we
24 live by codes. Certain things, you don't say. You know what
25 I'm saying? And at that time, I was in that mode to where I

Page 122

1  didn't want to say nothing.
2    Q. Well, what took you out of that mode?
3    A. I thought about what happened. It dawned on me,
4  really, what happened. You know what I'm saying? This man
5  did something that he wasn't supposed to do. My conscience
6  played a big part of it.
7    Q. Pardon? Your --
8    A. My conscience played a big part of it.
9    Q. And you've been in how long?
10   A. I'm -- February, I'll have 13 years.
11   Q. All right. When did you develop a conscience?
12   A. I've been having one.
13   Q. Well, you didn't have one when you pulled armed
14 robberies with shotguns, did you?
15   A. We all make mistakes.
16        MR. SIMS: Objection, argumentative.
17        THE COURT: Sustained.
18   Q. (BY MR. DURHAM) I'll rephrase.
19        Did you have a conscience at the time of your
20 conviction?
21   A. Yep.
22   Q. But you violated your conscience then?
23   A. More or less.
24   Q. Okay. So have you snitched off other people for
25 violations that have done wrong things?

THE STATE OF TEXAS                    Multi-Page™         TRIAL ON THE MERITS
vs. TRAVIS TREVINO RUNNELS                               OCTOBER 26, 2005

Case 2:12-cv-00410-RR  Document 84-2  Filed 01/17/13  Page 35 of 67  PageID 1377

---

Page 123

1    A. No, sir.
2        MR. SIMS: Objection, not relevant, Your Honor.
3        THE COURT: Sustained.
4    Q. (BY MR. DURHAM) You didn't actually see what
5 happened?
6    A. No, sir.
7    Q. And you do admit that you have two different
8 statements that don't tell the -- the first one tells a
9 partial story in which Travis is not even mentioned, correct?
10    A. Right.
11    Q. And you left out the part about the problems that he
12 and Mr. Wiley were having?
13    A. Right.
14    Q. Do you feel under any pressure to testify?
15    A. Yeah, it's kind of hard sitting here looking in his
16 face telling you what happened, yeah.
17    Q. Do you feel any pressure from the guards sitting
18 back there for you to testify?
19    A. No, sir.
20    Q. And you don't feel any pressure from the other
21 inmates for getting what's sometimes called a snitch jacket?
22    A. Well, I look at it like this here: If --
23    Q. That's a yes-or-no question, sir. Do you feel
24 pressure or not?
25    A. No, sir, I do not.

---

Page 124

1        MR. DURHAM: I have no further questions of
2 this witness, Your Honor.
3        MR. SIMS: I don't think I have any other
4 questions, Your Honor.
5        THE COURT: Okay, Mr. Gilchrist, you can step
6 down. Thank you, sir.
7        Call your next witness.
8        MR. SIMS: Jimmy Jordan.
9        THE COURT: Jimmy Jordan?
10        MR. SIMS: Yes, sir, Jimmy Jordan.
11        THE COURT: Mr. Jordan, if you would come right
12 around here and take a seat up there on the witness stand,
13 please, sir.
14        MR. JORDAN: All right.
15        THE COURT: Okay. Kind of speak into that
16 microphone. You don't have to get right up to it.
17        MR. JORDAN: Okay.
18        THE COURT: Sort of generally there. Thank
19 you.
20        MR. JORDAN: Yes, sir.
21            JIMMY JORDAN,
22 having been first duly sworn, testified as follows:
23            DIRECT EXAMINATION
24 BY MR. SIMS:
25    Q. Would you state your name, please, sir?

---

Page 125

1    A. Jimmy Jordan.
2    Q. Where are you residing, sir?
3    A. At this -- at this present time?
4    Q. Yeah.
5    A. Clements Unit.
6    Q. Now, is that the normal prison unit that you are
7 assigned to?
8    A. No, I'm on Smith Unit.
9    Q. And where is that located?
10    A. Lamesa. Lamesa, Texas.
11    Q. You've been transported up here --
12    A. Yes, sir.
13    Q. -- as a witness in this case; is that correct?
14    A. Yes, sir.
15    Q. Has anyone promised you anything in regards to your
16 testimony here?
17    A. No, sir.
18    Q. Been threatened in any way?
19    A. No, sir.
20    Q. Do you know Travis Trevino Runnels?
21    A. Yes, sir.
22    Q. Do you see him in the courtroom today?
23    A. Yes, sir.
24    Q. How long have you known the defendant?
25    A. Just about a week or two before he came -- when he

---

Page 126

1 started to work out in the factory.
2    Q. So you were once housed in the Clements Unit,
3 correct?
4    A. Yes, sir.
5    Q. When was that, sir?
6    A. January -- well, November up to January -- up to
7 February.
8    Q. Of --
9    A. Two thousand --
10    Q. November of 2002 until February of 2003?
11    A. Three, right.
12    Q. You got shipped off after something happened at the
13 prison, correct?
14    A. Right, yes, sir.
15    Q. Now, you're in prison for aggravated robbery and a
16 failure to stop and render aid; is that correct?
17    A. Yes, sir.
18    Q. How did you get to know Mr. Runnels?
19    A. Well, just by, you know -- I didn't really get a
20 chance, you know, to know him. I just seen him out there, you
21 know. He was a janitor out there in -- in the factory.
22    Q. Okay. Now, had you always been on the first shift?
23    A. Yes, sir.
24    Q. -- out at the boot factory?
25    A. Yes, sir.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00410-BR Document 84-2 Filed 01/17/13 Page 36 of 67 PageID 24126

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 127

1 Q. At one point, they closed the second shift and moved
2 in with y'all; is that correct?
3 A. Right, moved it up to the front, first shift.
4 Q. Prior to that happening, had you worked with
5 Mr. Runnels?
6 A. Well, you know, he -- you know, he didn't -- you
7 know, he was out there every day, you know, sweeping, you
8 know. I worked on the canvas machine, you know. I had spoke
9 to him, you know, but as far as just knowing him, I didn't
10 know him, you know.
11 Q. What about Mr. Wiley, did you know Stan Wiley?
12 A. Yes, sir.
13 Q. How did you know him, sir?
14 A. Well, I had talked to him, you know. He had served
15 a case to me one day. I had got a -- they had wrote me up by
16 mistake. He was on the evening shift, and he came and brought
17 the case to me, to serve me the case, said they said I wasn't
18 at work that day, and I talked to Mr. William about it and
19 Mr. William verified to Mr. Wiley that I -- that I was at
20 work.
21     MR. DURHAM: Hearsay response, Your Honor,
22 objection.
23     THE COURT: Sustained.
24 Q. (BY MR. SIMS) Once you called it to Mr. Wiley's
25 attention, did he fix the problem?

Page 128

1 A. Yes, it was taken care of. He told me he was sorry.
2     MR. DURHAM: Objection. What he told him would
3 be hearsay.
4     THE COURT: Sustained.
5 Q. (BY MR. SIMS) Just try to answer.
6 A. Okay.
7 Q. Did you have any problems with Mr. Wiley?
8 A. No, sir.
9 Q. How would you describe him, sir?
10 A. Well, he was fair, you know. I never had a problem
11 out of him and I was out there -- you know, I worked with him
12 out there, you know. I never did have a confrontation with
13 him, you know.
14 Q. Now, you've given three different statements in
15 regards to what happened out --
16 A. Right.
17 Q. -- there; is that correct?
18 A. Right.
19 Q. Are all three of them the same?
20 A. Yes, sir, all but one. You know, when it -- when it
21 first happened, you know, I seen Mr. Wiley when he -- when he
22 came from -- from the position where he was over -- over by
23 the box area, and he walked across. And that morning when all
24 this took place, they -- you know, they -- they -- they -- I
25 seen him when he walked from the box area over to the office

Page 129

1 straight across, and he had his hand in front up under his
2 neck, and --
3 Q. Let me ask you something.
4 A. Okay.
5 Q. Now, did you tell -- on the first statement you
6 gave, did you tell the people you were giving the statement to
7 all this?
8 A. No. I didn't even know -- you know, I didn't even
9 know he had been cut, you know. I just seen the blood. I
10 didn't know, you know, he had been cut.
11 Q. In the first statement that you gave, did you, in
12 fact, tell them basically you didn't know anything --
13 A. I didn't know anything.
14 Q. -- about anything?
15 A. Right. He asked me, he said -- he asked me did I
16 see anything that had happened out there and I told him no,
17 you know, which I didn't see anything, you know, that had --
18 you know, the incident that had took place.
19 Q. Now, the next time they got you out -- or did they
20 get you out again and talk to you?
21 A. Yeah, gang intelligence officer.
22 Q. Okay.
23 A. STG.
24 Q. Okay. Came and talked to you, and you gave them
25 another statement; is that correct?

Page 130

1 A. Right.
2 Q. Would it be fair to say there's more in that
3 statement than there was in the first one?
4 A. Yes, sir.
5 Q. Okay. When you got -- what time did you turn out
6 for work that day?
7 A. Normal time I think is about 6:00, 6:30 in the
8 morning.
9 Q. What did you do when you first got out there to
10 work, do you remember?
11 A. I went and -- I went to the tool -- where they
12 shake -- where they pat shake you when you first go in. And
13 went to the tool room and got my -- got my knife and gave them
14 my ID card.
15 Q. Now, before you went to work that day, did you have
16 any kind of feeling that there might be something going to
17 happen?
18 A. Well, you know -- you know, it was --
19     MR. DURHAM: Objection, nonresponsive. It's a
20 yes-or-no question.
21 A. No, sir, not that day.
22 Q. (BY MR. SIMS) I'm sorry?
23 A. No, sir, not that day.
24 Q. Did you have any kind of feeling that something
25 might be fixing to happen at the system sometime soon?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Case 2:13-cv-00070-DBR Document 84-2 Filed 01/17/13 Page 37 of 67 PageID 8726

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 131

1    A. Right.
2        MR. DURHAM: The question is --
3    A. Yes, sir.
4        MR. DURHAM: -- leading, Your Honor.
5        THE COURT: Sustained.
6    Q. (BY MR. SIMS) Prior to going to work that day, what
7    was your feeling in regards to the system out there at the
8    farm?
9        MR. DURHAM: Irrelevance.
10       THE COURT: Well, rephrase the question,
11   please.
12   Q. (BY MR. SIMS) Prior to going to work that day, did
13   you develop any kind of impression in regards to the farm
14   being different than what it normally was?
15   A. Yeah. You know, it had been -- you know --
16       MR. DURHAM: Objection to anything after "yes."
17   A. Yes.
18       THE COURT: Sustained.
19   Q. (BY MR. SIMS) How so?
20   A. Well, they was talking about, you know --
21       MR. DURHAM: Okay. I'm going to object to
22   hearsay response.
23       THE COURT: Sustained.
24   Q. (BY MR. SIMS) Don't tell me anything that was said.
25   A. Okay.

Page 132

1    Q. What, if anything, was going on as far as the
2    inmates?
3        MR. DURHAM: Your Honor, that calls for a
4    hearsay response.
5        THE COURT: Well, it kind of depends on what
6    the answer is, but -- so rephrase the question to -- the
7    "what's going on" is a little vague.
8    Q. (BY MR. SIMS) Did you observe inmates doing
9    anything in particular out of the ordinary prior to going to
10   work that day, any time earlier that week?
11   A. Yeah, trying to make commissary.
12   Q. What's making commissary?
13   A. You know, you know something going to take place,
14   you know, you're trying to get your groceries, trying to make
15   store, you know, because you're fixing to go on lockdown.
16       MR. DURHAM: That's speculation and I'll object
17   to the answer, and it's not responsive to the question.
18       THE COURT: Come up just a second, please.
19       (At the bench, on the record)
20       THE COURT: Now, carefully -- and you may be
21   able to qualify him to testify to this sort of thing, but at
22   this point, I've got to sustain that objection to what he just
23   said.
24       MR. SIMS: Okay.
25       (Open court)

Page 133

1        THE COURT: Objection is sustained. The jury
2    is instructed to disregard the last answer.
3    Q. (BY MR. SIMS) At that time, how long had you been
4    at the Clements Unit?
5    A. From November to February.
6    Q. How long had you been in the prison system?
7    A. About 20 -- about 20 some months. No --
8    Q. Plus the time before -- before you made parole?
9    A. Twenty-one -- 21 years.
10   Q. Twenty-one years?
11   A. Yes, sir.
12   Q. That you've been incarcerated at that point?
13   A. Yes.
14   Q. Through that, are you familiar with -- do you feel
15   like you are familiar with the prison system and the units
16   that you're at?
17   A. Yes, sir.
18   Q. Have to deal with a lot of inmates on a daily basis?
19   A. Yes, sir.
20   Q. As well as the supervision staff; is that correct?
21   A. Yes, sir.
22   Q. Now, in regards to you being back on the Clements
23   Unit at that time, on January 29th of 2003, prior to that
24   time, had you been back on that farm sufficient enough in time
25   to feel like what you felt like was a normal occurrence in the

Page 134

1    prison?
2        MR. DURHAM: -- on qualification, Your Honor?
3        THE REPORTER: I'm sorry, I didn't hear your
4    objection.
5        MR. DURHAM: That's a leading question and an
6    attempt to qualify.
7        THE COURT: Rephrase the question, please.
8    Q. (BY MR. SIMS) In the amount of time you had been
9    back to the Clements Unit, do you feel like you were or were
10   not familiar with basically a normal, if you want to call it
11   normal, situation at the prison?
12   A. No, no, it's not normal.
13   Q. Pardon me?
14   A. No, sir.
15   Q. You weren't familiar with what the normal situation
16   was at the prison?
17       MR. DURHAM: Asked and answered.
18       THE COURT: Did you understand the question you
19   were asked?
20       THE WITNESS: No, sir, no, sir.
21       THE COURT: Repeat the question, please.
22   Q. (BY MR. SIMS) In January of 2003, you had been back
23   on -- in the Clements Unit for several months, correct?
24   A. On the Clements Unit?
25   Q. Yes. In January of 2003 --

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Multi-Page™
Case 2:13-cv-00070-DBR Document 84-2  Filed 01/17/13  Page 38 of 67  PageID 3702
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 135

1    A. Right, right, right, right.
2    Q. -- you were at the Clements Unit --
3    A. Right.
4    Q. -- correct?
5    A. Right, right.
6    Q. And you had been there for several months?
7    A. Right. I was on -- I was there from November to --
8 up until February, February the 3rd.
9    Q. And based on all your time involved in being in the
10 prison system, plus the time that you were there at the
11 Clements Unit then, okay, do you feel you had an understanding
12 as to what was normal for being going on around that farm?
13    A. No, not really.
14    Q. Okay. All right.
15       If something unusual that was not day-to-day
16 routine activity was happening, would you be able to notice
17 that?
18    A. Yes, sir.
19    Q. Did you, in fact, notice that sometime before
20 January 29th of 2003?
21       MR. DURHAM: Your Honor, he's not qualified to
22 answer that question.
23       THE COURT: Sustained.
24    Q. (BY MR. SIMS) Did you -- well -- did you see
25 Mr. Runnels with any kind of weapon or anything on January

Page 136

1 29th?
2    A. No, sir.
3    Q. When is the first time you saw Mr. Wiley on January
4 29th of 2003?
5    A. When he came across from where he was working from
6 going to the office.
7    Q. Describe him as you saw him at that point.
8    A. I was working right at the canvas machine at the
9 front, that's where I work at. And I was right across from --
10 direct where Mr. Wiley work at. He came across with his hand
11 up under his neck and blood was running down his hand. Went
12 to the office and he got a jacket and put up under his neck.
13 He come back around by the shoe canvas machine and went around
14 by the tool room and up to the front, up to the exit door, up
15 to the front.
16    Q. Had you been assigned a knife on that day, sir?
17    A. Yes, sir.
18    Q. Did you ever let anybody else have it?
19    A. No, sir.
20       MR. SIMS: I'll pass the witness, Your Honor.
21       CROSS-EXAMINATION
22 BY MR. DURHAM:
23    Q. Mr. Jordan, I'm a little confused. You went to the
24 Clements Unit when in November?
25    A. I can't -- I can't -- I can't actually recall. I

Page 137

1 went to the Clements Unit on a hardship transfer. I don't
2 remember the date. But it was right before -- right before
3 Thanksgiving.
4    Q. So it was toward the end of November?
5    A. Right.
6    Q. So around the 25th --
7    A. Right.
8    Q. -- 26th, would be about right?
9    A. Right.
10    Q. And you -- so you were there all of December?
11    A. Right.
12    Q. And the incident happened January the 29th, right?
13    A. Yes, sir.
14    Q. So you were really there about two months?
15    A. Right.
16    Q. Before the incident, right?
17    A. Right.
18    Q. And then you transferred out pretty soon after the
19 incident?
20    A. Right.
21    Q. The 5th of February, you transferred out?
22    A. That's what I just said. I just told him that I was
23 there from November to February. I just made that statement.
24    Q. I'm not arguing with you --
25    A. Right.

