75318

# R E P O R T E R ' S   R E C O R D
## VOLUME 16 of 16

### TRIAL COURT CAUSE NO. 48,950-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE 320TH DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | IN AND FOR |
| | ) | |
| | ) | |
| TRAVIS TREVINO RUNNELS | ) | POTTER COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS

OCTOBER 27, 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
**COURT OF CRIMINAL APPEALS**

MAY 0 2 2005

Louise Pearson, Clerk

On the 27th day of October, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Don Emerson, Judge Presiding, held in Amarillo, Potter County, Texas:

Proceedings reported by Machine Shorthand.

*ORIGINAL*

A-P-P-E-A-R-A-N-C-E-S:

FOR THE STATE:                    MR. JAMES ALLEN YONTZ
                                  SBOT:   24044106
                                  MR. RANDALL C. SIMS
                                  SBOT:   18426650
                                  MR. JOHN L. "JACK" OWEN
                                  SBOT:   15369200
                                  47th District Attorney's Office
                                  501 Fillmore, Suite 5-A
                                  Amarillo, Texas   79101


FOR THE DEFENDANT:                MR. JAMES D. DURHAM
                                  SBOT:   06284000
                                  Attorney at Law
                                  1008 W. 10th
                                  Amarillo, Texas   79101


                                  MS. LAURA D. HAMILTON
                                  SBOT:   20016450
                                  Attorney at Law
                                  215 W. 7th
                                  Amarillo, Texas   79101

CHRONOLOGICAL INDEX

VOLUME 16

(TRIAL ON THE MERITS)

Page

OCTOBER 27, 2005

Caption and Appearances -------------------------------- 1-2

Proceedings --------------------------------------------- 3

| STATE'S WITNESSES: | DX | CX | RDX | RCX | VDX |
|---|---|---|---|---|---|
| PATTY WILKINS | 4 | | | | |
| CYNTHIA LUNA | 10 | | | | |
| CALVIN ASKINS | 14 | 27 | 34 | 39 | |
| FRANCES M. MADIGAN | 43 | 46 | 51 | | |
| TONIA L. BROWN | 54 | 57 | 64 | 65 | |
| | | | 77 | 78 | |
| CATHERINE N. McKINNEY | 84 | 86 | | | |
| ROBERT THREADGILL | 90 | 92 | | | |
| MICHAEL CRANDELL | 95 | | | | |
| A.P. MERILLAT | 101 | 121 | 125 | 126 | 114 |
| | 117 | | | | |
| CATHERINE NALL | 127 | 131 | | | |
| MICHAEL WRIGHT | 133 | 142 | | | |

State Rests --------------------------------------------- 143

Defendant Rests ----------------------------------------- 146

State Closes -------------------------------------------- 146

Defendant Closes ---------------------------------------- 146

Adjournment --------------------------------------------- 149

Reporter's Certificate ---------------------------------- 150

## ALPHABETICAL INDEX

### VOLUME 16

|                          | DX  | CX  | RDX | RCX | VDX |
|--------------------------|-----|-----|-----|-----|-----|
| Askins, Calvin           | 14  | 27  | 34  | 39  |     |
| Brown, Tonia L.          | 54  | 57  | 64  | 65  |     |
|                          |     |     | 77  | 78  |     |
| Crandell, Michael        | 95  |     |     |     |     |
| Luna, Cynthia            | 10  |     |     |     |     |
| Madigan, Frances M.      | 43  | 46  | 51  |     |     |
| McKinney, Catherine N.   | 84  | 86  |     |     |     |
| Merillat, A.P.           | 101 | 121 | 125 | 126 | 114 |
|                          | 117 |     |     |     |     |
| Nall, Catherine          | 127 | 131 |     |     |     |
| Threadgill, Robert       | 90  | 92  |     |     |     |
| Wilkins, Patty           | 4   |     |     |     |     |
| Wright, Mike             | 133 | 142 |     |     |     |

# EXHIBIT INDEX

## VOLUME 16

| EXHIBIT NUMBER | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| Sx. 6-A | Knife | 98<br>145 | 98<br>145 |
| Sx. 16 | Diagram of boot factory | 23 | 23 |
| Sx. 21 | Photographs | 24 | 25 |
| Sx. 26 | Pen Packet | 139 | 139 |
| Sx. 27 | Pen Packet | 140 | 142 |
| Sx. 27-A | Items redacted from Sx. 27 (For record only, not for jury) | 145 | 145 |
| Sx. 50 | Diagram of boot factory | 3 | 3 |
| Sx. 60 | Fingerprint card | 136 | 136 |

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00470-BR   Document 84-9   Filed 01/17/13   Page 6 of 43   PageID 2755

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 3

```
1              PROCEEDINGS
2            OCTOBER 27, 2005
3       THE COURT:  Okay.  Bring the jury in.
4       (Open court, defendant and jury present)
5       THE COURT:  Call your next witness.
6       MR. YONTZ:  Your Honor, just prior to doing
7  that, the State would move State's Exhibit 50 into evidence.
8  That's the diagram.
9       MR. DURHAM:  Which one?
10      MR. YONTZ:  The one that's been used and marked
11  by the inmates.
12      MR. DURHAM:  That's an incorrect statement.
13  The inmates did not mark it, the district attorney marked it.
14  No inmate marked on it.
15      THE COURT:  Do you have any objection to its
16  introduction?
17      MR. DURHAM:  No, I just wanted to correct the
18  incorrect statement.
19      THE COURT:  Okay.  The exhibit is received.
20      MR. YONTZ:  Your Honor, the State would call
21  Patty Wilkins -- excuse me, Watkins.
22      THE COURT:  Have you been sworn as a witness,
23  ma'am?
24      MS. WILKINS:  No.
25      THE COURT:  Raise your right hand, please.
```

Page 4

```
1       (Witness sworn)
2       THE COURT:  All right.  If you would take a
3  seat right up here on the witness stand.
4              PATTY WILKINS,
5  having been first duly sworn, testified as follows:
6          DIRECT EXAMINATION
7  BY MR. YONTZ:
8       Q.  Would you state your name, please?
9       A.  Patty Wilkins.
10      Q.  Ms. Wilkins, could you pull that microphone, just
11  reach up and grab it and pull it towards you?  There you go.
12      Ms. Wilkins, how are you employed?
13      A.  I'm a Licensed Vocational Nurse at the Clements
14  Unit.
15      Q.  And how long have you been licensed in nursing?
16      A.  Almost ten years.
17      Q.  Calling your attention back to the 29th day of
18  January, 2003, where were you working that morning?
19      A.  In the front clinic.
20      Q.  I'm sorry?
21      A.  I said I was working in the clinic area.
22      Q.  And did anything unusual happen that morning?
23      A.  Yes, it did.
24      Q.  Can you explain to the ladies and gentlemen what
25  occurred?
```

Page 5

```
1       A.  It was approximately around 7:00, there was a call
2  on the radio saying that they needed medical to the boot
3  factory.  So me and a coworker grabbed a gurney and we headed
4  to the front door.  And at that time is when we met Officer
5  Wiley at the front door of the infirmary.
6       Q.  Okay.  Did you know the nature of the call you were
7  responding to?
8       A.  Not exactly, they just said someone had been cut in
9  the boot factory.
10      Q.  And you indicated that you met him at the front
11  door.  Would that be the front door of the infirmary?
12      A.  Right.
13      Q.  Are you familiar with the layout of the
14  penitentiary?
15      A.  Yes.
16      Q.  About how far is the infirmary from the boot
17  factory?
18      A.  Oh, I would say almost a quarter of a mile.  It's
19  quite a ways.
20      Q.  When you met them at the front door, was it just
21  Mr. Wiley who was there or were other people with him?
22      A.  There was another officer with him.
23      Q.  Okay.  And what did you see when you opened the
24  front door?
25      A.  It was Officer Wiley with a coat wrapped around his
```

Page 6

```
1  neck.
2       Q.  Okay.  Did you -- were you able to observe anything
3  about his physical condition at that time?
4       A.  He was really pale, and at that time, no, just --
5  just the coat, and he was real pale.
6       Q.  What did you do?
7       A.  We escorted him to the emergency room and we sat him
8  down on the gurney.
9       Q.  Did you begin care at that time?
10      A.  Well, we took -- they removed the coat off and we
11  could see that he had been sliced -- he had been cut.
12      MR. DURHAM:  Excuse me, Your Honor.  The
13  characterization, "we moved the coat," "they removed the
14  coat," "we," if she could testify to what she did personally
15  unless she can name the people who were doing it later for
16  cross-examination purposes.
17      THE COURT:  Testify only from your personal
18  knowledge, ma'am.
19      THE WITNESS:  Okay.
20      Q.  (BY MR. YONTZ)  Were other people with you assisting
21  at this time?
22      A.  Yes.
23      Q.  Were you acting as a team?
24      A.  Yes.
25      Q.  What did you do?  You indicated you removed the
```

---

Page 7

1 coat. Who was involved with removing the coat?

2 A. It was me and another nurse.

3 Q. Okay. And when you removed the coat, what did you
4 see?

5 A. A cut from here to here on his neck. (Indicating)

6 Q. Let the record reflect she's indicated across her
7 neck from left to right, almost from under the right ear -- or
8 under the left ear to under the right ear.

9 MR. DURHAM: That's an incorrect statement.
10 That's totally incorrect. He said from the left ear to the
11 right ear and that's not consistent with the autopsy or what
12 she just said or indicated.

13 MR. YONTZ: It indicated her pointing on her
14 neck. If Mr. Durham wishes to cross-examine her, he can do
15 so.

16 THE COURT: Where did you point, ma'am?

17 THE WITNESS: It was a large cut just right --

18 THE COURT: Okay. Can you describe that for us
19 in words? Where did the cut begin and where did it end?

20 THE WITNESS: It was somewhere around here.

21 THE COURT: No, "here", we can't put down into
22 writing, see. That's what we're talking about. So that
23 everybody will know, where do you think it began?

24 THE WITNESS: Probably from ear to -- it was
25 from ear to ear.

---

Page 8

1 THE COURT: Okay.

2 THE WITNESS: Is that better?

3 THE COURT: Okay. That's fine.

4 Q. (BY MR. YONTZ) Did you make any phone calls or
5 request any phone calls be made?

6 A. I did not.

7 Q. Okay. Were any phone calls made for additional
8 help?

9 MR. DURHAM: Objection, unless --

10 A. Yes.

11 MR. DURHAM: She did not make them, how would
12 she know?

13 MR. YONTZ: She can have knowledge of what
14 other people did in an emergency treatment.

15 MR. DURHAM: That they made a phone call. What
16 the conversation was would be hearsay.

17 THE COURT: That question did not ask for the
18 substance of the conversation, if there was one.

19 MR. DURHAM: It asked -- it asked specifically,
20 was information requested.

21 THE COURT: Read it back, please.

22 MR. DURHAM: Withdrawn, withdrawn.

23 THE COURT: Read it back, please.

24 Okay. We can't find any glasses, so you can't
25 read anything back.

---

Page 9

1 MR. DURHAM: I'll withdraw the objection.

2 THE COURT: Okay.

3 Q. (BY MR. YONTZ) Was emergency help summoned?

4 A. Yes. A lot of people showed up in the ER.

5 Q. Okay. And at that time, what treatment were you
6 involved in providing to Mr. Wiley?

7 A. I had started an IV in his left arm.

8 Q. And did he indicate any other problems he was having
9 other than the blood that you observed?

10 A. Yeah, he had wrote a note that said --

11 Q. I'm sorry?

12 A. He had wrote a note. We couldn't understand him
13 because he couldn't talk. He was trying to lip that he
14 couldn't breathe because he had blood in his lungs.

15 Q. Were you able to maintain the IVs?

16 A. No. We had -- I had to end up restarting another
17 one in his left arm because he was jerking his arm back and
18 forth.

19 Q. Did he eventually leave the facility there?

20 A. Yes, he did.

21 Q. How did he leave?

22 A. He left -- he was intubated and unconscious at the
23 time.

24 Q. When you say "intubated," what do you mean?

25 A. We had to put a breathing tube down the cut in his

---

Page 10

1 neck. The laceration, you could -- we had to tube him that
2 way so we could breathe for him.

3 Q. Okay.

4 MR. YONTZ: I have no other questions.

5 MR. DURHAM: No questions.

6 THE COURT: Okay, you can step down, ma'am.

7 Call your next witness.

8 MR. YONTZ: Cynthia Luna.

9 THE COURT: Would you raise your right hand,
10 please, ma'am.

11 (Witness sworn)

12 CYNTHIA LUNA,
13 having been first duly sworn, testified as follows:

14 DIRECT EXAMINATION

15 BY MR. YONTZ:

16 Q. Ma'am, would you state your name, please?

17 A. My name is Cynthia Luna.

18 Q. How are you employed?

19 A. I'm a Registered Nurse for the Bill Clements Unit.

20 Q. Calling your attention back to the 29th day of
21 January, 2003, were you working that morning?

22 A. Yes, I was.

23 Q. What time did you start work?

24 A. 6:30.

25 Q. When you get to work at the unit, are there doctors

---

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

CASE 2:12-cv-00414-D-BR   Document 84-9   Filed 01/17/13   Page 8 of 43   PageID 3787

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 11

1  on duty also?
2  A. Usually not at that time.
3  Q. When do they come in?
4  A. Usually somewhere between 8:30 and 9:00.
5  Q. About seven o'clock that morning, did anything
6  unusual happen?
7  A. They called for medical, and we had an emergency
8  come in the ER.
9  Q. Did you respond to that?
10  A. Yes, I did.
11  Q. And how far did you respond?
12  A. All the way into the ER.
13  Q. Okay. You met the emergency, then, at the ER; you
14  didn't go to where it was located?
15  A. No. I was in the infirmary, which is --
16  Q. How far is the infirmary from the ER?
17  A. Oh, probably about 50 feet.
18  Q. When you got to the ER, what did you see?
19  A. I saw Mr. Wiley sitting on the end of a stretcher.
20  Q. And can you describe what you saw?
21  A. Yes.
22  Q. His condition.
23  A. Yes. He was bleeding profusely, and when I looked
24  at the wound, his throat had been slit.
25  Q. Is that where he was bleeding from?

Page 12

1  A. Yes.
2  Q. Did you assist in giving medical aid to Mr. Wiley?
3  A. Yes, I did.
4  Q. What did you do?
5  A. Started IVs, put a blood pressure cuff on a bag of
6  fluid because we couldn't get it to run fast enough by
7  gravity, so we started pumping fluid.
8  Q. How does the IV cuff assist in pumping fluid?
9  A. Put pressure on it so it goes in faster.
10  Q. Why was that necessary?
11  A. Because of the amount of blood he had lost. We were
12  slipping and sliding on the floor because the floor was
13  covered with blood.
14  Q. What else did you do other than the IVs?
15  A. I didn't do it, but I assisted in intubation.
16  Q. Okay. When you say "intubation," what is that?
17  A. You put an endotracheal tube down into the windpipe.
18  Q. And is that where they go in through the mouth and
19  down into the windpipe?
20  A. Under normal situations, yes.
21  Q. Was something different done this time?
22  A. Yes. We had to intubate through the wound directly
23  into the trach.
24  Q. Did you assist him in breathing once that was done?
25  A. Yes, I did.

Page 13

1  Q. How did you do that?
2  A. With an ambu bag.
3  Q. What's an ambu bag?
4  A. It's a bag you squeeze so that you can press oxygen
5  into the lungs.
6  Q. What else did you do in regard to his care?
7  A. Mainly just talked to him and tried to keep him calm
8  until he became unconscious.
9  Q. Was he transported from the ER?
10  A. Yes, he was.
11  Q. And how was he transported?
12  A. By ambulance.
13  MR. YONTZ: I have no further questions, Your
14  Honor.
15  MR. DURHAM: No questions.
16  THE COURT: Okay, you can step down, ma'am.
17  Call your next witness.
18  MR. YONTZ: Call Mr. Calvin Askins.
19  THE COURT: Would you raise your right hand,
20  please, sir?
21  (Witness sworn)
22  THE COURT: All right. Take a seat on the
23  witness stand, please.
24
25

Page 14

1  CALVIN ASKINS,
2  having been first duly sworn, testified as follows:
3  DIRECT EXAMINATION
4  BY MR. YONTZ:
5  Q. Mr. Askins, could you pull that microphone just back
6  towards you just a little bit there? There we go.
7  Would you state your name, please, sir?
8  A. Calvin Askins.
9  Q. How are you employed, sir?
10  A. I work for the Texas Department of Criminal Justice.
11  Q. And what facility, what location?
12  A. At the Clements Unit, Amarillo.
13  Q. Is that in Potter County?
14  A. Yes, sir.
15  Q. And you indicated Texas Department of Criminal
16  Justice. Was that previously known by another name?
17  A. Texas Department of Criminal Justice, that was the
18  original name. It is now changed to Institutional Division.
19  Q. Was it formerly known as Texas Department of
20  Corrections?
21  A. Yes.
22  Q. When did that change come about?
23  A. Approximately about two, two and a half years ago.
24  Q. What are your assignments? What do you do at the
25  Clements Unit?

Page 15

1   A. I'm an inventory coordinator.

2   Q. What do you do in that regard?

3   A. I see over all the property, all the way from

4 ammunition, all the way to computers, printers, anything that

5 the facility needs to operate.

6   Q. Calling your attention back to January 29th, 2003,

7 what did you do then?

8   A. I was an industrial specialist in the boot factory.

9   Q. What's an industrial specialist and what did you do?

10   A. Supervisor in the warehouse. And my -- my function

11 at that time was to interview offenders and assess them and

12 assign them job assignments with the direction of the plant

13 manager.

14   Q. Did you have any individuals or any group of

15 individuals who you were specifically over?

16   A. I was over the janitors, SSIs, the work pool.

17   Q. Okay. I know what a janitor is. What's an SSI?

18   A. The same thing as a janitor. They take care of

19 cleaning the offices, the restrooms, the plant.

20   Q. Okay. Did you know an individual by the name of

21 Stanley Wiley?

22   A. Yes, I did.

23   Q. How did you know him?

24   A. He was one of my fellow supervisors.

25   Q. How long had you known him?

Page 16

1   A. Probably approximately about seven, eight years.

2   Q. On January 29th, 2003, do you know what shift he was

3 working?

4   A. He just got assigned back to first shift. We just

5 closed down second shift.

6   Q. What time does first shift begin?

7   A. Approximately 4:45 in the morning.

8   Q. And how long does it last?

9   A. To 12:45.

10   Q. That day at the boot factory, did you have occasion

11 to contact an individual by the name of Travis Runnels?

12   A. Yes, I did.

13   Q. Is he in the courtroom?

14   A. Yes.

15   Q. Would you point him out and describe what he's

16 wearing, please?

17   A. This individual here, gold colored tie, green shirt.

18 (Indicating)

19   Q. What was the reason for your contacting Mr. Runnels?

20   A. Runnels was assigned to me as one of my janitors.

21   Q. Okay. Around seven o'clock that morning, did you

22 have any additional contact with him other than just as the

23 assignment?

24   A. Yes. I was doing my tour of the factory, checking

25 on all my janitors, be sure they was cleaning up their areas

Page 17

1 and stuff, and I found Runnels sitting in the boxing area not

2 doing his job.

3   Q. And what did you do?

4   A. I directed Runnels to get up, get a broom, get his

5 mop, get his area cleaned up.

6   Q. What was his response?

7   A. He just stared at me.

8   Q. Did he eventually do it?

9   A. He eventually got up off the table.

10   Q. Did you see what he did after he got up off the

11 table?

12   A. No.

13   Q. After that incident occurred, did something else

14 occur in the boot factory that caught your attention?

15   A. I don't understand the question.

16   Q. Within about a few minutes after you had told

17 Mr. Runnels to get up and to move, did something else occur

18 that grabbed your attention? Did you see Mr. Wiley?