Page 138

1    Q. -- Mr. Jones, I'm just -- Mr. Jordan, I'm sorry.
2    A. Right, right.
3    Q. I'm sorry, sir.
4    A. Right.
5    Q. I'm just -- I'm trying to get some time sequence in
6 here. Why did you transfer?
7    A. I got into an incident with some Crypt dudes.
8    Q. You got in an incident with a crippled person?
9    A. With some --
10       THE COURT: Mr. Jordan --
11    A. I got into an incident with some gang members.
12    Q. (BY MR. DURHAM) Oh. Had you had incidents with
13 gang members before?
14    A. No, I hadn't.
15    Q. That's the only time you had an incident?
16    A. Right.
17    Q. Okay. Is that the only incident you have had in
18 your 21 years in prison?
19    A. No, I'm -- you asked me on -- on -- I'm talking
20 about this here happened on the Clements Unit.
21    Q. Okay. But you have had a lot of incidents while
22 you've been in prison?
23    A. Oh, yeah, I've been into some -- you know, I've been
24 into some things.
25    Q. Incidents involving violence? Is that correct or

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Case 2:12-cv-00070-J-BR   Document 84-2   Filed 01/17/13   Page 39 of 67   PageID 1212
Multi-Page™
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 139

1  incorrect?
2     A. That's incorrect.
3     Q. You have not been in any incident that involved any
4  violence?
5     A. I've had some fistfights, you know, other than --
6     Q. Well, sir, generally, most people think that being
7  hit with a fist is a violent thing. Do you disagree with that
8  concept?
9     A. Well, you know, back in the -- you know, when I was
10 doing time back in the game (sic), you know, you know, you
11 could, you know, you could tell a boss -- an officer, you
12 know, I've got one over here, and they would let you fight,
13 you know, as long as you're fighting with your fists.
14    Q. It's okay to fight with your fist?
15    A. Right.
16    Q. Is that your testimony?
17    A. Yeah, you know -- you know, back, you know, when I
18 was doing time back in the early '70s, you know, and, you
19 know, you could -- you know, you could tell, you know, if you
20 had a problem with an inmate or something, y'all -- you know,
21 y'all had different concepts of things, you could tell the
22 officer, well, I -- you know, I got -- you know, we got some
23 business we need to take care of. They would let you fight
24 with your fists, you know.
25    Q. Okay. Then when did that change?

Page 140

1     A. You know, they got -- you know, right now, you know,
2  you assault somebody, you know, you can get -- you know, you
3  can get charged for it.
4     Q. All right. But when did that start being charged
5  for fistfighting?
6     A. You know, you're talking about recently or --
7     Q. No, sir, I'm talking about when it changed. I mean,
8  at some point --
9     A. Oh, you still --
10    Q. -- in time --
11    A. -- you know, you know --
12    Q. Pardon?
13    A. You know, you still fight. If you get -- if you get
14 caught, you know, you're going to have disciplinary, you know,
15 procedures.
16    Q. All right. Well, see, I'm having a little trouble
17 following your time line here.
18    A. Right.
19    Q. You said back in the '70s, you can say to the
20 supervisors or guards, or whoever, "I'm having trouble with
21 John Doe over there" --
22    A. Right.
23    Q. -- and he said, "Well, y'all -- y'all work it --
24 y'all duke it out"?
25    A. Right.

Page 141

1     Q. And y'all would?
2     A. Right.
3     Q. And that was the end of it?
4     A. That was the end of it.
5     Q. Okay. But at some point in time, the system changed
6  where if there was a fight, the people got written up and
7  there was disciplinary action taken, correct?
8     A. Right. That's what I just said, you know.
9  Nowadays, you know, if you get wrote up --
10    Q. Okay. Well, I'm asking you when did that change?
11 When did -- when did you quit fighting at will and you got
12 written up? About when did that change --
13    A. In the '80s.
14    Q. In the '80s?
15    A. Right.
16    Q. Sometime in the '80s?
17    A. Right.
18    Q. Okay. And that disciplinary procedure would consist
19 of what? I mean, if you're caught -- if you fight, what is
20 the procedure for disciplining you?
21    A. You're liable to go to solitary for 15 days, lose
22 amount of time of good time.
23    Q. Okay. What is solitary, please, sir?
24    A. You know, you're isolated off into -- off into a
25 cell to yourself, you know, with no commissary, no radio,

Page 142

1  no -- you know, you don't have no appliances.
2     Q. Have you been in solitary?
3     A. No, I haven't -- back in the '80s.
4     Q. Well, then you have been in solitary --
5     A. Right, right.
6     Q. -- right?
7     A. I've been in solitary once.
8     Q. Okay. And how did you find it?
9     A. How did -- well, you know, it -- you know -- you
10 know, you're just doing without, you know. It's a regular
11 thing, you know, you're doing -- you know, still, you're doing
12 your time, you just don't have no, you know, appliances and
13 things in there, you know.
14    Q. No appliances like coffee makers or --
15    A. Right, radio.
16    Q. -- TVs, radios?
17    A. Right.
18    Q. You're just sitting on steel?
19    A. Right.
20    Q. Is that the same as administrative segregation or
21 different?
22    A. Seg, it's different, you know.
23    Q. All right, sir. Now, let's talk -- have you had an
24 opportunity today to review your statements you made?
25    A. No, sir.

THE STATE OF TEXAS
Multi-Page™
TRIAL ON THE MERITS
vs. TRAVIS TREVINO RUNNELS
Case 2:13-cv-00040-J-BR   Document 84-2   Filed 01/17/13   Page 40 of 67   PageID 722
OCTOBER 26, 2005

Page 143

1    Q. Pardon?
2    A. No, sir.
3    Q. Do you have those with you?
4    A. Yes, sir.
5    Q. Okay. Do you want to take a moment and start with
6  the statement of January the 29th that you made and review it,
7  please?
8         THE COURT: Is that your statement, Mr. Jordan,
9  or somebody just left it up there?
10        THE WITNESS: No, this is not none of mine.
11  This is William. This is William.
12        THE COURT: Okay.
13        MR. DURHAM: Well, that's the reason I asked
14  him, because there was some up there.
15        Do you have -- may I approach the witness, Your
16  Honor?
17        THE COURT: Sure, sure.
18    Q. (BY MR. DURHAM) You have got three statements you
19  made, correct?
20    A. Yes, sir.
21    Q. Do you read well?
22    A. Yes, sir.
23    Q. All right. And you -- these statements were written
24  by you?
25    A. Yes, sir.

Page 144

1    Q. Your handwriting?
2    A. Yes, sir.
3    Q. Okay. Then look at the one of January 29th, review
4  it and get yourself familiar with it. I have a few questions
5  about it, please, sir.
6    A. (Witness reading) Okay.
7    Q. All right. That's a one-page -- one-page and four-
8  line statement, correct?
9    A. Right.
10    Q. All right. And in that statement, you essentially
11  say that you -- you didn't see or hear what happened, don't
12  you, sir?
13    A. Right.
14    Q. And you also say that you hadn't heard about
15  anything before you did your statement; is that correct?
16    A. That's not in here.
17    Q. You didn't say in there that you did not see the
18  events nor --
19    A. Oh, no, I didn't --
20    Q. -- hear about them --
21    A. -- see the event. No, I didn't see the event.
22    Q. And you didn't hear about it before your statement?
23    A. No.
24    Q. Right. .Okay. And that was your statement on the
25  day of the incident --

Page 145

1    A. Right.
2    Q. -- correct?
3    A. Right.
4    Q. All right. And then on the 30th, you made a new
5  statement, didn't you?
6    A. Right.
7    Q. Do you have that statement with you, sir?
8    A. Yes.
9    Q. Review it quickly, please, sir. It's about a page
10  and ten lines.
11    A. All right.
12    Q. Nine lines.
13    A. (Witness reading)
14       (Pause)
15    Q. Please let me know when you're through.
16    A. Okay. (Witness reading)
17       (Pause)
18       Okay.
19    Q. Okay. In the first statement of the 29th, you
20  didn't mention Mr. Runnels at all, did you?
21    A. No, sir.
22    Q. But on the second statement, you make the
23  observation that on the 28th, that Mr. Wiley got into it with
24  Mr. Runnels, do you not?
25    A. Yes, sir.

Page 146

1    Q. All right. Exactly what -- you don't elaborate in
2  your statement on what you mean by "got into it." Could you
3  tell the jury what kind of confrontation there was between
4  Mr. Runnels -- now, that was on the 28th that happened, the
5  day before the incident --
6    A. I think it was on the 28th.
7    Q. -- that that confrontation occurred; is that
8  correct?
9    A. Right.
10    Q. All right. Can you enlighten us on what happened on
11  that occasion?
12    A. It was about him, you know, working. You know, he
13  was telling him, you know, about going to work, you know,
14  about being in his area and not working. And he had told him
15  that, you know, he was tired of him messing with him, just to
16  leave him alone.
17    Q. So they had, at least in your observation, some type
18  of confrontation --
19    A. Right.
20    Q. -- and personality conflict?
21    A. Right.
22    Q. Did it continue?
23    A. No, I didn't -- no, not after then.
24    Q. Okay. And then later in your statement, you
25  remember that you did not see Runnels with a weapon?

THE STATE OF TEXAS
Case 2:13-cv-00114-JRG Document 84-2 Filed 01/17/13 Page 41 of 67 PageID #: 1223
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 147

1   A. No, I didn't see him with a weapon.
2   Q. And you did not see him by Wiley?
3   A. No, I didn't.
4   Q. But you did hear Wiley scream in the second
5   statement, correct?
6   A. I heard somebody scream, yeah. I don't know if it
7   was him, but I heard somebody scream.
8   Q. Well, but, you see, in the first statement --
9   A. Right, right.
10  Q. -- you didn't see --
11  A. Right, right.
12  Q. -- that.
13  A. Right.
14  Q. Right?
15  A. Right.
16  Q. What happened overnight that you remembered it?
17  A. I didn't -- you know, I didn't -- I didn't even know
18  Mr. Wiley was cut at first until he walked past -- he
19  wasn't -- he wasn't in no -- no -- no -- you know, no fast
20  moving or nothing. He just had his hand up under his neck,
21  you know. You know, if you had just looked at him, you
22  wouldn't have never thought, you know, something was wrong
23  with him, you know, because --
24  Q. You mean you're accustomed to seeing people with
25  coats around their neck and blood running down their hands?

Page 148

1   A. I didn't see -- I didn't see nobody -- I didn't see
2   nobody cut him.
3   Q. No, sir, but you said in your second statement you
4   saw blood running down his hands?
5   A. I did. That's what I said, I seen blood, but I
6   didn't see nobody harm him.
7   Q. And on that day, on the 29th -- on the statement of
8   the 30th, you stated that you did not see Runnels until he was
9   taken out the door; is that correct or incorrect?
10  A. No, I -- in the statement, I said I seen Mr. --
11  Mr. -- are you talking about Mr. Wiley?
12  Q. No, Runnels, Travis.
13  A. Right, right.
14  Q. You said, "I did not see" --
15  A. Right, that's --
16  Q. -- "Travis until" --
17  A. Right.
18  Q. -- "he was taken out the door," --
19  A. Right.
20  Q. -- right?
21  A. Right.
22  Q. That day, you didn't see him until he was taken out
23  the door, right?
24  A. Right.
25  Q. And then on the 5th of February, you were

Page 149

1   transferred to another unit. What unit were you transferred
2   to?
3   A. Smith Unit.
4   Q. Pardon?
5   A. Smith Unit.
6   Q. Was that an upgrade or a downgrade; how was that? I
7   mean, better -- better, did you have a better job there or
8   what?
9   A. No, I went straight back to a factory job. It
10  wasn't no better.
11  Q. Okay. Where is the Smith Unit?
12  A. Lamesa, Texas.
13  Q. All right. Why were you transferred to Clements in
14  the first place?
15  A. On a hardship.
16  Q. All right. What was the hardship?
17  A. Concerning my family.
18  Q. Where does your family live?
19  A. Lubbock.
20  Q. Okay. So Lamesa is closer to the Smith Unit than
21  Amarillo?
22  A. Right.
23  Q. Where were you before the Clements Unit?
24  A. Michael Unit.
25  Q. Pardon?

Page 150

1   A. Michael Unit.
2   Q. Where is that?
3   A. Tennessee Colony.
4   Q. Which is?
5   A. Palestine.
6   Q. All right. Which is some distance from here --
7   A. Right.
8   Q. -- I take it?
9      Okay. Were you transferred quite often during
10  your 21 years?
11  A. I went to -- three times, I think. I -- about three
12  times, three or four times.
13  Q. Well, now, I got the impression from what you
14  testified to -- and correct me if I'm wrong --
15  A. Right.
16  Q. -- that at some point in time, you made parole?
17  A. Yeah. Yes, sir.
18  Q. Well, if you made parole, why were you back in the
19  penitentiary?
20  A. I had -- I had a wreck. I'm on a parole violation.
21  Q. What was the parole violation?
22  A. Failure to stop and render aid.
23  Q. Okay. And were you charged in that case?
24  A. Yes, sir.
25  Q. Did you plead guilty?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00716-RBR Document 84-2 Filed 01/17/13 Page 42 of 67 PageID 4442

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 151

1  A. Yes, sir.
2  Q. Did you get a sentence?
3  A. Yes, sir.
4  Q. For how much?
5  A. Twenty-five -- 25 years.
6  Q. Was that on top of your prior sentence?
7  A. No, it was run concurrent.
8  Q. Run concurrent?
9  A. Right.
10  Q. And your original sentence was what?
11  A. Ninety years.
12  Q. For what?
13  A. Armed robbery.
14  Q. And you served 20 -- how many years did you serve
15  before you made parole?
16  A. Twenty years.
17  Q. Okay. And you made parole on 90 years?
18  A. Right.
19  Q. And you got out and -- and got the stop to render
20  aid. (sic) Was someone hurt in that?
21  A. No, sir. They enhanced my punishment.
22  Q. Because of the armed robbery?
23  A. Right.
24  Q. But no one was hurt?
25  A. No, sir.

Page 152

1  Q. Okay. Then you're transferred down to Lamesa?
2  A. Right.
3  Q. Which is much closer to Lubbock?
4  A. Right, yes, sir.
5  Q. How far is it from Lubbock?
6  A. Fifty-nine miles.
7  Q. Okay. And Amarillo is roughly 120 miles?
8  A. A hundred and -- 120, 110.
9  Q. A hundred and 20, 110. So you get transferred where
10  you're much closer to your family. And you remember a lot
11  more in your third statement than you did in your first or
12  second statement; is that correct?
13  A. Yes, sir.
14  Q. What refreshed your memory, the transfer?
15  A. No, it didn't.
16  Q. Well, why did you remember it?
17  A. Well, I -- just like I told you while ago, you know,
18  I didn't know that Mr. Wiley was cut until -- until the OGI
19  called me out and talked to me about it, you know. I
20  didn't -- I didn't know that he had got cut, you know, until
21  that day when I went in his office. He asked me did I see
22  Mr. Wiley, and I told him, I said, "Yeah," I said, "I seen him
23  with some blood running down his hand up under his neck." But
24  just like I told you while ago, if you had've seen Mr. Wiley
25  walking, you wouldn't have never thought nothing was wrong

Page 153

1  with him.
2  Q. That's fine, except what I have reference to, sir,
3  in your third statement, you recite the confrontation as being
4  more confrontational and which you say that Runnels and Wiley
5  were arguing.
6  A. Right.
7  Q. And Runnels told Wiley --
8  A. He needed, you know, to stop --
9  Q. Told him what?
10  A. That he needed to stop fucking with him.
11  Q. Or?
12  A. He was going to do something to his ass.
13  Q. Okay. So they had a pretty -- pretty violent
14  confrontation, didn't they?
15  A. Right.
16  Q. And that was on the 28th, the day before this
17  incident happened?
18  A. It was that -- I think it was that -- that -- that
19  Friday or that -- it was that Friday or that Monday, it was
20  one of them.
21  Q. Well, Friday would have been long before the 29th.
22  The 29th was on a Tuesday, wasn't it?
23  A. Yeah, 20 -- yeah, that Monday, I think it was that
24  Monday.
25  Q. You think it was that Monday?