19   A. Yes. After I directed Runnels to go to work, I went

20 around the end of the toe lasters and I spoke with Mr. Wiley.

21   Q. And where was Mr. Wiley at that time?

22   A. He was standing near the insole table.

23   Q. What did you -- how long did that conversation

24 between you and Mr. Wiley last?

25   A. Maybe two or three minutes.

Page 18

1   Q. And what happened after that?

2   A. I went to the office.

3   Q. Did you see where Mr. Wiley went?

4   A. No.

5   Q. Did you see Mr. Wiley again?

6   A. Approximately maybe two minutes later.

7   Q. And had his condition changed?

8   A. Yes.

9   Q. Can you describe to the ladies and gentlemen what

10 you saw when you saw him the next time?

11   A. I was standing looking out the office door,

12 Mr. Wiley was approaching the office with both hands around

13 his neck, and I opened the door, Mr. Wiley stepped in, and we

14 were face to face. I said, "Wiley?" And at that time,

15 Mr. Wiley threw his head back.

16   Q. And what did you see?

17   A. Mr. Wiley had his throat cut. And the only thing

18 that was holding Mr. Wiley's head on was his vertebras.

19   Q. This was in the office area?

20   A. In the office.

21   Q. What did you do once you observed this?

22   A. On the credenza near the door, Mr. Wiley's coat was

23 laying there. I grabbed his coat and slammed it up against

24 his neck.

25   Q. Why did you do that?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:15-cv-00744-BR   Document 84-3   Filed 01/17/13   Page 10 of 43   PageID 2759

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 19

1    A. Because he was bleeding profusely.
2    Q. What did you do then?
3    A. I turned and looked at Mr. Williams and asked him to
4 call medical, call B turnout --
5    Q. Who is Mr. Williams?
6    A. He's plant manager.
7    Q. He would be the guy that was the boss in the -- the
8 top boss in the boot shop?
9    A. Yes, sir.
10    Q. What did you do after you told him to call medical?
11    A. Wiley -- Mr. Wiley was wanting to leave the factory.
12 I escorted him to the front door to medical.
13    Q. How far is it from the boot factory to medical?
14    A. A long ways. I would say approximately between an
15 eighth and a quarter of a mile.
16    Q. Are you familiar with the layout of the boot shop?
17    A. Yes, I am.
18        MR. YONTZ: May I approach, Your Honor?
19        THE COURT: Sure.
20    Q. (BY MR. YONTZ) Mr. Askins, I'll show you what has
21 been marked as State's Exhibit No. 16 for identification, ask
22 if you're familiar with this?
23    A. Yes.
24    Q. What is this?
25    A. That's the layout of the boot factory.

Page 20

1    Q. I'll give you a purple marker to start off with
2 here.
3        MR. DURHAM: I'm going to object to marking on
4 the exhibit that's been introduced into evidence, Your Honor.
5 That alters the exhibit as introduced.
6        THE COURT: Made my chair fall over.
7        MR. DURHAM: I'm sorry, I didn't think it was
8 that good of an objection.
9        MR. YONTZ: What was the objection?
10        THE COURT: Okay.
11        MR. DURHAM: The objection is to marking on the
12 admitted exhibit.
13        MR. YONTZ: There's been no admitted exhibit.
14 I indicated it's been marked as Exhibit 16. I've not tendered
15 it.
16        THE COURT: Okay. This is not one that has
17 been --
18        MR. SIMS: It's not the same exhibit.
19        MR. YONTZ: It's not the same as 50, no.
20        THE COURT: Okay. Go ahead.
21    Q. (BY MR. YONTZ) Okay. You indicated earlier that
22 you observed the defendant in some area and you had a
23 conversation with him. Would you just put a purple "D" in
24 that area?
25    A. (Witness complies)

Page 21

1    Q. Okay. And then you walked over and talked with
2 Mr. Wiley; is that correct?
3    A. Yes.
4    Q. Where did you go and where was this conversation
5 held at?
6    A. The conversation was held right in here.
7 (Indicating)
8    Q. And could you just draw a dotted line over to that
9 area from the "D"?
10    A. (Witness complies)
11    Q. And then where did you go after you had this
12 conversation?
13    A. I left this area and walked through this way, up to
14 the office. (Indicating)
15    Q. Okay. And just put an "X" up there where the
16 offices are.
17    A. (Witness complies)
18    Q. Where did you next see Mr. Wiley?
19    A. I noticed Mr. Wiley right about here. (Indicating)
20    Q. And did he come into the office?
21    A. He walked directly into this door right there.
22 (Indicating)
23    Q. By the No. 32?
24        MR. DURHAM: Pardon me, I --
25    A. By No. 32.

Page 22

1        MR. DURHAM: -- for the purpose of the record.
2 Pardon me. For the purpose of the record, "right about here"
3 will not appear in the record, and I don't know how it's being
4 marked on the chart as the back of the chart is to me, and I
5 can neither acquiesce nor object, as I have no idea what's
6 going on.
7        THE COURT: Do you want to go stand over there?
8        MR. DURHAM: Well, the record will still be --
9 the record will still be silent as to what he's doing.
10        THE COURT: Okay. Try to be more specific,
11 please.
12        MR. DURHAM: May I stand right up here?
13        THE COURT: Sure.
14        MR. DURHAM: Thank you.
15    A. Let me clarify that, where the "X" is.
16 Approximately about 20, 25 feet in front of the office door.
17    Q. (BY MR. YONTZ) Were both of you then in the area
18 marked No. 32?
19    A. After opening the door for Mr. Wiley?
20    Q. Yes.
21    A. Yes.
22    Q. And would you trace again with a polka dotted line
23 the route you took to exit the boot factory?
24    A. (Witness complies)
25    Q. And this is the exit door down here?

Page 23

1    A. Yes, sir.
2         MR. YONTZ: Your Honor, at this time, we would
3    move State's Exhibit 16.
4         MR. DURHAM: I have no objection.
5         THE COURT: Exhibit is received.
6    Q. (BY MR. YONTZ) When you exited the boot factory,
7    where did you go?
8    A. We went towards B turnout, towards medical, both of
9    them in the same direction.
10   Q. And did you arrive at medical?
11   A. Yes.
12   Q. When you work there, are you working as a civilian
13   or as a corrections officer?
14   A. Civilian.
15   Q. And was Mr. Wiley a civilian or a corrections
16   officer?
17   A. Civilian.
18   Q. Did you wear any type of uniform or did you wear
19   civilian clothes?
20   A. Civilian clothes.
21   Q. When you got to the medical area, the infirmary
22   emergency room area, what did you do?
23   A. I directed the nurses and -- to open the door. And
24   once they opened the door, escorted Wiley around the corner to
25   the triage room.

Page 24

1    Q. Were photographs taken of Mr. Wiley while he was in
2    the triage room?
3    A. They were probably taken after I left.
4    Q. Did you have occasion to see Mr. Wiley as he was in
5    the triage room?
6    A. Yes.
7    Q. I'll show you what have been marked as State's
8    Exhibit 21, ask if you are familiar with those photographs?
9    A. Yes.
10   Q. And are those true and accurate depictions of what
11   is shown there as they appeared that day?
12   A. Yes.
13        MR. YONTZ: Your Honor, we would move State's
14   Exhibit 21.
15        MR. DURHAM: I have an objection to them I
16   would like to make outside the presence of the jury.
17        THE COURT: Okay. The jury will step into the
18   jury room, please.
19        MR. DURHAM: I think it could be at the bench.
20   It's very short.
21        THE COURT: Okay. Be seated again.
22        (At the bench, on the record)
23        MR. DURHAM: I just don't think that the
24   writing on the -- on there, he can't identify the writing as
25   being true and accurate. If the writing is excised, we have

Page 25

1    no objection to the exhibits, but the writing should be
2    deleted.
3         MR. YONTZ: We'll cover it before it's
4    published. We'll cover it.
5         THE COURT: Okay. Well, just take it now.
6         MR. DURHAM: Well, it's not -- I don't want it
7    admitted until it's covered.
8         THE COURT: Black it out.
9         MR. YONTZ: Okay.
10        THE COURT: Use a Marks-A-Lot and redact it.
11        MR. YONTZ: Let me see what I have here.
12        (Open court)
13        (Pause)
14        MR. DURHAM: No objection.
15        THE COURT: Exhibit is received.
16        MR. YONTZ: Thank you. May I publish, Your
17   Honor?
18        THE COURT: Sure.
19   Q. (BY MR. YONTZ) You've seen this, correct?
20   A. Yes.
21   Q. How long did you stay in the emergency room?
22   A. Total time?
23   Q. Yes, sir.
24   A. Probably a minute and a half, two minutes.
25   Q. Where did you go?

Page 26

1    A. After I left?
2    Q. Yes, sir.
3    A. I started back towards the boot factory.
4    Q. Why was that?
5    A. Because we still had offenders out there and other
6    bosses out there.
7    Q. Are you familiar with -- how long have you worked
8    with the penitentiary system?
9    A. Almost 12 years.
10   Q. And are you familiar with the term lockdown?
11   A. Yes.
12   Q. What is a lockdown?
13   A. A lockdown is all offenders are in their cells, in
14   their cubicles, locked down, no movement.
15   Q. Okay. What precipitates a lockdown?
16        MR. DURHAM: That calls for an interpretation
17   of the procedure of the department and he's not been
18   qualified.
19        THE COURT: Overruled.
20   Q. (BY MR. YONTZ) What precipitates a lockdown?
21   A. Anything unusual that happens on the farm.
22   Q. Would this incident precipitate a lockdown?
23   A. Yes.
24   Q. Are you familiar with the grounds of the
25   penitentiary?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00555-BR   Document 84-3   Filed 01/17/13   Page 12 of 43   PageID 1782

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 27

1    A. Yes.
2    Q. If a person is in the boot factory, where can you
3  run to hide?
4    A. If you're in the boot factory, if you have no key to
5  the door, you're in the boot factory.
6    Q. Those doors lock --
7    A. You're going nowhere. Doors are locked.
8    Q. And there's -- it's not a situation where you can
9  simply run out into the area?
10   A. No.
11   Q. If a person were to get out into the outside area
12 outside the boot factory, what restrains them from getting out
13 to the highway to escape?
14   A. We have fences and razor wire.
15   Q. How high are those fences?
16   A. Guesstimate, 12, 14 foot high.
17   Q. And you indicated razor wire. What's razor wire?
18   A. It's Constantine wire that has -- it's been
19 sharpened to keep somebody from trying to go over the fence.
20        MR. YONTZ: No further questions, Your Honor.
21        CROSS-EXAMINATION
22 BY MR. DURHAM:
23   Q. Do you have guard towers?
24   A. Do what, sir?
25   Q. Are there guard towers?

Page 28

1    A. Yes.
2    Q. Are there guards in those towers?
3    A. Yes.
4    Q. Do they have guns?
5    A. Yes.
6    Q. Do they shoot people who try to climb the fence?
7    A. Yes.
8    Q. Okay. So that, too, is a deterrent, isn't it?
9    A. Yes.
10   Q. The area is secure, correct?
11   A. Yes.
12   Q. All right. Now, that's all very interesting, but
13 what I want to talk to you about is about Travis. I want to
14 talk about how was he assigned to be a janitor.
15   A. When offenders are assigned to the factory, my job
16 was to interview all new offenders coming to the factory.
17   Q. So you interviewed him?
18   A. Yes.
19   Q. You are responsible for him being in there?
20   A. No.
21   Q. Well, who's responsible for him being placed in the
22 factory where there were knives?
23   A. Classification.
24   Q. So his classification was such that he could be
25 trusted around instruments like that?

Page 29

1    A. I did not know at the time what his classification
2  was.
3    Q. Well, you interviewed him and you didn't find that
4  out, sir? .
5    A. That is not part of my job.
6    Q. Okay. What exactly is your job, because it was my
7  understanding -- now, correct me if I'm wrong, okay? It was
8  my understanding Mr. Wiley was telling Travis what to do on
9  that occasion.
10   A. No.
11   Q. He was not?
12   A. No, it was not --
13   Q. He didn't have --
14   A. -- Wiley --
15   Q. -- the authority to tell him what to do?
16   A. Yes, he does.
17   Q. So Travis had more than one master there in the boot
18 factory?
19   A. I think you need to restate your question.
20   Q. More than one person --
21   A. What do you mean by master?
22   Q. -- could tell him what to do? You're his boss,
23 right?
24   A. Runnels was assigned to me, yes.
25   Q. All right. He wasn't assigned to Mr. Wiley, was he?

Page 30

1    A. No.
2    Q. All right. So you were his boss, correct?
3    A. Correct.
4    Q. And Mr. Wiley was boss over other people, correct?
5    A. Correct.
6    Q. And where -- where -- from whence does the term boss
7  come into common parlance in the penitentiary?
8        Do you understand the question?
9    A. Yes. It's a term that use as your supervisor or
10 anybody in authority. (sic)
11   Q. Anybody in authority. Any guard, any civilian,
12 they're all boss?
13   A. Yes.
14   Q. And deference is to be paid to that person; is that
15 correct?
16   A. Yes.
17   Q. As a matter of fact, as you're in the penitentiary,
18 you described the layout, there are painted lines in the
19 penitentiary, aren't there, in the halls?
20   A. Yes.
21   Q. All right. And those lines are about how wide
22 from -- how far are the lines from the wall?
23   A. Three to four feet.
24   Q. Okay. And between the lines is a wider aisle,
25 correct?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00893-BR   Document 84-1 Filed 01/17/13   Page 13 of 43   PageID 2762

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 31

1  A. Correct.
2  Q. Who can walk in the middle of the hall?
3  A. Any TDCJ employee.
4  Q. Where do the prisoners have to walk?
5  A. On the other side of the lines next to the walls.
6  Q. Next to the wall. So the TDJC (sic) employees, the
7  bosses can walk where they want to, the employees (sic) have
8  to walk within the lines, correct?
9  A. Correct.
10  Q. Okay. Now, you interviewed him. When you
11  interviewed him, I take it you were given a history of Travis?
12  A. No.
13  Q. Well, what did the interview consist of?
14  A. The interview consisted of how tall he was, his age,
15  date of birth, length of sentence, out -- free world
16  experience, what jobs did he hold in the free world, so we
17  could best determine what job to fit him.
18  Q. Well, you weren't there to determine what job would
19  fit him, you were there --
20  A. Yes, I determined what job fit him in the factory.
21  Q. In the factory or the janitorial branch?
22  A. In the factory.
23  Q. Oh, you -- you were responsible for determining who
24  worked where in the factory?
25  A. The plant manager determines that.

Page 32

1  Q. Well, that's not what you just said.
2  A. Okay. Once I interview them, I talk to
3  Mr. Williams, we go over it. He determines by looking at
4  their experience what area in the factory this individual will
5  work in.
6  Q. So you discussed Travis with Mr. Williams?
7  A. Yes.
8  Q. And y'all reached the conclusion that this was a
9  person who -- who could move around the factory and be a
10  janitor?
11  A. All offenders that were assigned to the factory
12  starts in the janitorial pool. Anybody that's missing an
13  offender for that day can come to me and say, "I need a
14  worker," and then I assign that worker to that other
15  supervisor that day.
16  Q. Okay. That's very interesting, but I don't believe
17  that was my question.
18  MR. DURHAM: And even though you don't have
19  your glasses, I'm going to ask you to read me the question for
20  him, please.
21  THE REPORTER: "And y all reached the
22  conclusion that this was a person who could move around the
23  factory and be a janitor?"
24  Q. (BY MR. DURHAM) It's a yes-or-no question.
25  A. Yes.

Page 33

1  Q. All right. Thank you.
2  Now, you didn't know his classification?
3  A. No.
4  Q. You didn't inquire about his classification?
5  A. No.
6  Q. You didn't discuss his classification with
7  Mr. Williams?
8  A. No.
9  Q. So you don't know whether or not he had a history
10  within the institution for starting trouble, did you?
11  A. No.
12  Q. You didn't know whether or not he was a peaceable
13  person within the institution or not, did you?
14  A. No.
15  Q. You didn't know if he got in fights a whole lot or
16  not, did you?
17  A. No.
18  Q. You didn't know whether or not he had a real temper,
19  real bad -- real easy -- hair-trigger temper, I guess would be
20  the best way to put it. You didn't know that?
21  A. No.
22  Q. You made no inquiry into those matters?
23  A. No.
24  MR. DURHAM: No further questions.
25

Page 34

1  REDIRECT EXAMINATION
2  BY MR. YONTZ:
3  Q. He was basically sent to you from classification,
4  said, "He's going to work in the boot factory and you decide
5  where" --
6  MR. DURHAM: Leading question, Your Honor.
7  THE COURT: Don't lead the witness.
8  Q. (BY MR. YONTZ) Is it correct that you then decide
9  where in the boot factory he fit in?
10  A. Yes.
11  Q. I take it this wasn't a pre-employment interview
12  like we have on -- outside the penitentiary; is that correct?
13  MR. DURHAM: Objectionable. Leading question.
14  THE COURT: Don't lead the witness.
15  Q. (BY MR. YONTZ) He was assigned there and that's
16  where he was going to be; is that correct?
17  A. Correct.
18  Q. You indicated Mr. Wiley also had -- although you
19  were over the janitors -- let me see if I can understand this.
20  Mr. Wiley also had authority over those individuals who were
21  under your supervision?
22  A. Yes.
23  Q. And would it be Mr. Wiley's job also to make sure
24  the janitors were continuing to do their job?
25  A. Yes. .

THE STATE OF TEXAS
Case 2:15-cv-00203-BR   Document 84-3   Filed 01/17/13   Page 14 of 43   PageID 1774
vs. TRAVIS TREVINO RUNNELS
Multi-Page™
TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 35

1    Q. Mr. Durham talked about the lines on the cement
2 floors. Why are those lines there?
3    A. For traffic control.
4    Q. What do you mean?
5    A. To keep the offenders from mixing in with the
6 employees.
7    Q. Is that a dangerous situation if that occurs?
8         MR. DURHAM: Calls for a conclusion. No proper
9 predicate.
10        THE COURT: Sustained.
11   Q. (BY MR. YONTZ) Are you familiar with the
12 environment within the boot factory?
13   A. Yes.
14        MR. DURHAM: Your Honor, this is a civilian
15 employee. I'm going to -- until he's qualified as to
16 departmental procedures and reasoning behind, I'm going to
17 object.
18        THE COURT: That's the line of questioning
19 that's begun. Go ahead.
20        MR. DURHAM: I'm sorry, I was premature.
21   Q. (BY MR. YONTZ) Having worked there, have you been
22 able to observe departmental procedures?
23   A. Yes.
24   Q. And have you had input into those procedures?
25   A. Those are established procedures.