Page 154

1  A. Right.
2  Q. And had they had any problems before that?
3  A. Not that I knows of.
4  Q. Well, Travis had only been working with him --
5  A. Three days.
6  Q. -- three or four days, hadn't he?
7  A. Three days, three days.
8  Q. Three days. And right away, there was -- there was
9  friction between the two of them right away. Would that be a
10  fair statement?
11  A. All I know -- the only thing I can say is Mr. Wiley
12  had told him to go to work, you know, about being in his area
13  and not working, told him to go to work. I was --
14  Q. But you saw they had a confrontation?
15  A. Right, yes, sir.
16  Q. Okay. And Travis, in fact, told you in a subsequent
17  conversation that he was going to do something if he didn't
18  quit fucking with him?
19  A. Right.
20  Q. But he didn't say what he was going to do?
21  A. Right.
22  Q. And that conversation and that incident you
23  remembered in your third statement of the 14th. Were you
24  given a transfer based on your revived memory?
25  A. No, I wasn't transferred on no memory. I was -- I

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00470-JRR Document 84-2 Filed 01/17/13 Page 43 of 67 PageID #: 26, 2005

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 155

1 had got into it with some gang members.
2    Q. That's the only reason you were transferred?
3    A. Right.
4    Q. All right. When you got into it with the gang
5 members, were you disciplined?
6    A. No. No, sir, no, sir, no, I wasn't.
7    Q. You were transferred for your safety?
8    A. Right.
9    Q. Okay. It's unusual to be at one unit just three
10 months, isn't it?
11    A. No, I wasn't on the Clements -- the Michael Unit but
12 90 days. I was there three months.
13       THE REPORTER: I'm sorry, what unit?
14       THE WITNESS: Michael Unit. I was there three
15 months.
16    Q. (BY MR. DURHAM) And before that, where were you?
17    A. Middleton Unit, private facility.
18    Q. Private facility?
19    A. Right, transfer facility.
20    Q. Okay. For how long were you there?
21    A. Seven days.
22    Q. And before that, where were you?
23    A. Byrd Unit.
24    Q. How long were you there?
25    A. Twenty-some days.

Page 156

1    Q. How many times have you been written up?
2    A. Since I've been back on this violation?
3    Q. No, sir, in your 22 -- 21-plus years in the
4 penitentiary.
5    A. I can't recall.
6    Q. Too many to remember?
7    A. Right. Could be, I don't know.
8    Q. Pardon?
9    A. I can't say.
10    Q. And fighting was involved in many of those?
11    A. Right.
12    Q. And they keep a pretty close eye on somebody that
13 gets into trouble and is a violent person, don't they?
14    A. I -- I couldn't -- I couldn't -- I wouldn't.
15    Q. Well, sir, you've been written up many, many times,
16 haven't you?
17    A. But all of them wasn't for fighting, though.
18    Q. Well, you don't consider fighting violence?
19    A. I said all of them wasn't for fighting.
20    Q. Well, back when -- what are you now, about 54?
21    A. I'm 57.
22    Q. Fifty-seven years old?
23    A. Right.
24    Q. And 20 years ago, you were 37. You went to the
25 penitentiary -- how old were you when you first went to the

Page 157

1 penitentiary?
2    A. Twenty-three.
3    Q. Twenty-three, a young man?
4    A. Right.
5    Q. And you were a little more prone to take offense
6 than you are when you get to be 57. Would that be a fair
7 statement?
8    A. Well, you know, when you're young, you know, you
9 do -- you do -- you do stupid stuff.
10    Q. And you do stupid stuff, and as you get older --
11    A. You get wiser.
12    Q. -- you realize it was stupid stuff?
13    A. You get wiser.
14    Q. You get wiser?
15    A. Yeah.
16    Q. Okay. Now, during the three months that you were at
17 Clements, you never saw Travis involved in any fights with
18 anyone, did you?
19    A. I wasn't on the building with him. I didn't stay on
20 the building with him.
21    Q. Well, sir, did you see him involved in any fights,
22 was my question.
23    A. No, I didn't.
24    Q. All right. Did you see him having words with anyone
25 other than Mr. Wiley?

Page 158

1    A. No.
2    Q. Thank you, sir, for being here.
3       MR. DURHAM: Pass the witness.
4       REDIRECT EXAMINATION
5 BY MR. SIMS:
6    Q. What are the boot knives or the shop knives used
7 for --
8    A. Trimming.
9    Q. -- that you had?
10    A. Trimming.
11    Q. What are you trimming?
12    A. Leather, leather and rubber.
13    Q. And what's the leather used for?
14    A. Boots.
15    Q. What about the rubber?
16    A. For canvas shoes.
17    Q. Are those knives dull or sharp?
18    A. No, we got our own whet rocks. We keep them sharp,
19 just like a razor.
20    Q. How sharp?
21    A. Sharp.
22    Q. Got to to cut that leather and rubber?
23    A. Sharp.
24       MR. DURHAM: Objection, leading.
25       THE COURT: Sustained.

THE STATE OF TEXAS
Case 2:12-cv-00074-PBR   Document 84-2   Filed 02/17/13   Page 44 of 67   PageID 2726
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 159

1    Q. (BY MR. SIMS) On January 29th of 2003, did anyone
2  ask you for your knife?
3    A. Yes, sir.
4    Q. Who? The defendant?
5    A. Right.
6    Q. Did you let him use it?
7    A. No, I didn't.
8        MR. SIMS: Pass the witness, Your Honor.
9            RECROSS-EXAMINATION
10 BY MR. DURHAM:
11   Q. Okay. That's in your third statement, right?
12   A. Right.
13   Q. Is that correct?
14   A. That's right.
15   Q. You made that known on the 14th, after you were
16 transferred after you had the trouble with the Crypts?
17   A. Right.
18   Q. Right? You didn't tell anyone that the 29th. You
19 knew absolutely nothing on the 29th, correct?
20   A. No, he had asked me for that knife, but --
21   Q. Sir --
22   A. Right.
23   Q. -- in your statement of the 29th, you knew
24 absolutely nothing about anything, correct?
25   A. I'm not --

Page 160

1    Q. Looking at the statement, sir, isn't that what your
2  statement says?
3    A. Right. But he had asked me for a knife --
4    Q. Well, sir, I'm just talking about --
5    A. Right, right.
6    Q. -- what you told --
7    A. Right.
8    Q. The story you told on the 29th is what I'm asking
9  about.
10   A. Right.
11   Q. And then the next day you told another story and you
12 didn't tell them about the knife, did you?
13   A. No, I didn't.
14   Q. All right. So it was two weeks later, after you
15 have this altercation with the gang members and you're
16 transferred closer to your family that you remembered about
17 the knife --
18   A. The knife --
19   Q. -- is that correct?
20   A. The knife, he asked me for the knife. You know,
21 I'm --
22   Q. Sir --
23   A. Yeah.
24   Q. -- is it after you were transferred that you
25 remembered about the knife and gave the statement?

Page 161

1    A. No, no, it wasn't -- it -- it was before the
2  transfer.
3    Q. Okay. Why didn't you give a statement before you
4  were transferred?
5    A. Well, I didn't -- I didn't -- I didn't realize, you
6  know, that -- that, you know, that he had asked -- you know,
7  he had asked me for that knife at the present time.
8    Q. Oh, you didn't realize he had asked you for the
9  knife, but you realized it in time to remember it for the
10 14th?
11   A. I remembered it.
12   Q. You remembered it. Okay. Did you go to the
13 authorities and say, "I remember something"?
14   A. I went to the STG.
15   Q. Okay. Was that before or after the transfer?
16   A. That was before.
17   Q. Before the transfer, you remembered it, they
18 transferred you, and then you gave a new statement, correct?
19   A. I gave a -- I gave a -- I gave a statement before
20 they -- before they transferred me.
21   Q. The third statement you gave before you were
22 transferred?
23   A. Right.
24   Q. Well, the third statement is dated 14th of February
25 and you said you were transferred the 5th of February.

Page 162

1  Which -- I'm really confused here. Please help me out. Which
2  was it?
3    A. I was on this unit in seg.
4    Q. Pardon?
5    A. I was in seg. I was housed in transit, in seg on
6  this unit in 11 Building.
7    Q. All right.
8    A. I hadn't left this unit.
9    Q. Okay. On what date?
10   A. I don't remember the date.
11   Q. Okay. Well, you testified to this jury a moment ago
12 you were transferred on the 5th of February to the Lamesa
13 Unit?
14   A. Right.
15   Q. Okay. This statement is dated the 14th of February?
16   A. I was on -- I was still on -- I was on this unit. I
17 talked to the STG on this unit right here.
18   Q. While you were in segregation or before you went to
19 segregation?
20   A. I was in 11 Building.
21   Q. What's 11 Building?
22   A. That's solitary.
23   Q. You were in solitary?
24   A. Right.
25   Q. And you remembered?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00744-BR Document 84-2 Filed 01/17/13 Page 45 of 67 PageID 2122

TRIAL ON THE MERITS
OCTOBER 26, 2005

Multi-Page™

---

**Page 163**

1   A. Right.
2       MR. DURHAM: Okay. No further questions.
3       REDIRECT EXAMINATION
4 BY MR. SIMS:
5   Q. Why were you in solitary?
6   A. That's where they had me placed on trans.
7   Q. Tell them what "trans" is.
8   A. Just like they got me housed right now on a -- it's
9 just like segregation or Ad Seg, you know, where you don't --
10 you know --
11   Q. What does "trans" mean? Tell them -- tell them what
12 that means.
13   A. Trans is you're going to be transferred.
14   Q. Okay. Anybody tell you what to say here today?
15   A. No, they didn't.
16   Q. We talked before you testified, haven't we?
17   A. Right.
18   Q. What's the most important thing I told you you could
19 do in here?
20   A. Tell the truth.
21   Q. Is that what you've done?
22   A. That's what I have did.
23       MR. SIMS: Pass the witness, Your Honor.
24
25

---

**Page 164**

1       RECROSS-EXAMINATION
2 BY MR. DURHAM:
3   Q. Tried to? Is that what you just said?
4   A. I said I did.
5   Q. I thought you used the word "tried"?
6   A. No, I didn't. You're trying to put words in my
7 mouth.
8   Q. No, sir, I just asked you if I heard you correctly.
9   A. Right.
10   Q. And if I didn't, I didn't.
11   A. Yeah.
12   Q. And I apologize --
13   A. Right.
14   Q. -- because -- I'm not trying to put words in your
15 mouth because I'm not taking your statement.
16   A. Right.
17       MR. DURHAM: No further questions.
18       MR. SIMS: Nothing further, Your Honor.
19       THE COURT: Okay, you can step down.
20 Call your next witness.
21       MR. SIMS: William Elkins.
22       THE COURT: William who?
23       MR. SIMS: Elkins.
24       THE COURT: Mr. Elkins, if you would come right
25 up there in the middle, please, right up to the front of the

---

**Page 165**

1 courtroom there, take a seat on the witness stand, please,
2 sir.
3       Mr. Elkins, once you get comfortable, kind of
4 pull that microphone there towards you a little bit so that
5 you -- you don't have to have it right up close to you, but
6 just so you can speak into it.
7       MR. ELKINS: Yes, sir.
8       WILLIAM ELKINS,
9 having been first duly sworn, testified as follows:
10       DIRECT EXAMINATION
11 BY MR. SIMS:
12   Q. State your name, please, sir.
13   A. William Elkins.
14   Q. Where are you living at right now, sir?
15   A. My assigned unit?
16   Q. Where are you living at right now?
17   A. Bill Clements Unit.
18   Q. And that's a prison unit in regards to the Texas
19 Department of Criminal Justice; is that correct?
20   A. Yes, sir.
21   Q. And you're there on transport from another unit; is
22 that correct?
23   A. Yes, sir.
24   Q. Where is your normal house at?
25   A. Ellis One.

---

**Page 166**

1   Q. Where is that, sir?
2   A. In Huntsville, Texas.
3   Q. And currently, you're in prison on a life sentence
4 for aggravated rape; is that correct?
5   A. Yes, sir.
6   Q. How long have you been in, sir?
7   A. Twenty-three.
8   Q. Twenty-three years?
9   A. Yes, sir.
10   Q. Now, previously, back in January of 2003, were you
11 an inmate at the Clements Unit?
12   A. Yes, sir.
13   Q. How long had you been at the Clements Unit at that
14 time?
15   A. Ten years.
16   Q. Did you have any job assignment at that time?
17   A. Yes, sir, at that time --
18   Q. What did you do?
19   A. I was a cooking officer dining room, and then I went
20 to the boot factory.
21   Q. In January -- or January 29th --
22   A. No, January, I was working in the boot factory, sir.
23   Q. In January of 2003, how long had you been working in
24 the boot factory?
25   A. Well, on and off about five years, I think it was.

---

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Case 2:13-cv-00070-BR Document 84-2 Filed 01/17/13 Page 46 of 67 PageID 682

Page 167

1    Q. On January 29th of 2003, what was your job at the
2 boot factory?
3    A. I was side laster.
4        THE REPORTER: I'm sorry?
5    A. I was side laster, machine operator.
6    Q. (BY MR. SIMS) Now, did you know an inmate by the
7 name of Travis Runnels from the Clements Unit at that time?
8    A. I knew of him from working out there, sir.
9    Q. Do you see him here in the courtroom today, sir?
10    A. Yes, sir.
11    Q. Can you please point him out and describe the
12 clothing he's wearing?
13    A. Shirt and tie, brownish shirt and tie.
14    Q. Can you point in his direction, please, sir?
15    A. (Witness complies)
16    Q. Okay. Thank you.
17        About -- at that time, about how long had you
18 known this defendant?
19    A. Well, from just working out there because about -- I
20 think he had been out there a week or two, I think, somewhere
21 around there.
22    Q. Now, did you also know a Stanley Wiley?
23    A. Mr. Wiley, yes, sir.
24    Q. Mr. Wiley. How did you know him, sir?
25    A. Well, he was my supervisor and I knew him quite

Page 168

1 well.
2    Q. How long had you been under his direction as a
3 supervisor?
4    A. Right at -- a little better than a year, I think it
5 was, or better, probably. He took another officer's place.
6 Another officer had retired and he took his place.
7    Q. Describe Mr. Wiley for us, please.
8    A. Mr. Wiley was probably like about five -- five nine,
9 five ten, somewhere about my height, somewhere around there.
10    Q. What kind of person was he, sir?
11    A. Mr. Wiley was a good man. He was -- he was like --
12 well, he was my supervisor.
13    Q. Did you get along with him?
14    A. Yes, sir.
15    Q. There are some tissues right there by you if you
16 need one.
17        Mr. Elkins, can you see this or do I need to
18 move it up closer?
19    A. Bring it up a little closer, please.
20    Q. Yes, sir.
21    A. All right.
22    Q. Are you able to recognize that, sir?
23    A. Yes, sir. That's the -- that's a diagram of the
24 boot factory.
25    Q. And it's marked as State's Exhibit No. 50 for

Page 169

1 identification purposes.
2        Now, you said you were working on some
3 equipment; is that correct?
4    A. Yes, sir.
5    Q. Tell me approximately where you were working that
6 day.
7    A. Well, I -- I was --
8    Q. I'm just going to start over here and I'll start
9 moving across and you tell me when to stop.
10    A. This over -- well, see over there, that's the side
11 lasting area there.
12    Q. The laster is right there?
13    A. Yes, sir.
14    Q. Okay.
15    A. And I was behind the side laster working, trimming
16 the boots.
17    Q. Okay. You see that No. 27 there?
18    A. Yes, sir. It should be right in there.
19    Q. There's a No. 26 there. Which one?
20    A. Where was the table?
21    Q. Eighteen, the table is 18 -- 17, 18, 19.
22    A. Okay. I was working right there -- right there --
23 right there by my machine, right in that area right there.
24    Q. Right in here somewhere? (Indicating)
25    A. Yes, sir.