Page 36

1    Q. And have you received training in regard to your
2 working in the -- within the penitentiary?
3    A. Yes.
4    Q. Based on your training, knowledge, and experience,
5 is it a security matter, or a security concern to have inmates
6 mingling with civilian personnel?
7         MR. DURHAM: He hasn't laid proper predicate --
8         THE COURT: Sustained.
9         MR. DURHAM: -- for the question.
10   Q. (BY MR. YONTZ) During the time that you were with
11 Mr. Wiley, about -- from the time you saw him at the office
12 until you got to the emergency room, about how long of a time
13 period had elapsed?
14   A. I would say not more than three minutes.
15   Q. And did it appear that Mr. Wiley was still feeling
16 the effects of what had occurred to him?
17        MR. DURHAM: No proper predicate laid for that
18 question, Your Honor.
19        THE COURT: Sustained.
20   Q. (BY MR. YONTZ) Did it appear that Mr. Wiley was
21 still suffering from some wound --
22        MR. DURHAM: That's a leading question.
23        THE COURT: Overruled.
24   Q. (BY MR. YONTZ) Did it appear that he was still
25 suffering from the wound --

Page 37

1    A. Yes.
2    Q. -- during that time?
3         At that time, did you ask any questions of
4 Mr. Wiley?
5    A. Yes.
6    Q. Was he able to talk?
7    A. No.
8    Q. Was he able to communicate with you?
9    A. Yes.
10   Q. How was he able to do that?
11   A. With his hands, his eyes.
12   Q. And -- okay. What did you ask him?
13   A. I asked Wiley, "Who did this to you?"
14   Q. And did he respond in any way?
15   A. He pointed towards me.
16   Q. Did you understand that immediately?
17   A. No.
18   Q. What did you do then?
19   A. I asked Mr. Wiley, "What are you trying to tell me?"
20   Q. What did he do?
21   A. Then he pointed at me adamantly.
22   Q. Can you describe the manner in which he pointed at
23 you?
24   A. The first time (indicating). And the second time I
25 asked him what it was he was trying to say, he went

Page 38

1 (indicating).
2    Q. Okay. Were you able to translate that?
3    A. Yes.
4    Q. Did you ask him anything after that?
5    A. I said, "Okay, Wiley, he works for me?"
6    Q. And did he respond to that?
7    A. Wiley nodded his head.
8    Q. In what way?
9    A. (Witness nods head up and down.)
10   Q. Did you inquire further?
11   A. Before I could ask him another question, Wiley put
12 his hand up to his eye doing this manner. (Indicating)
13   Q. Did you ask him what that meant?
14   A. Yes. I said, "Wiley, he wears glasses?"
15   Q. And did you get a response from Mr. Wiley?
16   A. Wiley nodded yes.
17   Q. Did you inquire further?
18   A. Yes, I did.
19   Q. What did you ask?
20   A. I said, "Okay, Wiley, is he white?"
21   Q. Did Mr. Wiley respond?
22   A. He just sat there and stared at me. Then I asked
23 him, "Okay, Wiley, is he Hispanic?" And he stared at me. And
24 then I asked Mr. Wiley, "Is he black?" And Wiley nodded his
25 head.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 39

1  Q. In what manner did he nod his head?
2  A. (Witness nods head up and down.)
3  Q. And you took that as a yes?
4  A. As a yes.
5  Q. Up-and-down motion?
6     How many black janitors did you have working
7  for you that wore glasses?
8  A. One.
9  Q. Who was that individual?
10 A. Runnels.
11 Q. The defendant?
12 A. Yes.
13    MR. YONTZ: No further questions.
14    RECROSS-EXAMINATION
15 BY MR. DURHAM:
16 Q. Well, you know, he pled guilty yesterday to this?
17    MR. YONTZ: Objection as to relevance.
18    THE COURT: Overruled.
19 Q. (BY MR. DURHAM) You do know that?
20 A. As of this morning, yes.
21 Q. You didn't know it before this morning?
22 A. No, sir.
23 Q. Okay. You brought up an interesting question that I
24 probably should have asked you a moment ago. In the
25 procedures they have out there, do they have job descriptions?

Page 40

1  A. Yes, they do.
2  Q. Okay. Do you have access to those job descriptions?
3  A. They're on file, yes.
4  Q. And Mr. Wiley's job is described there?
5  A. As industrial specialist.
6  Q. And what, does it give a further description of what
7  his duties are?
8  A. I don't understand your question. What his job
9  function was?
10 Q. Well, yes, sir. Generally, a job description says
11 that you are --
12    MR. YONTZ: I'm going to object, Your Honor, as
13 to the editorializing. Ask a question as opposed to providing
14 information.
15    THE COURT: Overruled.
16 Q. (BY MR. YONTZ) Generally, a job description
17 describes the job, that is what you're expected to do and
18 accomplish, would you agree with that?
19 A. If it's his job function. An industrial specialist
20 is listed out as a supervisor of people, knowledge of
21 production and quality. That is the job title. That is the
22 job description.
23 Q. There's nothing other than a title?
24 A. Yes.
25 Q. Where is that description located?

Page 41

1  A. It's located -- we have one in the boot factory and
2  we have one in personnel.
3  Q. Okay. So that -- and your job is described there,
4  too?
5  A. Correct.
6  Q. All right. And does it describe your duties?
7  A. No.
8  Q. Your duties are not described anywhere?
9  A. No.
10 Q. And his duties were not described anywhere?
11 A. No.
12 Q. So when you say you're over the janitors, how -- how
13 was it that you were over the janitors if it's not described
14 anywhere?
15 A. Plant manager makes assignments to the supervisors
16 on what area they will supervise.
17 Q. So you were assigned by the plant manager the
18 janitors?
19 A. Yes, sir.
20 Q. What was Mr. Wiley assigned by Mr. Williams?
21 A. Lasting area.
22 Q. Pardon?
23 A. Lasting area.
24 Q. A totally different area of the plant --
25 A. Yes.

Page 42

1  Q. -- in terms of operation?
2  A. Yes.
3  Q. Thank you, sir.
4     MR. DURHAM: No further questions.
5     MR. YONTZ: Nothing further.
6     THE COURT: Okay, you can step down, sir.
7     Call your next witness.
8     MR. YONTZ: Your Honor, the State will call
9  Officer Madigan.
10    THE COURT: What's the name?
11    MR. YONTZ: Madigan, M-a-d-i-g-a-n.
12    THE COURT: First name? First name? It's not
13 Officer.
14    MR. YONTZ: Initial F. I'm not sure.
15    MR. SIMS: Your Honor, may Mr. Askins be
16 excused?
17    THE COURT: Any objection? Defense have any
18 objection?
19    MR. DURHAM: No, I don't think so. He's
20 available, so we have no objection to him being
21 excused from attendance, but not from the Rule.
22    THE COURT: Okay.
23    MR. SIMS: Thank you, Your Honor.
24    THE COURT: Madigan?
25    THE BAILIFF: He's not out there. I think he's

THE STATE OF TEXAS
Case 2:13-cv-00070-AD-BR   Document 84-3   Multi-Page™ Filed 01/17/13   Page 16 of 43   PageID 765
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 43

1 upstairs.

2        THE COURT: Okay. Call your next witness.

3        MR. YONTZ: Officer Threadgill.

4        (Pause)

5        THE BAILIFF: No response.

6        THE COURT: Okay. Call your next witness.

7        MR. YONTZ: That would be Officer McKinney.

8 The other individuals are here, Your Honor.

9        (Off-the-record discussion)

10       THE COURT: Okay. Come up, please.

11       Raise your right hand, please, sir.

12       (Witness sworn)

13       THE COURT: Okay. If you'll take a seat up

14 there on the witness stand, please, and tell us your first,

15 middle, and last names, please, sir.

16       THE WITNESS: Frances M. Madigan.

17       THE COURT: Go right ahead, sir.

18             FRANCES M. MADIGAN,

19 having been first duly sworn, testified as follows:

20             DIRECT EXAMINATION

21 BY MR. YONTZ:

22    Q. Sir, how are you employed?

23    A. I work for the TDCJ, State of Texas.

24    Q. How long have you been employed in that capacity?

25    A. Approximately seven and a half years.

Page 44

1    Q. Sir, calling your attention back to January 19th,

2 1999, were you on duty that day?

3    A. Yes, sir, I was.

4    Q. What were your assignments?

5    A. I was doing the normal routine. I was running

6 showers on the wing.

7    Q. And is that something that's normally done?

8    A. Yes, sir, on that building, yes.

9    Q. On that day, did you have occasion to come in

10 contact with an individual that's identified as Travis

11 Runnels?

12    A. Yes, sir, I did.

13    Q. Is he in the courtroom today?

14    A. Yes, sir, he is.

15    Q. Would you point him out and describe what he's

16 wearing, please?

17    A. Wearing the green shirt and the tan tie.

18    Q. What was the nature of your contact with him?

19    A. The nature of the incident?

20    Q. Well, what were you doing at the time you made

21 contact?

22    A. I was involved in running the showers on that wing

23 at that time, which is, I have to escort offenders to and from

24 showers.

25    Q. Okay. Did you request Mr. Runnels to do anything?

Page 45

1    A. Yes, sir. He was on the 2 row and his house -- his

2 cell was on 3 row. I ordered him to get back to his cell.

3    Q. Is that normal, that they would be ordered to go

4 back to their cell?

5    A. Yes, sometimes, if they're problem offenders, yes.

6    Q. Did he comply with that order?

7    A. Somewhat he did, after he hit me in the jaw.

8    Q. Can you explain that?

9    A. Well, I was on 3 row and he was on 2 row.

10    Q. Are these tiers above each other?

11    A. Yes. There's -- 3 row is, 1, 2, 3. And some --

12 something happened to where he was down on 2 row, and I -- I

13 told him to get back to his cell on 3 row, I was at his door.

14 And he -- you know, I can't remember exactly what he said, but

15 I went down to confront him. And I told him to get back to

16 his cell, and he said something about, "What are you doing in

17 my cell fishing line," or something. And I don't know if

18 y'all know the terminology of a fishing line, which is a --

19    Q. That's okay.

20    A. Okay. I just -- I told him to go back to the cell

21 and he popped me in the jaw. And I was stunned for a second,

22 and I went to push him back. And as I did, he ran back up to

23 his cell and closed the door behind him.

24    Q. Were you in uniform at that time?

25    A. Yes, sir, I was.

Page 46

1    Q. And you were performing your duties as a corrections

2 officer?

3    A. Yes, sir.

4        MR. YONTZ: No other questions, Your Honor.

5             CROSS-EXAMINATION

6 BY MR. DURHAM:

7    Q. When was this, please?

8    A. I wrote that case on January 19th, 1999.

9    Q. January 19th, 1999. And that was at the Clements

10 Unit?

11    A. No, that was at the Robertson Unit, when the said

12 offender was assigned closed custody.

13    Q. I'm sorry.

14    A. When --

15    Q. It was a yes-or-no question.

16    A. I'm sorry. Yes, that was at the Robertson Unit.

17    Q. Thank you. And how long had he been there?

18    A. Have I been there?

19    Q. No, how long had he been there?

20    A. I have no idea, sir. I don't have that information.

21    Q. Okay. So you requested him to return to his cell or

22 you ordered him to return to his cell?

23    A. I ordered him to.

24    Q. Okay. And firmly, I guess?

25    A. Yes, sir.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00430-BR   Document 84-5   Filed 01/17/13   Page 17 of 43   PageID 2768

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 47

1    MR. DURHAM: May I have just a moment, Your
2 Honor?
3        (Pause)
4    Q. (BY MR. DURHAM) Now, as I understood your
5 testimony -- now, correct me if I'm wrong, because -- he was
6 where he wasn't supposed to be and you ordered him to return
7 to his cell?
8    A. Yes, sir.
9    Q. And y'all had no confrontation other than that?
10   A. No, sir.
11       MR. DURHAM: May I approach the witness?
12       THE COURT: Sure.
13   Q. (BY MR. DURHAM) I want you to read your offense
14 report and refresh your memory.
15   A. Yes, sir, I will.
16   Q. Yes, sir. Have you read it today?
17   A. Yes.
18   Q. You did?
19   A. Yes.
20   Q. Well, y'all didn't have a confrontation about
21 confiscating his fishing line?
22   A. That was involved in the words that we did have,
23 yes, sir.
24   Q. Oh, there was a confrontation --
25   A. It was -- I did not --

Page 48

1        MR. YONTZ: We'll object to --
2    A. -- consider it a --
3        MR. YONTZ: -- the word confrontation, Your
4 Honor.
5    A. -- confrontation.
6        THE COURT: Okay, folks. You know, it's hard
7 enough to have one person talking and get that all down
8 perfectly on the record. Two is pretty tough, but Ms. Zimmer
9 is real good at it. Three, nobody in the world can do it.
10 Okay?
11       All right. Let's start over. Ask your
12 question.
13       MR. DURHAM: I've forgotten it.
14       THE COURT: Okay. Think of another one --
15       MR. DURHAM: Okay.
16       THE COURT: -- and then you can think of
17 another objection.
18   Q. (BY MR. DURHAM) Y'all had words about your
19 confiscating a fishing line, so there was more to what
20 happened than just you ordering him to his cell, wasn't there?
21   A. Sir -- yes, sir, but I did not --
22   Q. It's a yes-or-no question, sir. Do you not
23 understand the question?
24       THE COURT: Mr. Durham --
25       MR. DURHAM: I'm sorry, Your Honor.

Page 49

1        THE COURT: -- if you need to object to
2 responsiveness --
3        MR. DURHAM: All right. Then I object to the
4 nonresponsive.
5        THE COURT: Sustained.
6        MR. DURHAM: Thank you.
7        THE COURT: Do you have another question?
8        MR. DURHAM: Yes, I do. I'm trying to read the
9 officer's writing.
10       May I approach and ask him to --
11       THE COURT: Sure, absolutely.
12       MR. DURHAM: -- interpret?
13   Q. (BY MR. DURHAM) What's that word?
14   A. Right here?
15   Q. Uh-huh.
16   A. Check.
17   Q. Check. Okay. You said he swung at you and hit you,
18 but he was backing up. He was backing away from you when he
19 hit you, wasn't he?
20   A. No, sir.
21   Q. Oh, well --
22       MR. DURHAM: May I approach?
23       THE COURT: Sure.
24   Q. (BY MR. DURHAM) That's what you wrote. You said,
25 "As he backed away, he swung at me." That's what you wrote,

Page 50

1 isn't it?
2    A. Okay. Yes, as he was backing away he swung at me.
3    Q. Well, that's what I just asked you.
4    A. Yes, sir.
5    Q. And you said no. Which is true, what you wrote or
6 what you just said?
7    A. It's what I wrote.
8    Q. Oh, okay. So what you just said under oath was
9 not --
10   A. Sir, this was seven years ago.
11   Q. Pardon?
12   A. This was seven years ago.
13   Q. But, sir, you said you read your statement before
14 you came in here, didn't you?
15   A. Yes.
16   Q. Okay. And it was seven years ago?
17   A. Yes.
18   Q. And was -- you wrote this up as a violation where
19 y'all could -- where he would disciplined, right?
20   A. Yes, sir.
21   Q. And then he returned to his cell after he swung?
22   A. Yes.
23   Q. Did you require medical treatment?
24   A. I did -- I did go to the local hospital for an exam,
25 but no --

| Page 51 | Page 53 |
|---|---|

**Page 51**

1  Q. I take it your answer is no, then?

2        MR. YONTZ: Objection, Your Honor. He can give

3  his answer.

4        MR. DURHAM: He said he went for an exam. The

5  question was: Did you require medical treatment? So his

6  answer was nonresponsive.

7  A. You didn't let me finish.

8        THE COURT: Sustained.

9        MR. DURHAM: Thank you, Your Honor.

10        I have no further questions of this officer.

11        REDIRECT EXAMINATION

12  BY MR. YONTZ:

13  Q. Why did you go to the hospital?

14  A. To get my jaw examined.

15  Q. Had you had any -- I think we got hung up on the

16  word confrontation -- any prior confrontations with

17  Mr. Runnels?

18  A. No, sir.

19  Q. You indicated you confiscated his fishing line?

20  A. Yes, sir.

21  Q. Was there a confrontation at that time?

22  A. I did not consider it a confrontation, no, sir.

23  Q. Did he question you or bring up the fact that you

24  had previously confiscated his fishing line at this time?

25  A. Yes, he did.

**Page 53**

1  from the Rule. I assume that he'll be available.

2        THE COURT: I think he wants to go back home,

3  right?

4        THE WITNESS: I would like to.

5        MR. DURHAM: Where is his home?

6        THE WITNESS: Abilene.

7        THE COURT: Wherever Robertson Unit is.

8        MR. DURHAM: I didn't know where Robertson was.

9  If he wants to go back to Abilene, okay.

10        THE COURT: Thank you very much, sir. You're

11  free to go.

12        MR. MADIGAN: Nothing wrong with Abilene.

13        MR. DURHAM: Didn't say there was.

14        THE COURT: Call your next witness.

15        MR. YONTZ: Brown.

16        THE COURT: Would you raise your right hand,

17  please, ma'am?

18        (Witness sworn)

19        THE COURT: Okay. If you would take a seat up

20  here on the witness stand, please. Once you're comfortable,

21  kind of pull the microphone to you and state your full name,

22  please.

23        THE WITNESS: Tonia LaShaon Brown.

24

25

**Page 52**

1  Q. So this all occurred at once, not on separate

2  incidences?

3  A. No, all at once, sir.

4  Q. What is a fishing line?

5  A. A fishing line in the penitentiary is a long string

6  with some type of manmade weight on it. It could be as little

7  as a toothpaste tube filled with wet toilet paper for a

8  weight. They sling it down the run, which is the walkway in

9  front of their cell, another inmate has another fishing line,

10  he catches it with that line, pulls it into his cell, and

11  whatever that inmate wants, he connects to that line and that

12  offender pulls it into his cell.

13  Q. Primitive way of communicating and passing things

14  back and forth?

15  A. Yes, sir.

16        MR. DURHAM: That was a pretty leading

17  question.

18        THE COURT: Sustained.

19        MR. YONTZ: No further questions.

20        MR. DURHAM: Nothing.

21        THE COURT: Okay, you may step down, sir.

22        THE WITNESS: Thanks.

23        MR. YONTZ: May this witness be excused?

24        THE COURT: Any objection?

25        MR. DURHAM: Excused from attendance, but not

**Page 54**

1        TONIA BROWN,

2  having been first duly sworn, testified as follows:

3        DIRECT EXAMINATION

4  BY MR. YONTZ:

5  Q. Ms. Brown, how are you employed?

6  A. Lieutenant at the correctional office of --

7  Lieutenant of Corrections -- excuse me, at Coffield.

8  Q. And how long have you been with the Department of

9  Corrections?

10  A. Since May 18th, 1990, about 15 years.

11  Q. Calling your attention back to November 18th, 2003,

12  were you on duty at that time?

13  A. Yes, I was.

14  Q. And where were you on duty at?

15  A. The Coffield facility in Administrative Segregation.

16  Q. Where is that?

17  A. Administrative Segregation is where we house

18  offenders who have been placed there either because of

19  disciplinary or because of their affiliation with some type of

20  security threat group.

21  Q. At that time, was Travis Runnels one of your persons

22  in Administrative Segregation?

23  A. Yes, he was.

24  Q. Did you have contact with him on this particular

25  date?

THE STATE OF TEXAS
Case 2:13-cv-00893-BR Document 84-3 Filed 01/17/13 Page 19 of 43 PageID 2768
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 55

1 A. Yes, I did.

2 Q. What was the nature of the contact?

3 A. This offender was housed in separate seg, what we
4 call separate seg, where we house 12 of our most dangerous
5 offenders. And he was in one of those cells. I had to bring
6 paperwork to him. And in doing so, he threw a light bulb at
7 me.

8 Q. In regard to that, was there anything that
9 precipitated the light bulb incident? Could you describe how
10 that occurred?

11 A. None whatsoever. In this area where he was assigned
12 at the time --

13 MR. DURHAM: Objection, nonresponsive after
14 "none whatsoever."

15 THE COURT: Sustained.

16 MR. YONTZ: And then the question was: Can you
17 describe what occurred?

18 MR. DURHAM: There was not a question between
19 her "none whatsoever" --

20 . MR. YONTZ: It's a two-part question. Was
21 there a --

22 MR. DURHAM: Your Honor, I object to the
23 question as being two questions in one.

24 THE COURT: Okay. She's answered the first
25 part, ask the second part.

Page 56

1 Q. (BY MR. YONTZ) Can you describe what happened?

2 A. In this area, I took some paperwork. It was my job
3 as a supervisor to take things to the offenders if necessary
4 because you can't open the cells unless there's a supervisor
5 present in the area where he was.

6 On this particular day, I was taking some
7 paperwork to him, and that was my only job, was to take the
8 paperwork to him. Nothing else occurred, and I was assaulted
9 with a light bulb.