Page 170

1    Q. Okay. I'm going to put "E" right there and mark
2 approximately where you were working, okay? Is that fair
3 enough?
4    A. Yes, sir.
5    Q. Okay. Was Mr. Runnels working that day?
6    A. Yes, sir.
7    Q. What was he doing that day, sir?
8    A. Well, he was janitor, I think it was, on the broom.
9    Q. Okay. Had he been out there very long, Mr. Runnels?
10    A. Well, he -- he was assigned out there. I think he
11 had been out there every day, I think it was.
12    Q. I'm sorry, I didn't understand you.
13    A. I think he was out there every day. He was assigned
14 out there to the boot -- I mean boot factory.
15    Q. Do you know how long he had been out there?
16    A. I would say maybe a couple of weeks, two weeks,
17 somewhere around there.
18    Q. Okay. That particular morning, when you first got
19 out there, did you talk to anybody or just went to work?
20    A. Just your regular people that associate -- that work
21 in that area with us. We be sitting around kicking and
22 drinking coffee and, you know, shooting -- shooting the bull,
23 you know, until time to go to work.
24        So Mr. -- so -- so --
25        MR. DURHAM: It became --

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS
Multi-Page™
Case 2:13-cv-00070-DPP Document 84-2 Filed 01/17/13 Page 47 of 67
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 171

1    A. -- Mr. Wiley --
2        MR. DURHAM: -- nonresponsive at some point in
3  time, I'll object.
4    A. Mr. Wiley --
5    Q. (BY MR. SIMS) Okay. Let me ask you --
6        THE COURT: Okay. Ask another question.
7    Q. (BY MR. SIMS) Did you see Mr. Wiley having any kind
8  of discussion with anyone?
9    A. No, not right offhand. He had told Mr. Runnels to
10 go to work or get on the wall.
11   Q. Okay. What happened at that point?
12   A. At that time, Mr. Runnels went to work.
13   Q. What was the defendant, Mr. Runnels, doing at that
14 point?
15   A. Sweeping.
16   Q. What's the next thing you remember happening that
17 day?
18   A. Well, went on back -- I went on back trimming my
19 boots and stuff, trying to -- because I was in vocational
20 training and I was trying to get through with my work and then
21 go to school. And so a few minutes later, Mr. Runnels, he
22 came to me about cutting some sleeves out of this shirt,
23 thermal shirt, so I was so far stuck out on the boots so I
24 didn't have time to let him go down there by himself and use
25 my knife, so I go down there and I cut the sleeves out of this

Page 172

1  shirt and I come back.
2    Q. Y'all went together?
3    A. Yes, sir.
4    Q. Okay. What was Mr. Runnels' attitude at that time?
5    A. He was --
6        MR. DURHAM: Objection. There's no proper
7  predicate for that question.
8        THE COURT: Sustained.
9    Q. (BY MR. SIMS) What happened next?
10   A. He had a -- he was -- he had a smile on his face.
11 He didn't act like he was mad or nothing like that there. He
12 had a smile on his face like all the other times I had seen
13 him, you know.
14       MR. DURHAM: That's not responsive to the
15 question, Your Honor.
16       THE COURT: Sustained.
17       MR. DURHAM: I'm going to object to it. Could
18 he ask a question and get a response?
19   Q. (BY MR. SIMS) Once you got back from cutting the
20 sleeves out, what happened?
21   A. I went back at the table to sit down and went to
22 kicking it with my friend, and then I went on -- fixing to
23 knocking some of the racks out because they were coming in
24 kind of regular on me, so I went back to work.
25       So shortly later, Mr. Runnels come back down

Page 173

1  there and wanted to use my knife where he can cut some Vs in
2  his shirt. He was making a muscle shirt, he said. So I told
3  him, I say, "Well, look here, man, as soon as I get caught up,
4  I'll let you use it."
5        And then I give him the knife and he -- he
6  didn't -- he wasn't mad. He had a smile on his face, so I
7  give him the knife, and he goes down --
8    Q. Let me ask you, what did you think he was going to
9  do with the knife when you gave it to him?
10   A. Well, I was thinking he was going to --
11       MR. DURHAM: Objection. It calls for
12 speculation, Your Honor.
13       THE COURT: Sustained.
14   Q. (BY MR. SIMS) Did Mr. Runnels tell you what he
15 wanted the knife for?
16   A. No, sir, other than to cut the Vs in his shirt, make
17 a muscle shirt.
18   Q. You gave him the knife. What happened?
19   A. I give him the knife, he went down there, and that's
20 what I assumed that's what he was going to do.
21       MR. DURHAM: Objection, nonresponsive. Assumed
22 is not a proper response. It's speculation.
23       THE COURT: Objection sustained.
24       MR. DURHAM: May I have an instruction to
25 disregard?

Page 174

1        THE COURT: Mr. Elkins, here's what I need you
2  to do. Listen carefully to the question that you're asked --
3        THE WITNESS: Yes, sir.
4        THE COURT: -- and answer that question.
5        THE WITNESS: All right.
6        THE COURT: Okay, thanks.
7        MR. DURHAM: Thank you, Your Honor.
8    Q. (BY MR. SIMS) So you -- what do you do after you
9  give the defendant the knife?
10   A. I stayed over there sitting down at the table
11 drinking coffee.
12   Q. You couldn't do any work without your knife?
13   A. No, sir.
14   Q. You couldn't do your assigned job, correct?
15   A. Yes, sir.
16   Q. Did you see where Mr. Runnels went?
17   A. He went down there by boxing area, somewhere down in
18 there.
19   Q. I guess we need to get that back up here.
20       THE COURT: Gary, just take it off the easel,
21 take the easel away, and we can just lean it against the
22 table.
23       Okay. Thank you.
24   Q. (BY MR. SIMS) On State's Exhibit No. 50 for
25 identification purposes, you had indicated that you were

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00717-BR Document 84-2 Filed 01/17/13 Page 48 of 67 PageID 1726

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

| Page 175 | Page 177 |
|---|---|

**Page 175**

1 approximately right here; is that correct?

2   A. Yes, sir.

3   Q. Now, where is the boxing area here?

4   A. Boxing area is down there by the warehouse. Where

5 is the warehouse area?

6   Q. Okay. Here's the lasters.

7   A. Uh-huh.

8   Q. Do I need to get closer so you can see?

9   A. Yes. It's further back down this way somewhere.

10   Q. Okay.

11   A. Right there. (Indicating)

12   Q. Right there? Right here? (Indicating)

13   A. Yes, sir, right in the boxing area.

14   Q. So you saw the defendant going from here toward this

15 area here which is marked -- actually, it's got a No. 30 over

16 there on it.

17   A. Yes, sir.

18   Q. Is that correct?

19   A. Yes, sir.

20   Q. What happened then, sir?

21   A. That's the last thing I seen.

22   Q. Okay. Did Mr. Runnels ever come back to you, sir?

23   A. He brought -- when he brought my knife back, he

24 brought my knife back to me. That's the only time he come

25 back.

**Page 176**

1   Q. About how long was he gone from the time he got your

2 knife until he came back to you, sir?

3   A. Seemed no more than about -- well, about ten

4 minutes, sir.

5   Q. About how many?

6   A. About ten, 15 minutes, sir. It wasn't that long,

7 wasn't gone that long, just --

8   Q. What's the next thing you recall happening at the

9 boot shop after that?

10   A. Well, I got my knife, I started knocking out the

11 racks, got ready for vocational school, then I seen Mr. Wiley

12 going toward the office holding his neck.

13   Q. And what happened then?

14   A. When he get up in the office, they wrapped his

15 jacket around his neck. About this time, Mr. Runnels come

16 back up that way by -- by the -- by the stair, blue stair, the

17 iron metal staircase we had out there in the floor, and he's

18 standing there.

19       Mr. Boomer --

20   Q. Who is Mr. Boomer?

21   A. The other supervisor that was out there. Mr. Bolin,

22 and I think it was Mr. Askins, they walking -- walking to --

23 toward the door to get him to the hospital.

24       So about this time, Mr. Wiley point. He can't

25 talk, but he point, let them know that he hurt him.

**Page 177**

1   Q. Who did he point at, sir?

2   A. Mr. -- Mr. --

3   Q. The defendant, Mr. Runnels?

4   A. Yes, sir.

5   Q. And then what happened?

6   A. Then Mr. Boomer told him, said, "Man" --

7       MR. DURHAM: Objection. That would be hearsay,

8 Your Honor.

9       THE COURT: Sustained.

10   Q. (BY MR. SIMS) After -- skip what was said. What's

11 the next thing that happened?

12   A. About that time, people came in, told us to get on

13 the floor, put our hands behind our backs, some laws from the

14 Neal Unit.

15   Q. What did they have you do with your knives?

16   A. They -- they made us put our knives on the desk. We

17 put our knives on the desk, and they took -- took them. I

18 guess they did a DNA --

19   Q. When you got your knife back, did you look at it,

20 when you got your knife first back from Mr. Runnels?

21   A. When I got it back, see what -- ain't nothing on it,

22 so that's the reason why I never did think that Mr. Runnels

23 had did anything --

24       MR. DURHAM: I don't think --

25   A. -- to Mr. Wiley.

**Page 178**

1       MR. DURHAM: -- that's responsive to a question

2 and I object.

3       THE COURT: Sustained.

4       MR. DURHAM: May I have an instruction to the

5 jury to disregard some of these nonresponsive answers?

6       THE COURT: Disregard the last answer, please.

7       MR. DURHAM: Thank you.

8       MR. SIMS: I'll pass the witness, Your Honor.

9       CROSS-EXAMINATION

10 BY MR. DURHAM:

11   Q. Mr. Elkins, you gave two statements and they are

12 quite different, aren't they?

13   A. Sir?

14   Q. Pardon? Did you understand the question?

15   A. No, sir.

16   Q. Okay. You gave two statements?

17   A. Yes, sir.

18   Q. All right. Have you reviewed those statements prior

19 to coming to court today?

20   A. My -- my first statement that I gave, I -- I -- I

21 gave --

22   Q. It's a yes-or-no question, sir.

23       Let me explain responsiveness to you. You

24 listen to the question --

25       THE COURT: Mr. Durham --

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00470-LRR Document 84-2 Filed 01/17/13 Page 49 of 67 PageID 1264

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

| Page 179 | Page 181 |
|---|---|
| 1  MR. DURHAM: Pardon me, Your Honor. | 1  A. No, someone else wrote them for me. |
| 2  THE COURT: Mr. Elkins, did you hear the | 2  Q. Someone wrote them for you? Okay. Well, you gave |
| 3 question? The question he asked you was: Did you review your | 3 your first statement on January 29th; is that right? |
| 4 two statements before you came here today? | 4  A. Yes, ma'am. |
| 5  THE WITNESS: No, sir. | 5  Q. Okay. And in that statement, that statement, you |
| 6  THE COURT: Did you look at them? | 6 just talked about being -- would it -- would it -- would it be |
| 7  THE WITNESS: Not today. | 7 better if I read to you -- |
| 8  THE COURT: Did you read them? | 8  A. Yes, ma'am. |
| 9  THE WITNESS: No, sir. | 9  Q. Okay. It says, "On January 29th" -- |
| 10  THE COURT: Okay. Would you like an | 10  MS. HAMILTON: I'm going to approach the |
| 11 opportunity to do that? | 11 witness, Judge. |
| 12  THE WITNESS: Yes, sir. | 12  Q. (BY MS. HAMILTON) Let me make sure that we're on |
| 13  THE COURT: Okay. You read those over, | 13 the same page, okay? |
| 14 Mr. Elkins, and then we'll continue. | 14  A. Okay. |
| 15  (Witness reading) | 15  Q. Now, have you read that? Can you read any of that, |
| 16  (Pause) | 16 sir? |
| 17  THE WITNESS: This was my first statement, sir. | 17  A. No. |
| 18  THE COURT: Okay. Read them -- there should be | 18  Q. Okay. Starting with that handwriting down there, |
| 19 two there. | 19 that's not your handwriting, is it? |
| 20  THE WITNESS: Yeah. | 20  A. No, ma'am. |
| 21  THE COURT: Read them both. | 21  Q. Okay. You -- and in that statement, you just talked |
| 22  THE WITNESS: I can't read that good. Can I | 22 about that you heard -- you say, "I heard Mr. Wiley telling an |
| 23 get someone to help me, please? | 23 inmate, 'I told you if you're not going to clean up, get on |
| 24  MR. SIMS: May we approach the bench? | 24 the wall.'"? |
| 25  THE COURT: Yeah, sure. | 25  A. Yes, ma'am. |

| Page 180 | Page 182 |
|---|---|
| 1  (At the bench, on the record) | 1  Q. Okay. What -- that just means to just kind of stand |
| 2  MR. SIMS: They have all seen their statements. | 2 aside? |
| 3 They have even seen them today. | 3  A. No, ma'am. They got a -- up there toward the |
| 4  THE COURT: Okay. | 4 office, that's what they call the wall. If you're not going |
| 5  MR. SIMS: And then he doesn't read well -- | 5 to work, you get on -- stand on the wall and they call for |
| 6 somebody is going to have to read it to him. | 6 security to come get you. |
| 7  (Open court) | 7  Q. Okay. And you heard that, but then did you see |
| 8  THE COURT: Okay. Just go through it the best | 8 Mr. -- did you see Mr. Wiley after that? |
| 9 you can, Mr. Elkins, and when Mr. Durham gets back, we'll | 9  A. No, he went on down to the other work area, you |
| 10 start asking some questions about it. | 10 know -- you know, because, you know, everybody have certain |
| 11  THE WITNESS: Well, on my first statement that | 11 jobs to do. |
| 12 I gave -- | 12  Q. Okay. But in that statement, you don't say |
| 13  THE COURT: Okay. Wait until Mr. Durham gets | 13 anything -- later in that statement, you say, "I -- I had my |
| 14 back here. Well, I guess you don't know who he is. He's the | 14 knife when Mr. Wiley was cut," but there's nothing in this |
| 15 guy that walked out the door. | 15 statement about what you testified to about what you saw. You |
| 16  (Mr. Durham returns to the courtroom) | 16 didn't put that in this statement, did you? |
| 17  THE COURT: Okay, Mr. Durham, Mr. Elkins said | 17  A. I didn't see anything. |
| 18 he can't read and write very well, so if you'll kind of go -- | 18  Q. Okay. You just heard -- you just heard? |
| 19 as you have questions, go up and show him what you're talking | 19  A. I just heard -- I know I had gave Mr. Runnels my |
| 20 about and read it to him. | 20 knife, and I never thought that he did anything because there |
| 21  MR. DURHAM: I'll let Ms. Hamilton. She can | 21 wasn't no blood or nothing on my knife, so I felt like he |
| 22 read it and I probably -- she can see it and I probably can't. | 22 hadn't hurt nobody because I couldn't say that he hurt |
| 23  THE COURT: Okay. All right. | 23 anybody. |
| 24  Q. (BY MS. HAMILTON) Mr. Elkins, could you read any of | 24  Q. Okay. And then you gave another statement, I |
| 25 your statements? Did you write them or -- | 25 believe, the next day? |

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00070-J-BR   Document 84-2   Filed 01/17/13   Page 50 of 67   PageID 326

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 183

1   A. Yes, ma'am.
2   Q. Okay. And then you gave another statement; is that
3 right?
4   A. The second statement.
5   Q. Did you give three statements --
6   A. No, ma'am.
7   Q. -- or two statements?
8   A. Two statements.
9   Q. Okay. How long had you known Mr. Runnels?
10   A. I hadn't known Mr. Runnels that long. I just know
11 him from working around him, seeing him out there. He always
12 had a smile on his face, always -- we suspected that he had --
13 a pretty cool fellow.
14   Q. You had only seen him a few times?
15   A. Yes, ma'am.
16   Q. Okay. And you said he always had a smile on his
17 face, seemed good-natured?
18   A. He always had a -- seemed like he was a great guy.
19   Q. Okay. And you had known Mr. Wiley how long?
20   A. Well, on and off probably about five years,
21 somewhere around there. I knowed him when he was in gray.
22        THE REPORTER: I'm sorry, knowed him when he
23 was in what?
24   A. When he was in gray -- gray uniform.
25   Q. (BY MS. HAMILTON) Isn't it true that there are --

Page 184

1 sometimes there are disagreements between supervisors and
2 inmates?
3   A. Sometime there is.
4   Q. And, in fact, there are times when -- when an inmate
5 might not want to work?
6   A. Yes, ma'am, there's quite a bit of that.
7   Q. Sorry?
8   A. Yes, ma'am.
9   Q. There's quite a bit of that, is that what you said?
10   A. Yes, ma'am.
11   Q. Okay. And sometimes people just don't get along out
12 there, like the supervisors and the inmates?
13   A. Well, I -- I wouldn't say don't get along, because,
14 I mean, you know, if you don't want to work, a lot of them
15 come out there that don't want to work, so they cause a
16 problem for themselves, you know, and --
17   Q. And that's happened to you in the past?
18   A. Yes, ma'am, I've had -- you know, I went through --
19   Q. You've had days you didn't want to work --
20   A. Yes --
21   Q. -- in the past?
22   A. Yes, ma'am.
23   Q. Okay. And you got written up for it?
24   A. Well, I never got written up. I got a warning.
25   Q. Oh, okay, got a warning, okay.

Page 185

1        What unit are you in now?
2   A. Ellis, Ellis One, Huntsville, Texas.
3   Q. And where were you before that?
4   A. Before Ellis One?
5   Q. Yes, sir.
6   A. Bill Clements Unit, Amarillo, Texas.
7   Q. Okay. When did you go from Clements to Ellis?
8   A. In 2003.
9   Q. When in 2003, sir?
10   A. In February. I think it was February the 7th --
11 February the 7th.
12   Q. February 7th? Why were you transferred?
13   A. Because I had a hit on my life.
14   Q. Okay. What does that mean to you, sir?
15   A. Ma'am?
16   Q. What does that mean?
17   A. That they threatened to kill me.
18   Q. Who?
19   A. I don't have the faintest idea. There was a note
20 under my -- a letter was -- well, a piece of paper was under
21 my door. We was on lockdown. And it told me, "Nigger, you
22 dead."
23   Q. Okay. Was it Mr. Runnels? He wasn't there, was he?
24   A. No, ma'am.
25   Q. You hadn't seen him since -- since that day?