10 Q. When the assault -- or when this occurred, had you
11 just opened the door, had you been there awhile, what -- how
12 long had your --

13 MR. DURHAM: Leading question, Your Honor.

14 Q. (BY MR. YONTZ) -- contact been?

15 MR. DURHAM: Suggest the answers.

16 THE COURT: Sustained.

17 Q. (BY MR. YONTZ) How long had your contact been with
18 him?

19 A. Just a few seconds.

20 Q. Did this cause you any concern in regard to having
21 something like this thrown at you?

22 A. Yes.

23 Q. What was that?

24 A. We wear safety glasses to cover our eyes, but when
25 an object is thrown at you, there are other areas of your body

Page 57

1 that's not protected. And so the light bulb and what consists
2 within the light bulb was still a danger to me.

3 MR. YONTZ: No further questions, Your Honor.

4 CROSS-EXAMINATION

5 BY MR. DURHAM:

6 Q. Administrative Segregation. Describe -- can you
7 describe Administrative Segregation? How big an area is the
8 cell?

9 A. The cell itself?

10 Q. Yes, ma'am.

11 A. Six by nine.

12 Q. Fifty-four square feet, would that be correct?

13 A. Six by nine, whatever that comes to, six by nine.

14 Q. Six times nine is 54, would you agree with me on
15 that?

16 A. I can agree with you to that.

17 Q. Okay. So he had 64 (sic) square feet, and how long
18 had he been in that cell?

19 A. That particular cell, I cannot specifically tell
20 you.

21 Q. An hour, a day, a week, a month?

22 A. He is housed there. That is his housing assignment.

23 Q. So that's where he kind of lives, in that 54 square
24 foot?

25 A. Yes.

Page 58

1 Q. And he had been living in that 54 square foot since
2 he was sent to Coffield from Clements; is that correct?

3 A. That would probably not be correct. In that area
4 where he was assigned, offenders were moved on a weekly basis
5 in the event that they would not be able to facilitate an
6 escape by doing something to manipulate the cell. So
7 specifically how long he was in this particular cell, I cannot
8 tell you.

9 Q. Okay. Let's talk about Administrative Segregation.
10 How long -- or all the cells 54 square foot?

11 A. Best of my knowledge on this facility.

12 Q. Okay. So if he was moved from Cell A to Cell B, the
13 difference would be Cell A is Cell A and Cell B is Cell B, but
14 that would be the only difference, the primary difference; is
15 that correct?

16 A. This is correct.

17 Q. Okay. I'm not trying to argue with you.

18 A. Oh, no, sir, no, sir.

19 Q. I'm -- I have not spent any time in your facility.

20 A. I understand.

21 Q. Okay. And I haven't been there to look at it, and
22 these jurors haven't seen it --

23 MR. YONTZ: Objection, Your Honor. Is this a
24 question?

25 THE COURT: Go ahead.

Page 59

1  Q. (BY MR. DURHAM) So that's the reason I'm trying to
2  describe what -- what it's like.
3  A. Okay.
4  Q. Do you understand that?
5  A. Yes.
6  Q. Okay. Thank you.
7      All right. Now, in that regard, how is that 54
8  square -- just -- may I -- can you kind of just -- I know you
9  can't do it to a T, but can you kind of indicate on the floor,
10  you know, starting here to here, from here to here, what the
11  size of the cell is? That's about 54 square foot, isn't it?
12  A. Good guesstimation maybe.
13  Q. Is that about the size of the cell?
14  A. That's possible.
15  Q. Well --
16  A. I mean, it's nine foot long --
17  Q. -- I haven't been there.
18  A. I understand. It's nine foot long, six feet wide.
19  Q. Okay.
20  A. The bunk where he is assigned is cemented to the
21  floor, so there's an area that's there, so it's not a moveable
22  bunk. The toilet is attached to the back of the wall, and
23  that's the only walking room, is from the space where the bed
24  ends to the other side of the wall.
25  Q. Which is about how much, three foot, two foot?

Page 60

1  A. The bed itself is approximately the size of a twin
2  bed, so whatever the distance would be from a twin bed to the
3  wall from the --
4  Q. Two or three foot?
5  A. Possible.
6  Q. Okay. All right. Now, I'm not talking about that
7  particular cell, I'm talking about Administrative Segregation
8  in the Coffield Unit. Do you know when he arrived at
9  Coffield?
10  A. He was transferred after the murder occurred.
11  Q. Okay.
12  A. What date that actually was, I wouldn't be able to
13  tell you.
14  Q. Would that have been the next day, a couple of days
15  later, pretty soon?
16  A. I really don't have privy to that information. I do
17  know he was immediately removed from his facility and this is
18  the facility that he ended up on after that incident. If
19  there were two other units in between his transfer, one, or
20  none at all, I wouldn't be able to tell you.
21  Q. And when he was at Coffield, he was in
22  Administrative Segregation?
23  A. Yes.
24  Q. Which would have been February, probably the month
25  of February, yes or no?

Page 61

1  A. Once again, I wouldn't be able to tell you.
2  Q. March?
3      MR. YONTZ: Objection, Your Honor, asked and
4  answered.
5      THE COURT: You're not going to be able to
6  identify any month, is that --
7      THE WITNESS: Yes, sir, this is correct. I
8  don't work in the division that deals with the classification
9  as to where the offender is assigned and when he's
10  transferred.
11  Q. (BY MR. DURHAM) Well, in all your contact with him,
12  he was in Administrative Segregation?
13  A. Yes, during the time that I was assigned to that
14  area, he was also there.
15  Q. Now, I'm not sure, but is -- when you feed the
16  prisoners in Administrative Segregation, there's a little door
17  that opens and a tray is set there; is that correct?
18  A. Yes, sir. It's called a food slot.
19  Q. Okay. Will papers not fit through the food slot?
20  A. In the area where he was assigned, you would have to
21  open the door in order to get them in. They would not slide
22  through.
23  Q. They wouldn't fit in the food slot, is what you're
24  saying?
25  A. Not for the area where he was.

Page 62

1  Q. Oh. Well, what was different about that area?
2  A. We have a -- what you would maybe consider to be a
3  general area of Administrative Segregation and then we have a
4  more confined area. At the time he was on our facility, he
5  was in the most confined area.
6  Q. All right. What's the difference in the general
7  Administrative Segregation area and the confined area?
8  A. Within the confined area, we house what we consider
9  to be 12 of the most dangerous offenders, and they're there
10  for either attempting to escape, harming of the staff members,
11  harming themselves, harming other offenders, potential escape
12  risk, and so they're placed there so that we have a constant
13  view on them.
14  Q. Is it the same size?
15  A. Yes.
16  Q. But they're under constant observation?
17  A. Yes.
18  Q. And the lights are on 24 hours a day?
19  A. Yes, unless the offender turns them off. Within the
20  cell, if that's what you're asking.
21  Q. Well, I mean, does he have the control to turn it
22  off?
23  A. Yes.
24  Q. Can you override that control?
25  A. No.

THE STATE OF TEXAS
Case 4:13-cv-00045-BR   Document 84-3   Filed 01/17/13   Page 21 of 43   PageID 1277
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 63

1  Q. Okay. And you don't know how long he had been in
2 there?
3  A. No, sir.
4  Q. And it was that small confined space. Is it unusual
5 for prisoners in that segregation unit to be hostile?
6  A. Is it unusual?
7  Q. Yes, ma'am.
8  A. Not in this particular area.
9  Q. Now, this light bulb, what wattage was it?
10  A. I would not know.
11  Q. Was it recovered?
12  A. It was shattered. I mean, when he threw it, it
13 shattered, so --
14  Q. What did it hit?
15  A. It went through the cell and hitting me.
16  Q. And shattered when it hit you?
17  A. Going through the outer doorway, yes.
18  Q. Now -- boy, you've lost me there.
19  A. I'm sorry. The outside door on the cell is made of
20 a mesh wire, somewhat similar -- similar to that of chicken
21 wire, I guess you could say --
22  Q. So it --
23  A. -- but stronger in nature.
24  Q. It hit the -- the mesh wire first?
25  A. Yes.

Page 64

1  Q. So it really didn't hit you? He threw the light
2 bulb, it hit the mesh wire, and you were behind the mesh wire?
3  A. It did strike me.
4  Q. Did it cut you?
5  A. No, it did not.
6  Q. Okay. Where did the light bulb come from?
7  A. From inside the cell. He's issued a light bulb in
8 order to generate light to his cell.
9  Q. Okay. So it's a lamp?
10  A. No, sir, it's an actual plate that has the light
11 bulb in it.
12  Q. Okay. So he only had the one bulb, and when he took
13 it out, he had no light?
14  A. That's correct.
15  Q. Was he disciplined for that?
16  A. I believe so.
17  Q. And that was after the murder that he pled guilty to
18 yesterday, right?
19  A. Yes.
20     MR. DURHAM: I have no further questions.
21     REDIRECT EXAMINATION
22 BY MR. YONTZ:
23  Q. As I take it, then, even in Administrative
24 Segregation, they have contact with corrections officers?
25  A. Yes.

Page 65

1     MR. YONTZ: No further questions.
2     RECROSS-EXAMINATION
3 BY MR. DURHAM:
4  Q. Describe that contact. How much time are they
5 allowed out of the cell?
6  A. One hour per day in the event that he's doing
7 everything he needs to do in order to receive that one hour.
8  Q. So he gets one hour a day if he's a good boy?
9  A. More or less.
10  Q. Okay. And when he leaves that cell, is there a
11 procedure you follow for handcuffing him?
12  A. Yes.
13  Q. All right. And will you describe that procedure to
14 the jury, please?
15  A. Of course. Would you like for me to describe that
16 of Administrative Segregation or the area where this
17 particular person was confined?
18  Q. Let's do it both ways.
19  A. Okay. In the general area --
20  Q. Do you want to demonstrate it? Would a
21 demonstration --
22  A. Either/or, sir, it's your preference.
23  Q. Well, let's just kind of show them what you do.
24 I've seen a film on this. You tell me if it's right. Like,
25 okay, here's my cell, okay?

Page 66

1  A. Uh-huh.
2  Q. You're the officer and you come and you tell me
3 you're going to take me out for my hour, right?
4  A. Yes.
5  Q. And during this hour a day, what do I get to do?
6  A. You may either go to the dayroom area or to an
7 outside recreation area.
8  Q. Is that alone or do I get to be with --
9  A. By themselves.
10  Q. By myself?
11  A. Yes.
12  Q. I can go outside to the recreation area, right?
13  A. Yes.
14  Q. Okay. And what if I want to shower, do I do that
15 within the hour?
16  A. No, sir, that's a separate time.
17  Q. At a separate time?
18  A. Yes.
19  Q. Okay. Here's my cell, this is my 54 square foot,
20 okay?
21  A. Okay.
22  Q. And you come to the door and say, "I'm -- it's your
23 hour," okay?
24  A. It's your hour.
25  Q. All right. Come to the door.

Page 67

1    A. The first procedure that's going to occur is we're
2  going to ask you to remove all of your clothing.
3    Q. I'm not going to do that. I'm sorry.
4        MR. YONTZ: He requested a demonstration, we
5  would request it be accurate.
6        MR. DURHAM: If that's what it takes.
7        Do you want me?
8        MR. YONTZ: No.
9        THE COURT: Perhaps Mr. Yontz wants to
10 demonstrate.
11       MR. DURHAM: All right. We'll let Mr. -- if
12 Mr. Yontz --
13       MR. YONTZ: We'll stipulate, Your Honor.
14       MR. DURHAM: I thought we could come to an
15 agreement.
16   Q. (BY MR. DURHAM) Okay. Pretend, without getting
17 sick, that I have removed my clothes.
18   A. Yes. Once you have removed your clothing, then
19 we're going to conduct the remainder of the strip search,
20 which we would go through. At that completion, you would
21 place your clothes back on.
22   Q. Okay. I'm in my cell?
23   A. Yes, sir.
24   Q. You come in the cell?
25   A. No, sir.

Page 68

1    Q. Okay. You're watching me?
2    A. Yes, sir.
3    Q. I mean, as a part of your duties?
4    A. Yes, sir.
5    Q. Okay. And -- all right, I'm stripped, you've
6  searched me.
7    A. I've searched you.
8    Q. Okay.
9    A. Now we will place -- you will place your hands
10 through the outer food slot.
11   Q. Food slot right here?
12   A. Back into that, yes, sir.
13   Q. Like that, okay.
14   A. The employee will then place the restraints on you,
15 double lock the handcuffs.
16   Q. Okay.
17   A. And then close the food slot.
18   Q. Uh-huh.
19   A. Open the outer door, and you would be removed by
20 walking backwards out of the cell.
21   Q. Walk backwards out of the cell?
22   A. Yes, sir.
23   Q. Okay. Now, that's for regular --
24   A. Anytime you're removed from the cell, that should be
25 the procedure.

Page 69

1    Q. Yeah. For regular Administrative Segregation. What
2  about the --
3    A. Those same procedures occur. The only difference is
4  in the area where this particular person was assigned, a
5  supervisor would have to be present.
6    Q. Two people would be there?
7    A. A supervisor would have to be present.
8    Q. Okay, so more than two people could be there?
9    A. Yes.
10   Q. All right. And I go out to the -- to the play area
11 and I play basketball or whatever it is --
12   A. Yes, sir.
13   Q. -- by myself, right?
14   A. Yes, sir.
15   Q. And then I get ready to come in, am I searched
16 again?
17   A. Yes, you are.
18   Q. I stand in a wire cage?
19   A. The same procedure where you are would be
20 followed --
21   Q. Take my clothes off?
22   A. -- as you go -- yes, sir.
23   Q. Bend over, arms --
24   A. Yes, sir.
25   Q. The whole nine yards, right?

Page 70

1    A. Yes, sir.
2    Q. And then I'm shackled again?
3    A. Once again.
4    Q. And go back?
5    A. Yes.
6    Q. That's one hour a day?
7    A. Yes.
8    Q. All right. And if -- if I violate some of the
9  rules, I don't get that hour?
10   A. Your punishment -- part of punishment that could be
11 imposed could be that you would not receive that one hour.
12   Q. So some people could be in that 54 square foot every
13 day for a very, very long period of time without going out at
14 all; is that correct?
15   A. There are still rules that ensure that we make sure
16 that you are out of your cell because we have to view you to
17 make sure that you're okay. But as far as you being able to
18 participate in those activities, yes, there are some that do
19 not get those activities.
20   Q. Okay.
21       MR. DURHAM: Just a moment, Judge.
22       (Pause)
23   Q. (BY MR. DURHAM) Now, there are different levels of
24 security even in Ad Seg. When we say "Ag Seg," what --
25 agri --

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 3:13-cv-00843-BR   Document 84-5   Filed 01/17/13   Page 23 of 43   PageID 2772

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 71

1    A. Administrative Segregation.

2    Q. Ad Seg?

3    A. Yes.

4    Q. A-d?

5    A. Yes.

6    Q. Ad Seg, okay. I was thinking Ag. Okay, Ad Seg.

7 All right. You have two levels in Administrative Segregation,

8 correct?

9    A. Actually, there are three.

10    Q. Three?

11    A. One, two, and three.

12    Q. One, two, and three. All right. Is one the highest

13 or the lowest?

14    A. One is the highest.

15    Q. Okay.

16    A. Three being the lowest.

17    Q. Okay. And describe the difference in the three

18 levels.

19    A. The three levels are determined based upon the

20 offender's disciplinary history. Level One means that he

21 doesn't have any disciplinary within the minimum of 120 days.

22 I'm kind of rusty on my thing. I haven't been in seg for a

23 while.

24        Two and three means there is some disciplinary

25 that has been imposed within the last 30, 90, to 120 days,

Page 72

1 which limits the amount of activities and property the

2 offender could have in his cell at the time.

3    Q. And three means he's limited in his time and

4 property. When you speak of property, does that include

5 radios, televisions, that type of thing?

6    A. We don't have televisions, sir, in segregation.

7    Q. Well, I had always heard they had color TV in

8 prison; is that not true?

9    A. Not in Texas, not at Coffield.

10    Q. Do they have radios?

11    A. Yes, they do.

12    Q. In all three levels?

13    A. What you can have in segregation is based upon your

14 level. If your level is high enough that you could purchase

15 the radio, then it would be part of your property that you

16 could have on you at that time.

17        As part of the disciplinary phase, if you are

18 disciplined for an aggressive act, then you can be limited in

19 the property you can have in your cell with you at that time.

20        If you do not get your disciplinary to a

21 positive point, then you could actually lose your property

22 altogether.

23    Q. Lose it all -- you mean you would take my radio

24 forever?

25    A. If your disciplinary did not improve within a

Page 73

1 certain time span.

2    Q. Okay. So I -- if I don't get proper within that

3 time span, the radio is gone. I --

4    A. If you don't --

5    Q. -- never can --

6    A. -- progress.

7    Q. -- have a radio?

8    A. You wouldn't be able to have that radio again. You

9 would have to progress to a point that you could purchase

10 another radio.

11    Q. Okay. What happens to that radio?

12    A. It is destroyed or you have the ability to send it

13 home.

14    Q. Okay. So in Ad Seg, you control the prisoner with

15 several things. First, they're limited in space, correct?

16    A. Yes, sir.

17    Q. And they are limited in movement, correct?

18    A. Yes.

19    Q. And if that doesn't bring them under, you limit

20 their time out of the cell, correct?

21    A. Through disciplinary, yes.

22    Q. Uh-huh. And you limit the property they can have

23 and when it's returned?

24    A. This is all true.

25    Q. Okay. And I've heard -- correct me if I'm wrong.

Page 74

1 Sometimes do they segregate people in Ad Seg because of gang

2 associations?

3    A. Yes.

4    Q. And for that reason and that reason alone?

5    A. Yes.

6    Q. Okay. It's not a pretty thing, is it?

7    A. No, sir.

8    Q. Okay. Now -- okay, we've got Ad Seg, then we have

9 other levels of incarceration within your unit. That's the

10 only one I -- is that the only unit you're familiar with?

11    A. I've worked on one other facility.

12    Q. Where was that?

13    A. The Michael -- the McConnell facility in Beeville,

14 Texas.

15    Q. Beeville. And Coffield is where?

16    A. In Tennessee Colony, Texas.

17    Q. Which is down by Palestine?

18    A. Yes, it is.

19    Q. Or is it Palestine?

20    A. Palestine if you live there, Palestine if you're

21 not.