Page 186

1   A. No, ma'am. Wasn't no inmates out, ma'am.
2   Q. Sorry?
3   A. Wasn't no -- no inmates out that day. We was all on
4 lockdown.
5   Q. So all the inmates were in lockdown, but a note got
6 slipped under your door threatening your life?
7   A. Yes, ma'am. An officer put it under there.
8   Q. Okay. Did you see the officer put it under there?
9   A. No, ma'am.
10   Q. Okay. But there was no inmates out walking around
11 the halls?
12   A. Wasn't no inmates out. We was all locked down.
13   Q. So when you were fed your food during the day, an
14 officer delivered it?
15   A. Yes, ma'am. We ate johnnies.
16   Q. I'm sorry?
17   A. We ate johnnies.
18   Q. That's the officer's name?
19   A. No, ma'am, that's what they fed us.
20   Q. What did they feed you?
21   A. Johnnies.
22   Q. Okay.
23   A. Sack lunches.
24   Q. Sack lunches, okay.
25        And what did the note say?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Case 2:12-cv-00410-BR Document 84-2 Filed 01/17/13 Page 51 of 67 PageID 2635

|  | Page 187 |
|---|---|
| 1 | A. "Nigger, you dead." |
| 2 | Q. "Nigger, you're dead"? |
| 3 | A. That's right. |
| 4 | Q. Okay. What did you do with that note, sir? |
| 5 | A. My cellie woke me up and said, "You need to look at |
| 6 | this." So I got up, and he read it. |
| 7 | Q. Okay. Did -- did the note -- do you know -- was |
| 8 | your cell mate black also? |
| 9 | A. No, he was Spanish. |
| 10 | Q. Okay. So you felt like the note was obviously |
| 11 | directed towards you, based on the words in the note? |
| 12 | A. Yes, ma'am, it was based towards me. |
| 13 | Q. Okay. And the note -- you said that after you got |
| 14 | the note, you felt like a guard had put it there? |
| 15 | A. (Witness nods head up and down) |
| 16 | Q. Now, was that before or after you gave your second |
| 17 | statement? |
| 18 | A. That was after I gave my second statement. |
| 19 | Q. That was after you gave your second statement? |
| 20 | A. Yes. |
| 21 | Q. Okay. And where is the note? |
| 22 | A. I flushed it down the toilet. I didn't pay -- |
| 23 | really pay it no attention. |
| 24 | Q. Okay. But then you -- but then you said that you |
| 25 | were transferred because of it? |

|  | Page 188 |
|---|---|
| 1 | A. That's why I was transferred. I told -- and they |
| 2 | already knew. |
| 3 | Q. How -- they already knew? |
| 4 | A. Yes, ma'am. |
| 5 | Q. Who did you tell? |
| 6 | A. I told AID. |
| 7 | Q. AID? |
| 8 | A. Internal affairs, yes, ma'am. |
| 9 | Q. Okay. When did you tell them? |
| 10 | A. That same -- that day they came and got me. They |
| 11 | came and picked me up that Tuesday morning. |
| 12 | Q. Did they take a statement from you about that? |
| 13 | A. Yes, ma'am. |
| 14 | Q. And where is that statement? |
| 15 | A. I don't have the vaguest idea. All I know, they |
| 16 | told me not to contact anyone, not to talk to anyone, and |
| 17 | don't even contact nothing. I told them, I said, "Well, I |
| 18 | need to talk to my mother." Said, "You can't even talk to |
| 19 | your mother." Said, "We're going to put you on a train -- on |
| 20 | a -- on a bus." |
| 21 | MR. DURHAM: May we approach? |
| 22 | THE COURT: Sure. |
| 23 | (At the bench, on the record) |
| 24 | MR. DURHAM: I think we're entitled to that. |
| 25 | MR. SIMS: News to me. |

|  | Page 189 |
|---|---|
| 1 | THE COURT: Don't talk to each other. |
| 2 | MR. DURHAM: I think we're entitled to that. |
| 3 | THE COURT: You're entitled to what? |
| 4 | MR. DURHAM: Their investigation into the |
| 5 | threat on his life. |
| 6 | THE COURT: Okay. All right. Have somebody |
| 7 | find out where it is and we'll continue with this exploration, |
| 8 | then. |
| 9 | MR. SIMS: I'll send Jack to go get somebody |
| 10 | started. |
| 11 | THE COURT: Okay. |
| 12 | (Open court          ) |
| 13 | Q. (BY MS. HAMILTON) Who did you talk to at AID? |
| 14 | A. I seen -- I forget. I really forget the name. It |
| 15 | was a black officer and a white officer. |
| 16 | Q. So two officers came to speak with you? |
| 17 | A. Well, they send -- they was -- they was in -- they |
| 18 | wasn't in uniform, they was in suits. |
| 19 | Q. Plain clothes? |
| 20 | A. I think it was Wilson. |
| 21 | Q. Might be Wilson? |
| 22 | A. Something like that, yeah. I forget the name. |
| 23 | Q. Okay. And -- |
| 24 | A. They on the Bill Clements Unit. |
| 25 | Q. And they worked on the Clements Unit? |

|  | Page 190 |
|---|---|
| 1 | A. Yes, ma'am. |
| 2 | Q. Okay. And -- okay. Now, if this deal in the boot |
| 3 | factory with Mr. Wiley, if that occurred on January 29th, you |
| 4 | said this was a few days later that this note got -- |
| 5 | A. Well, you know, what -- when they locked -- they |
| 6 | came and got me the second day -- about the second day after |
| 7 | the death and took me to question me. |
| 8 | Q. When you gave the second statement? |
| 9 | A. Yes, ma'am. |
| 10 | Q. That was on January 30th? |
| 11 | A. Yes, ma'am. |
| 12 | Q. Do you agree with me? |
| 13 | A. Yes, ma'am. |
| 14 | Q. Okay. Then after you gave the second statement, how |
| 15 | soon after that was that note left for you? |
| 16 | A. I think it was like the -- we still on lockdown. I |
| 17 | think it was like the following day or the next day or |
| 18 | somewhere around there. I really -- I really done forgot. |
| 19 | But I -- you know, just -- you know -- |
| 20 | Q. Last day of January, beginning of February? |
| 21 | A. No, it was still in January. |
| 22 | Q. How soon after -- you told me that you were |
| 23 | transferred out on February 7th? |
| 24 | A. Yes, ma'am. |
| 25 | Q. How soon after you told them about the note were you |

Page 191

1 transferred out?
2    A. About three days after -- three days before they
3 transferred me.
4    Q. So it was probably around February 4th?
5    A. Somewhere around there, yeah, somewhere. February
6 the 4th or February the 7th, somewhere around there.
7    Q. Okay. And as soon as you found that note, how soon
8 after you found that note did the AID officer come see you?
9    A. Law came and got me that same day.
10    Q. That day, okay.
11    A. And I told them about it and --
12    Q. Did you show them the note?
13    A. No, I had threw it away.
14    Q. Okay. Did you recognize the handwriting on the
15 note?
16    A. No, ma'am, I didn't recognize the handwriting
17 because I didn't know who it was and, you know, I couldn't
18 ever figure out why would anybody want to hurt me and I hadn't
19 did anything.
20    Q. What kind of paper was it written on?
21    A. Looked like typing paper.
22    Q. Like just plain --
23    A. Yes, ma'am.
24    Q. -- paper? Okay. And was it handwritten or was it
25 typed?

Page 192

1    A. Well, it was a fancy handwriting. It wasn't typed,
2 it was real nice handwriting.
3    Q. Okay. Did you believe --
4    A. Ma'am?
5    Q. Did you believe the note?
6    A. Did I believe in it?
7    Q. Did you believe in what it said?
8    A. Yes, ma'am, I truly believed it.
9    Q. You felt that your life was being threatened?
10    A. Yes, ma'am.
11       MS. HAMILTON: Your Honor, we would ask to
12 reserve further examination of this witness.
13       THE COURT: Okay. You pass the witness?
14       MS. HAMILTON: Yes.
15       THE COURT: Okay.
16          REDIRECT EXAMINATION
17 BY MR. SIMS:
18    Q. Now, this note you got, you don't know where it came
19 from?
20    A. No.
21    Q. Could have even been your bunkie that put it there?
22    A. I doubt it, but -- it could have, but I don't think
23 so.
24    Q. Sure. Have you received any other threats since
25 then --

Page 193

1    A. When I was --
2    Q. -- about this?
3    A. When I was coming through Huntsville to come over
4 here, Sunday before last, I went to breakfast --
5    Q. Who threatened you, sir, or what happened that made
6 you feel like it was a threat?
7    A. Well, when they came to me and said --
8       MR. DURHAM: I'm going to object to the hearsay
9 nature of this statement.
10       THE COURT: Well, if everybody will let the
11 witness answer the question. We're talking over each other.
12       Ask your question again, please, sir.
13    Q. (BY MR. SIMS) You said you were threatened again.
14 Where at?
15    A. At the wall in Huntsville on transit.
16    Q. How did that come about, sir?
17    A. I was coming back from breakfast, this inmate ran up
18 behind me, rammed my head into the wall and busted my eye on
19 the side.
20    Q. What happened then?
21    A. I don't know nothing about no disciples, but he just
22 said he was a disciple and he was a friend.
23       MR. DURHAM: I'm going to object to the hearsay
24 nature of the response.
25       THE COURT: Overruled. I don't believe it's

Page 194

1 being offered for the truth. It's offered for the fact that
2 the man thought he was threatened.
3       Okay. Go ahead.
4    A. So I asked the officer that was standing there, I
5 said, "Did you see that?" And he just turned his back. So --
6 "Go on in your cell." So I went on in my cell. So I'm
7 bleeding, so I asked him, I said, "Will you take me to the
8 hospital" --
9       MR. DURHAM: At some point in time, he quit
10 answering the question --
11       THE COURT: Sustained.
12       MR. DURHAM: -- and he's giving a narrative.
13       THE COURT: Ask another question.
14    Q. (BY MR. SIMS) An inmate did it -- did it to you,
15 but there was a correctional officer there that turned their
16 back. Am I understanding you correctly?
17    A. Yes, sir.
18    Q. Did you report that incident to anyone else?
19    A. I told that -- called for a captain or some -- where
20 I can talk to somebody, but he never did do it. So when I did
21 get out to go to the hospital, I had to wait until they called
22 chow for me to go, they let transit go out to eat. So I went
23 to the infirmary and they -- I was scared, so I never -- never
24 did -- so they asked me, said, "Well, you're going to get a
25 case if you don't tell me what happened to you." So I told

THE STATE OF TEXAS     Multi-Page™     TRIAL ON THE MERITS
vs. TRAVIS TREVINO RUNNELS     OCTOBER 26, 2005
Case 2:18-cv-00070-Z Document 84-2   Filed 01/17/13   Page 53 of 67   PageID 825

**Page 195**

1   them, I said, "Well, I just bumped my head." So I was afraid

2   to say --

3     Q. You told somebody else you just bumped your head

4   when asked about it?

5     A. Told the nurse.

6     Q. Any other thing happen that made you feel like you

7   were threatened?

8     A. No, sir. I've -- see, it's like this: I've been

9   there a long time, but just listen to me, that's all I ask,

10   just listen, please. I've been there a long time. And

11   whatever I did, I did my crime -- I did time on it and I'm

12   sorry about that. But I didn't have no part to none of this.

13     I had a lot of respect for Mr. Wiley. He

14   treated me like a friend and he was my supervisor. I didn't

15   have no dealing with him getting killed. That's all I'm --

16     MR. DURHAM: Nonresponsive --

17   A. Just listen to me.

18     MR. DURHAM: -- objection.

19     THE COURT: Ask another question, please, sir.

20     Q. (BY MR. SIMS) In regards to what you've testified

21   to here today, have you said that because of any kind of

22   threats?

23     A. No, sir.

24     MR. DURHAM: Bolstering, objection.

25     THE COURT: Sustained.

**Page 196**

1     MR. DURHAM: Instruction?

2     THE COURT: Jury is instructed to disregard.

3     Q. (BY MR. SIMS) What do you feel is the most

4   important thing you could do here today?

5     A. The most important --

6     MR. DURHAM: Your Honor, that's an open-ended

7   question. By its very nature, it invokes --

8     THE COURT: Okay. It's global. Sustained.

9     Q. (BY MR. SIMS) In regards to what you have told

10   these jurors here today, what have you tried to do, sir?

11     MR. DURHAM: That's bolstering.

12     THE COURT: Sustained.

13     MR. SIMS: I'll pass the witness, Your Honor.

14     RECROSS-EXAMINATION

15   BY MS. HAMILTON:

16     Q. Mr. Elkins, do you feel that the threat from the

17   guards was valid, was real?

18     A. Yes, ma'am.

19     MR. SIMS: I would object, Your Honor. He just

20   speculated it was from a guard, he didn't say for sure that it

21   was.

22     THE COURT: Sustained.

23     Q. (BY MS. HAMILTON) Mr. Elkins, do you feel that the

24   threat that you received was real?

25     A. I truly believe it was real, madame.

**Page 197**

1     Q. Okay. Do you feel that when the guard turned his

2   back on you at the wall unit (sic), did that cause you some

3   fear?

4     A. Well, let me put it like this here, I imagine you

5   would probably feel the same way if someone slammed your head

6   up against the wall and busted your head open. Yes, I feel

7   like that was fear, but I can't understand why. I ain't hurt

8   no one.

9     Q. Okay. I'm not talking about the inmate that you

10   said did that to you. You said that after the inmate did

11   that, then the guard turned his back on you. Is that what he

12   did, sir?

13     A. He turned away. I guess he wasn't -- he wasn't

14   concerned, or either he would let him die in there or what.

15     Q. Did that cause you further fear?

16     A. For someone to just -- I -- I said -- I said because

17   he -- for someone to just walk up that you don't know, and

18   just walk up and slam your head in there against the wall or

19   against the door, you know, it's pretty fear because --

20     Q. Do you recognize any of these people in the back of

21   the courtroom?

22     A. They was some of my supervisors, yes.

23     Q. Some of the guards, or supervisors?

24     A. Supervisors.

25     Q. Okay.

**Page 198**

1     MS. HAMILTON: I'll pass the witness.

2     REDIRECT EXAMINATION

3   BY MR. SIMS:

4     Q. Do you feel threatened by them being here today?

5     A. No, sir.

6     Q. Do you feel threatened at all being in here today

7   and testifying in front of this jury?

8     A. No, sir.

9     Q. Were you ever afraid that you might be in trouble

10   because possibly it was your knife that was used?

11     MR. DURHAM: That's a leading question, Your

12   Honor.

13     THE COURT: Overruled.

14     MR. DURHAM: Objection. It's not been

15   established that it was his knife used, so the question

16   assumes facts not in evidence.

17     THE COURT: That is sustained.

18     MR. DURHAM: Thank you.

19     Q. (BY MR. SIMS) Because of the events of January 29th

20   of 2003, did you ever feel concerned that you might be in

21   trouble?

22     A. Yes, sir.

23     Q. Why?

24     A. Because I feel like Mr. Wiley was hurt with my tool.

25     Q. How do you feel about that, sir?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cr-00014-DRR Document 84-2 Filed 01/17/13 Page 54 of 67 PageID 2476

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 199

1    MR. DURHAM: Objection, global question, Your
2 Honor.
3    THE COURT: Sustained.
4    MR. SIMS: Pass the witness, Your Honor.
5    THE COURT: Ms. Hamilton?
6    MS. HAMILTON: Pass, Judge.
7    THE COURT: Okay, you can step down, sir.
8    Do any of you folks want a break?
9    (No response)
10    Okay. Call your next witness.
11    MR. SIMS: Tony Irvine, Your Honor.
12    THE COURT: Mr. Irvine, if you would come right
13 around here, please, sir, and take a seat on the witness
14 stand.
15    Mr. Irvine, once you're comfortable, if you
16 would just sort of straighten that mike out, pull it to you a
17 little bit so that you can speak into it.
18    Okay, thanks.
19    TONY IRVINE,
20 having been first duly sworn, testified as follows:
21    DIRECT EXAMINATION
22 BY MR. SIMS:
23    Q. Would you state your name, please, sir?
24    A. Tony Irvine.
25    Q. Where are you currently residing?

Page 200

1    A. Bill Clements Unit.
2    Q. And that is --
3    A. Amarillo.
4    Q. -- your residence; is that correct?
5    A. Yes, sir.
6    Q. You're not on transport anywhere, transfer? You're
7 not on transfer from another unit?
8    A. Yes, I came from another unit.
9    Q. Okay. What unit did you come from?
10    A. Huntsville Unit.
11    Q. And you're currently in the prison system for a
12 credit card abuse conviction, a theft from person conviction,
13 an aggravated robbery, a robbery, and another aggravated
14 robbery and obstruction; is that correct?
15    A. No, sir, the first three charges you read out were
16 old charges. I'm currently in for two counts of aggravated
17 robbery, one robbery, and obstruction.
18    Q. Okay. Has anyone threatened you about your
19 testimony today?
20    A. Yes, sir.
21    Q. When did that happen, sir?
22    A. It happened in Huntsville at the Wynne Unit.
23    Q. When did that occur, sir?
24    A. Around March of 2003 -- 2004, I meant to say, excuse
25 me.