22    Q. Okay. Well -- all right. Some of these -- well,

23 within the Coffield Unit, what other level? We have the three

24 Administrative Segregation levels. What else -- what other

25 levels do we have?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00063-BR   Document 84-3   Filed 01/17/13   Page 24 of 43   PageID 2771

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 75

1  A. We house general population. We have G-2s and G-1
2  offenders and G-3s as well.
3  Q. All right.
4  A. And G-4s.
5  Q. All right. That means nothing to me.
6  A. Okay.
7  Q. Okay? Explain it to me, please.
8  A. We have --
9  Q. What's a G-1?
10  A. A G-1 is an outside trusty.
11  Q. That's somebody that can leave the facility?
12  A. He does not leave the facility, he is still
13  confined. It's that his restriction -- his contact with the
14  staff members is once every -- a minimum of once every two
15  hours. He's given a specific job. He can be outside working
16  on a tractor, he could be working in some other capacity,
17  but --
18  Q. File clerk?
19  A. -- it's the less restrictive category we have in our
20  facility.
21  Q. Okay. So -- okay. That's G-1?
22  A. Yes, sir.
23  Q. Then let's go on to G-2.
24  A. G-2 is what we know to be general population
25  offenders. These offenders have jobs. They're still confined

Page 76

1  inside the inner gates, but they're assigned to facilities to
2  work in food service, they may work in the laundry department,
3  the field force service. There are general population jobs
4  assigned to that custody level, G-2s and G-3 offenders.
5  Q. What's the difference in a 2 and 3?
6  A. The difference between a 2 and 3 is that a G-3
7  offender is an offender who is serving 50 years or more worth
8  of time, and he does not have the minimum of five to ten years
9  of time done on that.
10  Q. Okay. And G-4?
11  A. G-4 is what we consider to be a medium custody
12  offender. He is there because of his disciplinary or because
13  of an SPD, a security precaution designator.
14  Q. And what are the limitations placed on them?
15  A. They're out of their cells less, and the type of
16  jobs that they can have are more restrictive.
17  Q. Okay. So if you're not a G-4 and you're not an Ad
18  Seg, you have some freedom -- much more freedom of movement;
19  is that right?
20  A. Yes.
21  Q. And that classification is done how and when, if you
22  know?
23  A. The classification of the offenders?
24  Q. Yes, ma'am.
25  A. At the time that he comes in, he is immediately

Page 77

1  classified, and every year from his birth day is the date that
2  we use in our facility to reclassify the offender or to look
3  at him again, or in the event that he has not progressed six
4  months after a disciplinary hearing, he may be reviewed.
5  Q. Okay. Well, Lieutenant Brown, I want to thank you
6  for educating me about your unit and about Ad Seg, and I
7  appreciate you coming here from Palestine.
8  A. Thank you.
9  MR. DURHAM: Pass the witness.
10  REDIRECT EXAMINATION
11  BY MR. YONTZ:
12  Q. Good things are rewarded and bad things result in
13  things being taken away; is that correct?
14  A. Yes.
15  Q. You demonstrated getting a person out for rec time
16  or for -- in the dayroom or whatever, and you used a variety
17  of security procedures; is that correct?
18  A. That's correct.
19  Q. But they also get out to shower?
20  A. Yes.
21  Q. And if a medical situation arises, you have to open
22  the door and get in there without them being handcuffed; is
23  that correct?
24  A. If it's a situation to where the offender is harmed
25  to where we need to get in, yes.

Page 78

1  Q. So they may have contact with you without being
2  shackled?
3  A. It is possible.
4  Q. And when they -- you take security precautions, do
5  those security precautions eliminate all the dangers?
6  A. No, they don't.
7  Q. In fact, those people can still kick?
8  A. Yes.
9  Q. And kicks can be severe -- cause severe injuries?
10  MR. DURHAM: Can counsel ask a question that's
11  not leading. Objection, leading.
12  THE COURT: Sustained.
13  Q. (BY MR. YONTZ) Can kicks cause severe injuries?
14  A. Yes, they can.
15  MR. YONTZ: Nothing further, Your Honor.
16  RECROSS-EXAMINATION
17  BY MR. DURHAM:
18  Q. Well, you say it's possible to have injuries with
19  all the precautions, right?
20  A. Yes.
21  Q. Just like, if you're wearing your seat belt and you
22  have good tires and your car is inspected and you're driving
23  the speed limit, it's possible that you'll be injured in an
24  auto accident, isn't it?
25  A. That's possible.

Page 79

1    Q. Because you can't predict what some other person is
2 going to do?
3    A. No.
4    Q. Correct?
5        Would you agree that predicting what a person
6 is going to do is highly improbable?
7    A. In what situation?
8    Q. Any situation, driving, marriage, it's hard to
9 predict what people are going to do, isn't it?
10   A. Sometimes.
11   Q. Well, do you have some particular -- strike that.
12       Basically, you impress me as having been
13 educated in this area. Do you have a degree?
14   A. Yes, I do.
15   Q. All right. And that's a master's or what?
16   A. No, sir, I have an associate's.
17   Q. From?
18   A. Trinity Valley Community College.
19   Q. Okay. Where is that?
20   A. Palestine, Texas.
21   Q. Oh, it's in Palestine?
22   A. Yes.
23   Q. All right. You had other training at the
24 department, too?
25   A. Yes, I have.

Page 80

1    Q. Yeah. And they teach you to look out for things?
2    A. Yes.
3    Q. They teach you about how to do the handcuffs and how
4 to do the strip search and that type thing; am I correct?
5    A. Yes, you are correct.
6    Q. All right. What about the civilian employees, do
7 they give them the same training?
8    A. The what type of employees?
9    Q. Civilian.
10   A. Civilian employees?
11   Q. Do y'all have civilian employees?
12   A. We do have an inservice type training that gives you
13 basic awareness to potential danger working in this type of
14 environment, but the intense training that the correctional
15 officers receive, these employees do not receive.
16   Q. Okay. When you say "intense training," could you
17 describe the training that y'all are given to prevent the very
18 thing that Mr. Yontz asked about?
19   A. There's six weeks worth of training when you come to
20 our facility before employment. And depending upon what your
21 title is determines whether or not you are required to go
22 through this program. It's called pre-service training.
23       During your pre-service training, you are
24 taught the rules and regulations of our facility -- of our
25 agency, rather, as well as how to apply hand restraints,

Page 81

1 transportation of offenders, proxemics, defense tactics, as
2 well as other things within -- but that's somewhat basic to
3 your six weeks worth of training.
4    Q. Do they teach you any unarmed combat or anything
5 like that? I mean, I really don't know what they teach you.
6    A. It's basic defensive tactics, is the best I could
7 describe it for you.
8    Q. Could you demonstrate some of that on Ms. Hamilton?
9        Well, I'm trying to be equal opportunity.
10   A. What you're asking is -- it's not to the level that
11 they would receive a black belt in karate or anything of that
12 nature. It's basic maneuvers that we teach you in order to
13 attempt to defend yourself in the event that you are in harms
14 way, not as an offensive, but as a defensive, so that if -- we
15 teach proxemics and distance and how far you should be from
16 someone to lessen the danger, defensive stances, things that
17 are not aggressive to another individual in speaking with them
18 or dealing with them on a day-to-day basis.
19   Q. I've probably been watching too much of the Arts &
20 Entertainment channel, but they've had a deal on
21 penitentiaries and where they have an obstreperous inmate, one
22 who's sitting in the back of the cell just making a real
23 nuisance of himself, they'll rush in there with like nine or
24 ten ninjas, or they look like ninjas, you know, and take him
25 out and that type of thing. Do y'all have that kind of unit,

Page 82

1 response unit?
2    A. It's not specifically a unit that's assigned to the
3 facility. It's called a force cell move team, as you are
4 hinting toward. It's a five-person team that is utilized to
5 extract someone from an area in the event that their actions
6 would require that. But you don't just go in and just do
7 that. I mean, something would have to occur --
8    Q. Well, I --
9    A. -- to --
10   Q. -- I know.
11   A. But it's a minimum -- a minimum of five should be
12 sufficient in most cases to remove someone from an area.
13   Q. And they have -- they have more specialized training
14 than the average officer, or do they?
15   A. No, sir, not necessarily. Any employee could be
16 utilized that's a security staff member, but the supervisor is
17 going to make a decision based upon that employee's skill
18 level as to whether they would be used in that position.
19   Q. Do they have different equipment than the ordinary
20 officer who is just taking somebody out of the cell?
21   A. There is protective wear that those individuals
22 wear.
23   Q. What does that consist of?
24   A. It's a helmet, it's a jacket, more or less, I guess
25 you would consider it, and a -- the first person that goes in

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

## Page 83

1 the cell is going to use a shield to try and move that person
2 away so that the least amount of harm comes to the staff or
3 the offender, to pin them.
4  Q. Do they have batons or anything?
5  A. Not in this -- in this area when they go in.
6  Q. Okay.
7      MR. DURHAM: I have no further questions.
8      THE COURT: Anything else?
9      MR. YONTZ: Nothing further, Your Honor.
10     THE COURT: Okay, you can step down.
11     MR. YONTZ: May she be excused?
12     MR. DURHAM: Certainly, if she wants to go back
13 to Palestine.
14     THE COURT: Okay, you're excused.
15     MR. DURHAM: Thank you for coming up.
16     THE COURT: All right. Let's take a 15-minute
17 recess, please.
18     (Recess)
19     THE COURT: Call your next witness.
20     MR. YONTZ: Your Honor, the next witness the
21 State would call would be Officer McKinney.
22     THE COURT: Come right up, please. Raise your
23 right hand, please.
24     (Witness sworn)
25     THE COURT: All right. Take a seat up here on

## Page 84

1 the witness stand. When you make yourself comfortable, pull
2 that microphone, not up to your mouth, but in a direct line
3 with it just where you can sort of speak into it, and state
4 your full name, please.
5      THE WITNESS: Catherine Nicole McKinney.
6      CATHERINE NICOLE McKINNEY,
7 having been first duly sworn, testified as follows:
8           DIRECT EXAMINATION
9 BY MR. YONTZ:
10  Q. How are you employed?
11  A. Sir?
12  Q. I'm sorry?
13  A. I didn't understand you.
14  Q. How are you employed?
15  A. I am employed as a correctional officer at the Texas
16 Department of Criminal Justice.
17  Q. In what facility?
18  A. Coffield Unit.
19  Q. Calling your attention back to May 3rd of 2003, were
20 you also a corrections officer?
21  A. Yes.
22  Q. And were you also at the Coffield Unit?
23  A. Yes.
24  Q. On that date, did you have contact with an
25 individual identified as Travis Runnels?

## Page 85

1  A. Yes, sir.
2  Q. Is he in the courtroom today?
3  A. Yes, sir.
4  Q. Would you point him out and describe what he's
5 wearing, please?
6  A. A green shirt.
7  Q. And a tie?
8  A. Yes, brown tie.
9  Q. What were your duties at the Coffield Unit?
10  A. I was -- I escort offenders to and from the showers
11 and recreation and just make sure they're where they're
12 supposed to be when they're supposed to be there.
13  Q. How did you have contact with the defendant?
14  A. He threw urine in my face.
15  Q. Can you explain how that occurred?
16  A. What had happened, earlier that day, I had written
17 an offense report on him for a masturbation case, and when I
18 was escorting another offender to the cell, I had secured the
19 other offender, and when I was bending down to slide the bolt
20 closed on the bottom of the cell front, he threw urine in my
21 face.
22  Q. Was he the person that you were securing in the
23 cell?
24  A. No, it was another offender.
25  Q. Did you have any contact -- had you had contact with

## Page 86

1 him prior to this?
2  A. No, not that I recall.
3  Q. Was there anything that you observed that would have
4 precipitated this?
5  A. Other than the offense report I had written earlier
6 that day, no.
7      MR. YONTZ: No further questions.
8           CROSS-EXAMINATION
9 BY MR. DURHAM:
10  Q. You wrote an offense report earlier in the day?
11  A. Yes, sir.
12  Q. For him exposing himself?
13  A. Yes, sir.
14  Q. Is that unusual for prisoners to expose themselves
15 to you?
16  A. No.
17  Q. Pardon?
18  A. No, sir.
19  Q. That's fairly common?
20  A. Yes, sir.
21  Q. And he was in Ad Seg?
22  A. Yes, sir.
23  Q. Okay. He was in Ad Seg, and that's a solid door,
24 isn't it?
25  A. No, sir, it is not. It has an expanded metal mesh

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:13-cv-00070-BR   Document 84-3   Filed 01/17/13   Page 27 of 43   PageID 2762

TRIAL ON THE MERITS
OCTOBER 27, 2005

## Page 87

1 across the front of the cell front.

2 Q. It's not a solid door?

3 A. No.

4 Q. None of Ad Seg is solid doors?

5 A. No, sir. They have some type of mesh or like a

6 metal front that has some kind of holes in it where we're able

7 to see inside.

8 Q. Okay. And you were at a cell next to it?

9 A. Yes.

10 Q. How far?

11 A. Probably not even a foot away, maybe six inches.

12 Q. And was he aware you had written him up earlier in

13 the day?

14 A. Yes.

15 Q. And how was he made aware of that?

16 A. Another officer had gone and investigated the

17 offense report.

18 Q. Did you tell him you were going to write him up?

19 A. Yes, sir.

20 Q. Oh, so you had told him you were going to write him

21 up?

22 A. Yes.

23 Q. And he was still in the 54 square foot cell at the

24 time, right?

25 A. Yes, sir.

## Page 88

1 Q. And he had been there how long?

2 A. As far as I know, all day.

3 Q. Well, before that, had he been in Ad Seg?

4 A. Yes.

5 Q. And how long had he been in Ad Seg?

6 A. I can't really recall how long he had been there.

7 Q. Had you ever known him not to be in Ad Seg?

8 A. No, sir.

9 Q. Were you aware he came there sometime in early

10 February?

11 A. Yes, sir.

12 Q. So he had been there in February, March, April, and

13 May?

14 A. Uh-huh. Yes, sir.

15 Q. And he got out no more than one hour a day if

16 everything was right?

17 A. That's right.

18 Q. Did he get out every day for one hour --

19 A. Unless he had refused.

20 Q. -- or were there -- pardon?

21 A. Unless he had refused to come out of his cell.

22 Q. Well, what -- when you wrote him up, what would the

23 penalty be for being written up?

24 A. Cell restriction and commissary restriction.

25 Q. Cell restriction?

## Page 89

1 A. Yes, sir. He would not -- or he would be on

2 recreation restriction. He would not be allowed to go to

3 recreation.

4 Q. That means he couldn't get out for the hour?

5 A. Correct.

6 Q. And for how many days would that occur?

7 A. However the disciplinary captain -- how many days --

8 however many days the disciplinary captain said that he could

9 not come out.

10 Q. And that could be as many as how many?

11 A. Thirty.

12 Q. In other words, because you had written him up, he

13 could have to remain in his cell 30 days without recreation?

14 A. Yes.

15 Q. So he was angry?

16 A. Yes.

17     MR. YONTZ: Objection. Calls for speculation.

18     THE COURT: Sustained.

19 Q. (BY MR. DURHAM) Did he say anything to you that

20 would indicate he was angry?

21 A. No.

22 Q. You thought he was okay with you writing him up?

23 A. Yes, I suppose.

24     MR. YONTZ: Again, objection.

25     MR. DURHAM: What's the objection?

## Page 90

1     MR. YONTZ: Speculation.

2     THE COURT: Sustained.

3     MR. DURHAM: Well, it's speculation on what she

4 thought. It's not speculation. She --

5     THE COURT: Well, it's speculation based on

6 speculation -- answer based upon speculation. Sustained.

7     MR. DURHAM: Very well. No further questions.

8     MR. YONTZ: Nothing further, Your Honor.

9     THE COURT: Okay, you can step down, ma'am.

10 Call your next witness.

11     MR. YONTZ: Officer Threadgill.

12     THE COURT: Raise your right hand, please.

13 (Witness sworn)

14     THE COURT: If you would take a seat on the

15 witness stand, please, and once you're comfortable, make sure

16 that you're speaking into the microphone, and state your full

17 name, please, sir.

18     THE WITNESS: Robert Threadgill.

19     ROBERT THREADGILL,

20 having been first duly sworn, testified as follows:

21     DIRECT EXAMINATION

22 BY MR. YONTZ:

23 Q. How are you employed, sir?

24 A. I was employed with TDCJ at the Coffield Unit.

25 Q. Are you still employed with them?

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 91

1 A. No, sir.

2 Q. How long were you employed with the Department of

3 Corrections?

4 A. Ten months.

5 Q. Where were you employed at, what facility?

6 A. It was the seg unit of Coffield.

7 Q. Sir, in regard to that, calling your attention back

8 to June 25th, 2004, did you have occasion to come in contact

9 with an individual identified as Travis Runnels?

10 A. Yes, sir.

11 Q. Was he an inmate there?

12 A. Yes, sir.

13 Q. Is he in the courtroom?

14 A. Yes, sir.

15 Q. Would you point him out and describe what he's

16 wearing, please?

17 A. The green shirt.

18 Q. Okay. Thank you.

19 A. Tan tie.

20 Q. What were your duties at the unit?

21 A. As a correctional officer.

22 Q. What did you do?

23 A. That -- on that day?

24 Q. Yes, sir.

25 A. I was working Ad Seg, Super Seg. We were in the

Page 92

1 process of doing showers and changing out rec, recreational.

2 Q. Was Mr. -- what was the nature of the contact that

3 you had, or how did you come in contact with him?

4 A. At that point, we was changing out a shower at the

5 time, and I was walking across the cell and he had a -- like a

6 foot tub full of human feces, which he threw at that point

7 towards myself, and I had a shield in front of me that we have

8 to use to walk in front of their cells.

9 Q. Did any of it hit you?

10 A. Yes, it made contact on my boot because it hit the

11 ground and went up under the shield.

12 Q. Was he the person that you were transporting at that

13 time?

14 A. No, sir. He was in the first cell next to the

15 shower and we had to pass his cell to retrieve another inmate

16 for the shower.

17 Q. Did that cause you any concern?

18 A. Yes, sir.

19 Q. Why is that?

20 A. Just the health issues, the risk that -- you know,

21 the diseases that you can come in contact with.

22 MR. YONTZ: No further questions, Your Honor.

23 CROSS-EXAMINATION

24 BY MR. DURHAM:

25 Q. Ten months. Why did you quit?

Page 93

1 A. Why did I quit?

2 Q. Yes, sir.

3 A. A better -- a different job.

4 Q. Doing what?

5 A. I'm employed with Coffee City Police Department.

6 Q. Became a policeman instead?

7 A. Yes, sir.

8 Q. This was in May?

9 A. Sir?

10 Q. This was when, May of this year -- of last year?

11 A. Yes, sir. I was employed with Alto PD at the time.

12 Q. No, no, when this incident occurred, May of '04?

13 A. Yes, yes.

14 Q. How long had you been with the department at the

15 time it occurred?

16 A. About seven months, I would say.

17 Q. During that seven months, Mr. Runnels had been in Ad

18 Seg all of that time, hadn't he?

19 MR. YONTZ: Objection, Your Honor -- withdrawn.

20 A. I had no -- the first time I came in contact with

21 him was when I worked in Super Seg, and that was that one day

22 this incident occurred.

23 Q. (BY MR. DURHAM) That's the only time you came in

24 contact with him?

25 A. Yes, sir.

Page 94

1 Q. Never saw him before?

2 A. No, sir.

3 Q. And you don't know who did -- you don't know how

4 long he had been in there?

5 A. No, sir, I don't have a clue how long he's been in

6 the system.

7 Q. You don't know what the history was of people

8 walking by his cell saying things?

9 A. No, sir.

10 MR. DURHAM: No further questions.

11 MR. YONTZ: Nothing further, Your Honor.

12 THE COURT: Okay, you can step down,

13 Mr. Threadgill.

14 THE WITNESS: Thank you.

15 THE COURT: Do you want this witness released?

16 MR. DURHAM: No objection.

17 THE COURT: Okay, you're free to go. Thanks a

18 lot.

19 THE WITNESS: Thank you.

20 THE COURT: Call your next witness.

21 MR. YONTZ: Sergeant Crandell.

22 THE COURT: Can you give me a first name rather

23 than try to look this up?

24 MR. YONTZ: I'm sorry. Mike Crandell.

25 THE COURT: Raise your right hand, please, sir.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00410-BR  Document 84-4  Filed 01/17/13  Page 29 of 43  PageID 2777

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 95

1    (Witness sworn)
2    THE COURT: All right. Take a seat on the
3 witness stand, please.
4        MICHAEL CRANDELL,
5 having been first duly sworn, testified as follows:
6        DIRECT EXAMINATION
7 BY MR. YONTZ:
8    Q. Sir, would you state your name, please?
9    A. I'm Sergeant Michael Crandell.
10    Q. How are you employed, sir?
11    A. I am a sergeant for the Amarillo Police Department.
12    Q. In what capacity?
13    A. I'm currently assigned to the Special Crimes Unit,
14 which is the Homicide Investigation Unit compromised (sic) of
15 Potter County deputies and Amarillo police officers.
16    Q. Sir, calling your attention back to the 29th day of
17 January, 2003, were you also called to be involved in the
18 investigation of a homicide that occurred at the penitentiary
19 in the Clements Unit?
20    A. Yes, sir.
21    Q. During that time, what did you do initially?
22    A. I was assigned to assist Investigator Tim Burge, who
23 is an investigator for the prison system. I was -- my main
24 assignment was to assist him in the scene, which was the shoe
25 factory or boot factory where the offense had occurred.