Page 201

1    Q. I'm sorry, I didn't catch the last part.
2    A. March of 2004.
3    Q. Okay. Just the general category of who you felt
4 threatened by, who was that?
5    MR. DURHAM: Pardon me, Your Honor. I'm going
6 to object to that as calling for a hearsay response and
7 speculation.
8    THE COURT: Rephrase the question, please.
9    Q. (BY MR. SIMS) Well, I'll just -- did you know the
10 individual that threatened you?
11    A. No, I didn't know them, other than what they told
12 me.
13    Q. What was that individual's status at -- I'm
14 assuming -- you said it happened at the unit, so I'm assuming
15 it happened inside the unit?
16    A. Yes, sir. He -- to my knowledge, he was a gang
17 member of the gang called the Crypts.
18    MR. DURHAM: Speculation, Your Honor, and also
19 hearsay.
20    THE COURT: Overruled.
21    MR. DURHAM: May I be heard on that?
22    THE COURT: Sure. The reason I overruled it,
23 and I'll tell you, is because the first words out of the
24 witness's mouth were "to my knowledge, he is a member."
25    MR. DURHAM: That who is a -- that the person

Page 202

1 who threatened him is a member?
2    THE COURT: Yes, sir. Would you like to take
3 the witness on voir dire?
4    MR. DURHAM: Yes, I would.
5    THE COURT: Go right ahead.
6    VOIR DIRE EXAMINATION
7 BY MR. DURHAM:
8    Q. Do you know this person to be a member of the
9 Crypts?
10    A. This is something that I learned while --
11    Q. Sir, do you know this person to be a member of the
12 Crypts? It's a yes-or-no --
13    A. Not beforehand, no.
14    MR. DURHAM: That's my point, You Honor. I ask
15 the testimony be stricken and jury instructed.
16    THE COURT: Overruled. Go ahead.
17    DIRECT EXAMINATION - Cont'd
18 BY MR. SIMS:
19    Q. When did you arrive to the Bill Clements Unit this
20 time?
21    A. This time here?
22    Q. Yes, sir.
23    A. I've been on the Clements Unit approximately 30 days
24 now, I would say. I got there on the 28th, I believe.
25    Q. You were previously housed on that farm; is that

THE STATE OF TEXAS     Multi-Page™     TRIAL ON THE MERITS
vs. TRAVIS TREVINO RUNNELS     OCTOBER 26, 2005

Case 2:13-cv-00070-DPR Document 84-2   Filed 01/17/13   Page 55 of 67   PageID 778

Page 203

1 correct?
2    A. Yes, sir.
3    Q. When was that, sir?
4    A. I would say I got there around September --
5 September or October of 2002.
6    Q. When were you shipped off that farm?
7    A. I would say January the 30th of 2003, the day after
8 the incident happened.
9    Q. What was your work assignment?
10    A. I worked in the boot factory. I ran a toe lasting
11 machine.
12    Q. Are you able to see what's been marked for
13 identification purposes as State's Exhibit No. 50 from where
14 you're at, sir?
15    A. Yes, sir.
16    Q. Are you able to recognize that, sir?
17    A. Yes, sir.
18    Q. What does that represent to you, sir?
19    A. It's a graph of the boot factory.
20    Q. Now, you said you were working in lasting; is that
21 correct?
22    A. Yes, toe lasting.
23    Q. Where is that on this particular diagram, sir? I'll
24 come up here and I'll just let you point it to me, and then
25 I'll back away from you again.

Page 204

1    A. I was right here between 6 and 7, I would say.
2    Q. Between 6 and 7?
3    A. Yes, sir.
4    Q. Here, right in here? (Indicating)
5    A. Yes, sir.
6    Q. If it's all right with you, I'm going to put your
7 initials there.
8      Would that be the correct place, sir, where I
9 put "TI"?
10    A. Yes, sir.
11    Q. What was your job there, sir?
12    A. My job was to take boots off the rack and put them
13 in the toe lasting machine and to -- the machine brought the
14 toe of the boot together and glued the end of it together.
15    Q. Who does the work there in the boot factory?
16    A. Inmates.
17    Q. Okay. Are there other people there?
18    A. Yes, sir.
19    Q. Who else is there besides inmates?
20    A. Security, supervisors.
21    Q. Now, do you know Stan Wiley or Mr. Wiley?
22    A. Yes, sir.
23    Q. Where is that from? Where do you know him from?
24    A. From the Bill Clements Unit in the boot factory.
25    Q. About how long had you known Mr. Wiley, sir?

Page 205

1    A. I would say maybe three or four days at the most.
2    Q. And why is that, sir?
3    A. To my knowledge, Mr. Wiley was on second shift and I
4 worked first shift, and he had just been transferred to the
5 first shift boot factory when I met him. I had heard of him
6 before then, but I -- I had just met him when he came to first
7 shift.
8    Q. So he -- to your knowledge, he had just been down
9 there for three or four days on the first shift?
10    A. Yes, I would say three or four days.
11    Q. Now, do you know Travis Runnels?
12    A. Yes, sir.
13    Q. See him here in the courtroom today?
14    A. Yes, sir.
15    Q. Would you please point him out and describe what
16 he's wearing?
17    A. He's wearing a maroon shirt, a yellow and black tie,
18 tan khaki pants.
19    Q. How do you know this defendant?
20    A. I know him from the boot factory.
21    Q. There at the Clements Unit?
22    A. Yes, at the Bill Clements Unit.
23    Q. How long had you known the defendant at that time?
24    A. About the same as I know Mr. Wiley.
25    Q. Why is that, sir?

Page 206

1    A. Mr. Runnels hadn't -- he wasn't there when I first
2 got there. He previously had came to work around the same
3 time Mr. Wiley had started.
4    Q. Do you know where Mr. Runnels came from?
5    A. No, sir, I do not.
6      MR. DURHAM: Based on hearsay. I object.
7      THE COURT: Well, his answer was no.
8    Q. (BY MR. SIMS) Were you working around 7:30 on
9 January 29th, 2003, in close proximity to some other inmates?
10    A. Yes, I was.
11    Q. Who were they, sir?
12    A. I don't know any real names, but there was a guy
13 named J.R., Mr. Elkins, and J.J.
14    Q. Now, while you were standing there, or working there
15 with Mr. Elkins about that time of day, what, if anything, do
16 you recall happening?
17    A. That particular morning, me and Mr. Elkins and a
18 couple of more other guys that I just named were all standing
19 around having cups of coffee, speaking of the football game,
20 as I recall.
21    Q. What happened then?
22    A. We all split up and went to our work areas, as the
23 one I showed you on the poster there. And prior to that, the
24 boots that we work on in the factory had got like behind, so
25 in the process, a lot of times when the boots get behind,

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00070-J-BR Document 84-2 Filed 01/17/13 Page 56 of 67 PageID 2728

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 207

1 other inmates may help to catch up, catch the line back up.
2   Q. You've kind of got an assembly line out there for
3 putting the boots and shoes together; is that correct?
4   A. That's correct.
5   Q. And so what happened when you got behind?
6   A. Well, when we got behind, me, myself, I was looking
7 for a supervisor to get some help in the area. And while I
8 was doing that, I observed Mr. Runnels speaking to Mr. Elkins.
9 And Mr. Elkins gave him a knife that we use to cut the boots
10 with.
11       So at that time, I felt like Mr. Runnels was
12 going to come to the -- line where we was working and help
13 us to catch up on the boots.
14   Q. Now, at the time that that happened, did you know --
15 the inmate that got the knife from Mr. Elkins, did you know
16 him by name?
17   A. No, sir, I didn't.
18   Q. Not at that time?
19   A. No, sir.
20   Q. Do you see that inmate in the courtroom here today?
21   A. Yes, sir.
22   Q. Point him out, please.
23   A. (Witness complies)
24   Q. The same one you previously identified earlier; is
25 that correct?

Page 208

1   A. Yes, sir.
2   Q. The defendant, Mr. Runnels.
3       Okay. Got the knife, what happens then?
4   A. Well, prior to that, after I observed Mr. Elkins
5 giving Mr. Runnels the knife --
6       MR. DURHAM: I'm sorry, nonresponsive. The
7 question was: What happens then? He said "Prior to that," so
8 that would not be a responsive answer.
9       THE COURT: Sustained.
10   Q. (BY MR. SIMS) Had you seen what the defendant was
11 doing earlier that day, what kind of job he had?
12   A. He was a janitor, to my knowledge. He was pushing a
13 broom around.
14   Q. Once you had seen Mr. Elkins give the knife to the
15 defendant, what happened?
16   A. Once I seen Mr. Elkins give the knife to the
17 defendant, I observed the defendant walking around to the
18 right side of the trimming tables that we have behind me. And
19 upon that --
20   Q. Okay. Let me interrupt you. You said the trimming
21 table is behind you. We've got -- I'm going to stand up and
22 hold it up, I guess, so you can point to it.
23       We've got you working in this area, correct?
24 (Indicating)
25   A. Yes, sir.

Page 209

1   Q. Okay. Now, where are you referring to the trimming
2 tables?
3   A. Okay. We had trimming tables like ran up here, all
4 the way around here. (Indicating)
5   Q. From where 26 is on up toward 30?
6   A. Right.
7   Q. Okay. What else were you going to tell us?
8   A. Well, upon that time, I was -- I turned my attention
9 to Mr. Wiley to ask -- to go and ask him about getting some
10 help for the assembly line.
11   Q. Where was Mr. Wiley when you did that, sir?
12   A. He was on the edge of one of the tables, at the end,
13 towards No. 30.
14   Q. One of the trimming tables --
15   A. Yes, sir.
16   Q. -- that you indicated was in through here?
17 (Indicating)
18   A. Yes, sir.
19   Q. And you said back up here toward this No. 30?
20   A. Yes, sir.
21   Q. Okay. What happened then?
22   A. As I turned to go to Mr. Wiley, I seen Mr. Runnels
23 headed towards him also, so out of respect, I slowed up to let
24 Mr. Runnels go ahead and approach Mr. Wiley. And as he
25 approached him, I seen him raise the knife up and tilt

Page 210

1 Mr. Wiley's head back and cut his throat.
2   Q. What happened at that point, sir?
3   A. At that point, Mr. Wiley grabbed his neck and he
4 turned and looked at Mr. Runnels, and then he immediately
5 started walking towards the main office.
6   Q. And from this location here around the 30, where is
7 that main office on this diagram, sir?
8       MR. SIMS: I'm sorry, I'm doing that and you
9 folks can't see.
10   Q. (BY MR. SIMS) From here where -- this is where you
11 say the incident happened?
12   A. Yeah, this area here.
13   Q. Where is the --
14   A. The main office is up here. Mr. Wiley came between
15 the machines and went up towards the office.
16   Q. Okay. Then what happened?
17   A. I gave my attention back to Mr. Runnels at the time,
18 and I observed him taking a white rag and wiping the knife off
19 and walking back towards the tables.
20   Q. Walking back toward where, sir?
21   A. Towards the trimming tables.
22   Q. Okay. Now, where is that on the diagram here?
23   A. The trimming tables was here, and I observed him
24 walking back this way. (Indicating)
25   Q. Back toward No. 24 on the diagram?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:07-cv-00374-BR   Document 84-2   Filed 05/17/13   Page 57 of 67   Page ID 4789

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 211

1    A. Yes, sir.
2    Q. What's the next thing you remember about that day?
3    A. After Mr. Runnels was wiping the knife off, I kind
4 of took my eyes off of him for a second. I was looking back
5 up to see where -- what was going on with Mr. Wiley, and then
6 I observed Mr. Wiley had a -- by that time, he had got a --
7 one of the green inmate jackets that we wear on the unit and
8 he had it underneath his neck and he was speaking to another
9 supervisor and he was bleeding pretty bad.
10         So I turned to look back to see where
11 Mr. Runnels was, and at that time, I observed him sitting down
12 on a blue ladder that was over by No. 24 on the board.
13    Q. And what did you do at that point, sir?
14    A. At that point, I -- I got out of the -- I moved out
15 of the way, came back up towards, I would say by No. 12
16 machine. And then I observed --
17    Q. Which is down toward the end?
18    A. Yes, sir.
19    Q. I'm sorry again. Down toward the end down here
20 (indicating) --
21    A. Yes, sir.
22    Q. -- is that correct?
23    A. Yes, sir.
24    Q. Okay.
25    A. Then I observed Mr. Wiley at the time, and two of

Page 212

1 the other supervisors, or maybe more, escorted him towards
2 the -- the exit door. But as he got to the exit door, he came
3 back over towards the work area where we was at first, which
4 is -- I would say between 10 and 7, as like he was looking
5 around for Mr. Runnels or whoever, you know. That's what I
6 took it to be.
7         MR. DURHAM: Then I'm going to object to
8 speculation, Your Honor, what Mr. Runnels (sic) was doing.
9         THE COURT: Sustained.
10    Q. (BY MR. SIMS) He walked back up into the shop,
11 Mr. Wiley did, correct?
12    A. Yes, sir. He walked back over to the work area
13 where the incident almost took place.
14    Q. What, if anything, did he do when he got there?
15    A. He just stared around. He looked at several
16 inmates, looked at me, several other inmates that was there.
17 And then at the time, the other supervisor came and got him
18 and told him - led him, get him out of here and get him some
19 help.
20         MR. DURHAM: Objection, that's nonresponsive to
21 the question, it's also hearsay.
22         THE COURT: Sustained.
23    Q. (BY MR. SIMS) Without saying what was told, what
24 happened then?
25    A. Mr. Wiley was escorted out the exit door by a

Page 213

1 supervisor.
2    Q. Did you ever have any further communications with
3 Mr. Elkins or anyone regarding this right then?
4    A. No, sir.
5         MR. SIMS: Pass the witness, Your Honor.
6              CROSS-EXAMINATION
7 BY MR. DURHAM:
8    Q. Mr. Irvine, your original statement said you did not
9 want to make a statement if you had to testify in court,
10 correct?
11    A. Yes, sir.
12    Q. Okay. Now, Mr. Runnels didn't -- has not threatened
13 you, has he?
14    A. No, sir.
15    Q. There's no question that he's the person you saw who
16 attacked and killed Mr. Wiley, is there?
17    A. No, sir.
18    Q. Okay. And he made no attempt to escape; is that
19 correct or incorrect?
20    A. No, sir.
21    Q. He just sat and waited for the authorities to come?
22    A. Yes, sir.
23    Q. Did you ever hear any confrontation between
24 Mr. Wiley and Mr. Runnels?
25    A. No, sir.

Page 214

1    Q. Would it surprise you if there had been?
2    A. No, sir, it wouldn't.
3    Q. Wouldn't surprise you. Okay. Have you ever had any
4 trouble with Mr. Runnels -- you didn't know him as Travis
5 Runnels, did you?
6    A. No, sir.
7    Q. You just knew him as another inmate?
8    A. Yes, sir.
9    Q. And there's a bunch -- there's several out there,
10 many people out there at the Clements Unit?
11    A. Yes, sir.
12    Q. And you don't know all of them?
13    A. Yes, sir.
14    Q. Okay. And you're not trying to tell this jury that
15 he's associated with the Crypts, are you?
16    A. I couldn't say he was associated with them, but I --
17 I was --
18    Q. That was my question. Are you trying to make that
19 impression to them? You have not seen him wearing gang
20 colors, have you?
21    A. No, sir.
22    Q. You didn't know him well enough to even know who he
23 was, did you?
24    A. No, sir.
25    Q. So you would have no -- absolutely no idea about his

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:07-cv-00744-BR   Document 84-2   Filed 08/17/13   Page 58 of 67   TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 215

1 character for violence before that, would you?
2    A. No, sir.
3    Q. You would have no idea about his character for being
4 peaceable with other prisoners, would you?
5    A. No, sir.
6    Q. You would have no idea about his character for
7 getting along with other guards and supervisors, would you?
8    A. No, sir.
9    Q. All you're doing is testifying what you saw, and you
10 saw this man kill another man, didn't you?
11    A. Yes, sir.
12    Q. And it was unfortunate and you have a hard time
13 testifying to it, as any of us would; is that correct?
14    A. Yes, sir.
15    MR. DURHAM: I have no further questions of the
16 witness.
17    MR. SIMS: No further questions, Your Honor.
18    THE COURT: Okay, Mr. Irvine, you can step
19 down, sir. Thank you.
20    Break?
21    (No reponse)
22    THE COURT: Okay. Call you next witness.
23    MR. DURHAM: I think the lawyers need one if
24 they don't.
25    MS. HAMILTON: Please.