Page 96

1    Q. Sir, as a part of that investigation, did you have
2 occasion to take photographs?
3    A. Yes, sir.
4    Q. I'll show you what's marked as State's Exhibit
5 No. 51, and ask if you recognize that?
6    A. Yes, sir.
7    Q. What is that?
8    A. This is a photograph that I took of ten trimming
9 knives in the tool bin of the boot factory.
10    Q. Did you collect those knives, also?
11    A. Yes, I did.
12    Q. Sir, I'll show you a bag that has an exhibit sticker
13 on it that says "State's Exhibit No. 6, 10 knives." Are you
14 familiar with the contents of that bag?
15    A. Yes, sir.
16    Q. What is in that bag?
17    A. These are the ten knives that are displayed in the
18 photograph, State's 51.
19        MR. YONTZ: Your Honor, we would move State's
20 Exhibit 6 at this time indicating the contents of the bag.
21        MR. DURHAM: The tag is what he's admitting or
22 the bag and contents?
23        MR. YONTZ: The bag and contents.
24        MR. DURHAM: Well, I need to see what the
25 contents are before I can object or not object to it.

Page 97

1    Is it stapled? Do you want to unstaple it?
2    Your Honor, inside the bag are ten -- are brown
3 bags, that I have no idea what's in the brown bags.
4    May I open a brown bag?
5        THE COURT: Well, you know, all these things I
6 guess are marked separately, and so if State's Exhibit -- what
7 is it, 6?
8        MR. YONTZ: Yes, sir.
9        THE COURT: -- is the outside sack, then dump
10 everything out, and if you want to introduce State's 6, then
11 offer it, and then go through each other sack, I guess, until
12 you get down to the last thing that is contained --
13        MR. DURHAM: I would put it over there.
14    (Pause)
15        MR. DURHAM: I take it 6 that was tendered has
16 not been admitted at this point in time; is that correct?
17        THE COURT: That's correct.
18        MR. DURHAM: Thank you.
19        THE COURT: Okay. This exhibit has been marked
20 what now?
21        MR. YONTZ: This will be 6-A.
22        THE COURT: Okay. Hand that to Mr. Crandell,
23 then.
24    Q. (BY MR. YONTZ) Marked this one as 6-A. Can you
25 identify what's in that particular bag?

Page 98

1    A. Yes, sir.
2    Q. Would you take it out for us?
3    A. (Witness complies)
4        MR. YONTZ: Your Honor, I would request defense
5 counsel come to this location to examine these.
6        THE COURT: Okay. You're offering now?
7        MR. YONTZ: 6-A.
8        THE COURT: 6-A being the sack. What have you
9 marked the -- what you removed from 6-A?
10        MR. YONTZ: Well, this particular knife, I
11 marked as 6-A.
12        THE COURT: Okay. What was the sack? No, that
13 sack was State's 6. What's the smaller sack marked?
14        MR. YONTZ: The smaller sack is not marked.
15        THE COURT: Oh, I'm sorry, I thought I saw you
16 put a sticker on it.
17        MR. YONTZ: No, sir.
18        THE COURT: Okay. Any objection to 6-A?
19        MR. DURHAM: No. Where is 16, the picture of
20 the knives?
21        MR. YONTZ: State's Exhibit 51.
22        MR. DURHAM: No, they appear to be the same.
23 No objection.
24        THE COURT: Exhibit is received.
25    Q. (BY MR. YONTZ) I'll go ahead and mark that as

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00045-BR   Document 84-8   Filed 01/17/13   Page 30 of 43   PageID 3277

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 99

1 State's 6-B, ask if you're familiar with that?
2    A. Yes, sir.
3        MR. DURHAM: Your Honor, may I inquire into the
4 relevance of marking each of these knives when we have a
5 picture of the knives?
6        MR. YONTZ: Defense counsel requested each one
7 identified individually. He wanted to see each one before he
8 could make his determination as to whether or not he would
9 admit them.
10       MR. DURHAM: Well, if they're duplicitous of
11 State's 16, then I -- I'll object on grounds of duplicity.
12       MR. YONTZ: Your Honor, this is State's Exhibit
13 16. Those knives are not duplicitous --
14       MR. DURHAM: Well, whatever the picture is.
15 I'm sorry, I'm just not smart enough to remember the numbers.
16 Let me look at this and see. The number I'm talking about is
17 51.
18       THE COURT: Well, let's just stop arguing for a
19 minute. Is it the State's intention to offer each of those
20 knives?
21       MR. YONTZ: All ten, yes, sir.
22       THE COURT: Okay. His objection went to you
23 offering an exhibit that contained unknown items that would
24 not be within the record. That was the basis of that.
25       Now, if we're going to go down through and --

Page 100

1 to have each of these in, then let's just take them all out of
2 the sack and mark them 6-A infinitum, then.
3        Actually, let's have someone else do it while
4 you continue your interrogation. There are folks here from
5 the office that can mark these things.
6        MR. YONTZ: That's fine.
7        Your Honor, pending the admission of those
8 particular items, I have no further questions.
9        THE COURT: Any cross-examination, Mr. Durham?
10       MR. DURHAM: No.
11       THE COURT: Okay. Are you going to have
12 questions after --
13       MR. YONTZ: No, sir.
14       THE COURT: -- they're marked?
15       Okay. Well, then, you can step down, you're
16 free to go.
17       THE WITNESS: Thank you.
18       THE COURT: Call your next witness.
19       MR. SIMS: A.P. Merillat.
20       THE COURT: Raise your right hand, please, sir.
21       (Witness sworn)
22       THE COURT: If you would take a seat on the
23 witness stand, please.
24       Once you get comfortable, make sure you're
25 speaking directly into that microphone that just disappeared.

Page 101

1        THE WITNESS: Yes, sir.
2        THE COURT: And state your full name, please.
3        THE WITNESS: A.P. Merillat.
4            A.P. MERILLAT,
5 having been first duly sworn, testified as follows:
6            DIRECT EXAMINATION
7 BY MR. SIMS:
8    Q. How are you employed, sir?
9    A. I'm a criminal investigator with the Special
10 Prosecution Unit headquartered in Huntsville, Texas.
11   Q. How long have you been so employed with that group?
12   A. About 16-1/2 years.
13   Q. What is your educational background in regards to
14 law enforcement?
15   A. I'm a Certified Texas Peace Officer. I have been so
16 for -- since 1977. I worked for the Houston Police Department
17 for ten years, and I worked for the Huntsville Police
18 Department for three years, then I've worked at this office
19 for over 16. I've had about 1,700 hours of training in law
20 enforcement type matters, criminal investigations, all types
21 of situations like that.
22   Q. Have you also, based on your training and
23 experience, had the opportunity to train and educate others
24 and give lectures in regards to criminal investigations and
25 law enforcement related topics?

Page 102

1    A. Yes, sir. I've written five books in law
2 enforcement related topics. I've given seminars to college
3 students, to prosecutors and investigators, police officers
4 throughout the state of Texas. I've testified numerous times
5 across the state and in the state of Florida as an expert in
6 various types of criminal investigations, bloodstain
7 interpretation, fingerprints, and violence, particularly in
8 the penitentiary.
9    Q. In addition to your generalized knowledge in regards
10 to criminal investigation and law enforcement related topics,
11 as a result of your work with the Special Prosecution Unit,
12 have you developed an expertise in the specific area of Texas
13 prison system?
14       MR. DURHAM: That's leading and bolstering.
15       THE COURT: Sustained.
16   Q. (BY MR. SIMS) Have you developed any expertise in
17 regards to the Texas prison system?
18       MR. DURHAM: That's bolstering, Your Honor.
19 That's not a proper predicate for the --
20       THE COURT: Rephrase the question, please.
21       MR. DURHAM: No predicate has been laid.
22   Q. (BY MR. SIMS) Based on your experiences, have you
23 gained any kind of particular expertise?
24   A. Yes, I have.
25       MR. DURHAM: Same objection, Your Honor.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00074-J-BR   Document 84-3   Multi-Page™   Filed 05/17/13   Page 31 of 43   PageID 1740

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 103

1    THE COURT: Sustained.
2    MR. DURHAM: Instruction.
3    THE COURT: Jury will disregard the last
4 answer.
5    Q. (BY MR. SIMS) Do you specialize in any particular
6 areas?
7    A. Yes, I do.
8    Q. Based on what, sir?
9    A. Our office prosecutes prison crimes, and I have to
10 be familiar with the situation in prison as far as preparing
11 cases for trial.
12    Q. What are your specific responsibilities as Senior
13 Criminal Investigator for the Special Prosecution Unit?
14    A. I take cases from their inception, primarily in the
15 prison units across the state, cases of murder, rape, hostage
16 situations, things like that, I take those cases from their
17 inception through the investigation process, through the grand
18 jury, into trial, I work the trial with our lawyers, and then
19 we also go all the way through the appellate process until the
20 case is finalized.
21    Q. Have you previously testified in other courts as an
22 expert witness?
23    A. Yes, I have, many times.
24    Q. Specifically in regards to what area?
25    A. Primarily, I've been testifying in the area of

Page 104

1 prison violence in Texas.
2    Q. Okay. Are you familiar with how inmates are housed
3 in the Texas prison system?
4    A. Yes, I am.
5    Q. Are you familiar with the classification process in
6 the Texas system?
7    A. Yes, I am.
8    Q. Would you explain that, please, sir?
9    A. Yes, sir. The classification system in Texas prison
10 is the crux of how an inmate will spend his time from the time
11 he gets to the prison system until the time he paroles. The
12 classification system governs where he lives, how he's housed,
13 how tightly he's secured, what his privileges are within the
14 prison system, the jobs he can have, and his time earning
15 classification. All of those are part of the classification
16 system.
17    MR. DURHAM: I'm going to object, Your Honor.
18 That's a nonresponsive answer. He gave us the purpose of the
19 classification, but he did not give us the classification,
20 which was the question.
21    THE COURT: What was the question, do you
22 remember?
23    MR. YONTZ: Sir?
24    THE REPORTER: "Are you familiar with the
25 classification process in the Texas system?"

Page 105

1    "Yes, I am."
2    "Explain that, please, sir."
3    THE COURT: Objection is overruled.
4    Q. (BY MR. SIMS) Are there specific classification
5 designations under that system?
6    A. Yes, there are.
7    Q. Would you explain those, please, sir?
8    A. Yes, sir. The classification system relies on two
9 basic factors.
10    THE COURT: Okay. Maybe we ought to stay away
11 from narrative answers, then, and just ask direct questions,
12 please.
13    Q. (BY MR. SIMS) What are the specific classification
14 identifiers?
15    A. There are S classifications, the letter S, and there
16 are the letter G classifications.
17    Q. What do each of those stand for?
18    A. The S stands for State Approved Trusty or SAT
19 classification, and there are levels within that
20 classification.
21    Q. What levels are within that classification?
22    A. S-1 is like a trusty or a real good inmate. S-2, S-
23 3, and S-4, the more misbehaved or more of a problem an inmate
24 becomes, they lower in classification. In other words, 2 is
25 bad, 3 is worse, 4 is real bad.

Page 106

1    Q. And the other general classification you mentioned
2 is what?
3    A. The letter G.
4    Q. What does that stand for?
5    A. I have no idea what the letter G stands for. It's
6 just a letter the prison issued for that classification.
7    Q. Are there any subclassifications under it?
8    A. Yes, sir, there are. And once again, it's according
9 to how -- your behavior inside the penitentiary.
10    Q. How many levels are there in that --
11    A. There are four.
12    Q. What are they, sir?
13    A. G-1, 2, 3, and 4, and there's a 5 as well, G-5.
14    Q. What is G-1, sir?
15    A. A G-1 is a well-behaved inmate, doesn't present
16 problems, is a minimal-custody type inmate.
17    Q. What is G-2?
18    A. G-2 is also minimum custody, but he has more of a
19 disciplinary behavior problem. He has to be watched a little
20 closer and --
21    Q. What is G-3?
22    A. G-3 is what we call minimum/medium custody. It's an
23 inmate that has certain characteristics of violence in his
24 history or certain disciplinary problems. He's had to be
25 leveled out at a G-3. And then as you get worse, they go in

## Page 107

1 number.

2 Q. Okay. Do G-3s have any specific subcategory in
3 regards to aggravated or nonaggravated offenses?

4 A. Yes, sir.

5 Q. What are those, sir?

6 A. A G-3 inmate is an inmate, among other things, but
7 primarily an inmate who comes into the prison system with an
8 aggravated offense, like aggravated rape, robbery, murder,
9 capital murder, such as that. He will be a G-3 inmate, and
10 he'll be classified as such for a minimum of ten years.

11 And if he has a nonaggravated sentence of 50
12 years or more, for whatever crime, he'll be a G-3 inmate for a
13 minimum of five years before he can be eligible to be elevated
14 in his G classification.

15 Q. And included in that inmates that have been
16 convicted of capital murder?

17 A. Yes, sir.

18 Q. Explain how they wind up as a G-3.

19 A. It's an automatic classification. A capital
20 murderer or a -- what we call a straight murderer, when he
21 comes in the penitentiary, will automatically be classified as
22 G-3. And like I said, if it's an aggravated sentence, he'll
23 have to stay that way for ten years.

24 Q. What is G-4?

25 A. G-4 is a closed custody inmate.

## Page 108

1 Q. G-5?

2 A. That's also a closed custody or an Ad Segregated
3 type inmate.

4 Q. You indicated earlier you're familiar with how
5 inmates are housed --

6 A. Yes, sir.

7 Q. -- is that correct?

8 A. Yes, sir.

9 Q. Explain how capital murder convictions are generally
10 housed.

11 A. A G-3 inmate, like I said, he'll be automatically
12 classified as G-3. He will be housed in general population .
13 with a cell mate. He could have a cell mate who happens to be
14 a G-2 or a G-1 inmate. He could be housed with a DWI
15 offender, for example.

16 The -- G simply tells the prison officials
17 what kind of sentence that man has, not necessarily what the
18 details of his crime were that brought him to the
19 penitentiary. They're free to come and go from their cells.
20 They're not handcuffed when they're leaving their cells. They
21 can go to work, visitation, church, medical, chow, unescorted.

22 The G-3, like I said, simply tells them what
23 kind of sentence --

24 MR. DURHAM: Your Honor, we've gotten into a
25 very nonresponsive area here to the question, I believe.

## Page 109

1 THE COURT: Let's move back away from narrative
2 responses and questions, please.

3 Q. (BY MR. SIMS) Are those -- would a capital murderer
4 indicated as a G-3, are they going to be isolated or with
5 others?

6 A. No, sir, they will not be isolated.

7 Q. Are there certain stipulations that are placed on
8 inmates at times?

9 A. Yes, sir.

10 Q. Are they broken down into any specific categories?

11 A. Yes, sir.

12 Q. What are those categories?

13 A. That would be in the G classification, the 4 and the
14 5, and also the line classification, which would be a No. 3,
15 4, or 5, but it's for their behavior after their arrival at
16 the penitentiary.

17 Q. How does their behavior in the penitentiary affect
18 their status?

19 A. The more problems they present to the prison
20 officials, the tighter they are housed or restricted in their
21 freedoms with inside the penitentiary.

22 Q. If they behave appropriately, are they rewarded?

23 A. Yes, sir.

24 Q. How so?

25 A. First of all, they can earn more time for -- during

## Page 110

1 their sentence. They can earn opportunities to use the
2 telephone. They can earn recreational opportunities, more
3 visitation type privileges, opportunities to have more items
4 in their cells, make life more comfortable.

5 Q. Describe specifically how capital murder defendants
6 that receive a life sentence are classified.

7 A. They're classified as a G-3 and put into general
8 population.

9 Q. How are capital murder defendants convicted and
10 sentenced to the death penalty classified?

11 A. They are sent directly to death row and classified
12 separately according to their system, but it's -- they're
13 still put into Ad Seg, or segregation on death row in
14 Polunsky.

15 Q. Explain what Ad Seg is.

16 A. It's an abbreviation for Administrative Segregation,
17 and any inmate can be housed in Ad Seg for disciplinary
18 problems, but death row is Ad Seg. It's a very restrictive
19 housing custody and it's only found at the Polunsky Unit for
20 males, which is in Livingston, Texas, and it's in the Ad Seg
21 building.

22 Q. Have you ever heard the term "closed custody"?

23 A. Yes, sir, I've heard that term.

24 Q. Does that have anything to do with death row?

25 A. Death row inmates are closed custody, yes, sir.

Page 111

1  Q. Explain to the ladies and gentlemen of the jury what
2 closed custody means.
3    A. As it applies to death row, it means they have to
4 be -- an inmate has to be handcuffed when he leaves his cell.
5 He has to be escorted by two officers. He cannot co-recreate
6 with other inmates, he can't eat outside of his cell, very
7 restrictive housing and custody.
8    Q. Do all capital murder convictions result in a closed
9 custody status?
10   A. No, sir, only the death penalty ones.
11   Q. Briefly describe the security on death row.
12   A. As I said, it's very -- very tight security. An
13 inmate spends 23 hours a day inside that cell. He can only
14 come out when he's handcuffed and escorted by two officers.
15 He has to single recreate -- recreate by himself. He has to
16 be escorted to a shower once a day, if he chooses to. Then
17 he's back in his cell, he eats inside his cell, very
18 restrictive custody.
19   Q. So is there Administrative Segregation on other
20 places other than death row?
21   A. Yes, sir, there is.
22   Q. Okay. Is that the highest level of security that
23 there is?
24   A. No, sir, it's not.
25   Q. What's the highest level of security?

Page 112

1    A. The highest we have now is called high security and
2 there are a few units in the state that have high security
3 buildings which are separate from the main buildings.
4    Q. What is different about high security versus Ad Seg?
5    A. High security is for inmates who were in Ad Seg that
6 could not be controlled even in Ad Seg. They have to have a
7 more tight custody. So they have these special buildings
8 where inmates are virtually out of one-on-one contact with
9 prison guards. The buildings are designed so that everything
10 can be done for an inmate without personal contact between a
11 guard and that particular inmate.
12       He remains in his cell 23 hours a day, he
13 showers in his cell, he eats in his cell. He comes out --
14 like on death row, he comes out under handcuffs to a
15 single-man rec yard. It's very -- extremely strict housing,
16 but it's only for certain levels of inmates.
17   Q. What level of inmate would get to that point?
18   A. It's an Ad Seg inmate who cannot be controlled in Ad
19 Seg.
20   Q. Are there efforts by the prison system to try to
21 negate violence inside its system?
22   A. Yes, sir. That's how our office came into
23 existence.
24   Q. And the office has been in existence for how long?
25   A. Twenty-one years.