Page 216

1    THE COURT: Okay. Ten minutes.
2    (Break)
3    THE COURT: Okay. Let's proceed.
4    MR. SIMS: Eugene Johnson.
5    THE COURT: Eugene Johnson.
6    If you would come right up here, Mr. Johnson,
7 and take a seat there on the witness stand.
8    All right. Mr. Johnson, pull that microphone
9 up a little bit so it's sort of aimed at you. There you go.
10 And just kind of speak -- you don't have to get right up to
11 it, but speak sort of toward it.
12    All right. Thank you.
13    MR. SIMS: Thank you, Judge.
14    EUGENE JOHNSON,
15 having been first duly sworn, testified as follows:
16    DIRECT EXAMINATION
17 BY MR. SIMS:
18    Q. Would you state your name, please?
19    A. Eugene Johnson.
20    Q. Where are you currently residing?
21    A. Hughes Unit. Hughes Unit.
22    Q. And currently right now, you're being kept at the
23 Clements Unit, right?
24    A. Clements Unit, yes.
25    Q. You're on transfer from the Hughes Unit; is that

Page 217

1 correct?
2    A. Correct.
3    Q. Previously, you were housed, and your permanent
4 housing was at the Clements Unit; is that correct?
5    A. Yes.
6    Q. Back in January of 2003, would that be correct?
7    A. Yes.
8    Q. How long had you been at the Clements Unit at that
9 time?
10    A. Probably about four years.
11    Q. Now, you're currently serving a sentence in the
12 prison system for murder?
13    A. Yes.
14    Q. And also for burglary of a habitation; is that
15 correct?
16    A. Yes.
17    Q. On the habitation, you received a seven-year
18 sentence, and on the murder conviction you received a life
19 sentence; is that correct?
20    A. Ninety-nine.
21    Q. Ninety-nine, okay.
22    Those are the two sentences you're being housed
23 for; is that correct?
24    A. Yes.
25    Q. Now, back in January 29th of 2003, were you assigned

Page 218

1 a particular work duty there at the Clements Unit?
2    A. Yes, I was.
3    Q. What was it that you were doing at that time, sir?
4    A. I was nailing on -- stapling on insoles for the
5 boots.
6    Q. So you were working in the boot factory?
7    A. Yes.
8    Q. Approximately how long had you been working in the
9 boot factory?
10    A. Probably two and a half years.
11    Q. Now, they had done some rearranging of shifts at the
12 boot factory; is that correct?
13    A. Yes.
14    Q. On that particular day, what shift did you work?
15    A. First shift, A.M.
16    Q. What shift had you been working prior to that?
17    A. P.M.
18    Q. Did you know -- at that time, did you know a Travis
19 Runnels?
20    A. Not personally, no.
21    Q. Okay. Did you know a Stan Wiley, or Mr. Wiley?
22    A. Yes, I did.
23    Q. How do you know Mr. Wiley?
24    A. I worked for him at the factory.
25    Q. In what capacity, sir, did he serve?

Page 219

1    A. Did he serve?
2    Q. Yes.
3    A. He was line boss over the -- over the lasting
4  machines out there.
5    Q. For approximately how long had you worked for
6  Mr. Wiley?
7    A. Most all the time I was there.
8    Q. Okay. So most of your four years, he had been a
9  supervisor to you in some --
10    A. No, for the time I worked at the -- at the factory,
11  for about two and a half years, I guess.
12    Q. What happened to the P.M. shift on the boot factory?
13    A. They just decided to end it and just do first shift
14  only.
15    Q. So that's how you wound up on the first shift that
16  morning, correct?
17    A. Yes, sir.
18    Q. Did Mr. Wiley make that transfer also?
19    A. Yes, he did.
20    Q. About what time do you remember starting work that
21  day, sir?
22    A. Oh, 5:30 or six o'clock.
23    Q. Was that pretty much a typical morning of what time
24  you would start?
25    A. Yes, it is.

Page 220

1    Q. At some point during that morning shift, did you
2  observe Mr. Wiley having a conversation with another inmate?
3        MR. DURHAM: Leading question, objection.
4        THE COURT: Overruled.
5    Q. (BY MR. SIMS) Did you see Mr. Wiley having a
6  conversation with another inmate?
7    A. Yes, sir.
8    Q. Let's pick up with that. Where was this taking
9  place? Where did you see Mr. Wiley and the other inmate?
10    A. There's a table that was right there where I was
11  working that I put the -- put the staples and gun on and stuff
12  like that. So at the end of the table, between it and a row
13  of racks is where they were speaking.
14        MR. SIMS: May I approach, Your Honor?
15        THE COURT: Sure.
16    Q. (BY MR. SIMS) I'm going to show you what's been
17  marked for identification purposes as State's Exhibit No. 50,
18  and I'll ask you if you're able to recognize that, sir?
19    A. Yes, I am. That's the factory.
20    Q. That's the boot factory?
21    A. Yes, sir.
22    Q. While I'm up here, why don't you, if you will, point
23  so the ladies and gentlemen of the jury can see -- sorry if I
24  blocked your view -- approximately where on this diagram it
25  was that you were working.

Page 221

1    A. Right about here. (Indicating)
2    Q. Along in here? (Indicating)
3    A. Yes, sir.
4    Q. And you said you were at a table?
5    A. Yes. There was a long table right here and racks
6  running along this wall right here, and racks running right
7  here. (Indicating) And --
8    Q. So you've got the table between running between 26
9  and 30 and the racks along 24 to 31; is that correct?
10    A. Yes, sir.
11    Q. Okay. If it's all right with you, I'm going to put
12  your initials, "EJ," right here. Would that be approximately
13  the place that you were working?
14    A. Yes, sir.
15    Q. Okay. Now, you indicated to the jury where you saw
16  Mr. Wiley and the other inmate talking. What was happening at
17  that point?
18    A. Well, what roughly it was, I just heard Mr. Wiley
19  said -- saying something like -- he said, "I don't really
20  care, just go on over there and do what I asked."
21    Q. Had you seen that particular inmate before?
22    A. Yes, on the unit. We was in -- I was moved several
23  times, and he was in a section I was at one time, and just,
24  you know, casual -- seeing each other casually, you know,
25  offhand.

Page 222

1    Q. So you didn't know him from work, you knew him from
2  where your housing area was at one point?
3    A. Right. And like I didn't know him personally.
4    Q. Do you see that same person here in the courtroom
5  today?
6    A. Yes, I do.
7    Q. Would you please point him out and describe what
8  he's wearing?
9    A. Yes. He's at the defendant's table. He's wearing a
10  red shirt, glasses, and spotted tie.
11    Q. What happened at that point with the inmate and
12  Mr. Wiley?
13    A. I guess he went on over to where he was supposed to
14  go and --
15    Q. What did you do?
16    A. I turned around and continued working and --
17    Q. What's the next thing you recall that day besides
18  working?
19    A. All right. I had my -- slightly to the side,
20  nailing on the insole -- stapling on the insoles, and then Mr.
21  Wiley kind of made a lunging motion back off beside me like
22  that, and it caught my attention. I turned around and looked
23  and he like kind of bounded two or three steps. He turned
24  around and he had his hand like this (indicating), and just
25  was blood coming all out like that. And he kind of turned

## Page 223

1 like that and then he looked back -- I looked the direction he
2 was looking at and I saw Mr. Runnels standing there with the
3 blade by his hand -- by his side. And then --
4     Q. Was there anyone else standing around there?
5     A. Not where Mr. Wiley or Mr. Runnels was.
6     Q. Did you see anyone else in close proximity to
7 Mr. Wiley with a knife?
8     A. No, sir.
9     Q. Once he jumped up, Mr. Wiley, what happened?
10     A. Well, the first thing I did, I moved out of the way.
11 I didn't know what was going on. I didn't know if something
12 else was going to happen or what, you know. I kind of moved
13 over to an area by myself.
14     And then when I looked back, I saw Mr. Wiley
15 heading towards the office area, and then I saw Mr. Runnels
16 over by the lavatory, and then a -- he was I believe washing
17 his hands, and then he went and got a drink of water.
18     Q. And then what's the next thing you saw happen?
19     A. Mr. Wiley, they was escorting him back by the tool
20 room area, and then several of us just kind of got, you know,
21 gathered up in groups, you know, and just said, "You see
22 that?", and stuff, you know.
23     MR. DURHAM: Objection. Your Honor, the
24 conversation would be hearsay.
25     THE COURT: Sustained.

## Page 224

1     Q. (BY MR. SIMS) Approximately how far were you from
2 Mr. Wiley when he jumped off this table?
3     A. Seven foot.
4     Q. So was it a table that's about the size that we're
5 using for counsel tables, a little bit bigger?
6     A. It would be -- it would be maybe two or three foot
7 longer than the counsel tables.
8     Q. You were on one end and Mr. Wiley was on the other?
9     A. Yes.
10     MR. SIMS: Pass the witness, Your Honor.
11     CROSS-EXAMINATION
12 BY MR. DURHAM:
13     Q. Mr. Johnson, I just have a few questions for you,
14 but then I'm sure you've heard lawyers say that before,
15 haven't you?
16     A. Yes, sir.
17     Q. And it proved to be more than a few, at least more
18 than you thought were a few. Would that be a fair statement?
19     A. Yes.
20     Q. I'm going to try and keep it short and get to the
21 point here.
22     The fact -- is it or is it not a fact that
23 Mr. Wiley and Mr. Runnels had some type of verbal altercation,
24 they raised their voices at each other?
25     A. I did not hear them raise their voices.

## Page 225

1     Q. But you -- you used the word "argument" in your
2 statement. Did you or did you not?
3     A. I only heard the one side. I only heard Mr. Wiley
4 say what he said.
5     Q. Then you don't know what -- what was -- you heard
6 all of it or parts of it?
7     A. I only heard Mr. Wiley reply, "I don't care, just go
8 on over there and do your job."
9     Q. Was that the only talk they had that day, or do you
10 know?
11     A. I don't know.
12     Q. You weren't around close enough to hear all of it,
13 were you?
14     A. No, sir.
15     Q. It wasn't -- at least they weren't screaming and
16 shouting and waving their fists at each other?
17     A. No, sir.
18     Q. But something was going on?
19     A. Obviously.
20     Q. Obviously. Okay. Now, there's something in your
21 statement that kind of puzzled me. You said that you were the
22 only white guy there, so you moved away to a safe area.
23     A. Yes.
24     Q. What did you mean by that, please, sir?
25     A. Well, there's -- I didn't know what was going down.

## Page 226

1 There's a lot of animosity towards white people in general,
2 and I -- I didn't know if it was an isolated thing or maybe
3 something going down. I just got over out of the way.
4     Q. How is there a lot of animosity towards white
5 people?
6     A. In prison, that is, not out -- I didn't say out
7 here, in prison.
8     Q. And how is that expressed?
9     A. Well, you mean in general or --
10     Q. Yeah, in general. I mean, do the blacks and whites
11 just not get along?
12     A. No. I have several black friends.
13     Q. Okay. Speaking of black friends, you had just been
14 moved to Mr. Runnels' unit?
15     A. No, I've -- I've been here --
16     Q. You had been on his unit for some period of time?
17     A. Yes.
18     Q. How long had you been on the same unit as Travis?
19     A. Probably four years, maybe four and --
20     Q. So you had known him for four years?
21     A. I didn't know him, no.
22     Q. Well, you had seen him around?
23     A. Here and there, yes.
24     Q. Yeah.
25     A. You pass people in the hallway and around.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 227

1    Q. But you really do know -- if you're in prison very
2  much, you really do know the troublemakers, don't you?
3    A. You can tell a lot of the hardheads, you know.
4    Q. They get in trouble, don't they?
5    A. Yes.
6    Q. They get written up for fighting?
7    A. Yes.
8    Q. Okay. And you kind of steer clear of them because
9  you know that's the way they are?
10    A. Yes.
11    Q. Did you find Travis to be one of the hardheads?
12    A. Like I say, I didn't know the gentleman enough to --
13  to judge one way or the other.
14    Q. But, sir, if he had been a troublemaker, you would
15  have made it your business to know where you could avoid him,
16  wouldn't you?
17        MR. SIMS: Objection, Your Honor, asked and
18  answered.
19        THE COURT: Overruled.
20    Q. (BY MR. DURHAM) If he had been one of the
21  hardheads, you would have made it your business to know where
22  you could avoid him; isn't -- is that a fair assumption?
23    A. Yes, it is.
24    Q. Okay. So as far as you know, he was not a
25  troublemaker?

Page 228

1    A. Not that I know of.
2    Q. Okay. You had never had any trouble with him?
3    A. No, sir.
4    Q. And you don't know what the trouble that he was
5  having with Mr. Wiley exactly stemmed from, do you?
6    A. No, sir.
7    Q. And you heard parts of the conversation?
8    A. Yes.
9    Q. And you -- you actually didn't quote in your
10  statement exactly what it was because you used the words --
11  and correct me if I'm wrong on this -- you used the words,
12  "Wiley said something like, 'I don't care, go over there and
13  do it.'" Those were not his exact words. That's a paraphrase
14  of what he said, correct?
15    A. As far as I know, that's what he said.
16    Q. Well, you used the word in your statement, you said,
17  "something like that," as opposed to "he said." Do you see
18  there's a difference?
19    A. Well, he might not have phrased it word for word
20  exactly like that.
21    Q. That's exactly my point. That's not exactly what he
22  said. You put down your impression of what he said, right?
23    A. I know what he said, I was there.
24    Q. Okay. Then that's an exact quote?
25    A. Yes.

Page 229

1    Q. Okay. So when you used the word "he said something
2  like," that was just a misstatement?
3    A. Yes.
4    Q. Okay. So the misstatement that was made two years
5  ago on the same day of the incident is different today,
6  correct?
7    A. He said what he said.
8    Q. Well, but two years ago, or three years ago, almost
9  three years ago, your words was, "he said something like," and
10  today it's an exact quote. It's changed in two years and nine
11  months -- ten -- ten months from something like to exact,
12  correct?
13    A. I'll stand by my statement -- by my written
14  statement.
15    Q. You stand by your written statement, which says, "he
16  said something like."
17    A. Okay.
18    Q. Is that correct?
19    A. Yes.
20    Q. Okay. All right. And Travis was walking away,
21  washed his hands, sat down and waited; is that correct?
22    A. I saw him go over and wash his hands and take a
23  drink of water, and that was the last I saw of him.
24    Q. All right. Did you -- you didn't see where he went
25  from there?

Page 230

1    A. No, I didn't.
2    Q. He didn't seem to be running toward the door to get
3  away?
4    A. He was very calm.
5    Q. Didn't wave the knife that he had in his hand?
6    A. No. The only time I saw the knife was when he was
7  standing there with it by his side.
8    Q. Okay. Did you see blood on the knife?
9    A. No, I didn't.
10    Q. Thank you, sir.
11        MR. DURHAM: I'll pass the witness.
12        MR. SIMS: Nothing else, Your Honor.
13        THE COURT: Okay. You can step down,
14  Mr. Johnson. Thank you.
15        Call your next witness.
16        MR. SIMS: Phillip Yow. He has not been sworn,
17  Your Honor.
18        THE COURT: Come right up here and take a seat
19  on the witness stand, if you would, please, sir.
20        Okay. Would you raise your right hand and take
21  the oath of a witness, please?
22        (Witness sworn)
23        THE COURT: Okay. Thank you. Once you're
24  comfortable and where you're going to be, sort of aim that
25  microphone toward your mouth. You don't have to get right up

THE STATE OF TEXAS
Case 2:12-cv-00074-J-BR Document 84-2 Filed 08/17/13 Page 62 of 67 PageID 1414
vs. TRAVIS TREVINO RUNNELS
Multi-Page™
TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 231

1 to it or anything, just keep it in the general vicinity and
2 speak toward it. Thank you.
3          PHILLIP YOW,
4 having been first duly sworn, testified as follows:
5          DIRECT EXAMINATION
6 BY MR. SIMS:
7     Q. Would you state your name, please, sir?
8     A. My name is Phillip Yow.
9     Q. Mr. Yow, where are you currently residing?
10    A. At the Clements Unit.
11    Q. What is your status there?
12    A. As far as line class or what I'm there for?
13    Q. You're in transport; is that correct?
14    A. I'm in general population.
15    Q. You're in general population?
16    A. Yes, sir.
17    Q. Okay. My bad. How long have you been housed at the
18 Clements Unit, sir?
19    A. Since 2002.
20    Q. Prior to that, where were you housed, sir?
21    A. I was on the Robertson Unit.
22    Q. You've been in the penitentiary since 2000; is that
23 correct?
24    A. Yes, sir.
25    Q. For the felony offense of injury to a child; is that

Page 232

1 also correct?
2     A. Yes, sir.
3     Q. You're serving a 60-year sentence; is that also
4 correct?
5     A. Yes, sir.
6     Q. I want to take you back to January 29th of 2003.
7 You were living at the Clements Unit then, correct?
8     A. Yes, sir.
9     Q. Did you have a job at that time, sir?
10    A. Yes, sir.
11    Q. Where were you working?
12    A. The boot factory.
13    Q. How long had you been working at the boot factory at
14 that time?
15    A. I had been working there awhile. I don't know how
16 long.
17    Q. Now, had you always worked -- well, what shift were
18 you working?
19    A. I was working -- I was working, at the prior time
20 this take place, I was working second shift, but then that was
21 the first day, the day of the offense, that they put me on
22 first shift.
23    Q. Okay. Now, from being on second shift and then onto
24 the first shift, were you familiar with Stanley Wiley; I
25 believe y'all would refer to him as Mr. Wiley?