Page 113

1    Q. In addition do the Department of Corrections take
2 actions themselves to try to negate violence inside the prison
3 system?
4    A. Yes, sir. Yes, sir, that's true.
5    Q. Would few or many of most of the regulations that
6 are imposed inside a prison be based on security and
7 protection?
8    A. Yes, sir. The primary factor for the restrictions
9 inside the penitentiary are safety oriented.
10   Q. Okay. Now, in regards to your function with the
11 Special Prosecution Unit, do you have the opportunity to keep
12 up with statistics in regards to the state of Texas regarding
13 violence in the prison system?
14   A. Yes, I do.
15   Q. How long have you been doing that, sir?
16   A. Since I've been there. We have to report to the
17 governor's office every year.
18   Q. Okay. What is the trend in regards to assaultive
19 behavior --
20       MR. DURHAM: Predicate. There has been no
21 showing that he has --
22       THE COURT: We haven't even heard the end of
23 the question.
24       MR. DURHAM: Oh, okay, I'm sorry. Withdrawn.
25   Q. (BY MR. SIMS) Have you collected -- specifically

Page 114

1 collected numbers in regards to the assaultive behavior -- or
2 assaultive cases inside the prison system?
3    A. Yes, I have.
4    Q. Okay. And how long have you been keeping a record
5 of that, sir?
6    A. For over 16 years; since I've been there.
7    Q. Have you noticed any kind of trend in regards to
8 those numbers?
9       MR. DURHAM: Objection. I want to take the
10 witness on voir dire --
11      THE COURT: Go right ahead, sir.
12      MR. DURHAM: -- to test the statistics.
13      THE COURT: Be seated.
14          VOIR DIRE EXAMINATION
15 BY MR. DURHAM:
16   Q. Officer, these statistics you've prepared, do you
17 investigate the report?
18   A. Do I investigate the report?
19   Q. Yes, to determine that it was, in fact, an assault?
20   A. Oh, yes, sir, yes, sir.
21   Q. You do?
22   A. Yes, sir.
23   Q. You investigate each one of them?
24   A. We investigate each one to see if it --
25   Q. No, sir, not we, you.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:07-cv-00744-SS BR   Document 84-3   Filed 08/17/13   Page 34 of 43   PageID 2783

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 115

1   A. No, sir, I personally don't investigate each one.
2   Q. Okay. So you -- you do not have any reliable base
3   for your statistical analysis, do you?
4   A. Yes, I do.
5   Q. You do?
6   A. Yes.
7   Q. What constitutes an assault?
8   A. Contact -- in the prison system, contact between a
9   prison inmate and another inmate or a guard or an employee or
10  a visitor.
11  Q. Any contact?
12  A. Any contact that's considered offensive or harmful
13  to that person.
14  Q. And that is a subjective consideration?
15  A. No, sir, not in my view.
16  Q. Well, if I say I consider the contact offensive,
17  that's an assault, isn't it?
18  A. That's -- you as a reportee, would tell me that and
19  I would have to investigate to determine whether or not --
20  Q. But you have not investigated each case. In other
21  words, your base for assault includes anything as simple as
22  throwing water on a guard, would be an assault, wouldn't it?
23  A. That's correct.
24  Q. Whether the guard was hit with it or not?
25  A. That is not correct.

Page 116

1   Q. Oh. It has to splash on him?
2   A. Yes, sir.
3   Q. If you throw it and it hits the floor and splashes
4   on him, that would be an assault?
5   A. If it bounces off the floor and hits him?
6   Q. Yes.
7   A. Technically, it could be, probably.
8   Q. Uh-huh. So it could be included in your statistical
9   base.
10      Now, in arriving at your statistical base, do
11  you take into consideration the nature of the expansion of the
12  prison system?
13  A. I don't understand what you mean by that.
14  Q. Well there are more prisoners than there were 16
15  years ago?
16  A. Yes, sir.
17  Q. Okay. So there are probably going to be more
18  assaults. If there are more people -- if there are more
19  chances for a car wreck because there are more cars, makes
20  more chances, right?
21  A. That's correct.
22  Q. Okay. And do -- what is your mathematical factor
23  for determining the effect of increased population and prison
24  crowding upon your statistical conclusions?
25  A. There is not a statistical analysis. Perhaps that's

Page 117

1   a bad term.
2       MR. DURHAM: Well, then, I'm going to object to
3   him testifying about statistical trends.
4       THE COURT: Sustained.
5       MR. DURHAM: Thank you.
6       DIRECT EXAMINATION - Cont'd
7   BY MR. SIMS:
8   Q. Are you familiar with the numbers of assaultive --
9   A. Yes, sir.
10  Q. -- reports?
11  A. Yes, sir.
12  Q. How many assaultive reports were reported in the
13  prison system --
14      MR. DURHAM: Object --
15      THE COURT: You have got to let the man --
16      MR. DURHAM: All right. Yes, sir.
17      THE COURT: -- ask the question, please, sir.
18      MR. DURHAM: I'm sorry.
19  Q. (BY MR. SIMS) Are you familiar with the number of
20  inmate-on-inmate assaults that were reported in the year 2000
21  in the prison system?
22      THE COURT: Are you familiar or are you
23  unfamiliar?
24      THE WITNESS: Not for that year, no, sir.
25  Q. (BY MR. SIMS) Based on your expertise, and we've

Page 118

1   heard -- I'll rephrase it.
2       Based on your knowledge in regards to what
3   you've already expressed, is there any safe place in the
4   prison system?
5   A. No, sir.
6   Q. At what level have you found offenses to occur as
7   far as the G rating?
8   A. Everywhere from the trusty camp to the chapel.
9   Q. Does that include even death row?
10  A. Yes, sir. We've worked murders on death row.
11  Q. You've worked murders on death row?
12  A. Yes, I have.
13  Q. What about Administrative Segregation?
14  A. I've worked numerous murders in Ad Seg.
15  Q. Have there ever been escapes from Ad Seg?
16  A. Yes, sir.
17  Q. Approximately how many murders have occurred inside
18  the prison system since you have been keeping records?
19      MR. DURHAM: I'm going to object as to
20  relevance, Your Honor; also would be hearsay reporting. As to
21  whether it was a murder or not would depend upon the facts and
22  circumstances, and it does not deviate between assaults on
23  guards or prison personnel and upon personnel and people
24  acting in self-defense, and we -- there's no basis for the
25  question to be answered. There's no definition of murder.

Page 119

1    THE COURT: Overruled.
2    A. There have been 138 murders, prosecutable murders,
3 inside the Texas penitentiaries since 1984.
4    Q. (BY MR. SIMS) How many convicted capital murderers,
5 if you are aware, have been involved in further murders?
6    A. I don't know the exact number today.
7    MR. DURHAM: Then I'm going to object to the
8 response because it assumes by the very nature of the response
9 that there have been some.
10    THE COURT: Sustained.
11    MR. DURHAM: May I have an instruction for the
12 jury to disregard?
13    THE COURT: The jury is so instructed.
14    Q. (BY MR. SIMS) Have capital murderers been known to
15 commit murder in prison?
16    A. Yes, sir.
17    Q. You previously said that, hadn't you?
18    A. I believe I have said that.
19    Q. I thought you had.
20    MR. SIMS: Pass the witness, Your Honor.
21    THE COURT: Let's just -- it's a quarter of
22 12:00. I assume you've got some cross-examination of this
23 witness?
24    MR. DURHAM: I do have a few questions, yes.
25    THE COURT: Let's break until -- be back here

Page 120

1 at 1:15, please, folks.
2    All folks out in the gallery need to remain
3 seated, please.
4    (Jury left the courtroom)
5    Okay. I need all members of the gallery there
6 to remain seated until all the jurors have cleared the
7 elevators.
8    Gary, if you would come back in and tell them
9 at that point.
10    MR. YONTZ: Your Honor, may I --
11    THE COURT: Sir?
12    MR. YONTZ: I just have one question for
13 defense counsel. I gave them earlier State's Exhibits 26 and
14 27, which are prior convictions. I don't know --
15    THE COURT: Inside what? Which was inside
16 what?
17    MR. DURHAM: Which we will not stipulate to.
18    THE COURT: Okay.
19    MR. YONTZ: Okay. Then what we need is, we
20 need to take his fingerprints during the lunch hour.
21    THE COURT: Fine. Get me an order on it.
22    MR. YONTZ: Okay.
23    THE COURT: Okay. You can step down.
24    (Recess)
25    THE COURT: Okay. Let's proceed.

Page 121

1    (Jury returned to the courtroom)
2    CROSS-EXAMINATION
3 BY MR. DURHAM:
4    Q. Will you pronounce your last name for me where I
5 don't mess it up.
6    A. Merillat.
7    Q. Okay. I'm just going to refer to you as sir because
8 I'll mess up Merillat --
9    A. That's fine either way.
10    Q. -- more often than not.
11    Okay. Now, as I understand it, you're with the
12 Special Prosecution Unit?
13    A. Yes, sir.
14    Q. Is that correct?
15    A. Yes, sir.
16    Q. Okay. And it's your job to prosecute crimes that
17 occur in prison?
18    A. Primarily, yes, sir.
19    Q. So you're part of the prosecution team?
20    A. Yes, sir.
21    Q. So you don't ever testify for a defendant?
22    A. I've been called many times by the defense, but they
23 don't put me on the stand.
24    Q. Well, but my question was testify for them, and I
25 guess what you just said was no?

Page 122

1    A. That's correct.
2    Q. So the answer to my question was no?
3    A. That's correct.
4    Q. Okay. All right. Now, I've got a couple of
5 questions on this -- when a capital murderer goes in, he's
6 classified as a 3, right?
7    A. Yes, sir.
8    Q. Okay. And anybody that has an aggravated offense or
9 has a sentence over 50 years is a 3?
10    A. That's correct.
11    Q. All right. Is that without regard to any other
12 history?
13    A. No, sir, it's not -- it's not without regard to --
14    Q. What I mean -- let me give you an example because I
15 really don't -- I'm not as familiar with your system as maybe
16 I could be or should be, and you need to educate me and the
17 jury a little bit.
18    Suppose that a man has been in prison for
19 manslaughter or something and did a stint and then he's in
20 prison for 20 years for murder and he finishes that, and then
21 he commits a capital murder, so he's got -- he's going in with
22 two prior offenses and a capital murder. Is he going to come
23 in as a 3?
24    A. He is certainly going to come in as a G-3, yes, he
25 is. You're talking about a brand new conviction, although --

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:07-cv-00734-D-BR   Document 84-3   Filed 05/17/13   Page 36 of 43   PageID 2165

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 123

1  Q. So -- I'm sorry, I didn't mean to interrupt you.
2  A. If he had prior convictions -- if I understand you
3  correctly, say he came in for burglary, paroled, got out into
4  the free world, got convicted for a manslaughter, came back
5  in, paroled, went back out, came back in for a capital murder,
6  yes, he's going to come back in as a G-3.
7      The prison is not going to look at those
8  previous convictions. They're going to start him with his
9  capital case as a G-3, and then his behavior will determine
10 what happens after that situation.
11 Q. Okay. So y'all assume that his behavior is what
12 you're going to look at from then on?
13 A. Did you just say I assume that?
14 Q. No, the system assumes it. I'm not asking you to
15 assume that. I'm asking you about classifications.
16 A. No, sir, the system doesn't assume anything like
17 that. The system assigns that classification as a result of
18 an incident that happened in Texas not too long ago. There
19 was no G system before that incident.
20     MR. DURHAM: Nonresponsive, objection.
21     THE COURT: Sustained.
22 A. Perhaps I don't understand your question.
23 Q. (BY MR. DURHAM) Well, let's move on. I'm probably
24 asking bad questions.
25     But there are provisions for people who are

Page 124

1  considered risks to be more than 3s; is that correct?
2  A. Yes.
3  Q. There is 4, which is higher than 3?
4  A. That's correct.
5  Q. And then you get into the Administration Segregation
6  categories?
7  A. Yes, sir.
8  Q. Which have more than one level?
9  A. That's correct.
10 Q. And you actually have a unit where you put people
11 whose behavior is extremely violent in -- in this new prison?
12 A. Yes, sir, high security.
13 Q. And what prison is that?
14 A. They're all over the state. They're at the larger
15 prisons. There's one here in Amarillo, they're in Livingston
16 and Gatesville, all over the state, Beeville.
17 Q. Where they have that to have that (sic)?
18 A. Sir?
19 Q. Where they -- where they are locked in a very --
20 very -- a 5 level, I think you -- what did you call it?
21 A. Well, it's called high security. It's not
22 necessarily for 5s only, but it's for the ones who cannot be
23 managed in Ad Seg. It's a separate building.
24 Q. Well, would you have somebody that is a G-1 that
25 could end up in Ad Seg?

Page 125

1  A. Absolutely. You could have someone who has a trusty
2  classification in Ad Seg.
3  Q. So -- all right. Now, in that regard, say you have
4  a trusty that does something so outlandish, do you move them
5  to G-2 or do -- or do you move them up the ladder or can they
6  jump from a trusty to 5?
7  A. You sure can, yes, sir.
8  Q. You can go from trusty to 5?
9  A. That's correct.
10 Q. Okay. Did you testify in that rape case of the
11 inmate in Wichita Falls?
12 A. No, sir, I worked that case, I didn't testify in it.
13 Q. Didn't testify for the plaintiff in that?
14 A. No, sir.
15 Q. Now, you didn't hear Lieutenant Brown's testimony,
16 did you?
17 A. No, sir.
18 Q. Okay.
19     MR. DURHAM: I'll pass the witness.
20     REDIRECT EXAMINATION
21 BY MR. SIMS:
22 Q. For inmates housed in the high security -- the high
23 security I think is what you called it?
24 A. Yes, sir.
25 Q. Have there been acts of violence committed by those

Page 126

1  inmates --
2  A. Yes, sir.
3  Q. -- in prison?
4      Have there been murders committed by those --
5  A. Yes, sir.
6  Q. -- type classed inmates?
7  A. Yes, sir.
8      MR. SIMS: Pass the witness, Your Honor.
9      RECROSS-EXAMINATION
10 BY MR. DURHAM:
11 Q. In the high security, there have been murders
12 committed?
13 A. Yes, sir.
14 Q. When was that?
15 A. The Allred Unit in 2003, I believe the date was.
16 Q. Was that another prisoner?
17 A. Yes, sir.
18 Q. So the guards failed to protect the other prisoner?
19 A. They did the best they could.
20 Q. I didn't say they didn't do their best, I said they
21 failed. Is that correct or incorrect? It happened?
22 A. Yes, it happened.
23     MR. DURHAM: Okay. No further questions.
24     MR. SIMS: Nothing else, Your Honor.
25     THE COURT: Okay, you can step down, sir.

Page 127

1    Do you want this witness released?
2    MR. DURHAM: No objection.
3    MR. SIMS: That will be fine.
4    THE COURT: You're free to go. Thanks a lot.
5    THE WITNESS: Thank you.
6    THE COURT: Call your next witness.
7    MR. YONTZ: Michael Wright.
8    Call Catherine Nall, Your Honor. Mr. Wright
9 will be here in a few minutes.
10    THE COURT: Catherine who?
11    MR. YONTZ: Catherine Nall.
12    THE COURT: Ms. Nall, come up, please. Come
13 right up and take a seat on the witness stand.
14    Once again, make yourself comfortable and move
15 that mike around to wherever you need to so you're speaking
16 into it.
17    You're still under the same oath that I
18 administered to you previously.
19    THE WITNESS: Yes, sir.
20    CATHERINE NALL,
21 having been previously duly sworn, testified as follows:
22    DIRECT EXAMINATION
23 BY MR. YONTZ:
24    Q. Would you state your name for the record, please?
25    A. My name is Catherine Nall.

Page 128

1    Q. And Catherine, you testified previously in this
2 case; is that correct?
3    A. That's correct.
4    Q. And at that time, you identified a photograph; is
5 that right?
6    A. Yes, a photo of my brother.
7    Q. Is your brother older than you or younger?
8    A. He's my younger brother by about three years.
9    Q. Okay. How old was he when he died?
10    A. I'm sorry, I can't do the math.
11    Q. Still a couple of years younger than you?
12    A. He's three years younger than me, yes.
13    Q. And what type of person was he?
14    A. He was a wonderful person.
15    Q. Can you give me some examples of what -- what you
16 mean?
17    A. I think the best way that I can describe his
18 character to you is that I named my youngest son after
19 Stanley, and I think when you share a family name with one of
20 your children, it's because that you hope when that child
21 grows up, that they'll emulate that person and display their
22 characteristics and use them as a role model. I think that's
23 one of the highest forms of praise that I can think of.
24    Q. Do you know what other people thought of him?
25    A. He was well liked.

Page 129

1    MR. DURHAM: I'm sorry, that calls for
2 speculation and conclusions without proper predicate.
3    THE COURT: Sustained.
4    MR. DURHAM: May I have an instruction?
5    THE COURT: The jury is instructed to disregard
6 the last question and answer.
7    Q. (BY MR. YONTZ) How has his loss affected your
8 family?
9    MR. DURHAM: I think she can testify how the
10 loss has affected her, but not other people.
11    THE COURT: Sustained.
12    Q. (BY MR. YONTZ) Are you familiar with the members of
13 your family?
14    A. Yes.
15    Q. Who all is in your immediate family?
16    A. My father is still living, my mother died of cancer
17 about three months before Stanley was killed. I have another
18 sister, Margaret.
19    Q. Okay. What about your children?
20    A. I have three children, all teenagers, and I'm
21 married.
22    Q. Your sister -- you have a sister; is that correct?
23    A. Yes, I have an older sister.
24    Q. Does she have children?
25    A. Yes, she has two. I have two nieces with her.

Page 130

1    Q. How about Stanley, did he have children?
2    A. No, Stanley was not married and he didn't have any
3 children.
4    Q. Have you had occasion since his death to meet with
5 family members at various occasions?
6    A. Oh, yes.
7    Q. Has there been a difference in things since Stanley
8 is not there?
9    A. Yes.
10    Q. Can you explain that?
11    A. Stanley was incredibly family oriented. He made a
12 huge effort to spend time with family. Anytime Margaret's
13 family or mine would come to Amarillo, Stanley would arrange
14 to have as much time off as possible to spend with us and the
15 kids, and he adored the children.
16    And we have a huge Thanksgiving dinner in
17 Dallas every year, and he was always there if it was at all
18 possible. And, of course, at the lake every year, we have a
19 bit of a family reunion. And, again, whoever could come would
20 be there, and Stanley was always there.
21    Q. How has his death affected you?
22    A. Well, I can't even come home without flying into the
23 Amarillo airport and I drive past the prison and all of those
24 details of his death just crowd in on you and you can't get
25 away from it, so I can't even come home without being vividly

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:08-cv-00743-BR Document 84-3 Filed 02/17/13 Page 38 of 43 PageID 2718

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 131

1 reminded of what happened.
2          At Thanksgiving now, it's -- it's still a happy
3 occasion. We enjoy having the family all together, but, of
4 course, I usually wind up in the kitchen cooking, and as I
5 prepare those special dishes that were Stanley s favorites,
6 I'm crying in the deviled eggs and -- at the lake this year,
7 we had six children there from the different family groups,
8 and not all together, but during the course of the days that
9 we were at the lake, each and every one of those children
10 found a time to come and talk with me, and the common thread
11 in those conversations was is that the lake was just never
12 going to be the same. There was a big hole that Stanley left
13 behind. The kids just -- and, of course, the adults and
14 everyone, we just -- we're still grieving.
15          MR. YONTZ: I have no other questions.
16          CROSS-EXAMINATION
17 BY MR. DURHAM:
18    Q. Ms. Nall, you've suffered a terrible, terrible
19 double loss. You're telling this jury your mother died just
20 three months before your brother was murdered?
21    A. Yes, sir.
22    Q. And so the void that she presented was exacerbated
23 by your brother's death, wasn't it? You have our deepest
24 sympathy and we hope -- I personally hope that you can get
25 past the grieving, but you'll never get past your brother's

Page 132

1 memory. And I have no questions.
2          MR. YONTZ: Nothing further.
3          THE COURT: Okay. You can step down, Ms. Nall.
4          MR. YONTZ: May she be excused, Your Honor?
5          MR. DURHAM: I have absolutely no objection.
6          THE COURT: Okay, you're free to go. Thank
7 you, ma'am.
8          MS. NALL: Does that mean I can stay in the
9 courtroom, sir?
10          THE COURT: Absolutely you can, sure.
11          MR. DURHAM: Under those circumstances, I don't
12 agree to excuse.
13          THE COURT: Okay. All right. Ms. Nall, you'll
14 need to step back outside, please, ma'am.
15          MS. NALL: Yes, sir.
16          THE COURT: Call your next witness.
17          MR. YONTZ: Michael Wright.
18          THE COURT: Raise your right hand, please.
19          (Witness sworn)
20          THE COURT: Take a seat on the witness stand,
21 please.
22          MICHAEL WRIGHT,
23 having been first duly sworn, testified as follows:
24
25