Page 233

1     A. Yes, sir.
2     Q. How long had you known Mr. Wiley?
3     A. He was my boss, my supervisor.
4     Q. For approximately how long?
5     A. Awhile.
6     Q. Describe Mr. Wiley for the jurors, please.
7     A. He was my supervisor.
8     Q. Did you also know a Travis Runnels --
9     A. Yes, sir.
10    Q. -- at the Clements Unit?
11       How did you know Mr. Runnels?
12    A. Stayed on the same section together, the same
13 building, stuff like that. Had interaction with each other in
14 the rec yard and stuff like that.
15    Q. So you had been around him for a while also; would
16 that be fair to say?
17    A. Yes, sir.
18    Q. Do you see him here in the courtroom today?
19    A. Yes, sir.
20    Q. Would you please point him out and describe the
21 clothing he's wearing?
22    A. Red shirt, yellow and black tie, black boots, look
23 like tan pants.
24    Q. Now, was he also working at the boot factory?
25    A. Yes, sir.

Page 234

1     Q. Now, specifically, on January 29th of 2003, before
2 you went to work, did you go anywhere?
3     A. Before I went to work?
4     Q. Uh-huh.
5     A. Well, when they called us out that morning --
6     Q. Yes, sir?
7     A. -- they called us to the multipurpose room where all
8 the workers go, and we wait to be transported to the boot
9 factory.
10    Q. What happened while you were in there, sir?
11    A. Travis Runnels, he told me to -- to go back to the
12 building, don't come to work today.
13    Q. At that point, did he give you any explanation as to
14 why?
15    A. He just said, "Don't go to work," and I -- I asked
16 him why. He just said, "Don't come." And I was like, "I'm
17 not fixing to get" --
18       MS. HAMILTON: Objection, it's nonresponsive,
19 Judge.
20       THE COURT: Sustained.
21    Q. (BY MR. SIMS) What did you say to him in response
22 to that, sir?
23    A. I told him that, "I'm not going to get a case, I'm
24 going to work." So he was like, you know, "All right," you
25 know. He was like, "All right."

Page 235

1    Q. Did you eventually make it to work that day, sir?
2    A. Yes, sir.
3    Q. What duties were you assigned to do that day?
4    A. I was on the toe lace.
5        MR. SIMS: May I approach, Your Honor?
6    Q. (BY MR. SIMS) I'll show you what's been marked for
7  identification purposes as State's No. 50, and are you able to
8  recognize that, sir?
9    A. Where's the front door? Front door, front door --
10  (sotto voce)
11       I'm not exactly sure. I'm not exactly sure. I
12  can't really understand the board.
13   Q. Okay. Well, if I turn it this way, does it help you
14  out any? I should have turned it that way to begin with.
15   A. This is the front door? (sotto voce)
16       Are these the machines part, the machines that
17  they have? I'm trying to understand where I'm at. I can't
18  really understand the board.
19   Q. So what was it you were assigned to do, sir?
20   A. Toe lace.
21   Q. What's that?
22   A. Where a person -- the person before me -- it's like
23  an assembly line, the person before me put a deal -- a boot
24  hoof on the deal, and they send it to where I'm at, the guys
25  where I'm at, and we put it in a machine and we lace the top

Page 236

1  of it up, and then we pass it down.
2    Q. Did you see this defendant, Mr. Runnels, out at the
3  boot factory that morning?
4    A. Yes, sir.
5    Q. What was he doing the first time you remember seeing
6  him?
7    A. He was talking to me most of the time.
8    Q. Do you recall what job duties he was assigned, if
9  any?
10   A. Janitor.
11   Q. At some point that morning, after -- shortly after
12  getting out there, did you have another conversation with
13  Mr. Runnels?
14   A. We was talking about -- we was talking about a book
15  he had let me use.
16   Q. I'm sorry?
17   A. We was talking about a book he had let me look at
18  and read.
19   Q. Did he say anything else to you at that point, sir?
20   A. Not that I can recall.
21   Q. Did you give a statement in regards to what occurred
22  that day?
23   A. Yes, sir.
24   Q. If you were to see that statement, would it -- would
25  it help refresh your memory --

Page 237

1    A. Yes, sir.
2    Q. -- about what happened that day?
3        MR. SIMS: May I approach, Your Honor?
4        (Witness reading)
5    Q. (BY MR. SIMS) Does that help refresh your memory
6  some, sir?
7    A. Yes, sir.
8    Q. Okay. Did Mr. Runnels talk to you about anything
9  else at that point, sir?
10   A. He was just saying that he going to do something,
11  but he really wasn't giving any details what he was going to
12  do.
13   Q. Did you hear any kind of arguments involving
14  Mr. Wiley or Mr. Runnels that day?
15   A. Them two particular with each other or just any type
16  of argument, period?
17   Q. Between each other.
18   A. I haven't -- I didn't hear Mr. Wiley and Mr. Runnels
19  arguing with each other.
20   Q. When is the next time you remember seeing
21  Mr. Runnels; where was he at?
22   A. The next time, he -- well, I see him, he was
23  cleaning a knife with a tissue or a cloth. He was cleaning a
24  knife. He had a cut on his hand.
25   Q. Did you see Mr. Runnels prior to that, sir?

Page 238

1    A. He was -- all I know is, he was behind me somewhere.
2  He was behind me, or just motion in the area, walking back and
3  forth. That's all I can remember, him being behind me.
4    Q. Do you recall seeing Mr. Runnels do anything that
5  day?
6    A. I seen him -- I seen him walk by Wiley. Wiley was
7  sitting like on the table. I was waiting on another rack to
8  come, talking to a guy named Chris Fuller --
9        THE REPORTER: Talking to a guy named what?
10   A. Talking to another offender named Chris Fuller. And
11  the next thing I know, I see Runnels go -- and Wiley's back is
12  towards me, and Wiley turned around, I seen blood running out
13  through his hands and stuff, and he started coming my way.
14   Q. (BY MR. SIMS) Who started coming your way?
15   A. Wiley, Officer Wiley.
16   Q. Was there anyone else standing in the immediate
17  vicinity of Mr. Runnels and Mr. Wiley at that time when you
18  saw that?
19   A. They was just right there by -- they was right there
20  by each other by -- by the table, and we was a few feet away,
21  me and some other guys.
22   Q. Mr. Wiley starts towards you. What happens then?
23   A. He started -- when he started towards me -- well, I
24  didn't know what was going -- well, I didn't know exactly what
25  was going on. I know he was holding his neck. And then when

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00744-BR Document 84-2 Multi-Page™ Filed 09/17/13 Page 64 of 67 PageID 2740

TRIAL ON THE MERITS
OCTOBER 26, 2005

---

**Page 239**

1 I started seeing blood, it was like -- it was like he was
2 reaching towards me like for help, and I just moved out of the
3 way and stuff like that.
4     And then a guy named Christopher Fuller grabbed
5 my arm, tell me to keep on working, keep on working, just keep
6 on working. And I told him --
7     Q. What did you -- okay, go ahead.
8     A. I told him, "Man, folks getting their necks cut
9 around here, no, I'm not fixing to keep on working," you know
10 what I'm saying? So I grabbed --
11     Q. What did you do then?
12     A. I grabbed two of the -- the boot deals that they --
13 they heavy, like if -- they real heavy. I grabbed two of
14 those and I put my back up against the wall, because I really
15 didn't know if it was like one person doing it or a lot of
16 people, so I wanted to secure myself, so I put my back up
17 against the wall.
18     When I started seeing what was going on, I came
19 on back -- I came up towards the front and sat in the middle
20 of the table.
21     Q. Mr. Wiley goes by you. Now let's turn your
22 attention to Mr. Runnels. Do you start watching him some at
23 that point?
24     A. Yeah. He was washing -- he got a cloth or some
25 tissue or a towel or something, I don't know exactly what it

**Page 240**

1 was, he was washing the knife and stuff like that.
2     Q. Okay. What happened then after that?
3     A. Well, after that, after they got Mr. Wiley out,
4 everybody ran him out, the officer got on the intercom and
5 said, "Turn your knives in," and stuff like that. So after I
6 seen everybody going and turning their knives in, I sat -- I
7 sat in the middle in a chair, me and this guy was talking.
8 Then Mr. Runnels came over and sat with us and stuff like
9 that.
10     Q. Sat down with you?
11     A. Yes, sir.
12     Q. What happened then?
13     A. I asked him, you know, why -- you know, why he cut
14 Mr. Wiley, why he would do that. He said, "It could have been
15 any offender or inmate, you know, as long as they was white."
16     Q. What happened after that?
17     A. I said -- I told him if he die, that he going to --
18 you know, that he could get a death -- you know, he could get
19 the death penalty if he die, you know.
20     Q. What happened then?
21     A. He told me that a dead man can't talk.
22     Q. After that, what happened, Mr. Yow?
23     A. I got up, started -- because I seen everybody going
24 every which a way, and I'm just trying to make sure -- you
25 know, I'm trying to get away. I just got up, started moving,

**Page 241**

1 you know, he start -- and he followed me and he --
2     Q. Who is "he"?
3     A. Chris Fuller and Mr. Runnels followed me. And then
4 by that -- we took a couple of steps, like towards the back
5 where the incident happened, but going back this way by the
6 door (indicating), and then I think I seen the managers,
7 Mr. Williams, and I think it was Captain Davis, come in and
8 tell everybody, "Get on the floor, get on the floor," and
9 stuff like that.
10     Q. Everybody respond to that?
11     A. Yes, sir.
12     Q. Including yourself?
13     A. Yes, sir.
14     Q. Did you see Mr. Runnels do anything else after you
15 saw him wiping the knife off?
16     A. Put a jacket on, because -- just put a jacket on. I
17 think it -- I don't know if some blood was on his clothes or
18 not. I know he --
19     MS. HAMILTON: Objection, that's nonresponsive.
20     MR. YOW: Yeah.
21     THE COURT: Sustained.
22     Q. (BY MR. SIMS) What else, if anything, did you see
23 him do?
24     A. We all got on our knees and waited. And then they
25 told us to stick our hands out. The officers all came in,

**Page 242**

1 told us to stick our hands out. They was looking at
2 everybody's hands and stuff like that.
3     Q. Okay. Did you see Mr. Runnels' hands?
4     A. Yes, sir.
5     Q. Tell us about those.
6     A. I don't know exactly which hand it was. I know he
7 had a cut because I gave him some tissue out of my pocket to
8 put on his cut. That's all I can remember exactly about his
9 hands.
10     MR. SIMS: Pass the witness, Your Honor.
11     CROSS-EXAMINATION
12 BY MS. HAMILTON:
13     Q. Mr. Yow, you -- did you say you're still in the
14 Clements Unit?
15     A. Yes, ma'am.
16     Q. Okay. And how long did you know Travis?
17     A. I'm not sure exactly how long I knew him.
18     Q. A day, a week?
19     A. Some months.
20     Q. Several months?
21     A. Several months. I'm not sure if it was quite a year
22 yet, but some months.
23     Q. Okay. How long had you known Mr. Wiley?
24     A. Since I've been working in the boot factory, and I'm
25 not sure how long I've been working in the boot factory.

THE STATE OF TEXAS
Case 2:12-cv-00074-BR   Document 84-2   Filed 01/17/13   Page 65 of 67   PageID 1747
vs. TRAVIS TREVINO RUNNELS

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 243

1   Q. Longer than you've known Mr. Runnels, though?
2   A. Yes, ma'am.
3   Q. Okay. In the time that you had known Travis, had
4 you observed him to be in fights with other people?
5   A. Have I seen him fight anybody?
6   Q. Yes.
7   A. No, ma'am.
8   Q. Did he seem to get along with the people that you
9 saw him with? When you saw him, did he seem to be getting
10 along with people?
11   A. Inmate-wise, as far as -- he -- he wasn't getting in
12 any physical conflicts with anybody, but mentally, he was --
13   Q. Mentally, he was?
14   A. -- having conflict.
15   Q. Okay. Now, in your statement, you said that -- or
16 you -- you don't say that Mr. Runnels and Mr. Wiley were
17 arguing?
18   A. No, ma'am, I don't say that.
19   Q. But you do say that Mr. Wiley was arguing with
20 someone?
21   A. Yes, I did say that.
22   Q. Who was he arguing with?
23   A. I said -- I said an inmate was arguing with
24 Mr. Wiley and another officer, if I'm not mistaken.
25   Q. Okay.

Page 244

1   A. But not Travis Runnels. It was another inmate, I
2 don't know his name.
3   Q. And how long before this incident -- before this did
4 you see Mr. Wiley arguing with the other inmate?
5   A. Excuse me, I couldn't hear you.
6   Q. I'm sorry. How long before this happened did you
7 see the inmate arguing with Mr. Wiley?
8   A. This particular -- it had been about, I guess five
9 or ten minutes, approximately five or ten minutes, because I
10 thought -- I thought the other inmate was going to fight one
11 of the officers that was arguing.
12   Q. And why did you think that?
13   A. Because he was cursing and stuff, the inmate was
14 cursing and saying all kinds of stuff.
15   Q. Okay. And -- but you didn't see Mr. Runnels doing
16 that?
17   A. No, ma'am.
18   Q. Okay. You said that Chris Fuller grabbed your arm?
19   A. Yes, ma'am.
20   Q. Okay. And what were -- when he grabbed your arm,
21 what were you trying to do?
22   A. "Let me go." I don't want him holding me.
23   Q. Okay. What -- where were you going when he grabbed
24 your arm?
25   A. I was going to get -- put my wall against the back.

Page 245

1 (sic) When things happen in the penitentiary, you put your
2 wall against the back (sic) until you know what's going on.
3   Q. Okay. And he was trying to prevent you from doing
4 that?
5   A. Yes. It was like -- when he grabbed me, it was
6 like, you know, he probably knew what was going on. He -- he
7 was telling me, "Just keep working," because he seen the
8 officer grab me -- trying to grab for me. He was like, "Keep
9 working." But I didn't know exactly was it more than one
10 person or not, so I'm like trying to get away.
11   Q. Okay. After this occurred, you said that
12 Mr. Runnels put a jacket on?
13   A. No, I said -- no, I said Mr. Runnels put a jacket
14 on, like when we was headed, like -- just a little bit before
15 the officers came in.
16   Q. Yes, sir.
17   A. After I walked away.
18   Q. After Mr. Wiley had left the building?
19   A. After the other two officers was getting -- about a
20 second before they walked in.
21   Q. And Mr. Runnels put a jacket on?
22   A. Yes, ma'am.
23   Q. And then did he comply with what he was asked to do?
24   A. Yeah, he applied -- yeah, he complied.
25      MS. HAMILTON: I'll pass the witness, Judge.

Page 246

1      MR. SIMS: No other questions, Your Honor.
2      THE COURT: Okay, Mr. Yow, you can step down.
3 Thank you very much, sir.
4      MR. SIMS: May we approach?
5      THE COURT: Sure.
6      (At the bench, on the record)
7      MR. SIMS: That's all the witnesses we have for
8 the guilt/innocence stuff. The rest of it's going to start
9 the punishment stuff, and we've got them lined up to be here
10 in the morning. I mean, with what they did --
11      THE COURT: He's out of witnesses for today.
12      MR. DURHAM: Okay. That's all right. I need
13 to get my afternoon nap in.
14      (Open court)
15      THE COURT: Okay, folks, this is one of those
16 times where, regardless of the planning we've done, we've run
17 short of witnesses for the day, so we're going to break early
18 today. I'll see you at nine o'clock in the morning.
19      Please remember what I told you about
20 television, radio, and the newspapers, or allowing anyone to
21 approach you and discuss anything with you.
22      I'll see you at 9:00 in the morning.
23      (10/26/05 proceedings adjourned)
24
25

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00744-D-BR   Document 84-2   Filed 03/17/13   Page 66 of 67   PageID 2746

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 26, 2005

Page 247

THE STATE OF TEXAS          )

COUNTY OF POTTER           )

    I, JILL ZIMMER, Official Court Reporter in and for the

320th District Court of Potter County, State of Texas, do

hereby certify that the above and foregoing contains a true

and correct transcription of the proceedings in the above-

styled and numbered cause, all of which occurred in open court

or in chambers and were reported by me.

    I FURTHER CERTIFY that this transcription of the record

of the proceedings truly and correctly reflects exhibits, if

any, offered by the respective parties.

    WITNESS my hand this the _____ day of

_____, 2006.

        _____

        JILL ZIMMER

        Official Court Reporter

        Certificate Number 533

        Expiration Date: 12-31-2006

        Potter County Courts Building

        Amarillo, Texas  79101

        (806) 379-2372

THE STATE OF TEXAS          )

COUNTY OF POTTER           )


    I, JILL ZIMMER, Official Court Reporter in and for the 320th District Court of Potter County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I FURTHER CERTIFY that this transcription of the record of the proceedings truly and correctly reflects exhibits, if any, offered by the respective parties.

    WITNESS my hand this the 25th day of

_____ April _____, 2006.


_____

JILL ZIMMER
Official Court Reporter
Certificate Number 533
Expiration Date: 12-31-2006
Potter County Courts Building
Amarillo, Texas  79101
(806) 379-2372