Page 133

1          DIRECT EXAMINATION
2 BY MR. YONTZ:
3    Q. Sir, would you state your name, please?
4    A. Deputy Mike Wright.
5    Q. How are you employed, sir?
6    A. With the Potter County Sheriff's Office.
7    Q. In what capacity?
8    A. I work as an ID technician. One of the tasks I do
9 is fingerprint comparisons.
10    Q. What's an ID technician?
11    A. We do several tasks, sir. We handle crime scenes,
12 we'll gather evidence. We specialize in processing evidence
13 for latent fingerprints and then doing comparisons against a
14 possible suspect.
15    Q. Have you had any training in regard to fingerprints
16 and fingerprint comparison?
17    A. Yes, sir, I have.
18    Q. Can you explain that to the ladies and gentlemen?
19    A. Yes, sir. Fingerprint comparison, there are several
20 schools available. I have been to two of them, the basic and
21 the intermediate, and they are conducted in Austin at the DPS
22 academy by certified latent print examiners. And as I said,
23 I've been through the first two series and will continue on
24 after this as well.
25    Q. Is that something that basically continues on

Page 134

1 throughout your career then, additional training?
2    A. Yes, sir.
3    Q. Approximately how many fingerprints have you
4 compared?
5    A. Tens of thousands.
6    Q. And in your job, you make fingerprint comparisons;
7 is that correct?
8    A. Yes, sir, I do.
9    Q. What -- we say what type of comparisons do you do,
10 but what does that consist of?
11    A. To make a fingerprint comparison, you take either a
12 known fingerprint or a latent fingerprint, one that you've
13 developed off of a piece of evidence and you compare it
14 against another known print to look for similarities. You
15 look for ridge characteristics, whether the ridges are going
16 in a straight line and then break off into two, called a
17 bifurcation, or whether they end all of a sudden, whether
18 there's a small island.
19          There's five basic characteristics that you
20 look for, and you look for the same characteristics in the
21 same place in your latent or your known against your other
22 print that you're comparing to so that you can match them and
23 say that they are one and the same.
24    Q. Okay. You lost me a little bit there. You started
25 talking about bifurcation --

Page 135

1    A. Yes, sir.
2    Q. -- and things like that.
3        Could you open the board behind you and show --
4    A. Yes, sir.
5    Q. -- us what you're talking about when you say those
6 things?
7        You can erase that item that's on there.
8    A. Yes, sir.
9        When you talk about ridge characteristics,
10 there are certain characteristics that you look for. The
11 first thing you look for is general patterns, whether you've
12 got all of your ridges coming in in a general pattern that
13 come in from one side, circle around, then go back out the
14 other. You might have some that are just almost like a little
15 whirl in there. I mean, you can have --
16        MR. DURHAM: I'll stipulate he's a qualified
17 fingerprint examiner, if --
18        MR. YONTZ: I'll accept the stipulation as to
19 his qualification. I just wanted a basic understanding of
20 what we're looking at.
21        MR. DURHAM: Then I go to relevance.
22        THE COURT: Overruled.
23        MR. YONTZ: That's the underlying basis for
24 the --
25        THE COURT: Overruled. Go ahead, just kind of

Page 136

1 hold it down a little bit.
2        MR. YONTZ: Okay.
3    A. As far as the characteristics go, if you have a
4 ridge that's coming up and then all of a sudden it breaks off
5 into two, you can have a small dot, you can have if this one
6 closes back off. Each of these are certain characteristics
7 that we look for and compare between one print and another to
8 see if they're the same, and not only in the same appearance,
9 but the same place in the print.
10    Q. (BY MR. YONTZ) Sir, I'll show you what have been
11 marked -- or what is marked as State's Exhibit 60, State's
12 Exhibit 26, and State's Exhibit 27.
13        Let's deal with State's Exhibit 60 first. Are
14 you familiar with that item?
15    A. Yes, sir. It is a set of fingerprints, a rolled set
16 of fingerprints that I took from Mr. Runnels earlier this
17 afternoon.
18    Q. And is that the exact card that you took them on?
19    A. Yes, sir, it is.
20        MR. YONTZ: Your Honor, we would at this time
21 move State's Exhibit No. 60.
22        MR. DURHAM: No objection.
23        THE COURT: Exhibit is received.
24    Q. (BY MR. YONTZ) When you took those prints, what was
25 the purpose in taking them?

Page 137

1    A. To compare them against what we call Pen Packets,
2 documents that talk about previous convictions of an
3 individual, to see if the Pen Packet can match the
4 fingerprints of Mr. Runnels that I took today.
5    Q. Okay. Are you familiar with that method of doing it
6 in Texas where you match known prints to the Pen Packets?
7    A. Yes, sir.
8    Q. And referring to State's Exhibit 26, are you
9 familiar with that?
10    A. Yes, sir, I am.
11    Q. And when did you become familiar with that?
12    A. I believe I saw it once during pretrial, and then I
13 saw it again today, sir.
14    Q. Did you take that with you to make any comparisons?
15    A. Yes, sir, I did.
16    Q. Can you explain to the ladies and gentlemen what you
17 did in making any comparison?
18    A. As far as making comparisons, the first thing I do
19 is I look at all ten fingers, I look at the generic pattern of
20 it, whether it's a loop, whether it's a whirl, just to see if
21 the pattern is similar from finger to finger, in which case
22 they were. If they are, then I will go on and do an actual --
23 I will pick a finger out and start finding exact ridge
24 characteristics to come up with a match.
25    Q. Okay. You've got a device in front of you there.

Page 138

1 What is that?
2    A. Yes, sir. That is a magnifying lens, sir. It just
3 makes it a little bit easier where I can go ahead and see a
4 larger image of the fingerprint so I can make a determination
5 whether or not the details are the same.
6    Q. Okay. On State's Exhibit No. 26, did you do that
7 comparison?
8    A. Yes, sir, I did.
9    Q. And what did you conclude?
10    A. That all ten fingers have the same basic pattern,
11 and I used finger number four, which would be the right hand
12 ring finger, and that is the one I compared against the known
13 set of prints that I took from Mr. Runnels, and I did
14 determine that it was a match, that the same person made both
15 fingers - prints.
16    Q. When you say a "match," how many points -- I guess
17 the term is points of comparison?
18    A. Ridge characteristics, yes, sir.
19    Q. Was there a specific number you were looking for?
20    A. No, sir. There is no set number. In this case, I
21 had pretty clear fingerprints to work with and I stopped at
22 16.
23    Q. Sixteen points of --
24    A. Sixteen matching ridge characteristics on one that were not
25 and no areas that showed characteristics on one that were not

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:12-cv-00074-PBR   Document 84-3   Filed 08/17/13   Page 40 of 43   PageID 2789

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 139

1 on the other, no discrepancies.
2       MR. YONTZ: Your Honor, we would move State's
3 Exhibit 26 at this time.
4       MR. DURHAM: May I examine?
5       THE COURT: Sure.
6       MR. DURHAM: The exhibit, I mean.
7       (Pause)
8       MR. DURHAM: I have no objection to 26, Your
9 Honor.
10      THE COURT: Exhibit is received.
11      Q. (BY MR. YONTZ) Would you look at State's Exhibit
12 27, please?
13      A. Yes, sir.
14      Q. Have you seen that previously?
15      A. Yes, sir.
16      Q. What is that?
17      A. I'm not familiar with the actual form themselves.
18 There were a set of fingerprints that I am familiar with. It
19 looks to be a set of records of disciplinary actions that
20 occurred while incarcerated.
21      Q. And have you examined the fingerprints on that?
22      A. Yes, sir, I did.
23      Q. And what conclusions did you reach in regard to
24 that?
25      A. On this particular one, again, the ten basic

Page 140

1 patterns were the same, and I used the finger number six,
2 which is left hand thumb, and made a match off of that one.
3       Q. Okay. When you say you made a match off of that
4 one, what do you mean?
5       A. That means that I discovered enough points that were
6 the same without any discrepancies that I felt comfortable in
7 saying that the fingers -- the prints were made by the same
8 person.
9       Q. Okay. And that would be the defendant?
10      A. Yes, sir, Mr. Runnels.
11      MR. YONTZ: We would move admission of State's
12 Exhibit No. 27.
13      MR. DURHAM: I have objections to it.
14      THE COURT: Come up.
15      MR. DURHAM: May I approach? I have objections
16 outside the presence or at the bench.
17      THE COURT: Come up.
18      (At the bench, on the record)
19      MR. DURHAM: These disciplinary records contain
20 hearsay statements that the declarant is not available. It's
21 not admissible for any purpose and I'll object to it. Also,
22 you know, there's no way I can tell what period of time this
23 covers.
24      THE COURT: Okay. I need to take a look at it
25 and see.

Page 141

1       (Open court)
2       THE COURT: Okay. Members of the jury, if you
3 would please return to the jury room.
4       (Jury left the courtroom)
5       MR. YONTZ: Your Honor, in this matter, I
6 believe what counsel is referring to are the back several
7 pages of this which contain items -- the first pages contain
8 the actual fingerprints, as well as the judgment and sentence
9 in regard to this. If we would redact the item, remove the
10 complained of items, I believe we would have the same result.
11      MR. DURHAM: If they make a Pen Pack out of it,
12 I will withdraw my objection, if they take off the
13 disciplinary records, yes.
14      MR. YONTZ: That's fine. That's -- in fact,
15 that's what I'm offering to do.
16      MR. DURHAM: Well, then, that meets my
17 objection.
18      THE COURT: Okay. All right.
19      MR. YONTZ: May I have just a moment with the
20 staple remover?
21      THE COURT: Sure.
22      (Pause)
23      MR. DURHAM: Just a second here, Judge. No
24 objection.
25      THE COURT: Okay. That's 27?

Page 142

1       MR. YONTZ: Yes, sir.
2       THE COURT: Okay. Bring them back in.
3       (Jury returned to the courtroom)
4       THE COURT: Okay. State's Exhibit No. 27 is
5 received into evidence.
6       MR. YONTZ: Your Honor, State's Exhibit 27
7 having been admitted, I have no further questions.
8              CROSS-EXAMINATION
9 BY MR. DURHAM:
10      Q. Deputy Wright, just a couple of questions. I guess
11 you're always right?
12      A. In one manner, yes, sir, I guess so.
13      Q. Now, the second question, is AFIS going to put you
14 out of a job?
15      A. No, sir, it will not.
16      Q. Okay. Well, that -- is that one method of
17 comparing?
18      A. The method of using an AFIS system, it uses a
19 computer-generated batch of algorithms --
20      Q. Uh-huh.
21      A. -- formula, and it -- any results that we get from
22 AFIS are still manually compared to give a valid comparison.
23 We don't just rely on a machine.
24      Q. That's not the way they do it in CSI.
25      A. Well, I'm sorry, sir.

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

Case 2:07-cv-00744-PBR   Document 84-3   Filed 08/17/13   Page 41 of 43   PageID 2750

Multi-Page™

TRIAL ON THE MERITS
OCTOBER 27, 2005

Page 143

1    MR. DURHAM: No further questions.
2    THE WITNESS: Yes, sir.
3    MR. DURHAM: Thank you, sir.
4    MR. YONTZ: Your Honor, may I tender these to
5 the jury?
6    THE COURT: Sure.
7    Okay. You may step down.
8    Do you want this witness released?
9    MR. YONTZ: Yes, sir.
10    THE COURT: Any objection?
11    MR. DURHAM: No.
12    THE COURT: Okay, you're free to go.
13    THE WITNESS: Thank you, sir.
14    THE COURT: Call your next witness.
15    MR. SIMS: The State of Texas rests, Your
16 Honor.
17    MR. DURHAM: Before I make an opening
18 statement, I would like a short break.
19    THE COURT: Okay. All right, folks, ten
20 minutes.
21    (Jury left the courtroom)
22    MR. DURHAM: Your Honor, we have a witness
23 who's teaching a class, the class is over at 2:45. He's in
24 Canyon, it will be 3:15 before I can have him here. I do have
25 one witness that I need to confer with counsel about as to

Page 144

1 whether or not I'm calling that witness.
2    The other -- I have witnesses out of Dallas
3 that are subpoenaed for tomorrow.
4    THE COURT: Well --
5    MR. DURHAM: Well, I moved it up from Monday to
6 tomorrow.
7    THE COURT: Okay. So at this point, you don't
8 want to call anybody until 3:45?
9    MR. DURHAM: No, I -- it depends on what
10 counsel tells me about this one witness we have in the hall,
11 as to whether or not we will call her.
12    THE COURT: Okay. Any way this witness can
13 excuse himself for one afternoon and come up here, the one
14 that's being here at 3:45?
15    MR. DURHAM: He's a teacher at WT. He's in
16 class right now.
17    THE COURT: That's been a long time ago, but I
18 recall a whole lot of them walking out of the courtroom when I
19 was there. [sic]
20    MR. DURHAM: Well, I'll find out from
21 Ms. Garrison.
22    THE COURT: Okay. All right. Well --
23    MR. DURHAM: I'll see if I can get him up here.
24    THE COURT: -- see what we can work out.
25    MR. DURHAM: Okay.

Page 145

1    (Break)
2    THE COURT: Okay, Mr. Yontz, outside the
3 presence of the jury you told me you've got something you want
4 to put in for the --
5    MR. YONTZ: Yes, Your Honor.
6    THE COURT: -- simply for the court reporter to
7 retain only and for the record later.
8    MR. YONTZ: That's correct. These were the
9 items that were deleted from State's Exhibit No. 27 at the
10 bench pursuant to counsel's objections. I have placed them in
11 a plastic binder and sealed the top of it, marked 27-A with
12 the note that says, "Do not go to the jury."
13    THE COURT: Okay. 27-A is received for that
14 purpose.
15    MR. YONTZ: Your Honor, at this time, also, we
16 would tender Exhibit 6-A. That was the knife. That was the
17 one that was identified just -- that one exhibit as opposed to
18 all ten of them.
19    THE COURT: Oh, the first one you pulled out?
20 Okay. Any objection?
21    MR. DURHAM: No.
22    THE COURT: All right. 6-A is received.
23    MR. YONTZ: Thank you.
24    MR. DURHAM: I just question the wisdom of
25 sending six -- of sending ten knives back into the jury room

Page 146

1 in case they become deadlocked.
2    THE COURT: There's only one.
3    MR. DURHAM: Only one knife?
4    THE COURT: Only 6-A is going back.
5    MR. DURHAM: Just one knife?
6    MR. YONTZ: Just one knife.
7    MR. DURHAM: All right. Can we designate that
8 for the foreman?
9    THE COURT: As soon as we determine who that
10 will be.
11    MR. DURHAM: Very well.
12    THE COURT: Okay. Bring the jury in.
13    (Jury returned to the courtroom)
14    THE COURT: What says the defense?
15    MR. DURHAM: Your Honor, the defendant elects
16 to rest at this time.
17    THE COURT: What says the State?
18    MR. SIMS: The State of Texas closes, Your
19 Honor.
20    THE COURT: All right.
21    MR. DURHAM: We close.
22    THE COURT: Thank you. Members of the jury,
23 that is all the evidence you will hear in the trial of this
24 case. I need to work with the lawyers this afternoon to get
25 the Charge of the Court that I will read to you correct, so I

THE STATE OF TEXAS
vs. TRAVIS TREVINO RUNNELS

TRIAL ON THE MERITS
OCTOBER 27, 2005

Case 2:07-cv-00744-SBR   Document 84-3   Filed 08/17/13   Page 42 of 43   PageID 2791

## Page 147

1  will recess now and let you go home and we'll work on the
2  charge.
3        The lawyers -- I will read the charge to you
4  beginning at nine o'clock in the morning. When I finish, then
5  the lawyers will make their closing argument.
6        It is important now that you have heard all of
7  the evidence that you not pay any mind to any media report
8  whatsoever, just like I previously told you. I would prefer
9  that you just simply did not watch the local news at all, that
10 you not listen to radio at all until we get back here, and
11 have someone else go through the newspaper and delete any
12 articles that may be found in there.
13        If you want to put them up on the closet shelf
14 in a shoebox to read them later, that's fine, but certainly
15 not before your deliberations have concluded in this case.
16        Likewise, it's important that should you see
17 each other out somewhere between now and tomorrow that you not
18 discuss anything about this case. No deliberations should
19 take place at all unless all 12 of you -- and tomorrow I will
20 -- after the argument, I'll release the two alternate jurors
21 -- until you are in the jury room and deliberating upon your
22 verdict. You just simply cannot do that, and I'm trusting you
23 to follow that direction.
24        My only other option would be to put you up in
25 a hotel and I don't know that there are any that will hold 14

## Page 148

1  folk right now. And I know you don't want to do that, too,
2  right?
3        JURY PANEL: Right.
4        THE COURT: Okay. All right. I'll release you
5  now. I'll see you in the morning.
6        I tell you what, I prefer you do that in the
7  morning. All these things will go in with you.
8        (Jury left the courtroom)
9        THE COURT: Okay. May I see your draft?
10       MR. SIMS: Yes, sir.
11       MR. DURHAM: Ms. Hamilton will represent our
12 interest.
13       (Pause)
14       MR. OWEN: Your Honor, may I be excused for a
15 moment? I need to get another copy of the charge.
16       (Pause)
17       THE COURT: Okay. Nine is the paragraph,
18 correct?
19       MR. SIMS: I'm sorry?
20       THE COURT: Nine, Paragraph 9.
21       MR. SIMS: He only brought two copies up here,
22 Judge, so we don't have one.
23       THE COURT: Okay. All right.
24       MS. HAMILTON: Are you saying that should even
25 be in there at all?

## Page 149

1        THE COURT: Yeah.
2        MS. HAMILTON: I think it should.
3        THE COURT: Well, Paragraph 9 doesn't have -- I
4  mean, what it tells them to think about there doesn't have
5  anything to do with the question they're asked, does it?
6        MR. OWEN: Which paragraph, Your Honor?
7        MS. HAMILTON: Nine.
8        THE COURT: Nine.
9        MR. OWEN: The parole instruction?
10       THE COURT: I'm sorry?
11       MR. OWEN: The parole instruction?
12       MS. HAMILTON: That's not 9.
13       THE COURT: IX.
14       THE REPORTER: Do you want this on the record?
15       THE COURT: No.
16       (Off the record)
17       (10/27/05 proceedings adjourned)
18
19
20
21
22
23
24
25

## Page 150

THE STATE OF TEXAS        )

COUNTY OF POTTER          )

        I, JILL ZIMMER, Official Court Reporter in and for the

320th District Court of Potter County, State of Texas, do

hereby certify that the above and foregoing contains a true

and correct transcription of the proceedings in the above-

styled and numbered cause, all of which occurred in open court

or in chambers and were reported by me.

        I FURTHER CERTIFY that this transcription of the record

of the proceedings truly and correctly reflects exhibits, if

any, offered by the respective parties.

        WITNESS my hand this the _____ day of

_____, 2006.

        _____

        JILL ZIMMER
        Official Court Reporter
        Certificate Number 533
        Expiration Date: 12-31-2006
        Potter County Courts Building
        Amarillo, Texas  79101
        (806) 379-2372

THE STATE OF TEXAS          )

COUNTY OF POTTER            )


     I, JILL ZIMMER, Official Court Reporter in and for the

320th District Court of Potter County, State of Texas, do

hereby certify that the above and foregoing contains a true

and correct transcription of the proceedings in the above-

styled and numbered cause, all of which occurred in open court

or in chambers and were reported by me.

     I FURTHER CERTIFY that this transcription of the record

of the proceedings truly and correctly reflects exhibits, if

any, offered by the respective parties.

     WITNESS my hand this the 25th day of

_____, 2006.


JILL ZIMMER
Official Court Reporter
Certificate Number 533
Expiration Date: 12-31-2006
Potter County Courts Building
Amarillo, Texas   79101
(806) 379-2372